William **KREAR**, Vonda Krear, The William Krear Revocable Living Trust, Tad Krear, Elizabeth Krear, David Gonynor, Sadie Gonynor, Robert Bacon, Gail, Peter Manetta, Bruce Abbott, Diana Abbott, Peerless Polymers, Ltd., Defined Benefit Pension Plan, Peerless Polymers, Ltd., Pension and Profit Sharing Plan, Polly Kenton, Kevin McQuigg, Frances Pistorius, David Rich, Shelbyco, a Michigan corporation, Gerald Gadowski, M.D., Sharon Gadowski, Steven Gateman, Dorotha Reynolds, George S. Stevens, Burt Stillman, M.D., Bengt Swenson, Elaine Swenson, Scott Wasserman, Lisa Wasserman, L. Brooks Patterson, Alfred Woody, and Gerald McCarthy, Plaintiffs,

v.

William **MALEK**, Dean Turner, Lease Equities Fund, Inc., National Business Funding, Inc., NBF Cable Systems, Inc. and Dean Witter Reynolds, Inc., Defendants.

Civil Action No. 95–40468.

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1997.

---

Robert A. Hudson, James P. Murphy, Berry, Moorman, King & Hudson, Detroit, MI, for plaintiffs.

Arnold S. Schafer, Robert S. McWhorter, Schafer & Weiner, Jack J. Mazzara, Brian Witus, Hertz, Schram and Saretsky, Bloomfield Hills, MI, Leslie K. Carr, Giarmarco & Bill, Troy, MI, Mark R. Werder, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for defendants.

*MEMORANDUM OPINION AND ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT*

GADOLA, District Judge.

Before the court are defendants, Dean Turner ("Turner") and William Malek ("Malek") (hereinafter "Defendants") motion to dismiss filed on March 29, 1996 and January 3, 1997 respectively.[1] Oral argument was heard on February 27, 1997. For the reasons discussed below, this court will grant the defendants' motion to dismiss, in part, and allow plaintiffs to amend their complaint/rico case statement as directed by this opinion.

## Background

This action involves a purported securities fraud scheme ("Ponzi scheme") allegedly perpetrated upon the various plaintiffs by defendants William Malek ("Malek") and Turner separately or together. Defendant Dean Witter Reynolds, Inc. ("DWR") employed Turner, and as such, derivative liability is asserted against it. Defendants Lease Equities Inc. ("Lease Equities"), National Business Funding, Inc. ("NBF"), and National NBF Cable Systems Inc. ("NBF Cable") are the alleged vehicles through which the scheme was perpetrated.

The alleged Ponzi scheme occurred from late 1989 through late 1995. Essentially Malek and Turner are alleged to have offered the plaintiffs the opportunity to transfer money to defendant Lease Equities, a corporation which was dissolved in 1993, in exchange for promissory notes. Those notes, by their terms, secured assignments by Lease Equities of equipment leases entered into between Lease Equities and third parties. Plaintiffs claim that each alleged secured loan transaction was a sham. That although plaintiffs were told that the stream of income arising from the business leases was used as collateral for the repayment of the promissory notes, the same leases were assigned multiple times to secure various promissory notes.

It is further alleged that the individual defendants, through the use of the corporate defendants Lease Equities, NBF and NBF

---

1. The defendants filed a joint brief in support of Malek's motion to dismiss which was filed in all four of the cases that were consolidated at that time, i.e. *Krear. et al. v. Malek et al.,* 95–40468; *Eder et al. v. Malek et al.,* 96–40255; *McMaster et al. v. Malek et al.,* 96–40268; and *Calamari et al. v. Malek et al.,* 96–40346. This court, of course, will only consider this brief to the extent it addresses issues in the *Krear* case.

Cable, perpetrated the Ponzi scheme by using new investor funds to pay out old promissory notes. In addition, plaintiffs allege, many of the initial promissory notes were for lesser and smaller amounts, while the later promissory notes were for increasingly larger amounts up to $500,000.00. Plaintiffs further allege that the monies received by the defendants from the plaintiffs were not used for any proper business purpose and that some of the defendants have diverted and/or absconded with the monies obtained from the plaintiffs and have additionally used those funds to repay other notes.

It is also alleged that the defendants induced certain plaintiffs to enter into short term loan transactions to raise funds to discharge a loan Lease Equities had secured from First National Bank of Pittsburgh.

On December 8, 1995, the original complaint, alleging claims for violations of various federal securities laws and RICO[2] as well as state laws, was filed by some twenty plaintiffs. Thereafter, a first amended complaint ("FAC") was filed on March 4, 1996 and a second amended complaint ("SAC") on March 12, 1996 with new plaintiffs being added each time. On September 18, 1996, this court dismissed plaintiffs' state law claims contained in Counts IV–VI, IX, XIII–XVI, XIX–XXII. On October 15, 1996, plaintiffs filed their RICO case statement ("RCS")in response to this court's September 17, 1996 order for a case statement. On January 17, 1997, plaintiffs filed a first amended RICO case statement ("FARCS").

On August 6, 1996, Malek pleaded guilty to six counts of wire fraud in connection with the sale of notes in Lease Equities. Four of the counts involved sale of notes to five plaintiffs in this case. They are: Gail and Robert Bacon, David Rich, and Bruce and Diana Abbott.

---

**2.** Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961.

**3.** Fed.R.Civ.P. 8 provides, in pertinent part:

(a) **Claims for Relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain ... (2) a short and plain

## Discussion

The thrust of the defendants' motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), is that plaintiffs have failed to allege fraud with particularity as required by Federal Rule of Civil Procedure 9(b). In deciding a motion to dismiss under Rule 9(b) this court is guided by the Sixth Circuit's opinion in *Michaels Building Co. v. Ameritrust Co.. N.A.*, 848 F.2d 674 (6th Cir. 1988). In *Michaels,* the Sixth Circuit stated, in relevant part, that:

> In ruling upon a motion to dismiss under Rule 9(b) for failure to plead fraud "with particularity," a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. Rule 8 requires a "short and plain statement of the claim," and calls for "simple, concise, and direct" allegations. [3] Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony. (citation omitted). "Thus, it is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." (citation omitted)

> \* \* \* \* \* \*

> Given this backdrop admonition of simplicity in pleading, we note that the purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. (citation omitted)

*Id.* at 679. Judge Taylor in *Pittiglio v. Michigan National Corp.,* 906 F.Supp. 1145 (E.D.Mich.1995) explained *Michaels* by stating:

> statement of the claim showing that the pleader is entitled to relief ...
>
> \* \* \* \* \* \*
>
> (e) **Pleading to be Concise and Direct; Consistency.**
>
> (1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.

... In the Sixth Circuit, however, strict application of Rule 9(b) in complex securities fraud cases is disfavored.... The purpose of Rule 9(b) is to provide defendants with notice adequate to prepare a proper responsive pleading. The particularity requirement also protects defendants' reputations, and "inhibits the filing of complaints that are a pretext for the discovery of unknown wrongs, or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves." (citations omitted).

*Id.* at 1152.

Because of the unusual posture of this case, which is due in large part to delays in reassignment of this case as well as other later filed companion cases, this court has the benefit of being apprised of certain developments which have occurred during the past fourteen months. Specifically, as a result of ongoing parallel criminal investigations, as well as discovery that has taken place in the civil cases, this court is now aware that Malek stands convicted of six felony counts relating to a scheme to defraud. A decision on whether Turner will be indicted is expected by May. Accordingly, it is abundantly clear to this court that plaintiffs have not filed suit for any of the improper purposes identified by Judge Taylor.

That alone, however, does not relieve plaintiffs of their obligations under Federal Rules of Civil Procedure 8, 9, and 11. In *Michaels,* the Sixth Circuit noted that fraud was sufficiently pleaded where the complaint specifies 1) the parties and the participants to the alleged fraud; 2) the representations made; 3) the nature in which the statements are alleged to be misleading or false; 4) the time, place and content of the representations; 5) the fraudulent scheme; 6) the fraudulent intent of the defendants; 7) reliance on the fraud; and 8) the injury resulting from the fraud. *Michaels,* 848 F.2d at 679. In addition, the fraudulent loan docu-

ments were identified and copies of them were attached. *Id.*

While this court finds that plaintiffs have generally complied with the requirements of *Michaels,* certain aspects of the SAC and FARCS[4] are lacking in factual support as to the time and place of the alleged misrepresentations. This court is mindful that there are allegedly hundreds of misrepresentations and that it is unnecessary for plaintiffs to recite each one. However, those alleged representations that are referenced in the SAC and the FARCS must be identified by time and place since they are necessarily within the knowledge of the plaintiffs. *Cf. of Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical Inc.,* 886 F.Supp. 1134, 1142 (S.D.N.Y.1995) ("Rule 9's strictures are relaxed where the alleged fraud concerns facts 'peculiarly within the opposing party's knowledge'") (*quoting DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)). Accordingly, plaintiffs may further amend their second amended complaint and their first amended RICO case statement so as to correct the deficiencies therein as to sufficient designation of times and places of alleged misrepresentations. *See also* discussion *infra,* p. 1070.

This court notes, however, that since there are more than eighty alleged transactions involved in this case, it would be unduly burdensome for plaintiffs to have to attach copies of each note involved in those transactions to the complaint. Accordingly, this court finds that it is sufficient that plaintiffs have accurately identified each of the alleged transactions.

This court will now specifically address the arguments made in each of the two motions.

**Dean Turner's Motion to Dismiss**

Turner seeks to dismiss Counts I–IV, X–XIII, XVII–XVIII, XX and XXII. On September 18, 1996, this court dismissed plaintiffs' state law claims contained in Counts

---

**4.** This court notes that a RICO case statement can be used to supplement a complaint. *See McLaughlin v. Anderson,* 962 F.2d 187, 189 (2nd Cir.1992); *Guidry v. Bank of LaPlace,* 954 F.2d

278, 281 (5th Cir.1992); *Domestic Linen Supply & Laundry Co. v. Central States,* 722 F.Supp. 1472 (E.D.Mich.1989).

IV–VI, IX, XIII–XVI, XIX–XXII. Accordingly, Turner is now only seeking dismissal of Counts I–III, X–XII and XVII–XVIII.

#### a. Counts II, III, X–XII

Turner argues that counts II, III, and X–XII should be dismissed because they fail to allege fraud and violations of RICO with sufficient particularity as required by Fed. R.Civ. P. 9(b). In Counts II and III, plaintiffs allege securities fraud violations under § 10(b) of the Securities and Exchange Act ("SEA") of 1934. In Counts X–XII, plaintiffs allege violations of RICO § 1962(b), 1962(c), and 1962(d) respectively.

Specifically, Turner contends that plaintiffs' SAC does not distinguish between individual plaintiffs, individual defendants, and specific investments nor does it specifically allege the misrepresentations relied upon by plaintiffs.

While Turner's argument may have been more compelling prior to the filing of plaintiffs' RICO case statement, that argument is no longer convincing. In the FARCS, plaintiffs sufficiently distinguish between individual plaintiffs, between individual defendants, and the specific investments as well as specifically allege the misrepresentations which were relied upon. As stated above, however, plaintiffs have failed to plead the time and place of the misrepresentations with sufficient specificity. For instance, in response to ¶ 5(c) of this court's order for case statement, the FARCS identifies more than ten alleged misrepresentations with respect to plaintiffs Bruce and Diana Abbott, yet only identify one place where a representation took place, to wit: "Dean Witter's Troy Office." FARCS p. 29. Moreover, the SAC and FARCS only generally refer to the times when misrepresentations occurred, to wit: "Summer of 1994" FARCS p. 30; "latter in 1994" FARCS p. 32. These examples are in no way to be construed as exhaustive. Unless plaintiffs can identify the time[5] and place of each alleged misrepresentation, then they have failed to satisfy the Rule 9(b) pleading requirements, even under the re-laxed standard set forth in *Michaels supra*. If plaintiffs can sufficiently plead the alleged misrepresentations, and they have, then they necessarily can and must plead the time and place that those misrepresentations took place.

As to the RICO claims, Turner makes four arguments. First, he argues that plaintiffs have failed to plead the elements of a RICO claim because the SAC contains conclusory allegations. Second, he argues that plaintiffs' § 1962(c) claim does not properly allege an "enterprise" since it alleges that Lease Equities, NBF, NBF Cable, Turner and Malek were alter egos of each other and that a RICO defendant, i.e. Malek, Turner or Lease Equities, cannot also be an "enterprise". Third, he argues that plaintiffs' § 1962(d) claim does not allege an "agreement" to conspire. Finally, he argues that even if an "agreement" is properly alleged, it cannot survive in any event since intra-corporate conspiracies are not actionable under § 1962(d) and plaintiffs have alleged that Malek and Turner were officers of Lease Equities.

Turner's arguments are, however, without merit. First, plaintiffs' SAC as supplemented by their FARCS sufficiently alleges a RICO claim notwithstanding the defects discussed above regarding pleading the time and place of alleged misrepresentations.

With regards to Turner's second argument, it should be noted at the outset that plaintiffs' "alter ego" allegation (Count XIX) was apparently pleaded in the alternative to the RICO claims and has, in any event, been dismissed by this court's prior order dismissing state law claims. Regardless, plaintiffs have sufficiently alleged an "enterprise" in that they have alleged an association-in-fact between Lease Equities, NBF, NBF Cable, Turner and Malek. *See Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993). In *Frank,* the Sixth Circuit stated that: "To satisfy the enterprise requirement, an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and

---

5. While this court is mindful of the burden of pleading the exact date of the alleged misrepresentations in every instance, more specificity than "Summer of 1994" or "later in 1994" is required.

it must be separate from the pattern of racketeering activity in which it engages." *Id.* (citing *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981)).

■ Plaintiffs have properly alleged that the racketeering activity, i.e., the sale of notes through Lease Equities to perpetuate the alleged Ponzi scheme, is distinct from the association-in-fact which associated for legitimate business purposes, to wit: Lease Equities entered into legitimate leases with third parties; NBF Cable entered into legitimate cable television contracts; and Lease Equities was a secured creditor of NBF Cable.

■ Third, plaintiffs have sufficiently alleged, under § 1962(d), that defendants conspired to violate §§ 1962(b) and (c). To state a claim under § 1962(d), a plaintiff must plead that the defendant agreed to join the conspiracy, agreed to commit predicate acts, and knew that those acts were part of a pattern of racketeering activity. *See Glessner v. Kenny,* 952 F.2d 702, 714 (3rd Cir. 1991). While plaintiffs have not used the word "agreement" *per se,* they have stated that defendants Malek, Turner and Lease Equities "have conspired to violate RICO," and have well-pleaded a set of facts from which a conspiracy can be inferred in the FARCS. *See Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993); *Manning v. Stigger,* 919 F.Supp. 249, 254 (E.D.Ky.1996).[6]

■ Finally, Turner's reliance on the intra-corporate conspiracy doctrine is not well taken. The Sixth Circuit, in *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837 (6th Cir. 1994), recognized that the doctrine is limited to circumstances in which the corporate agent is operating within the scope of his or her corporate authority. *Id.* at 841. In this regard, the *Johnson* court indicated that "corporate actors might be beyond the scope of their employment where the aim of the conspiracy exceeds the reach of legitimate corporate activity." *Id.* at 840. While plaintiffs' do allege that Turner was an employee of Lease Equities in their RICO statement, they also allege that it was in the course of his employment as an agent of DWR and the enterprise, not Lease Equities, that he conducted racketeering activity. Moreover, plaintiffs allege conduct which exceeds the reach of legitimate corporate activity and therefore arguably takes Turner's conduct outside the scope of the intra-corporate doctrine. Accordingly, plaintiffs have sufficiently alleged facts from which this court could infer that Turner was not acting in the course of his employment with Lease Equities and therefore an intra-corporate conspiracy is not alleged.

#### b. Count I

Turner contends that plaintiffs have failed to allege that Turner actually and successfully solicited Lease Equities notes pursuant to § 12(1) of the Securities Act.

Once again, while this argument may have been more availing prior to plaintiffs' filing their RICO case statements, the RICO case statements make unequivocal allegations that Turner solicited Lease Equities notes. Accordingly, this argument is rejected.

### C. Counts XVII, XVIII

Turner contends that plaintiffs have failed to sufficiently allege that Turner was a controlling person for purposes of control person liability pursuant to § 15 of the Securities Act of 1933[7] and § 20(a) of the Securities Act of 1934.[8]

To establish control person liability, the Sixth Circuit has stated that the plaintiff must plead that the alleged controlling person 1) actually participated in the operations of the primary defendant in general, and 2) possessed the power to control the specific transaction or activity that constitutes the primary violation. *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 486 (6th Cir.1992).

---

6. This court notes, however, that plaintiffs would do well, in light of this court's decision to allow an amendment to the SAC or the FARCS, to include the word "agreement" in that amendment.

7. 15 U.S.C. § 77o

8. 15 U.S.C. § 78t

Plaintiffs, in their SAC and FARCS have sufficiently pleaded facts which establish a prima facie case of control person liability. The SAC and FARCS allege that Turner brought plaintiffs to Lease Equities, that Turner diverted Lease Equities' funds to NBF Cable or to himself and that he invested Lease Equities funds in a failed business to provide airline service from New York to Detroit City Airport. Accordingly, this argument is rejected.

### William Malek's Motion to Dismiss

Malek seeks dismissal of plaintiffs' entire complaint.

### a. All Counts Based on Fraud

Malek argues, as did Turner, that all counts based on fraud, i.e. the RICO and securities fraud claims, should be dismissed for failure to satisfy Fed. R.Civ. P. 9(b). Specifically, Malek contends that plaintiffs have failed to plead with particularity the time and place of any of the alleged misrepresentations; the contents and identity of alleged misrepresentations; to attach any promissory notes or security agreements; or to allege any communication by Malek using the mails or wire fraud.

For the reasons stated above, plaintiffs' FARCS cures most of the defects in the SAC with respect to pleading fraud with particularity and also alleges specific communications of Malek using the mails or wire communications. As stated, the only exception is that plaintiffs failed to particularly plead the time and place of the alleged misrepresentations.

Malek also contends that plaintiffs have failed to plead a "strong inference" of scienter pursuant to § 21D(b)(2) of the Exchange Act, 15 U.S.C. § 78u–4. That section provides, in pertinent part:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

For the same reason that fraud is pleaded with sufficient particularity, notwithstanding the failure to plead the time and place of certain alleged misrepresentations, plaintiffs have sufficiently alleged a strong inference of scienter.

### b. RICO Counts

Malek makes three arguments. First, Malek argues that securities fraud no longer serves as a predicate act for a RICO claim in light of the Private Securities Litigation Reform Act of 1995 [9] ("PSLRA"). Second, Malek argues that plaintiffs have not stated a § 1962(c) claim because they fail to allege a separate enterprise or a pattern of racketeering activity. Third, Malek argues that plaintiffs have not stated a § 1962(d) claim because they allege a conspiracy in conclusory terms or alternatively if they have sufficiently alleged a conspiracy it is an intracorporate conspiracy which is not actionable.

Taken out of order, Malek's second and third arguments have previously been covered under the discussion of Turner's motion to dismiss with the exception of Malek's contention that plaintiffs have failed to plead a pattern of racketeering. This argument is derivative of Malek's argument that plaintiffs have failed to plead fraud with particularity and is therefore similarly rejected with the same proviso that plaintiffs amend their SAC or FARCS, as necessary, to plead the time and place of alleged misrepresentations. Accordingly, plaintiffs have sufficiently pleaded a pattern of racketeering.

Malek's first argument, however, raises novel questions of law. Section 107 of the PSLRA amends 18 U.S.C.1964(c) [10] to read as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this Chapter may sue therefore in any appropriate United States district court and shall recover threefold the dam-

---

9. Pub.L.No.104–67, 109 Stat. 737 (1995).

10. § 1964(c) provides the civil remedies for RICO violations.

ages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may entirely rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.*

18 U.S.C.1964(c) (amended text emphasized). *See* Section 107 (Pub.L. No. 104–67, 109 Stat. 737, 758 (Dec. 22, 1995)).

 The first question raised by this amendment is whether the PSLRA, which was enacted on December 22, 1995 applies to some or all of the plaintiffs since the original complaint was filed on December 8, 1995, the FAC was filed on March 4, 1996 and the SAC was filed on March 12, 1996. In other words, is the amendment to be applied retrospectively.

This court is persuaded by the reasoning of its sister court in Tennessee which recently addressed this issue and concluded that the statute should, indeed, be applied retrospectively. *See Rowe et al. v. Marietta Corporation et al.,* 955 F.Supp. 836, 848–49 (W.D.Tenn.1997). In *Rowe,* Judge Donald concluded that:

> The fact that Congress provided no express temporal reach for the application of § 107 to RICO, although expressly providing that Title I of the Reform Act would not operate retroactively against the 1933 and 1934 Acts, leads the Court to conclude that Congress knew it was amending a jurisdictional statute and correcting a mistake, and that Congress intended the regular judicial rules of construction to apply to this amendment.

*Id.* The judicial rule of construction Judge Donald was referring to was *inclusio unius*

est exclusio alterius. The applicability of the PSLRA is addressed in § 108 of the Act and provides that: "The amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act." The amendment's express reference to prospective applicability in regards to title I of the Securities and Exchange Acts of 1934 and 1933 respectively, while omitting any reference to RICO, lead Judge Donald to reason that Congress did not intend the RICO amendment to be limited to prospective application.

Moreover, Judge Donald noted Congress' clear intent to rectify an unintended situation, to wit: plaintiffs were recovering treble damages under RICO for securities fraud injuries. *See Rowe,* 955 F.Supp. at 847–48.[11] The judge reasoned that since a plaintiff's right to recover for securities fraud under RICO was an unintended situation, retrospective application of the amendment would not impair any rights that the plaintiff therein had when he acted. *Id.* (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994) (instructing that a statute would have impermissible retroactive effect where, *inter alia,* it would impair the rights a party possessed when he acted)). *Cf. General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992) (impermissible retroactive effect where a party is deprived of legitimate expectation or impacted by settled transactions.)

Judge Donald then distinguished those cases which have not applied the amendment retrospectively.[12] He stated that: "Of the cases finding against retrospective application, all share one common characteristic pertinent to the disposition of the instant case—the plaintiffs in all five cases were barred from bringing § 10(b) actions by the limitations period adopted in [*Lampf v. Gil-*

---

**11.** *See also* this court's discussion of legislative intent *infra,* pgs. 1075–1076.

**12.** *See, e.g., District 65 Retirement Trust v. Prudential Securities, Inc.,* 925 F.Supp. 1551 (N.D.Ga.1996); *Baker v. Pfeifer,* 940 F.Supp.

1168 (S.D.Ohio 1996); *Klein v. Boyd,* 1996 WL 675554 (E.D.Pa. Nov.19, 1996); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68 (S.D.N.Y.1996); *Mathews v. Kidder, Peabody & Co., Inc.,* 947 F.Supp. 180 (W.D.Pa.1996).

*bertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ]." *Id.* at 846.[13] Judge Donald reasoned that since Rowe had timely filed his federal securities fraud claims, the retrospective application of the amendment would not impair his right to recover for the alleged securities fraud. *Id.* at 846–48 (citing *Landgraf,* 511 U.S. at 280–81, 114 S.Ct. at 1505). Judge Donald, quoting *Reading Wireless Cable Television Partnership v. Steingold,* 1996 WL 741432 (D.Nev. July 30, 1996), concluded that:

> The nature of the amendment made by § 107 does not bring it within the class of enactments as to which the presumption against retroactivity arises. As has been seen, the amendment was to remove what Congress considered an unnecessary and unfair provision for damages. This taken together with the implication given by the omission from § 108's specific temporal reach language of any mention of the RICO amendment, calls for retrospective application of [§ 107] as to plaintiffs' RICO claims.

*Rowe,* 955 F.Supp. at 847 (quoting *Reading Wireless,* 1996 WL 741432, at *3.)

In the instant case, this court is faced with an analogous situation to *Rowe* and *Reading Wireless,* namely, that the plaintiffs' herein who have asserted pre-amendment RICO claims have also asserted § 10(b) claims in a timely fashion. Accordingly, this court finds that the retrospective application of the amendment to § 1964(c) does not impair those plaintiffs' rights to recover for alleged securities fraud. As such, this court will apply the amendment to all plaintiffs including those plaintiffs who filed suit before December 22, 1995.

The second question is whether the amendment applies only to plaintiffs' predicate acts alleging securities fraud or to those alleging mail fraud and wire fraud as well. On this issue, there is some guidance from Congress. The House Conf. Rep. No. 104–369 states in relevant part:

> The Conference Committee amends section 1964(c) of title 18 of the U.S.Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as racketeering activity under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. *In addition. the Conference Committee intends that a plaintiff may not plead other specified offenses. such as mail or wire fraud. as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.* (emphasis added).

*Id.* at p. 47. The Senate Committee Report contains identical language regarding Congressional intent. *See* P.L. 104–67, Private Securities Litigation Reform Act of 1994, Senate Report No. 104–98 (June 19, 1995). *See also Baker,* 940 F.Supp. at 1175 note 7.

 It is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the amendment if such conduct would also be actionable as securities fraud. Since plaintiffs herein have pleaded predicate acts of mail fraud arid wire fraud based on conduct that also forms the basis of their claims of securities fraud, all of plaintiffs' RICO claims must be dismissed unless an exception applies.

This raises a third issue, that being: what is the applicable scope of the "conviction exception" language in the amendment. In other words, which plaintiffs, if any, can avail themselves of the "conviction exception" and maintain a RICO action against the defendants. The relevant statutory language provides that:

> The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on-which the conviction becomes final.

After a thorough review of the case law it is apparent to this court that the application of the "conviction exception" is an issue of first impression. Moreover, the Congressional record is devoid of any substantive discussion of the exception. While there is legislative

---

**13.** *See, e.g, District 65 Retirement Trust,* 925 F.Supp. at 1570; *Baker,* 940 F.Supp. at 1179; *Klein,* 1996 WL 675554, at *29; *In re Prudential,* 930 F.Supp. at 79; *Mathews,* 947 F.Supp. at 185–86.

history regarding the amendment generally, none of it addresses the "conviction exception" specifically.[14] Regardless, the purpose of the amendment, generally, also serves to instruct this court as to the purpose for the exception.

The reason for the elimination of conduct constituting securities fraud as a RICO predicate act, as proffered in the Senate Report, is to reduce the cost of raising capital. *See* Senate Report, *supra,* p. 7. Representative Cox of California, who introduced the bill, stated on the Congressional record that:

> ... [O]ur economy's health depends on the efficient operation of America's capital markets. We must continue to balance the provisions of adequate remedies for injured investors and the imposition of excessive penalties on all participants in our capital markets. The treble damage blunderbuss of RICO undermines this balance and imposes exorbitant litigation costs, impedes the raising of capital and ultimately puts these costs on the shoulders of consumers and emerging innovative companies.

141 Cong. Rec. H2773.

Mr. Cox further explained that the aim of the amendment was to correct the misapplication of RICO. Mr. Cox, invoking the Supreme Court's opinion in *Sedima, S.P.R.L. v. Imrex Co. Inc.,*[15] stated that "[i]n its private civil version RICO is evolving into something quite different from the original conception of its enactors; in other words, Congress." 141 Cong. Rec. H2772 (Statement of Rep. Cox). Mr. Cox quoted Chief Justice Rehnquist who stated: "Virtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended when it enacted the statute in 1970. Most of the civil suits filed under the statute have nothing to do with organized crime." *Id.* (quoting Rehnquist, Reforming Diversity Jurisdiction and Civil RICO, St. Mary's L.J. 5, 9 (1989)).[16] Representative Cox went on to state that:

> Because many claims that could be asserted as securities laws claims can also be characterized as mail or wire fraud, and because mail and wire fraud are also predicates for civil RICO liability, Plaintiffs' attorneys have a devastating, potent, and readily available alternative for bringing actions under RICO instead of under our securities laws. As the SEC general counsel stated in his 1989 testimony before the

---

**14.** The "conviction exception" language was added after Senator Biden offered it as amendment 1481 to the Senate bill, S.240, on June 27, 1995. *See* 141 Cong. Rec. § 9163 (Statement of Sen. Biden). The relevant legislative history is as follows:

> H.R. 1058 was introduced in the House on February 27, 1995. It passed the House on March 8, 1995. On June 19, 1995, the Senate Committee on Banking, Housing, and Urban Affairs reported S. 240, a companion bill to H.R. 1058, to the Senate. On June 28, 1995, H.R. 1058 was passed, as amended, in the Senate. After disagreeing on the amendment, H.R. 1058 was sent to conference which filed a report on November 28, 1995. Both the Senate and the House agreed to the conference report on December 5th and 6th of 1995 respectively. On December 19, 1995 President Clinton vetoed H.R. 1058. On December 20, 1995 and December 22, 1995, the House and Senate, respectively, passed H.R. 1058 by override.

**15.** 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

**16.** *See also* 141 Cong. Rec. H2773–74 (Statement of Rep. McCollum) (stating that "Congress never intended for the RICO statute to be used as the principal means of litigating disputes over securities transactions. The securities laws themselves provide aggrieved buyers and sellers with private causes of action so that they may seek compensation for their losses. The increases in the use of the racketeering statue (sic) for this purpose, however, has produced consequences that Congress never intended. The threat of RICO sanctions has had a chilling effect on entrepreneurship and ultimately economic growth."); 141 Cong. Rec. H2775 (Statement of Rep. Fields) (stating that "... we enacted civil RICO many years ago to provide private citizens with a weapon against organized crime and racketeering. We did not intend RICO to be a supplement to the Federal securities laws. We never intended to give trial lawyers treble damages in these types of civil lawsuits. Nonetheless, unless we adopt this amendment, plaintiffs' attorneys will use RICO to evade our efforts of reform."); 141 Cong. Rec. H2776 (Statement of Rep. White) (stating: "That is why a statute designed to apply to racketeering and organized crime in 40 percent of the cases now applies to securities lawsuits. This is a statute that is out of control. If we do not exempt this litigation from this statute, we will never get this job done.")

House Committee on the Judiciary, and I quote now,

The commission is concerned that the civil liability provisions of RICO can, in many cases, convert private securities law fraud claims into RICO claims. Successful plaintiffs in such cases are entitled to treble damages, despite the express limitations on recovery under the securities laws to actual damages. Private plaintiffs may be able to bypass the carefully crafted liability provisions of the securities laws and thereby recover damages in cases in which Congress or the courts have determined that no recovery should be available.

\* \* \* \* \* \*

[T]he failure to adopt this amendment would undermine the reforms we are hoping to achieve because attorneys could then do an end run around all of the reform by simply using the RICO statute. . . .

141 Cong. Rec. H2771 (statement of Rep. Cox). Finally, Mr. Cox concluded that:

It is certainly important that criminals be prosecuted and that is exactly what will happen before and after this amendment. But what we do not want to see is for our carefully crafted Federal securities laws to be shunted aside and instead for people to be able to use a statute never intended to apply in these civil cases in this way so that they can get treble damages, something not provided for in our securities laws, so that they can get discovery going all the way back 10 years to show a pattern which is part of RICO, not part of the securities laws, and in short so they can gin up settlements where a settlement is not in order.

141 Cong. Rec. H2778 (Statement of Rep. Cox).

At the outset, it is clear from the plain language of the "conviction exception" that it can only apply, at this time, to Malek and not Turner. This is so because only Malek now stands "convicted in connection with the fraud." This, of course, would change if

Turner is subsequently convicted. Accordingly, all RICO claims against Turner are dismissed without prejudice.[17]

The issue as to which plaintiffs can take advantage of the "conviction exception" as against Malek is, however, more involved. Malek argues that only those persons who are named in the information to which he pleaded guilty are entitled to invoke this exception, i.e. plaintiffs Robert and Gail Bacon, Bruce and Diana Abbott and David Rich. Plaintiffs, on the other hand, contend that they are all entitled to invoke the exception since the scheme to defraud to which Malek pleaded guilty was, in effect, a Ponzi scheme and therefore all of their claims are "in connection with" that scheme.

■ As evidenced from the Congressional record cited above, Congress, by enacting this amendment, was intending to correct the misapplication of RICO in the securities fraud context. Moreover, the record reveals that Congress was weary of the susceptibility of civil RICO to litigation abuses in the securities fraud area. In recognition of Congress' intention and mindful of its concerns, this court is inclined to interpret the "conviction exception" language as narrowly as possible so that the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.

If this court were to find otherwise, plaintiffs who were not found to have been criminally defrauded would be allowed to "bootstrap" their RICO claims to the claims of those plaintiffs who were found to have been criminally defrauded. This would necessarily cause the "conviction exception" to swallow the rule which prohibits civil RICO claims for securities fraud.

For instance, the plaintiffs who were not named in the information but who claim to have been defrauded by the same scheme to defraud which is identified in the information argue that they should therefore be able to bring a RICO action against Malek under the "conviction exception." However, Malek was

---

**17.** This court notes that in the event Turner is subsequently convicted, the "conviction exception" provides that the statute of limitations for filing a RICO claim against Turner shall start to run on the date on which his conviction becomes final.

not convicted of a scheme to defraud all of the thirty-three named plaintiffs. Nor was he, of course, convicted of a "Ponzi scheme." Instead, he was convicted of a scheme to defraud as to only those individuals named in the information. Under these circumstances, the exception would swallow the rule if plaintiffs who cannot show that they were criminally defrauded would, nevertheless, be able to bring a civil RICO action based on alleged securities fraud.

The information provides, in relevant part, that Malek:

> intended to devise and devised and carried out a scheme to defraud and obtain money from *numerous individuals* from within the State of Michigan and elsewhere, by means of false or fraudulent pretenses and representations, and, for the purpose of executing such scheme, did knowingly cause mail to be delivered by the United States Postal Service....

> It was a part of the scheme to defraud that defendant [Malek], would and did offer for sale, and did in fact sell, promissory notes *to the following individuals,* in the following amounts .... [naming individuals] (emphasis added).

Although the information refers to "a scheme to defraud numerous individuals," it does not necessarily follow that every plaintiff who claims to be a victim of the alleged Ponzi scheme was criminally defrauded. It is quite possible that certain transactions between those plaintiffs and Malek were entirely legal, notwithstanding that those plaintiffs may have lost money on their investment. Simply put, those plaintiffs who were not found to have been criminally defrauded cannot, by merely asserting that a Ponzi scheme existed, invoke the "conviction exception." Unless the plaintiffs are named victims of the

scheme to defraud in the information, this court cannot find that they have been criminally defrauded and are thereby entitled to invoke the "conviction exception." To hold otherwise would allow the anomalous situation of permitting a plaintiff who was not criminally defrauded and who would not otherwise be entitled to bring a civil RICO action to, in fact, bring such an action simply because he claims to be part of an alleged Ponzi scheme.

This court is mindful that a seemingly inequitable result may be compelled under certain circumstances. For instance, the United States attorney may have elected to name only certain victims of the scheme to defraud based on the evidence available to him at the time the indictment was sought or the information filed. Moreover, the prosecutor may not name more victims of the scheme to defraud due to practical considerations such as the relative ease of obtaining a conviction based on a minimum showing of a scheme to defraud rather than exposing an entire elaborate scheme.[18] In addition, defendants could plead guilty to defrauding only certain plaintiffs as part of a plea agreement. This court, however, must presume that Congress was sufficiently familiar with the criminal prosecution process, including plea bargaining, so that it understood that a defendant who may have defrauded many plaintiffs could be convicted of defrauding only certain of those plaintiffs.[19]

While it may be that the fraudulent conduct that Malek pleaded guilty to indirectly effected other plaintiffs of the alleged Ponzi scheme, by helping to facilitate that scheme, this court is not prepared to read the "conviction exception" language so broadly as to include any plaintiff who claims to have been defrauded by that scheme. Such an interpretation would be contrary to the Act's goal

---

18. The United States Attorney may also rely upon establishing relevant conduct at the time of sentencing to show the extent of the scheme to defraud. *See* United States Sentencing Commission, *Guidelines Manual,* § 1B1.3 (Nov.1995)

19. While a discussion of the relative strengths and weaknesses of the negotiated plea bargain process is beyond the scope of this court's analysis, it should be noted that, notwithstanding the inability of those plaintiffs not specifically named in the information and subsequent Rule 11 plea

agreement to recover under RICO, the instant plea bargain has enured to the benefit of plaintiffs as a whole in that they have been speedily provided with discovery that may not have otherwise been available in such a timely manner, if at all. For instance, were it not for the Rule 11 plea agreement, Malek would not be available for deposition, at least in any meaningful way, as he would most assuredly invoke his Fifth Amendment privilege.

to significantly limit, if not eliminate, a defendant's exposure to treble damages for securities fraud.

Nor will this court find, on these facts, that an exception to the "conviction exception" is warranted which would allow plaintiffs who were not criminally defrauded, *per se*, to maintain a civil RICO action when the defendant is convicted of a scheme to defraud in which they claim to have been defrauded. While this court appreciates that the facts of this case lend themselves well to making such an argument, this court is, nevertheless, constrained by the old adage that "hard facts make bad law." *See United States v. McRee*, 7 F.3d 976, 983 (11th Cir.1993) (dissenting opinion); *United States v. Stagman*, 446 F.2d 489, 494 (6th Cir.1971) (dissenting opinion).[20] Accordingly, this court will find that the "conviction exception" only applies to those plaintiffs whom Malek was specifically convicted of defrauding.

### ORDER

**IT IS THEREFORE HEREBY ORDERED** that plaintiffs are **GRANTED** leave to amend their second amended complaint and first amended RICO case statement to correct the deficiencies therein herein before noted, such amendments to be filed within thirty (30) days.

**IT IS FURTHER ORDERED** that all RICO claims contained in Counts X, XI, XII are **DISMISSED**, with prejudice, against all defendants except all RICO claims in Counts X, XI, XII against defendant WILLIAM MALEK by plaintiffs ROBERT and GAIL BACON, BRUCE and DIANA ABBOTT and DAVID RICH and except that all RICO claims against defendant DEAN TURNER contained in Counts X, XI, XII are **DISMISSED**, without prejudice.

**SO ORDERED.**

**AMERIWOOD INDUSTRIES INTERNATIONAL CORPORATION, a Michigan corporation, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO., n/k/a Arthur Andersen LLP, a partnership, Defendant.**

No. 1:95–CV–67.

United States District Court,
W.D. Michigan,
Southern Division.

March 11, 1997.

---

20. While this court is loath to engage in judicial legislation, it does note that Congress could certainly have been more lucid in the drafting of this amendment. Representative Dingell recognized as much when he stated:

> [T]he hard fact is the legislation is poorly drawn, it is hurried to the floor without proper hearings, without any intelligent consideration, and it has results far different, far broader, far worse from the standpoint of RICO, law enforcement, and getting at criminals generally. That is what is involved here.
>
> The amendment ought to be rejected, if for no other reason than it is sloppy work. It is an embarrassment to the House. It may not embarrass the author of the amendment, but it assuredly embarrasses me, because I believe that this body should legislate well and efficiently. it should legislate wisely, so we· do not surprise ourselves with the stupid consequences of irresponsible, unwise, and careless work. I urge that the amendment be rejected.

141 Cong. Rec. H2778 (Statement of Rep. Dingell).

Notably, Mr. Dingell made these remarks before the "conviction exception" language was added as an amendment to the bill on the Senate floor. The "conviction exception" language has only served to further muddy an already murky amendment. Congress would do well to reconsider precisely what problems it intended RICO remedies to address with particular attention being given to the meaning of the phrase "in connection with the fraud." As Representative McCollum noted:

> ... adopting this amendment will not remedy all of the problems with the way the civil RICO statute is being misused. As chairman of the Subcommittee on Crime, where jurisdiction over this issue resides, I intend to introduce RICO reform. It is my hope that the subcommittee will bring forward legislation to help ensure that the RICO statutes are used in the manner that Congress originally intended.

141 Cong. Rec. H2773 (Statement of Rep. McCollum).

Gregory L. Curtner, Gary W. Faria, Miller, Canfield, Paddock & Stone, Detroit, MI, Marta M. Manildi, Miller, Canfield, Paddock & Stone, Ann Arbor, MI, for Plaintiff.

Richard A. Glaser, Geoffrey A. Fields, Dickinson, Wright, Moon, Van Dusen & Freeman, Grand Rapids, MI, for Defendant.

## OPINION

HILLMAN, Senior District Judge.

This case has been pending for 25 months and is scheduled for a jury trial beginning April 8, 1997. Presently before the court are five motions. Plaintiff Ameriwood Industries ("Ameriwood") has filed four separate motions to dismiss or for summary judgment on various counterclaims and affirmative defenses. Defendant Arthur Andersen & Co. ("Andersen") has moved to partially dismiss the complaint as barred by the statute of limitations.

## BACKGROUND

The present malpractice and breach of contract case arose out of securities violations allegedly committed by Ameriwood (formerly Rospatch Corporation), its accountants (Andersen) and legal counsel. Shareholder actions were instituted against all three, and settlements eventually were entered.

The history of this litigation has been discussed in the previous opinions of this court dismissing plaintiff's contribution claim and various other matters. Essentially, however, Ameriwood alleges that Andersen is liable for damages to Ameriwood caused by Andersen's audits in the years 1986, 1987, 1988 and 1989, which failed to discover the existence of high-level fraud at Ameriwood. Andersen, for its part, denies negligence and raises various counterclaims based on its detrimental reliance upon fraudulent documents and information provided to it by Ameriwood.

At this time, Ameriwood has filed four separate motions to dismiss or for summary judgment. First, Ameriwood has moved to dismiss counterclaims I through IV because Andersen's own allegations fatally undermine its claims. Second, Ameriwood has moved to dismiss counterclaims V, VI and VII for failure to state a claim on which relief can be granted, and has requested sanctions. Third, Ameriwood has moved to dismiss most of Andersen's affirmative and special defenses for various assorted and overlapping reasons. Fourth, Ameriwood moves for summary judgment on counterclaims I through IV.

Andersen, for its part, has moved to dismiss Ameriwood's claims of professional negligence and breach of contract based on Andersen's performance of company audits for 1986, 1987 and 1988 fiscal years on the basis of the statute of limitations.

I will address each motion in turn.

## DISCUSSION

### I. MOTION TO DISMISS COUNTS I—IV (DOCKET # 170)

■ Plaintiff's first motion requires little attention. Ameriwood contends that Andersen's counterclaims alleging fraud are fatally

flawed because elsewhere in its answer and counterclaim, Andersen denies that its financial statements were materially incorrect, even in light of the after-discovered fraud.

Ameriwood's argument, however, is patently frivolous. Andersen is entitled to plead its claims and defenses in the alternative. *See* Fed.R.Civ.P. 8(e)(2). Accordingly, mere contradiction in theories does not bar a claim.

Moreover, as I read Andersen's counterclaim, it denies that its audits contained material or misleading misstatements. It asserts, however, that should a jury conclude that any misstatements were material or misleading, Ameriwood itself was responsible for the misstatements. Such an argument is not contradictory.

Accordingly, Ameriwood's motion to dismiss counterclaim counts I through IV is denied as unfounded.

## II. *MOTION TO DISMISS COUNTS V—VII (DOCKET # 171)*

■ Ameriwood has moved to dismiss or for summary judgment of counterclaim counts V, VI and VII, contending that Andersen's claims are insufficient as a matter of law. Ameriwood also seeks sanctions for costs associated with bringing the motion to dismiss, ostensibly made necessary by Andersen's refusal to agree to voluntary dismissal of the counts. Ameriwood presents extensive arguments concerning why Andersen's counts V, VI and VII are legally and factually insupportable as a matter of law. Ameriwood also attaches copies of its correspondence to Andersen seeking voluntary dismissal of the action.

The counts at issue involve three theories under which Andersen seeks contribution and attempts to avoid the effects of a contribution bar order entered at the time Ameriwood settled its part of the underlying securities litigation. In response to Ameriwood's motion to dismiss, Andersen contends that its contribution counterclaims expressly were contingent on this court's denial of Andersen's then-pending motion to dismiss Ameriwood's claim for contribution directed at Andersen. As a result, Andersen acknowledges that the counterclaims at issue, by their own terms, are now moot in light of this court's March 1996 order dismissing Ameriwood's contribution claim.

With respect to the request for sanctions, Andersen attaches its replies to the letters written by Ameriwood seeking voluntary dismissal. In those replies, which Ameriwood has not contested, Andersen states that it would be willing to agree to voluntary dismissal if the parties could agree either that Ameriwood would abandon its intent to appeal this court's decision on Ameriwood's claim for contribution or to dismiss without prejudice with an appropriate tolling agreement. Andersen expressly advised Ameriwood that it considered the counterclaims moot, that it had conducted no discovery on those claims and that they were no longer in issue in the case. Andersen advised Ameriwood that its only requirement for dismissing the claims voluntarily was to preserve its ability to reinstate the counterclaims in the event of a successful appeal by Ameriwood of its own contribution claim.

Ameriwood has not disputed the documents submitted by Andersen. Yet Ameriwood neglected to mention in its motion that Andersen was not pursuing the claims and considered them moot. Nor has Ameriwood contended that the claims should be dismissed as moot based on this court's March 1996 decision holding that contribution claims were insupportable where a party had not completely settled the claims of the nonsettling defendant. Instead, Ameriwood has asked this court to decide its motion on the merits of three claims that are no longer at issue in the case.

As Andersen observes, motions on the merits of the counterclaims are not ripe. The claims are moot on their face. The claims also are moot insofar as this court previously has held that no contribution action will lie where the settling party has not resolved the complete liability of the party from whom it seeks contribution. As a consequence, there exists no actual case or controversy before the court for deciding the legal sufficiency of such claims generally.

In addition, Ameriwood's request for sanctions is without merit. Andersen was not required to prejudice its rights in the event

Ameriwood prevailed on appeal. Once Andersen abandoned its claims, both by the terms of the counts themselves and by express notification to Ameriwood, Ameriwood could have obtained dismissal on the basis of mootness in light of the court's March 1996 decision. Ameriwood, however, did not seek such dismissal, moving instead for this court to render a decision on the merits of issues no longer in controversy. Such a motion was ill-founded and obviously not ripe.

Accordingly, because counterclaim counts V, VI and VII are now moot both by their terms and by the reasoning of this court's opinion and order entered March 19, 1996, the court will grant Ameriwood's motion to dismiss for reasons other than those stated in the motion. Ameriwood's request for sanctions is denied.

### III. *MOTION TO DISMISS CERTAIN AFFIRMATIVE AND SPECIAL DEFENSES (DOCKET # 172)*

In its third motion, Ameriwood seeks to dismiss most of Arthur Andersen's affirmative and special defenses, asserting varying multiple reasons.

■■■ Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading any insufficient defense." Fed.R.Civ.P. 12(f). Although motions to strike affirmative defenses pursuant to Rule 12(f) are generally disfavored, such motions are within the sound discretion of the district court. *Federal Sav. & Loan Ins. Corp. v. Burdette*, 696 F.Supp. 1183, 1186 (E.D.Tenn.1988); *FDIC v. Butcher*, 660 F.Supp. 1274, 1277 (E.D.Tenn.1987); *FDIC v. Berry*, 659 F.Supp. 1475, 1479 (E.D.Tenn. 1987). An affirmative defense is insufficient if, as a matter of law, the defense cannot succeed under any circumstances. *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir.1953). A motion to strike under Rule 12(f) is proper where it will eliminate spurious issues before trial and streamline the litigation. *Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1442 (W.D.Mich.1989).

In response to Ameriwood's motion, Andersen first asserts that the motion should be denied as untimely. I disagree. Fed. R.Civ.P. 12(f) requires motions to strike pleadings to be filed within 20 days after service, but the rule also authorizes the district court to strike pleadings "upon the court's own initiative at any time...." *Id.* This grant of judicial discretion has been interpreted to allow the district court to consider untimely motions to strike and to grant them if doing so seems proper. *See United States v. Lot 65 Pine Meadow*, 976 F.2d 1155, 1157 (8th Cir.1992); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380, at 652–54 (2d ed.1990). Accordingly, this court has authority to consider such late motions.

### A. *Defenses # # 1, 11, 14, 29, 30, 31 and 32*

Andersen concedes that defenses # # 11, 14, 30, 31 and 32 are moot in light of this court's dismissal of Ameriwood's contribution claims. Andersen further concedes that defense # 1 (failure to state a claim) and defense # 29 (failure to plead fraud with specificity) previously have been rejected by this court. Accordingly, defenses # # 1, 11, 14, 29, 30, 31 and 32 will be stricken.

### B. *Defenses # # 2 and 9*

Defense # 2 (statute of limitations) and defense # 9 (breaches of contract, misrepresentations, and negligence caused or contributed to Ameriwood's injuries) are the subject of other pending motions. Ameriwood moves to strike the defenses in anticipation of a favorable ruling by this court on those motions. I decline to address these issues at this time. The pending motions will be addressed in turn.

### C. *Defenses # # 3, 4, 5 & 6*

■■■ Ameriwood moves to strike Andersen's defense of equitable estoppel on the basis of written management representations about the truthfulness and accuracy of the financial statements. Ameriwood contends that such management representation letters may not relieve an auditor of it professional obligations or provide the basis for an estoppel defense. In support of its motions, Ameriwood cites *Seafirst Corp. v. Jenkins*, 644

F.Supp. 1152, 1157 (W.D.Wash.1986), which Ameriwood contends holds that the defense of equitable estoppel is untenable in an accountant malpractice action.

Ameriwood's reliance on *Seafirst* is misplaced. In *Seafirst*, the district court denied Andersen's motion for summary judgment on its defense of estoppel based on representation letters. The court held that, at the summary judgment stage, erroneous representation letters could not estop the corporation from bringing suit against Andersen. The *Seafirst* court did not rule that party representations to an auditor could never form the basis for estoppel.

■ As noted in this court's September 7, 1995 decision on Andersen's motion to dismiss, equitable estoppel generally is available as a defense to a legal action. *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990). The elements of a defense of equitable estoppel are the following: (1) intentional misrepresentation by a party; (2) intended to produce some action in reliance; and (3) which does reasonably induce action in reliance by another party to his detriment. *United States v. Guy*, 978 F.2d 934 (6th Cir.1992).

First, I note that I previously have held that genuine issues of material fact exist on the estoppel defense, particularly with respect to Ameriwood's intent and Andersen's reasonable reliance on Ameriwood's representations. *See* Opinion of Sept. 7, 1995, at 9–10. Second, to the extent that the motion to strike the estoppel defense overlaps with Ameriwood's motion for summary judgment on the breach of duty claims, I will discuss those claims infra. In the absence of a factual challenge, however, Ameriwood has submitted no argument that would undermine the general availability of the doctrine of equitable estoppel. Inasmuch as Ameriwood's motion is one strictly based on the facial sufficiency of the pleadings, Ameriwood has proffered no basis for granting its motion to strike. I therefore deny Ameriwood's motion to strike the estoppel defenses.

### D. *Defense # 27*

■ Ameriwood next asserts that the defense of judicial estoppel is legally insupport-

able. This court held in its decision of September 7, 1995 that it had not relied upon Ameriwood's alleged representations that it did not intend to assert a contribution claim against Andersen. In addition, the court has ruled that Ameriwood's contribution claim must fail. Acknowledging those decisions, Andersen concedes that, with respect to the contribution claim, the judicial estoppel defense is moot.

Andersen contends, however, that the defense remains relevant to its argument based on *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), articulated in Andersen's motion for summary judgment of March 27, 1995. Andersen argues that Ameriwood (then Rospatch) was granted summary judgment by this court in certain related insurance litigation on the basis that Rospatch's liability was grounded exclusively in the fraud of its highest management. Andersen contends that Ameriwood's representations, because relied upon, constitute a basis for judicial estoppel in the present action.

Ameriwood makes no specific response. Instead, it broadly contends that, because the underlying securities case was settled, no position taken by Ameriwood in the securities litigation could have formed the basis for a judicial ruling or determination. Such a vague and generalized objection is an inadequate basis for striking an affirmative defense. From a review of Andersen's brief in support of its motion for summary judgment filed March 27, 1995, it appears that some basis may exist for the defense of judicial estoppel. Inasmuch as Ameriwood has failed to set forth reasons why Andersen's defense of judicial estoppel cannot succeed under any circumstances, Ameriwood's motion to strike is denied.

### E. *Defenses # # 15 and 16*

■ Ameriwood next moves to strike Andersen's defenses # # 15 and 16, which assert that Ameriwood's damages were the result of its own recklessness or intentional misconduct, in whole or in part. In defense # 15, Andersen asserts that Ameriwood's

comparative fault caused the whole or part of the damages it experienced. Alternatively, in defense # 16, Andersen contends that Michigan recognizes the doctrine of in pari delicto, which denies a plaintiff the right to recover in a malpractice action where plaintiff itself has committed greater, intentionally culpable conduct. *See Orzel v. Scott Drug Co.*, 449 Mich. 550, 537 N.W.2d 208 (1995) (in pharmacist malpractice action, wrongful-conduct rule (encompassing in *pari delicto* rule) bars suit where plaintiff has engaged in illegal conduct that was a proximate cause of the harm at issue, and for which plaintiff's fault was at least as great as defendant's); *Pantely v. Garris, Garris & Garris, P.C.*, 180 Mich.App. 768, 447 N.W.2d 864 (1989) (applying doctrine of *in pari delicto* to bar legal malpractice claim when client engaged in perjury), *lv. denied*, 435 Mich. 870 (1990). *See also General Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274, 278–79 (Iowa 1996) (doctrine of *in pari delicto* applies to bar suit when plaintiff has committed illegal or fraudulent conduct of equal or greater fault than fault of defendant).

Ameriwood first argues that *in pari delicto* does not apply in Michigan, because the doctrine of pure comparative negligence controls. In support of that proposition, Ameriwood cites *Capital Mortg. Corp. v. Coopers & Lybrand*, 142 Mich.App. 531, 537, 369 N.W.2d 922, 925 (1985) (holding that, following institution of comparative negligence in Michigan, accountant malpractice claims were not completely barred by client's negligence). *Capital Mortgage*, however, did not address the doctrine of *in pari delicto*. Further, the doctrine of *in pari delicto* applies only to cases involving criminal conduct, not mere negligence as existed in *Capital Mortgage*. *See Orzel*, 449 Mich. 550, 537 N.W.2d 208. Finally, Michigan case law firmly recognizes the continuing viability of the doctrine following the advent of pure comparative negligence. *See Orzel*, 449 Mich. 550, 537 N.W.2d 208; *Pantely*, 180 Mich.App. 768, 447 N.W.2d 864.

In the instant case, Andersen alleges that Ameriwood engaged in deliberate and illegal misrepresentations in preparation of its financial statements and in its disclosures to Andersen. Such allegations are squarely within the requirements of the *in pari delicto* defense. Accordingly, Andersen's defense of *in pari delicto* is proper.

Somewhat confusingly, Ameriwood next contends that the doctrine of comparative fault is not a defense to an accountant malpractice action. Inasmuch as the *Capital Mortgage* case, the only case cited by Ameriwood on this proposition, holds that the doctrine of comparative negligence applies to accounting malpractice cases, Ameriwood's proposition is both unsupported and unsupportable under Michigan law.

Finally, Ameriwood contends that defense # 16 is duplicative of defense # 9, which broadly claims that damages in the action were not caused by Andersen, but by Ameriwood's own negligence, recklessness or intentional conduct. Defense # 16, however, is the defense of *in pari delicto*, which specifies that Ameriwood's conduct was either reckless or intentional. The defense is not strictly cumulative of defense # 9.

Accordingly, Ameriwood's motion to strike defenses # # 15 and 16 is denied.

### F. *Defenses # # 17, 21, 22 and 23*

Ameriwood moves to strike defenses 17, 21, 22 and 23, asserting that all four are defenses based on the theory that Ameriwood, as a corporation, is a legal fiction and therefore lacks standing to bring claims for harm caused to its shareholders. As I read the four defenses, however, only defense 17 and, implicitly, defense 23 assert the claim that Ameriwood lacks standing. Because Ameriwood has asserted no alternate basis for striking defenses 21 or 22, Ameriwood's motion to strike those defenses is denied.

With respect to defenses # # 17 and 23, Andersen concedes that the defenses are moot with respect to the contribution claim. Andersen asserts, however, that the standing defense is relevant to other claims in the case.

I disagree. As Ameriwood notes, while a corporation is a legal fiction, it is well established that corporations have the right to sue and be sued. *See New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 54 S.Ct. 788,

78 L.Ed. 1348 (1934); Mich. Comp. L. § 450.1261(b). The fiction itself "is intended to be acted upon as though it were a fact." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

Here, Ameriwood seeks damages alleged to have been experienced by the corporation itself, not the then-existing shareholders. It is the corporation itself that retained Andersen and allegedly relied upon its audits. I conclude, therefore, that Andersen's standing defenses, # # 17 and 23, are legally insufficient and should be stricken.

### G. *Defense # 19*

In defense # 19, Andersen claims that it may not be held liable for Ameriwood's litigation expenses in the underlying securities action. As Andersen admits, this issue previously has been decided against it in this court's opinion of March 19, 1996. The defense therefore shall be stricken.

### H. *Defense # 24*

Andersen's affirmative defense # 24 is unclean hands. Because the court has dismissed the contribution claim, the only equitable claim in the case, defense # 24 is moot and will be stricken.

### I. *Defense # 26*

Defense # 26 asserts that, in order to recover the amounts paid to settle the securities litigation, Ameriwood had to prove "a case within a case," *i.e.,* that Ameriwood was liable in the underlying securities litigation and that the amounts it paid were reasonable. Because the court has held that the amounts paid to settle the underlying securities litigation are not recoverable, defense # 26 is moot and will be stricken.

### J. *Defense # 33*

Defense # 33 is Andersen's notice of right to add affirmative defenses. Andersen stipulates that it has stated all affirmative defenses at this time and the time for amending pleadings has passed. Accordingly, defense # 33 will be stricken.

### K. *Defenses # # 7, 8, 10, 12–14, 18, 20–23, 25 and 27*

Ameriwood last contends that certain of Andersen's defenses are duplicative or involve matters that are not truly affirmative defenses, but are instead denials of Ameriwood's case in chief. As a result, Ameriwood contends that the various defenses should be stricken "in order to streamline the pleadings for trial." In support of its motion, Ameriwood simply lists the theoretically offending defenses, thrusting the burden on the court to analyze the pleadings and evaluate whether there exists any repetition.

While certain of Andersen's defenses may overlap, there is little to be gained by the court or the litigants in dissecting each defense to determine whether any are cumulative. Striking duplicative defenses will not serve to "streamline" the litigation. *See Kelley,* 714 F.Supp. at 1442. Instead, it will serve no purpose other than to "streamline" superfluous language in the pleadings. Since the case will not be presented to the jury by way of neatly packaged pleadings, I decline to waste further judicial resources combing through sustainable defenses in order to strike repetitious language.

Similarly, I decline to closely analyze which defenses are true affirmative defenses and which amount to mere denials of plaintiff's case. As other courts previously have noted, the obligation to plead all "matter[s] constituting an avoidance or affirmative defense" creates a difficult problem for answering defendants in distinguishing between denials and affirmative defenses. *See, e.g., Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736–7 (N.D.Ill.1982). Because the penalty for not asserting an affirmative defense is waiver, it is prudent for a defendant to state defenses as affirmative defenses if in doubt whether they could be raised by a denial. *Id.* By failing to challenge the substance of the defenses, plaintiff implicitly admits that the defenses constitute legitimate matters that will be the subject of proofs at trial. Granting a motion to strike therefore "will not promote the disposition of the case on the merits . . . ." *Id.* Plaintiff's motion to strike duplicative defenses therefore is denied.

## IV. MOTION FOR SUMMARY JUDGMENT ON "BREACH OF DUTY" COUNTERCLAIMS (DOCKET # 173)

Ameriwood's fourth motion is for summary judgment pursuant to Fed.R.Civ.P. 56(c) on what it calls Andersen's "breach of duty" counterclaims: (1) Count I, breach of contract; (2) Count II, fraud; (3) Count III, negligent misrepresentation; and (4) Count IV, negligence. Ameriwood essentially contends that Andersen, as auditor for a public corporation, may not abrogate its professional obligation to independently audit by relying upon information provided by company officers.

Under Fed.R.Civ.P. 56, a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Material facts are those that are defined by the substantive law and are necessary to apply that law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return a judgment for the non-moving party. *Id.*

A party may move for summary judgment at any time, with or without supporting affidavits. Fed.R.Civ.P. 56(b); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The burden of the moving party is met by pointing the court to the absence of evidence in support of the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Once the moving party has come forward with such a showing, the burden is on the nonmoving party to go beyond the allegations in the complaint and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court must draw all inferences in the light most favorable to the nonmoving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### A. Count I: Breach of Contract

■ Ameriwood contends that, as a public auditor, Andersen may not allege a breach of contract action based on the failure to provide truthful and accurate information as promised in written management representation letters and as set forth in the auditor engagement letter. Ameriwood contends that the auditors's role is to verify the accuracy of management's financial statements. As a result, Ameriwood asserts that an auditor may not avoid its duty by alleging that such statements were inaccurate or misrepresented. It therefore contends that to allow an auditor to sue for breach of contract based on management representations would violate public policy.

Ameriwood cites no authority for its conclusion that an auditor may never bring a suit against a client for breach of contract based on client misrepresentations. It relies instead on broad general logic that such a claim would eviscerate the auditor's duties to the corporate client to ascertain the accuracy of management representations.

Admittedly, Andersen itself cites no authority confirming an accountant's right to bring a breach of contract action against its client. However, general contract theory is well established. When parties make a contract, presumably either side may breach and be liable to the other for resulting damages. Ameriwood has proffered and this court can find no reason why Andersen should not be entitled to bring a claim based on the same contract relied upon by Ameriwood.

Regardless, however, I conclude that Andersen's breach of contract claim must fail for a different reason. While Andersen may be entitled in theory to bring a claim for breach of contract, its remedy is limited to ordinary contract damages. Here, Andersen has alleged damages

including, but not limited to the amounts Andersen paid in settlement of the shareholder securities litigation, the attorneys' fees and related costs expended in defending these suits, and the value of the time

and effort expended by Andersen's partners, employees and representatives in defending the shareholder securities litigation.

Under Michigan law, contract damages are limited to those damages "that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Mass. Mut. Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50, 53 (1980). In the absence of unusual circumstances, such damages ordinarily are limited "to the monetary value of the contract had the breaching party fully performed under it." *Id.*

Exceptions to this general rule exist, but none is applicable here. The contracts at issue were standard commercial arrangements. Nothing in the documents suggests that the parties contemplated any consequential damages to reputation that may be at issue here. *See Kewin,* 295 N.W.2d at 56 (holding that even bad faith breach of insurance contract cannot create right to non-contract damages including exemplary damages). Nothing in the contracts provides that attorney fees made necessary by breach will be recoverable. *See Burnside v. State Farm Fire & Cas. Co.,* 208 Mich.App. 422, 528 N.W.2d 749, 752–53 (holding that attorney fees ordinarily not recoverable in breach of contract action, even where defendant has acted in bad faith), *lv. denied,* 450 Mich. 893, 539 N.W.2d 508 (1995). Moreover, damages resulting from settlement of the securities action no longer are at issue in the case. Therefore, even had the parties contemplated recovery of such damages for breach, those damages are barred by this court's prior decisions.

Were this a case in which Andersen alleged that it had been prevented from performing on its contract because of misrepresentations or failure to provide necessary information, it might well be entitled to seek damages for the value of the contract that it had been prevented from performing. Andersen, however, does not seek damages in the amount of contract value. Presumably, Andersen was paid for performance of those contracts long ago.

Instead, Andersen seeks damages that are extraordinary and consequential. Because I conclude that the damages Andersen seeks are not recoverable in a breach of contract action, I dismiss counterclaim count I with prejudice.

### B. *Count II: Fraud*

Ameriwood moves to dismiss Andersen's counterclaim sounding in fraud. Specifically, Ameriwood contends that, because part of Andersen's duty as auditor was to test for management fraud, it may not bring an action against a company alleging that it was harmed by fraud.

In order to state a claim for fraud, a plaintiff must prove the following elements: (1) a false, material representation; (2) known to be false; (3) made with the intent that another should rely upon it; (4) actual reliance; and (5) resulting injury. *Sheldon Co. Profit Sharing Plan and Trust v. Smith,* 858 F.Supp. 663, 669 (W.D.Mich.1994); *Doe v. Johnson,* 817 F.Supp. 1382, 1387 (W.D.Mich.1993).

Ameriwood broadly contends that the fraud claim must fail because Ameriwood did not intend for Andersen to rely upon management representations. Accordingly, it claims that Andersen's reliance on such representations was unreasonable. Ameriwood further contends that Andersen's claims are untenable because they require the client to warrant the accuracy of the very information the auditor is hired to examine. Finally, in an argument made in Ameriwood's motion to dismiss (Docket # 170), Ameriwood again argues that Andersen has admitted that it was not harmed by any management misrepresentations when it states that its audit was not materially misstated.

In response, Andersen attaches among other things, the report of Douglas R. Carmichael, its auditing expert. Dr. Carmichael states that auditors are not intended to check every representation by management. Instead, an audit is designed to provide reasonable cross-checks on management accuracy. If such determinations fail to reveal discrepancies, the auditor is entitled to reasonably rely on management representa-

tions. Exhibit 1, at 7. In the instant case, Carmichael opines that Andersen conducted proper checks on the accuracy of management representations and, finding no material discrepancy, was entitled to rely upon those representations. Carmichael also states that management representations necessarily constitute some of the primary evidence to be relied upon by an auditor. Although Ameriwood's experts contend that Andersen's investigation was negligent and that the auditor's obligation was broader, the Carmichael testimony clearly raises a question of material fact for a jury on the reasonableness of reliance and the company's expectation that Andersen would rely to its detriment.

Moreover, Andersen's fraud claims allege much more than simple inaccuracy. Instead, Andersen contends both that management intended to deceive Andersen by multiple misrepresentations and that it succeeded in doing so. Andersen claims that senior management and members of the board deliberately kept relevant information from Andersen, represented that such information did not exist and interfered with audit checks that would have revealed the misrepresentations. In other words, Andersen alleges far more than that Ameriwood was required to warrant that the information provided by management was truthful. Instead, Andersen alleges that the company engaged in actual fraud to create an inaccurate picture of company financial condition. Carmichael's report substantiates these allegations and creates a genuine issue of material fact for the jury.

Finally, in Section I of this opinion, I previously rejected Ameriwood's argument that Andersen has admitted that it was not harmed by management representations. Instead, Andersen has asserted not that the audit was entirely correct, but that it contained no *material* misstatements. Should a jury determine that the misstatements were material, Andersen asserts that damages caused by such misstatements were the fault of Ameriwood.

For the foregoing reasons, I conclude that Andersen's counterclaim for fraud is sustainable. I therefore deny Ameriwood's motion

for summary judgment on counterclaim count II.

## C. *Counts III & IV: Innocent Misrepresentation/Negligence*

In counterclaim counts III and IV, Andersen claims that Ameriwood is liable for its innocent misrepresentations and other negligence in providing information to Andersen that led to misstatements in Andersen's audits. Ameriwood moves to dismiss Andersen's claim of innocent misrepresentation, asserting that Ameriwood had no duty to Andersen to avoid negligence that may cause harm to Andersen.

The tort of innocent misrepresentation requires "proof that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 174 Mich.App. 14, 436 N.W.2d 70, 81 (1989) (citing *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988)). *See also Williams v. Polgar*, 391 Mich. 6, 215 N.W.2d 149, 156 (1974) (adopting tort of negligent misrepresentation in context of abstracter's negligent performance of title search).

Similarly, ordinary negligence actions require the existence of a legal duty owing to plaintiff from defendant. *Bonner v. Chicago Title Ins. Co.*, 194 Mich.App. 462, 487 N.W.2d 807, 810 (1992), *lv. denied*, 442 Mich. 909, 503 N.W.2d 445 (1993). Finding the existence of a duty usually "reflects policy considerations which lead the law to say that a particular injured person is entitled to protection." *Rose*, 436 N.W.2d at 81 n. 4. "The determination of whether a duty should be imposed upon a defendant is based on a balancing of the societal interest involved, the severity of the risk, the burden upon the defendant [to meet the duty], the likelihood of occurrence and the relationship between the two parties." *Swartz v. Huffmaster Alarms Sys., Inc.*, 145 Mich.App. 431, 434, 377 N.W.2d 393 (1985). *See also Doe*, 817 F.Supp. at 1386. In determining whether a duty exists, courts frequently weigh such considerations as the following:

(1) Foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for the breach; and (7) availability, costs, and prevalence of insurance for the risk involved.

*Doe,* 817 F.Supp. at 1387 (quoting *Vu v. Singer Co.,* 538 F.Supp. 26, 29 (N.D.Cal. 1981), *aff'd,* 706 F.2d 1027 (9th Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 350, 78 L.Ed.2d 315 (1983)). As a result, "courts often consider public policy implications in making a determination whether a legal duty exists in any given situation." *Doe,* 817 F.Supp. at 1387 (citing *Moore v. St. Joseph Nursing Home, Inc.,* 184 Mich.App. 766, 767–68, 459 N.W.2d 100 (1990) ("In attempting to determine whether a defendant owes an actionable duty to a plaintiff as a matter of law, it is necessary to assess competing policy considerations for and against recognizing the asserted duty.")).

In the instant case, the parties have not cited and this court has not located any case holding that a client who hires a professional for services owes a duty of due care in making his or her factual representations to that professional. It is unquestionably true that such a duty may arise out of contractual relationships of the professional to the client or foreseeable third parties. *See Clark v. Grover,* 132 Mich.App. 476, 347 N.W.2d 748 (1984). However, to find that such a duty is owed from the client to the professional would turn on its head the relationship that itself forms the basis for professional malpractice claims. *Cf. Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585, 594 (1981) (declining to recognize duty of due care running from attorney to adverse party); *Commercial Union Ins. Co. v. Medical Protective Co.,* 426 Mich. 109, 393 N.W.2d 479, 485 (1986) (declining to recognize duty of good faith and due care running from primary insurer to excess insurer).

Here, the auditor was engaged by the corporation at least in part to evaluate the relia-bility of financial statements. Part of the auditor's duty was to test the accuracy of client representations about its financial position. While the exact scope of the auditor's investigative duty is an issue of fact in the instant case, both sides agree that there exists at least some duty to investigate. Because discovery of negligent representations is an anticipated purpose of the audit relationship itself, it would be odd at best to allow a suit in tort based solely on the negligent representations of the client. Therefore, in the absence of bad faith intent to undermine the auditor's function, I conclude that policy considerations weigh against holding the client responsible for the very negligence underlying the auditor's role.

In contrast, plaintiff's fraud claim is based on actual knowledge of misrepresentations or reckless disregard of the truthfulness of representations. The intent to deceive increases substantially the foreseeability of the harm. In fact, where the harm is intended and sought, the occurrence of actual harm is both likely and desired by the offending party. In such circumstances, the policy balance shifts. *See Doe,* 817 F.Supp. at 1391–93 (distinguishing between duty to disclose actual knowledge of AIDS or AIDS symptoms and duty to disclose knowledge of high-risk behavior). Imposition of a duty not to affirmatively misrepresent constitutes a less intrusive burden on defendant offset against a far more likely harm to plaintiff and society.

Having reviewed Michigan case law and the policy considerations at issue, I conclude that Ameriwood owed no duty to avoid ordinary negligence in making representations to its auditors. According, I grant Ameriwood's motion to dismiss the counterclaims of innocent misrepresentation and negligence.

## V. *STATUTE OF LIMITATIONS (DOCKET # 143)*

Pursuant to Fed.R.Civ.P. 12(b)(6), Andersen has filed a motion to dismiss Ameriwood's claims arising out of the 1986, 1987 and 1988 audits based on the statute of limitations. Andersen contends that the action arising out of each audit accrued and the limitations period began to run at the time each audit was completed. In contrast, Am-

eriwood contends that the statute of limitations is controlled by the last date of Andersen's service to Ameriwood as auditor, or October 3, 1990.

The parties agree that a two-year statute of limitations applies to actions alleging accounting malpractice. *See Local 1064, RWDSU AFL–CIO v. Ernst & Young,* 449 Mich. 322, 535 N.W.2d 187 (1995) (applying Mich. Comp. L. § 600.5805(4) to malpractice actions against accountants). Accrual of a malpractice action is controlled by Mich. Comp. L. § 600.5838(1), which provides in relevant part:

> Except as otherwise provided in Section 5838a, a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional or pseudo-professional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

Essentially at issue in this case is whether Andersen's services to Ameriwood amount to separate matters out of which multiple limitations periods arise or whether it is a continuous service for which the action does not accrue until the date of termination of all accounting services. Andersen contends that its performance of auditing functions for Ameriwood resulted from independently contracted matters. As evidence of this fact, Andersen refers the court to the engagement letters upon which Ameriwood relies for its breach of contract claims. Because Andersen separately agreed to each audit in an independent engagement letter, Andersen contends that the statute of limitations separately ran from the last date it supplied accounting services for each audit.

In contrast, Ameriwood contends that the running of the statute of limitations is a fact question that may not be decided on a motion to dismiss. *See Pantely,* 180 Mich.App. at 780, 447 N.W.2d 864. Ameriwood recites a variety of facts to support its contention that the matter cannot be decided on a motion to dismiss. First, Ameriwood claims that each financial statement is dependent on earlier statements and is presented in connection with at least two years' prior statements. Second, each year's audit is planned on the basis of the work and information done in previous years. Ameriwood contends that such interdependence prevents viewing the audits as separate agreements. Third, Andersen was listed with the SEC as auditor for Rospatch until its discharge by the company on October 3, 1990. Such representation, Ameriwood asserts, was continuing, not limited to the performance of an individual audit. Fourth, Ameriwood contends that Andersen provided a broad range of services to Ameriwood throughout each year. It reviewed, helped draft and commented on Rospatch's 10–Q filings with the SEC, its amendments to registrations statements filed with the SEC, its tax returns and planning, and its internal accounting and control practices. In sum, Ameriwood contends that the services provided by Andersen were continuous and interconnected rather than discrete contracted services. As a result, Ameriwood contends that the limitations period did not begin to run until Ameriwood discharged Andersen on October 3, 1990.

Having reviewed the statute, case law and facts presented, I conclude that whether the limitations period has expired on any portion of Ameriwood's claims is a question of fact for the jury to determine.

In support of its contention that each of its audits was a separate contract for services, Andersen cites *Enzymes of America, Inc. v. Deloitte, Haskins & Sells,* 207 Mich.App. 28, 523 N.W.2d 810 (1994), *rev'd in part,* 450 Mich. 889, 539 N.W.2d 513 (1995). In *Enzymes,* the district court held that malpractice claims based on audit services provided by defendant were barred by the two-year statute of limitations governing malpractice actions, Mich. Comp. L. § 600.5805(4). The court of appeals partially reversed the district court's grant of summary judgment, holding that the general three-year statute of limitations for torts under Mich. Comp. L. § 600.5805(8) applied. The Michigan Supreme Court subsequently summarily reversed the court of appeals, based on its decision in *Local 1064,* 449 Mich. 322, 535 N.W.2d 187, holding that the two-year stat-

ute of limitations for malpractice actions under Mich. Comp. L. § 600.5805(4) applied to accountant malpractice proceedings.

Andersen argues that the reversal without directions for remand reinstated the district court's holding that actions on audits accrued at the time of the audit, before the last date of service performed by the accountants. In reversing, however, the Supreme Court did not address the accrual issue. The Supreme Court did not discuss the difference between the accrual provisions for general tort actions under Mich. Comp. L. § 600.5827 ("[T]he claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.") and § 600.5838 (claim "accrues at the time that person discontinues serving the plaintiff in a professional ... capacity"). The mere fact of reversal rather than remand, therefore, says little about how Michigan appellate courts may view the accrual of claims against auditors.

In contrast, in *Morgan v. Taylor*, 434 Mich. 180, 451 N.W.2d 852 (1990), the Michigan Supreme Court directly addressed the meaning of the accrual provision contained at § 600.5838. In *Morgan*, an optometrist and his office were sued for failure to diagnose glaucoma and failure to refer plaintiff for treatment with an ophthalmologist. At the time of the alleged negligence, the defendant optical service had a contract to provide routine eye examinations with plaintiff's employer. The optometrist conducted a routine eye examination of plaintiff in 1981 and diagnosed no eye problems. The same facility provided a second routine examination to plaintiff in 1983, and glaucoma was detected. Plaintiff alleged that he should have been diagnosed and referred after the first eye examination, which revealed increased eye pressure.

The Supreme Court held that, despite the fact that plaintiff was receiving no ongoing course of treatment, regular routine checkups constituted continuous treatment on which the statute of limitations did not accrue until the last date of optometric service. The Court specifically noted that the statute codified prior existing case law governing the "last treatment rule." The Court held that

cessation of the physician-patient relationship constituted the point of accrual for malpractice actions. The Court observed that the rationale, which developed out of the trust relationship between patient and doctor, applied equally where the trust was placed in the advice that no further treatment was required, as well as when that advice was to follow a particular course of treatment. Inasmuch as no intervening event had occurred to sever the relationship, the Court held that the statute did not begin to run until the last date of service, in 1983. *Morgan*, 451 N.W.2d at 858.

I acknowledge that the *Morgan* Court expressly limited its holding to the facts of that case. At the time *Morgan* was decided, the legislature had revised the accrual provision for the statute of limitations governing health professionals. *See* Mich. Comp. L. § 600.5838a. Inasmuch as the last treatment rule had been repealed by the legislature as to health professionals, the Court's decision necessarily was limited.

The legislature, however, did not revisit the accrual provision as it applied to other professionals. As a result, the *Morgan* case, while limited insofar as its reasoning applies to health professionals, continues to shed light on how the Michigan Supreme Court would interpret the malpractice accrual provision under § 600.5838 as it applies to accountants, attorneys, and other professionals. The reasoning of *Morgan* suggests that the Michigan Supreme Court reads broadly the statutory language governing the last date of service.

Moreover, in *Nugent v. Weed*, 183 Mich. App. 791, 455 N.W.2d 409, 411 (1990), the Michigan Court of Appeals, like the Supreme Court in *Morgan*, placed particular emphasis on the last date of service provided by an attorney to a client, rather than on the specific services alleged to be negligently performed. The court reasoned that defendant performed a variety of legal services for plaintiff over a substantial period of time. It held that the nature of the relationship was one of ongoing advice and service on all of plaintiff's legal needs rather than one of discreet agreements to perform particular services. As a consequence, the court held that

plaintiff's claim did not accrue until the last date of legal service performed by defendant.

Similarly, in *Maddox v. Burlingame*, 205 Mich.App. 446, 517 N.W.2d 816, 818 (1994), the court of appeals held that an attorney's last date of billed legal services was the date of accrual, despite the fact that the land transaction out of which the complaint arose had been completed some months earlier.

The reasoning of controlling Michigan cases, therefore, appears to place the greatest emphasis on that part of the accrual statute referring to the last date of service provided. By so doing, it implicitly also reads broadly that part of the statute referring to "matters out of which the claim for malpractice arose." Where the parties have a longstanding relationship with respect to multiple interrelated matters, the statute of limitations generally has been held to run from the last date of service on all matters. The courts acknowledge, however, that where the parties have entered into specific discreet agreements to provide service, the statute of limitations will run from the date service is completed on the limited service agreements. *See, e.g., Chapman v. Sullivan*, 161 Mich.App. 558, 411 N.W.2d 754 (1987).

In the absence of Michigan decisions directly on point, Andersen has cited cases from two other jurisdictions holding that the statute of limitations should be considered to run from the date of the publication of each audit. *See Lincoln Grain, Inc. v. Coopers & Lybrand*, 215 Neb. 289, 338 N.W.2d 594 (1983); *FDIC v. Deloitte & Touche*, 834 F.Supp. 1129 (E.D.Ark.1992). Although those decisions unquestionably support Andersen's proposed result, both apply statutes of limitations entirely distinct from the Michigan statute.

In fact, I observe that the passage quoted by Andersen in its brief at page 19 underscores the differences in the understanding of the Arkansas statute from that of the Michigan courts. *See* Brief (Docket # 143) at 19 (quoting *FDIC*, 834 F.Supp. at 1150). The *FDIC* court specifically compares the conduct of annual audits to the conduct of annual physical examinations at which the physician negligently fails to diagnose illness

from one year to the next. The *FDIC* court states that such annual physicals would not describe the sort of continuous course of treatment "for the same or related illnesses or injuries," but instead describe a "mere continuity of a general physician-patient relationship." The same must be said for the Complaint's description of the relationship between DH & S and First-South.

*Id.* In Michigan, in contrast, the *Morgan* Court expressly held that the failure to diagnose an illness in one year continued until some event terminated the physician-client relationship. Accordingly, the very analogy relied upon in *FDIC* has been rejected by the Michigan Supreme Court.

I acknowledge that the Arkansas and Nebraska interpretations of the "continuous treatment" doctrine are reasonable and, in the abstract, perhaps more persuasive than the expansive interpretation of that doctrine by Michigan courts. I also acknowledge that, in the context of long-term relationships between professionals and their clients, the Michigan interpretation of "continuous treatment" may allow stale claims to come before the court. Further, the result is incongruous where, as here, Ameriwood was on notice of its potential claims over a year before it elected to terminate Andersen's services. *See Gebhardt v. O'Rourke*, 444 Mich. 535, 544, 510 N.W.2d 900 (1994) (under tolling doctrine of discovery rule, plaintiff need only have notice of a possible cause of action to renew running of the statute of limitations).

Such observations, however, do not alter the result under Michigan law. However persuasive Andersen's interpretation of the statutory language may be, this court does not write on a clean slate. Instead, the role of this court is to apply the law as it believes Michigan courts would apply it.

In the instant case, some evidence suggests that Andersen provided ongoing continuous and interrelated services to Ameriwood. Unlike in the cited Michigan cases, however, other evidence indicates that Andersen entered into individual agreements with respect to each of the services it provided to Ameriwood. Given the analysis of the Michigan courts on the accrual of malpractice actions, I

am persuaded that whether the parties were engaged in a continuous relationship or in a series of discrete agreements to perform particular services is a question of fact for the jury. Andersen's motion to dismiss claims based on the 1986, 1987 and 1988 audits is denied.

### CONCLUSION

For the foregoing reasons, I deny Ameriwood's motion to dismiss counterclaim counts I—IV (docket # 170). I also deny Ameriwood's motion to dismiss counterclaim counts V—VII and its request for sanctions (docket # 171). Ameriwood's motion to strike affirmative and special defenses (docket # 172) is denied in part and granted in part, and affirmative defenses # # 1, 11, 14, 17, 19, 23, 24, 26, 29, 30, 31, 32 and 33 are hereby stricken. Ameriwood's motion for summary judgment on Andersen's breach of duty counterclaims (docket # 173) is granted as to counterclaim counts I, III, and IV and denied as to count II. Andersen's partial motion to dismiss based on the statute of limitations (docket # 143) is denied.

### ORDER

In accordance with the opinion filed this date,

**IT IS ORDERED** that Ameriwood's motion to dismiss counterclaim counts I—IV (docket # 170) is denied.

**IT IS FURTHER ORDERED** that Ameriwood's motion to dismiss counterclaim counts V—VII and its request for sanctions (docket # 171) are denied.

**IT IS FURTHER ORDERED** that Ameriwood's motion to strike affirmative and special defenses (docket # 172) is denied in part and granted in part. Affirmative defenses # # 1, 11, 14, 17, 19, 23, 24, 26, 29, 30, 31, 32 and 33 are hereby stricken.

**IT IS FURTHER ORDERED** that Ameriwood's motion for summary judgment on Andersen's breach of duty counterclaims (docket # 173) is granted as to counterclaim counts I, III, and IV and denied as to count II.

**IT IS FURTHER ORDERED** that Andersen's motion for partial dismissal based

on the statute of limitations (docket # 143) is denied.

**Floyd J. SPRUYTTE, Plaintiff,**

v.

**Anthony GOVORCHIN, et al., Defendants.**

**No. 4:95–CV–208.**

United States District Court, W.D. Michigan, Southern Division.

March 26, 1997.

See also: 190 Mich.App. 127, 475 N.W.2d 382.

Floyd J. Spruytte, Jr., New Haven, MI, pro se.

Christine M. Campbell, Frank J. Kelley, Attorney General, Corrections Division, Lansing, MI, for Defendants.

### *OPINION*

HILLMAN, Senior District Judge.

This is a *pro se* civil rights action filed by a Michigan state prisoner pursuant to 42 U.S.C. § 1983. The matter is before the court on plaintiff's objections to the magistrate judge's Report and Recommendation ("R & R") recommending that this court grant defendants' motion to dismiss and/or for summary judgment. Having reviewed those objections, I accept the recommendation of the magistrate judge and **GRANT** defendants' motion.

### *BACKGROUND*

As the magistrate judge noted, the instant case arises out of a lengthy state court action, *Spruytte v. Owens,* in which plaintiff sued a Michigan Department of Corrections ("MDOC") official to be allowed a particular word processor, the Smith Corona Model PWP–80 ("PWP–80"). Defendants in the instant case are the Assistant Attorney General representing defendant in *Spruytte v. Owens* (defendant Govorchin) and the Hearings

Administrator for the Office of Policy and Hearings for the MDOC (defendant Stapleton).

After the MDOC refused to allow plaintiff to receive the PWP–80, plaintiff brought suit against MDOC official Owens, alleging that he had a due process property interest in receiving the word processor. The Ionia County Circuit Court dismissed the case on the basis of absolute immunity. Plaintiff appealed, and the Michigan Court of Appeals held that defendant was not entitled to absolute immunity. The court went on to find that plaintiff had a property interest in receiving the PWP–80. *Spruytte v. Owens,* 190 Mich.App. 127, 475 N.W.2d 382 (1991).

On remand, the circuit court granted summary judgment to defendant. Plaintiff again appealed. On May 31, 1994, the Michigan Court of Appeals concluded that its earlier opinion constituted law of the case, and remanded for entry of an order directing defendant to permit plaintiff to possess the "subject word processor." *Spruytte v. Owens,* No. 155278 (Mich.App. May 31, 1994). On remand, the circuit court entered such an order.

By the time plaintiff prevailed on appeal, however, the PWP–80 was no longer being manufactured. As a result, plaintiff engaged in renewed disputes with the MDOC concerning whether he was entitled to receive a particular replacement model of word processor (Brother model 9000) as the functional equivalent of the word processor the court of appeals determined he was entitled to receive. On September 27, 1994, plaintiff had the Brother 9000 delivered to the Lakeland Correctional Facility. On October 4, 1994, a hearing officer rejected the Brother 9000 on the basis that it had neither been purchased within the requirements of the department nor constituted the court-ordered model. Plaintiff did not appeal the hearing officer's decision. Instead, plaintiff moved for an order of contempt in the *Spruytte v. Owens* case.

Before a contempt proceeding was held, plaintiff entered into an agreement settling his state court lawsuit. In that settlement agreement, plaintiff stipulated that the particular word processor referenced in the ap-

pellate court order and subsequent circuit court order was the PWP–80, which was no longer manufactured. The parties also stipulated that a third model (the Brother WP–1700–MDS) was comparable to the PWP–80. Finally, the parties agreed to a sum of damages and attorney fees to compensate for the harm suffered by plaintiff. Plaintiff further agreed that the settlement served as a compromise of the claims and defenses of the then-pending litigation and discharged defendant Owens from all claims known and unknown. The full text of the agreement is set forth on pages 6–7 of the magistrate judge's R & R.

On December 4, 1994, the state court action was dismissed with prejudice pursuant to the settlement stipulation. Two days after entry of that order, plaintiff filed the instant action.

In his present complaint, plaintiff alleges that defendants predetermined the outcome of the hearing officer's decision by ordering the hearing officer to reject the Brother 9000. He alleges that defendants' action constituted a violation of his right of access to the courts and that defendants took the action in retaliation for plaintiff's exercise of his First Amendment right to file a lawsuit in *Spruytte v. Owens.*

Defendants have moved to dismiss and/or for summary judgment. The magistrate judge recommended that defendants' motion be granted. Plaintiff has filed timely objections to that recommendation.

### STANDARD OF REVIEW

This court reviews *de novo* those portions of the report and recommendation to which timely objections are made. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court may accept, reject or modify any or all of the magistrate judge's findings or recommendations. *Id.*

On a motion for summary judgment, the court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538

(1986). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate that there exists a genuine issue for trial. *Id.*

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his claim. *Id.* After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). " '[D]iscredited testimony is not [normally] considered a sufficient basis' " for defeating the motion. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553; *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356; *Street,* 886 F.2d at 1480.

On a motion under Fed.R.Civ.P. 12(b)(6), the determination of whether a complaint states a claim for relief is a question of law. *Phoenix Engineering, Inc. v. MK–Ferguson of Oak Ridge Co.,* 966 F.2d 1513, 1516 (6th Cir.1992), *cert. denied,* 507 U.S. 984, 113 S.Ct. 1577, 123 L.Ed.2d 146 (1993). In deciding a motion to dismiss, this court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would

entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Andrews v. State of Ohio,* 104 F.3d 803, 806 (6th Cir. 1997). A complaint need only give fair notice of what plaintiff's claim is and the grounds upon which it rests. *Andrews,* 104 F.3d at 806. A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations. *Id.* While this standard is decidedly liberal, it requires more than a bare assertion of legal conclusions. "In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993) (internal citations omitted).

## DISCUSSION

Defendant raises numerous objections to the R & R. First, he contends that the magistrate judge erred by adopting the facts as stated by defendants, rather than considering those facts in the light most favorable to plaintiff. Second, plaintiff complains that the magistrate judge erred in concluding that plaintiff failed to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) on his allegation that he was denied his right of access to the courts. Third, plaintiff objects to the magistrate judge's recommendation that plaintiff's demands for injunctive relief be dismissed as moot. Fourth, plaintiff objects to the magistrate judge's recommendation that defendant Govorchin be granted summary judgment on the basis of qualified immunity. Fifth, plaintiff objects to the grant of summary judgment to defendants before allowing plaintiff discovery. Sixth, plaintiff objects to the magistrate judge's decision to the extent that it concludes he failed to state a claim of retaliation. Seventh, plaintiff claims that the facts alleged have stated a claim of denial of procedural due process and that he should be allowed to amend his complaint for a second time to incorporate that claim.

Because several of plaintiff's objections overlap or affect multiple issues in the R & R, I will address each objection in the specific context of plaintiff's individual claims as set

forth in the R & R. I observe, however, that, with the exception of certain admissions by plaintiff himself in the underlying litigation, I have accepted plaintiff's allegations as true. Plaintiff has suggested no facts beyond his allegations that he believes additional discovery would disclose. Accordingly, this matter is ripe for review prior to discovery.

### A. *Claims for Injunctive and Declaratory Relief*

■ The magistrate judge recommended dismissing all claims for declaratory and injunctive relief as those claims previously had been adjudicated by the settlement of the *Spruytte v. Owens* case, which resolved all issues regarding the word processor. Plaintiff objects that not all potential injunctive relief was addressed by the underlying settlement. Specifically, plaintiff contends that he is entitled to challenge the policy and practice of the department in reaching decisions in cases before the hearings have been conducted.

■ Under Michigan law, a voluntary dismissal with prejudice is a final judgment with *res judicata* effect. *Brownridge v. Michigan Mut. Ins. Co.*, 115 Mich.App. 745, 321 N.W.2d 798, 799 (1982). The stipulation and dismissal fully resolved all issues concerning plaintiff's use and possession of a word processor. Having obtained relief for his own interests, plaintiff has no standing to bring claims based on the permissibility of word processors. *See Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996) ("It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered or will suffer, actual harm; it is not the role of courts, but that of political branches to shape the institutions of government in such fashion as to comply with the laws and the Constitution.").

■ Plaintiff also seeks a permanent injunction that the MDOC refrain from due process violations in deciding issues before hearings. Plaintiff contends that the allegation that the MDOC decided the result of his grievance in the advance of hearing supports the inference that the MDOC decides many or all such hearings in advance of their being held. He asserts the right to conduct discovery on such claims.

■ The remedy plaintiff seeks, a broad permanent injunction, is unavailable absent "the most 'extraordinary circumstances.'" *Lewis,* —— U.S. at ——, 116 S.Ct. at 2198 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137, 97 S.Ct. 2532, 2544, 53 L.Ed.2d 629 (1977)). Moreover, plaintiff must at a minimum establish a constitutional deprivation in the first instance. For the reasons set forth below, I conclude that plaintiff has failed to state a claim for relief.

### B. *Interference With Access to the Courts*

■ The magistrate judge recommended dismissal of plaintiff's claim that he was denied access to the courts when he was deprived of the word processor of his choice. As the magistrate judge correctly determined, the state is required only to ensure a reasonably adequate opportunity to present claimed violations of fundamental rights to the court. *See Lewis,* —— U.S. at ——, 116 S.Ct. at 2180 (holding there exists no freestanding right to particular resources, but only the right to have "meaningful access to courts"); *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Walker v. Mintzes*, 771 F.2d 920, 931–32 (6th Cir.1985). This circuit repeatedly has held that denial of a right of access to a typewriter or word processor is not a denial of access to the courts. *See, e.g., Wehner v. Lewis*, No. 92–5793, 1993 WL 22435, at * 1 (6th Cir. Feb.2, 1993) (affirming dismissal where right of access alleged to be denied by refusal to allow use of typewriter).

■ In his objections, plaintiff apparently now concedes that he was not entitled to a word processor as an incident of his right of access to the court. Instead, plaintiff claims that his right of access was impaired in the *Spruytte v. Owens* case by a pre-hearing decision to deny the replacement word processor. Plaintiff also apparently claims that his right of access was impaired by defendants' refusal to comply with the order of the Michigan Court of Appeals to allow plaintiff a word processor.

■ As the magistrate judge held, plaintiff's right of access to the court does not create a right to bring an independent lawsuit to complain of noncompliance with state court orders in the prior litigation. Plaintiff's remedy was to seek a finding of contempt in the state court. Plaintiff elected instead to settle his state court claim, thereby abandoning his request for an order of contempt. Plaintiff is not entitled to collaterally attack in federal court the decisions of a state court. See *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482–86, 103 S.Ct. 1303, 1314–17, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923) (federal review of final determinations in state judicial proceedings may be obtained only in United States Supreme Court); *Johns v. Supreme Court of Ohio,* 753 F.2d 524 (6th Cir.), *cert. denied,* 474 U.S. 824, 106 S.Ct. 79, 88 L.Ed.2d 65 (1985).

■ Moreover, plaintiff's settlement of his underlying lawsuit bars his claim that his right of access was impaired in that litigation. Plaintiff can allege no harm to the *Owens* litigation caused by these defendants' actions. Plaintiff was able to and did seek a contempt order. A decision on the question of contempt was not barred by defendants' interference with getting the word processor, but instead by plaintiff's decision to settle that litigation.

Accordingly, plaintiff has failed to state a claim for interference with his right of access to the courts.

#### C. *Retaliation*

Plaintiff also alleges that his First Amendment rights were violated when he was retaliated against by defendants for filing the lawsuit in *Spruytte v. Owens.* The magistrate judge held that defendants were entitled to summary judgment on the basis of qualified immunity.

■ The doctrine of qualified immunity protects government officials in civil cases from liability for damages if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitz-*

gerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1094 (6th Cir.1992). For a right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that right. The unlawfulness of the official or employee's conduct must be apparent in light of pre-existing law. *Wegener v. City of Covington,* 933 F.2d 390, 392 (6th Cir.1991). A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred. *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988).

■ Once a defendant pleads a defense of qualified immunity, " '[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.... Until this threshold immunity question is resolved, discovery should not be allowed.' " *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (quoting *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2738). Accordingly, the court must determine first whether a constitutional right has been violated, and, if so, whether that constitutional right was clearly established at the time of the alleged actions. *Id.*

The magistrate judge concluded that plaintiff had failed to establish the violation of a constitutional right by failing to set forth facts that would support his claim of retaliation. The magistrate first observed that defendant Govorchin submitted an affidavit stating that, as an assistant attorney general, he had no authority to order anyone in the MDOC to perform any act. The magistrate judge concluded that, in the absence of such authority, defendants' actions could not constitute more than legal advice for which defendant is immune.

Plaintiff objects to the magistrate's conclusion, asserting that the magistrate inappropriately weighed facts as opposed to accepting the facts in the light most favorable to plaintiff. Specifically, plaintiff alleges that

the magistrate judge mistakenly relied upon defendant Govorchin's sworn statement that he did not order, but only advised, the hearing officer to deny plaintiff's request to receive the replacement word processor, the Brother 9000. In contrast, plaintiff has submitted an affidavit in which he swears that Warden Howes informed him both before and after the hearing that she had been "instructed" to deny plaintiff's receipt of any typewriter other than the PWP–80. He therefore contends that whether Govorchin "ordered" the warden and hearing officer to reject the word processor, or merely "advised" that action in his capacity as legal counsel, was an issue of fact that may not be disposed of on summary judgment.

Plaintiff misunderstands the nature of the magistrate's conclusion. Regardless of plaintiff's evidence concerning how corrections officers understood Govorchin's advice, in order for Govorchin to have actually ordered the action, he must have had authority over the corrections officials. As the magistrate judge stated:

> Plaintiff has adduced no evidence, however, to show that the Attorney General, or his assistants, have any authority over the conditions of plaintiff's confinement. To the contrary, plaintiff is in the legal custody of the Department of Corrections, not the Attorney General. Mich. Comp. L. § 791.204; *see Cross v. Dep't of Corrections*, 103 Mich.App. 409, 303 N.W.2d 218 (1981).

Plaintiff therefore has neither proven nor alleged any fact or legal basis to support Govorchin's actual authority.

 In any event, the magistrate judge also rejected plaintiff's claim on alternative grounds. The magistrate judge concluded that plaintiff had failed to allege a claim of retaliation for the exercise of First Amendment rights because plaintiff failed to set forth a violation of his right to substantive due process. *See Newsom v. Norris*, 888 F.2d 371, 376–77 (6th Cir.1989) (holding that inmate states federal claim when he is fired from a prison job in retaliation for complaining about prison conditions); *Cale v.Johnson*, 861 F.2d 943, 949 (6th Cir.1988) (holding that inmate states federal claim when drugs are planted on inmate in retaliation for complaints). To prove such a violation, the magistrate held that plaintiff must demonstrate that the prison officials' conduct constituted an "egregious abuse of governmental power." *Cale*, 861 F.2d at 949 (citing *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 201 (6th Cir.1987)). The magistrate judge concluded that the giving of arguably correct legal advice could not constitute an egregious abuse of governmental power.

 While I agree with the magistrate's conclusion that plaintiff has not stated a claim of retaliation, I disagree with the legal standard he applied. Retaliation against an individual for exercise of his First Amendment rights is itself a First Amendment violation. *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir.1994), *cert. denied*, ―― U.S. ――, 115 S.Ct. 1400, 131 L.Ed.2d 288 (1995); *Riley v. Kurtz*, 893 F.Supp. 709, 710 (E.D.Mich.1995). Where a defendant has alleged deprivation of a specific constitutional right, the constitutional claim is analyzed as a violation of the particular constitutional right, not as a substantive due process challenge. *Id*. *See also Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) ("Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' ") (quoting *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871). Here, plaintiff ostensibly has claimed that he was retaliated against for exercise of his First Amendment right to bring a lawsuit. Consequently, plaintiff need not allege conduct that constitutes an "egregious abuse of authority" or that "shocks the conscience." *See Riley*, 893 F.Supp. at 715–16.

 Regardless of the appropriate standard, however, plaintiff has failed to set forth allegations that would support a claim of retaliation under Fed. R. Civ. p. 12(b)(6). While plaintiff asserts that the refusal to permit him to receive the Brother 9000 was taken in retaliation for the filing of a lawsuit, his claim is based on nothing more than the

fact that the refusal followed the filing of his lawsuit. Such an allegation is insufficient. *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987) (plaintiff must allege more than that the unwanted action followed the exercise of rights). Instead, plaintiff must allege a "chronology of events from which retaliation may plausibly be inferred." *El–Amin v. Tirey,* 817 F.Supp. 694, 699 (W.D.Tenn.1993), aff'd, 35 F.3d 565 (6th Cir.1994).

Plaintiff asserts that he has alleged numerous facts supporting his claim of retaliation. He alleges that he had conversations with Govorchin in which Govorchin suggested that he was opposed to plaintiff's receipt of the word processor. Further, plaintiff alleges that Govorchin stated that he believed that the appeals court erred in its decision in *Spruytte v. Owens,* and that Govorchin intended if possible to block the receipt of the substitute word processor. Plaintiff also alleges that defendants deliberately interfered with his hearing to receive a "replacement" model for the discontinued word processor.

Accepting these allegations as true, however, none suggests a retaliatory motive stemming from the filing of the lawsuit. In fact, the allegations suggest another reason entirely: that defendants generally opposed plaintiff's possession of the word processor, not that they were angry over his filing a lawsuit. Therefore, plaintiff's allegations, even if true, fail to set forth a claim that he was subjected to retaliation because of the exercise of First Amendment rights.

Accordingly, I conclude that plaintiff has failed to state a valid claim of retaliation. I therefore grant defendants' motion to dismiss the retaliation claim pursuant to Fed. R.Civ.P. 12(b)(6).

### D. *Due Process Violation*

Plaintiff contends that he should be allowed to amend his complaint to allege a violation of procedural due process. In order to state a claim of procedural due process, plaintiff must allege both that he has a protected property or liberty interest, and, if so, what procedures are required. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Protected property interests may be created through either statutory

entitlement, the operation of institutional common law, or principles of contract law. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In order to establish a property interest in a particular benefit, plaintiff must have a "legitimate claim of entitlement to it." *Id.* " '[A]n abstract need or desire for it' or a 'unilateral expectation' is insufficient.' " *LRL Properties v. Portage Metro Housing Auth.,* 55 F.3d 1097, 1108 (6th Cir.1995) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709) (other quotations omitted).

Plaintiff contends that he had a property interest in being permitted to receive the Brother 9000 word processor. As a consequence, he alleges that he had a right to an untainted hearing on the receipt of that word processor.

In support of his alleged property interest, plaintiff asserts that the existence of a property interest in acquiring the Brother 9000 word processor previously was decided by the Michigan Court of Appeals in the *Spruytte v. Owens* case. Accordingly, he contends that this court must consider the *Owens* decision to be law of the case and/or must give full faith and credit to that decision.

The decision in *Owens,* however, was not part of the instant case. Consequently, the law of the case doctrine clearly is inapposite. In addition, as conceded by plaintiff in his settlement of the case, the *Owens* decision addressed plaintiff's property interest in the PWP–80. At issue in the present case, in contrast, is receipt of the Brother 9000. This question never was decided by the Michigan court, and consequently is not the subject of any order of court that could be entitled to full faith and credit in this court.

Moreover, as the magistrate judge noted, in *Spruytte v. Owens,* plaintiff stipulated that the PWP–80 was the "subject word processor" referred to in the order of the Michigan Court of Appeals. In other words, plaintiff has admitted that the subject word processor was different than the one he sought to receive in October 1994. He therefore is barred by the doctrine of judicial

estoppel from now asserting that the Brother 9000 was the "subject" word processor in which he had a property interest. *See Consolidated Tel. Cable Serv., Inc. v. City of Frankfort,* 857 F.2d 354, 359 n. 4 (6th Cir. 1988), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989). The most he can claim is that, for equitable reasons, the Brother 9000 should have been treated as substantially the same as the PWP–80. In the settlement, however, plaintiff stipulated that a different Brother word processor was comparable (the Brother WP–1700–MDS). By the terms of his own stipulation, therefore, plaintiff agreed that a different Brother model was comparable.

Further, as the Michigan Court of Appeals itself noted, subsequent to the initial decision of the Michigan Court of Appeals in *Spruytte v. Owens* but before the deprivation at issue here, the MDOC rescinded the administrative regulation in which the *Owens* court found a property interest. *See Spruytte v. Owens,* No. 155278 (Mich.App. May 31, 1994) (noting that 1979 AC R 791.6637(4) had been repealed subsequent to the decision in *Spruytte v. Owens,* 190 Mich.App. 127, 475 N.W.2d 382 (1991)). As a consequence, the very regulation upon which plaintiff based his property interest no longer exists. Plaintiff has suggested no alternate basis for his alleged property interest in the word processor. Therefore, because plaintiff has failed to allege a threshold property interest, he has failed to allege a deprivation of constitutional magnitude.

Finally, plaintiff's due process claim also is barred by *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In *Parratt,* the Supreme Court held that the negligent deprivation of a prisoner's property does not violate due process if adequate state remedies are available to redress the wrong. The *Parratt* doctrine has been extended to cover intentional deprivations. *See Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (citing *Hudson v. Palmer,* 468 U.S. 517, 533–36, 104 S.Ct. 3194, 3203–05, 82 L.Ed.2d 393 (1984)). Further, the Sixth Circuit has held that, in order to claim a deprivation of property without procedural due process, a plaintiff "must plead and prove that state remedies for redressing the wrong are inadequate." *Vicory v. Walton,* 721 F.2d 1062, 1066 (6th Cir.1983), *cert. denied,* 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984). Thus, the *Parratt* doctrine permits dismissal of procedural due process claims brought under 42 U.S.C. § 1983 based on the fact that the state provides the claimant an adequate postdeprivation remedy if:

1) the deprivation was unpredictable or "random"; 2) predeprivation process was impossible or impracticable; and 3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty.

*Copeland,* 57 F.3d at 479.

In the instant case, the hearing plaintiff is now claiming was defective was nothing more nor less than a single act that would itself be unauthorized under state procedures. Plaintiff attempts to allege a general practice of such deprivations, but he offers no factual allegations to support such a claim. As a result, his claim falls squarely within the strictures of *Parratt.* See *Copeland,* 57 F.3d at 479–80.

As the Sixth Circuit has held, "redress for most prisoner actions, including alleged constitutional violations, is available under the extensive process provided by Michigan state law." *Copeland,* 57 F.3d at 480 (reciting tort remedies). *See also* Mich. Court R. 3.105 (allowing actions for claim and deliver); Mich. Comp. Laws § 600.2920 (civil action to recover possess of or damages for goods unlawfully detained); Mich. Comp. Laws § 600.6401 (Michigan Court of Claims Act, allowing compensation for alleged unjustifiable acts of state officials). In addition, as an agency subject to the Michigan Administrative Procedures Act, Mich. Comp. Laws §§ 24.201–.403, the MDOC is subject to numerous laws governing prisoner grievances. *See* Mich. Comp. Laws §§ 791.251–.255 (including right to raise constitutional claims and the right to judicial review of hearing decisions). The Sixth Circuit has held that such rights provide a more-than-adequate state court remedy for violations of due pro-

cess for purposes of *Parratt.* *See Copeland,* 57 F.3d at 480.

Accordingly, I deny plaintiff's request to amend his complaint to include a procedural due process claim because such a claim would be futile. Plaintiff has failed to establish the existence of a property interest in the acquisition of the Brother 9000 word processor. Moreover, plaintiff's procedural due process claim is barred under the doctrine of *Parratt,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420.

## CONCLUSION

For the foregoing reasons, I accept the magistrate judge's R & R with certain modifications and additions. Defendants' motion to dismiss and/or for summary judgment is **GRANTED.**

John DOE, Richard Roe, and
Paul Poe, Plaintiffs,

v.

Frank J. KELLEY, in his capacity as Attorney General of Michigan, Col. Michael D. Robinson, in his capacity as Director of the Michigan State Police, William Hegarty, in his capacity of Chief of the Grand Rapids, Michigan, Police Department, Walt Sprenger, in his capacity as Chief of the Walker, Michigan, Police Department, Robert W. Smith, in his capacity as Chief of the Sparta, Michigan, Police Department, John Porter, in his capacity as Chief of the Rockford, Michigan, Police Department, Robert Carter, in his capacity as Sheriff of Muskegon County, Marvin Weinrick, in his capacity as Chief of the

Cedar Springs, Michigan, Police Department, Gary Rosema, in his capacity as Chief of the Ottawa County Sheriff's Department and James Dougan, in his capacity as Sheriff of Kent County, Michigan, Defendants.

No. 1:97–CV–203.

United States District Court,
W.D. Michigan,
Southern Division.

March 28, 1997.

Frank E. Stanley, Frank Stanley, P.C., Grand Rapids, MI, for Plaintiffs.

Margaret A. Nelson, Asst. Atty Gen., Lansing, MI, for Defendants Kelley & Robinson.

G. Douglas Walton, Deputy City Atty., Grand Rapids, MI, for Defendant Hegerty.

Teresa S. Decker, Varnum Riddering Schmidt & Howlett, Grand Rapids, MI, for Defendant Sprenger.

Scott G. Smith, Law, Weathers & Richardson, Grand Rapids, MI, for Defendants Smith & Weinrick.

Joseph A. Fink, Dickinson Wright Moon VanDusen, Lansing, MI, for Defendant Porter.

Stephen C. Corwin, Williams Hughes Corwin & Sininger, L.L.P., Muskegon, MI, for Defendant Carter.

Gregory J. Rappleye, Ottawa County Prosecuting Attorney's Office, Grand Haven, MI, for Defendant Rosema.

## OPINION OF THE COURT ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

McKEAGUE, District Judge.

This case presents constitutional challenges to a recent amendment to Michigan's Sex Offenders Registration Act ("Act"), M.C.L. § 28.721 *et seq.* The Act is Michigan's version of "Megan's Law." Since 1994, every state in the Union has enacted a similar law requiring registration of certain sex

offenders. In 1994, seven-year old Megan Kanka was abducted, molested and strangled near her home in New Jersey. The accused perpetrator was a twice-convicted sex offender, who lived in the neighborhood. The Kanka family and others in the neighborhood had been unaware of the accused's prior history. Legislatures have responded quickly in an attempt to offer protection to the public through sex offender registration laws.

The subject amendment will go into effect on April 1, 1997. It provides public accessibility to information about persons convicted of certain sex offenses. Plaintiffs are three unidentified persons who have been convicted of such offenses and have complied with the registration requirements of the Act. If the amendment goes into effect on April 1, 1997, each plaintiff's name and any alias, address, physical description, birth date and sexual offense of which he has been convicted will be available for inspection upon request at the local state police post, local law enforcement agency or sheriff's department having jurisdiction over the zip code area in which the respective plaintiff resides. In a complaint filed on March 19, 1997, plaintiffs ask the Court under 42 U.S.C. § 1983 to declare retroactive application of the "notification provisions" of the amendment unconstitutional on several grounds, and to enjoin the same. Plaintiffs contend the amendment as applied to them, (1) violates the Ex Post Facto Clause, (2) violates the Double Jeopardy Clause, (3) deprives them of liberty or property without due process, (4) violates their rights to privacy, (5) constitutes cruel and unusual punishment, and (6) constitutes an unlawful bill of attainder. Now before the Court are plaintiffs' motions for leave to proceed anonymously and for preliminary injunction. The Court conducted a hearing on the motions on March 27, 1997, and now issues its ruling.

## I

Plaintiffs have identified themselves simply as John Doe, Richard Roe and Paul Poe. They seek leave to proceed anonymously because disclosure of their identities in this action will allegedly result in the very harm they are trying to prevent through this action.

There are recognized exceptions to the general requirement of Fed.R.Civ.P. 10(a) that a complaint include the names of all parties. See *Rowe v. Burton,* 884 F.Supp. 1372, 1385–87 (D.Alaska 1994). In order to determine the appropriateness of such exceptional treatment, the Court is required to inquire into the particular circumstances of the case. *James v. Jacobson,* 6 F.3d 233, 238 (4th Cir.1993). On the present record, it is impossible to determine whether plaintiffs' interests warrant leave to proceed anonymously. At the hearing, plaintiffs' counsel offered to provide additional personal information pursuant to a suitable protective order. Accordingly, the Court will require counsel for all parties to collaborate in the preparation of a proposed protective order which shall govern use of personal information to be made available to the Court and defendants in support of plaintiffs' motion. The attendant requirements are set forth in the order accompanying this opinion. In the meantime, plaintiffs' motion for leave to proceed anonymously is taken under advisement.

## II

Plaintiffs' motion for preliminary injunction is evaluated under standards well-settled in the Sixth Circuit. The matter is committed to the Court's discretion based on consideration of four factors:

(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of extraordinary relief; (3.) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

*Dayton Area Visually Impaired Persons v. Fisher,* 70 F.3d 1474, 1480 (6th Cir.1995), quoting *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994). These are factors to be balanced, not prerequisites that must be met. *Id.* Thus, the degree of likelihood of success required to support the grant of a prelimi-

nary injunction depends on the strength of the other factors. *Id.*

### III

■ The parties agree that assessment of plaintiffs' likelihood of success on the merits of four of their claims—the ex post facto, double jeopardy, cruel and unusual punishment, and bill of attainder theories—essentially devolves into a determination of one question: whether retroactive application of the notification provisions constitutes "punishment." In the criminal justice context, punishment, generally, is the deliberate imposition, by some agency of the state, of some measure intended to chastise, deter or discipline an offender. *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991). However, no universal test for determining whether state action constitutes punishment applies to all of these four constitutional theories. See *United States v. Ursery,* —— U.S. ——, —— – ——, 116 S.Ct. 2135, 2144–49, 135 L.Ed.2d 549 (1996). Yet, for purposes of the present motion, the parties agree, it is appropriate to employ the analytical approach set forth in *Doe v. Pataki,* 940 F.Supp. 603 (S.D.N.Y. 1996). That is, determining whether government action is punishment requires consideration of the totality of circumstances, and particularly (1) legislative intent, (2) design of the legislation, (3) historical treatment of analogous measures, and (4) effects of the legislation. *Id.* at 620; see also *W.P. v. Poritz,* 931 F.Supp. 1199, 1209 (D.N.J.1996) (employing similar approach).

### A. Legislative Intent

■ In contrast with other cases dealing with retroactive application of similar sex offender notification schemes in other states, the present record is devoid of evidence of legislative intent. See e.g., *Doe v. Weld,* 954 F.Supp. 425, 429 (D.Mass.1996); *Doe v. Pataki,* 940 F.Supp. at 621–23; *W.P. v. Poritz,*

931 F.Supp. at 1213. While these courts generally acknowledge that the official purpose of such notification provisions is regulatory or remedial—allowing public access to information so as to better enable prevention of and protection from future predatory offenses—in *Doe v. Pataki,* the New York Assembly debate minutes were deemed strong evidence of punitive intent. Here, on the other hand, based on the present record, what can be known of the Michigan Legislature's intent must be discerned from the design of the amendment.

### B. Design

The subject amendment of the Michigan Sex' Offenders Registration Act requires the Department of State Police ("department") to maintain a computerized data base consisting of a compilation of individuals registered under the Act. M.C.L. § 28.728. Individuals required to be registered are individuals domiciled or temporarily residing in Michigan who have been convicted of any of the "listed offenses" since October 1, 1995, and are incarcerated or on probation or parole for such offense; or were so convicted prior to October 1, 1995, but were incarcerated or on probation or parole for such offense on October 1, 1995. The listed offenses:

— accosting, enticing or soliciting a child for immoral purposes, M.C.L. § 750.145a;

— accosting, enticing or soliciting a child for immoral purposes, second offense, M.C.L. § 750.145b;

— child pornography production, distribution, promotion and possession offenses, M.C.L. § 750.145c;

— disorderly person (indecent or obscene conduct in public place), third or subsequent violation, M.C.L. § 750.167(1)(f);[1]

— indecent exposure, third or subsequent violation, M.C.L. § 750.335a;

---

1. The Court notes a facial ambiguity in the language of § 2(d)(ii)(A) of the Sex Offender Registration Act, M.C.L. § 28.722(d)(ii)(A). It is not immediately clear whether the Legislature intended to include all types of disorderly person offenses under M.C.L. § 750.167 as listed offenses or only that defined at M.C.L.

§ 750.167(1)(f) as indecent or obscene conduct in a public place. Defendant Frank J. Kelley, Attorney General, argues for the latter construction, which the Court concludes, with due regard for the regulatory scheme established by the Act, is the only sensible construction.

— third or subsequent violation of a corresponding local ordinance prohibiting indecent exposure or indecent or obscene conduct in a public place;

— pandering (enticing female to become prostitute), M.C.L. § 750.455;

— first degree criminal sexual conduct, M.C.L. § 750.520b;

— second degree criminal sexual conduct, M.C.L. § 750.520c;

— third degree criminal sexual conduct, M.C.L. § 750.520d;

— fourth degree criminal sexual conduct, M.C.L. § 750.520e; assault with intent to commit criminal sexual conduct, M.C.L. § 750.520g;

— attempt or conspiracy to commit any of the above offenses;

— an offense substantially similar to any of the above described offenses under a law of the United States, any state or any country.

M.C.L. § 750.722(d).

The department is required to index the compiled information numerically by zip code area. Within each zip code area, the compilation must contain the name and aliases, address, physical description, birth date and listed offense of every registered person who resides in that zip code area. M.C.L. § 28.728(2). The department is required to provide this compilation to every department post, local law enforcement agency and sheriff's department in the state, each of which is, in turn, required to make information from the compilation for zip code areas located within its jurisdiction available for public inspection during regular business hours. M.C.L. § 28.730(2). The department is also authorized to make the compilation available to the public through electronic, computerized or other accessible means. M.C.L. § 28.730(3).

On its face, the notification scheme is purely regulatory or remedial. It imposes no requirement on the registered offender, inflicts no suffering, disability or restraint. It does nothing more than create a mechanism for easier public access to compiled information that is otherwise available to the public only through arduous research in criminal court files. If the expressed legislative purpose precipitating enactment of similar laws in other states is any guide, the Michigan Legislature, too, sought to make information available to the citizenry concerning persons residing in their communities who have engaged in sexually predatory conduct and who, by virtue of relatively high recidivism rates among such offenders, are recognized to be resistant to reformation and deemed to pose potential danger of repeat misconduct. See *Doe v. Weld*, at 429 (notification provisions designed to enable members of the public to protect themselves from danger of repeat sex offenses); *Doe v. Pataki*, 940 F.Supp. at 621 (notification provisions based on perceived danger of recidivism posed by sex offenders and public need for protection); *Roe v. Office of Adult Probation*, 938 F.Supp. 1080, 1085 (D.Conn.1996) (same); *W.P. v. Poritz*, 931 F.Supp. at 1212–13 (same) The information is made available to members of the public so that they might modify their behavior in appropriate and lawful ways to protect themselves and prevent crime. *Id.*

Plaintiffs argue that even assuming these notification provisions were enacted for ostensibly regulatory or remedial purposes, the overbreadth of the above scheme indicates a punitive intent as well. The scheme is said to be overbroad in two ways. First, the compilation made available to the public includes all registered offenders irrespective of the seriousness of the convicted offense and of the risk of recidivism. Second, disclosure of the compiled information is unregulated, permitting inspection by any member of the public irrespective of need to know or risk of harm.

In *W.P. v. Poritz*, 931 F.Supp. at 1212–13, 1217, the court observed in evaluating New Jersey's "Megan's Law," that it includes notification limitations, so that only more serious offenders are included and unnecessary dissemination is minimized. The court concluded this careful tailoring of the notification provisions confirmed that they were not punitive, but were designed to narrowly serve the perceived need, protection. In *Doe v. Pataki*, 940 F.Supp. at 623, the court considered a broader notification scheme and, re-

versing the above reasoning from *W.P. v. Poritz,* surmised that the less narrowly tailored New York notification provisions evidenced punitive intent.

Plaintiffs here rely heavily on this *Pataki* reversal of the *Poritz* reasoning. Yet, the obverse does not *necessarily* follow. In *Pataki,* the court's reasoning may in fact have been justified because it was fundamentally premised upon abundant evidence, in flagrant legislative floor comments, of punitive subjective intent. Here, there is no such evidence. The Michigan scheme is undisputably simpler and broader than those considered in both of the above cases. Yet, even when pressed, plaintiffs have been unable to identify a single reason why the alleged overbreadth of the Michigan notification provisions should rationally be deemed to suggest a punitive purpose, as opposed to what it plainly appears to be, simply a broad protective purpose.

Though broad, the Michigan scheme cannot be said not to be rationally related to its presumed purpose. It permits identification of persons in the community who have been convicted of a serious sexual offense at least once, as well as those who have been convicted of a less serious sexual offense three or more times. With respect to the former category of offender, the perceived risk of danger justifying notification is supported by growing evidence of relatively high recidivism rates recognized in the above caselaw. With respect to the latter category, the perceived risk is supported by the offender's own history of repetitive criminal conduct. The Court is in no position, based on the present record, to contest legislative judgment in this regard.

Moreover, even if the Court were to recognize that the notification provisions may serve as a deterrant to future criminal activity—a traditionally recognized punitive purpose—such a finding would not necessarily undermine the scheme's primary regulatory or remedial purpose. See *Poritz,* 931 F.Supp. at 1214, *citing Ursery,* —— U.S. at ——, 116 S.Ct. at 2149, and *Artway v. Attorney General,* 81 F.3d 1235, 1263 (3rd Cir. 1996), (an incidental or complementary deterrent purpose does not render remedial

scheme punitive); *Roe v. Adult Probation,* 938 F.Supp. at 1089–90, citing *United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1901–02, 104 L.Ed.2d 487 (1989), (remedial sanction will only be held punitive if it can only be explained as also serving either retributive or deterrent purposes).

In sum, the Court finds nothing in the challenged amendment's design that indicates punitive purpose.

## C. Historical Treatment

Consistent with the court's opinion in *Pataki,* 940 F.Supp. at 624–26, plaintiffs argue the notification provisions are modern-day equivalents of branding, shaming or banishment. While it is certainly appropriate to consider the purposes for and manner of application of similar antecedent sanctions, *Pataki's* analysis of historical treatment is flawed, confused by comparison of perceived ultimate *effects,* rather than the state imposed sanctions themselves. In the analytic approach distilled in *Pataki* and here employed by this Court, effects are properly considered elsewhere. The "appropriate concern in a historical inquiry is the nature of the measure itself." *Artway,* 81 F.3d at 1257; *Poritz,* 931 F.Supp. at 1215.

As observed *supra,* the instant amendment does nothing more than provide for compilation of and public accessibility to information that is already a matter of public record. Unlike historical uses of branding, shaming and banishment, the notification provisions do not affirmatively impose any suffering, restraint or obligation upon the offender. The notification provisions themselves do not touch the offender at all. While branding, shaming and banishment certainly impose punishment, providing public access to public information does not. See *Poritz,* 931 F.Supp. at 1216–17. And while public notification may ultimately result in opprobrium and ostracism similar to those caused by these historical sanctions, such effects are clearly not so inevitable as to be deemed to have been imposed by the law itself. *Id.*

This Court agrees with the *Poritz* assessment that the subject notification scheme has no identical historical antecedent. 931

F.Supp. at 1215. Perhaps the best, though imperfect, analogue is a governmental warning of the presence of dangerous persons. However, warnings have not been understood as imposing punishment. *Id.* at 1217.

The Court thus remains unpersuaded that a historical analysis offers support for plaintiffs' contention that the amendment is punitive.

## D. Effects

Plaintiffs correctly argue the effects of a state imposed sanction should be considered in determining whether it serves a punitive purpose. In support of their present motion for preliminary injunctive relief, however, they offer no evidence of the real or likely effects *upon them* of public access to compiled information.[2] Instead, they rely almost exclusively on the recitation of examples of abuses of information in several states set forth in Pataki. 940 F.Supp. at 608–611. The Court does not question the accuracy of the reported experiences. Neither does the Court condone the harsh treatment that has been visited on some offenders. Yet, reference to these experiences is insufficient in the present context to materially support plaintiffs' claims for several reasons.

First, the anecdotal "evidence" does not speak directly to effects the present plaintiffs are likely to suffer. See *Doe v. Weld,* at 430 (noting failure of plaintiff, who has burden of proof, to show that disclosure will have "substantial, tangible punitive effects").

■ Second, the effects upon which plaintiffs rely—anecdotal evidence of others' experiences of harassment, assault, job loss, eviction and dislocation—are effects that proceed only indirectly from public access to information. This connection has been deemed strong enough by some courts. See *Pataki,* 940 F.Supp. at 626–28; *Roe v. Office of Adult Probation,* 938 F.Supp. at 1092–93. Yet, both of these courts paid lip service to recognition that the punitive nature of a sanction

should be measured by the legal consequences flowing from the sanction itself. See *Pataki,* 940 F.Supp. at 626–27 (discussion of effects requires consideration of whether *the Act* imposes an affirmative disability or restraint or increases punishment); *Adult Probation,* 938 F.Supp. at 1089 (focus is on legal consequences imposed *by the law* ). Both decisions also recognize that, to the extent a law results in "mere disadvantage" or "unpleasant consequences," its effects are not punitive. Yet, both decisions summarily attribute actions taken by independent members of the public in response to released information directly to the notification law.

This Court is unwilling to assign blame for such indirect consequences to the mere compilation and provision of public information under the notification amendment. There is a connection, to be sure. However, as indicated *supra,* punishment in the criminal justice context must be reviewed as the *deliberate imposition by the state* of some measure *intended* to chastise, deter or discipline. Actions taken by members of the public, lawful or not, can hardly be deemed dispositive of whether legislation's purpose is punishment. See *Poritz,* 931 F.Supp. at 1212–13 (misuses of information not to be equated with punishment).

Third, if the Court takes cognizance only of those potential actions of notice recipients that are lawful, the effects that may be visited on plaintiffs will generally be no more serious than many other sanctions previously held not to be punishment. *See Artway,* 81 F.3d at 1266 (listing cases); *Poritz,* 931 F.Supp. at 1218–19 (same).

Fourth, even if anecdotal evidence of potential actions by members of the public were considered effects likely to be visited on plaintiffs as a direct result of the notification provisions, such evidence would be insufficient, in light of the other discussed considerations, to persuade that any punitive effect

---

**2.** In a post-hearing letter from plaintiffs' counsel, he cites two voice mail messages received in his office last night in reaction to publicity of his representation of plaintiffs in this matter. He argues these communications are indicative of the sort of opprobrium to which his clients are

likely to be subjected. While such communications are disturbing, they are not so directly caused by the notification scheme as to be cognizable as evidence that the amendment is itself punitive for purposes of constitutional analysis.

overwhelms the primary and legitimate remedial purpose of the law.

For all the foregoing reasons, the Court remains unpersuaded that the subject amendment to Michigan's Sex Offenders Registration Act is punitive. Plaintiffs have thus filed to demonstrate a substantial likelihood of success on the merits of their ex post facto, double jeopardy, cruel and unusual punishment and bill of attainder claims.

## IV

The parties have paid considerably less attention in their briefing and arguments to plaintiffs' claims that implementation of the notification provision will violate their due process and privacy rights. The Court remains unpersuaded that plaintiffs have a substantial likelihood of success on the merits of either.

With respect to the due process claim, plaintiffs have failed to show that the amendment threatens to deprive them of any protected liberty or property interest. The amendment, again, does nothing more than compile truthful, public information and make it available. To the extent public use of such information may result in damage to plaintiffs' reputation or may destabilize their employment and other community relations, such effects are purely speculative on the present record and, in any event, would appear to flow most directly from plaintiffs' own convicted misconduct and from private citizens' reaction thereto, and only tangentially from state action.

With respect to the privacy rights claim, plaintiffs have failed to demonstrate the existence of a legitimate privacy interest in preventing compilation and dissemination of truthful information that is already, albeit less conveniently, a matter of public record.

## V

The Court having thus determined that plaintiffs have relatively little likelihood of success on the merits of their claims, their motion for preliminary injunction, to be granted, must be supported by strong showings that they would otherwise be subjected to irreparable harm, that an injunction would not cause substantial harm to others, and that the public interest would be advanced by issuance of the injunction. The required strong showing is lacking.

First, plaintiffs have presented practically no evidence that *they* are likely to imminently suffer irreparable harm as a result of implementation of the notification amendment. As explained *supra,* most of the harm they anticipate flows not from the notification provisions, but from their criminal past when exposed to public view in light of current information concerning sex offender recidivism rates.

Second, there is no evidence that issuance of an injunction would result in probability of harm to any identified third persons.

Third, issuance of an injunction that would frustrate legislative will, expressed in legislation that enjoys a presumption of constitutionality, can hardly be deemed to advance the public interest. On the contrary, it is undisputed that implementation of the notification provisions will enable members of the public to take legitimate and effective actions to protect themselves and prevent future crime.

## VI

In conclusion, the Court holds, in the exercise of its discretion, considering the totality of the circumstances presented in these necessarily expedited proceedings, that plaintiffs are not entitled to preliminary injunctive relief. An order consistent with this opinion shall issue forthwith.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

In accordance with the Court's written opinion of even date,

**IT IS HEREBY ORDERED** that plaintiffs' motion for a preliminary injunction restraining retroactive application of Michigan's amended Sex Offenders Registration Act's notification provisions is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs shall, in cooperation with defendants, fashion an appropriate protective order, under which personal information may be sub-

mitted to the Court in support of their motion for leave to proceed anonymously, and submit the same for the Court's approval not later than April 9, 1997. Upon approval and issuance of the protective order, the Court shall establish a supplemental briefing schedule respecting the motion for leave to proceed anonymously, which motion remains under advisement.

**TELXON CORPORATION, Plaintiff,**

v.

**SYMBOL TECHNOLOGIES, INC., Defendant.**

**No. 5:96 CV 1911.**

United States District Court, N.D. Ohio, Eastern Division.

Dec. 18, 1996.

---

Richard S. Mitchell, Robert A. Goodman, Sergio Anthony Carano, Goodman, Weiss, Miller, L.L.P., Cleveland, OH, for Plaintiff.

Hugh E. McKay, Porter, Wright, Morris & Arthur, Cleveland, OH, Philip S. Van Der Weele, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, OR, for Defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

Plaintiff Telxon Corporation ("Telxon") has filed a motion for preliminary injunction and an amended motion for preliminary injunction (Docket Nos. 3 and 40).[1] Defendant Symbol Technologies, Inc. ("Symbol") has opposed the motion, as amended. (Docket No. 64).[2]

On November 6, 1996, the Court conducted a hearing on the motion, as amended.[3] Following the hearing, the parties were directed to submit briefs on the issue of likelihood of success as it related to three of the six alleged false statements made by Symbol: (1) its product's compliance with IEEE 802.11; (2) the issue of an open system; and (3) the issue of interoperability. The Court also requested that counsel provide proposed findings of fact on the sole issue of likelihood

1. Other supporting documents filed by the plaintiff include Docket Nos. 68, 69 and 76.

2. Other supporting documents filed by the defendant include Docket Nos. 65, 66 and 67.

3. A transcript of the hearing has been filed. (Docket No. 77).

4. Telxon filed a motion (Docket No. 83) to strike portions of Symbol's post-hearing submissions, specifically Defendant's Supplemental Exhibits and Declarations in Opposition to Plaintiff's Motion for Preliminary Injunction (Docket No. 79), which document is referred to in Symbol's post-hearing memorandum (Docket No. 78) at pages 1–6, 9–12, 14, 15, 22, 25, 27–33, 35, 37 and 39–41. Telxon argues that the additional submissions go far beyond this Court's order of November 6, 1996.

of success. These documents have been filed. (Docket Nos. 78, 79, 81 and 84).[4] The motion is now ripe for determination.

### II. THE PARTIES' POSITIONS WITH RESPECT TO THE MOTION FOR PRELIMINARY INJUNCTION

This case arises out of allegedly false statements made by Symbol about the performance of products manufactured by both Telxon and Symbol for use in wireless computer networks.[5] Telxon asserts that Symbol's false and misleading statements violate the Lanham Act, § 43(a), 15 U.S.C. § 1125(a), and the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.02. The statements about which Telxon complains can be arranged into six general categories:

(1) Direct sequence is obsolete and not available under the IEEE 802.11 D4 standard.

(2) Symbol's frequency hopping network can be made compliant with IEEE 802.11 by a software upgrade.

(3) Telxon will not be able to deliver frequency hopping networks for six to twelve months.

(4) Symbol's frequency hopping products are interoperable.

(5) Symbol's frequency hopping network is compliant with the IEEE 802.11 specifications.

(6) Symbol's frequency hopping network is an open system.

Symbol has not only opposed the motion, it has filed its own "Precautionary Motion" (Docket No. 85) for leave to file the supplemental exhibits and declarations contained in Docket No. 79.

The Court has addressed these two motions (Docket Nos. 83 and 85) in a separate order wherein it granted Telxon's motion and denied Symbol's. Therefore, Docket No. 79 has not been considered in the resolution of the motion for preliminary injunction, nor has any argument relating solely to the exhibits and/or declarations contained in Docket No. 79.

5. In essence, these are computer networks that communicate (or "talk") through radio airwaves instead of wires. Telxon's product is known as ARLAN 3000; Symbol's product is the Spectrum24 ™.

Telxon seeks an order enjoining Symbol from making these statements.

## III. DISCUSSION

### (Including Findings of Fact and Conclusions of Law)

### A. Standard for Granting a Preliminary Injunction

There is a well-established test for determining whether to grant a preliminary injunction. It requires the court to weigh and balance four factors:

1) Whether the [movant has] shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the [movant has] shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). These criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1984) (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982)). They are "factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

### B. Findings of Fact

#### General Background

1. Telxon designs, manufactures, integrates and markets wireless and mobile transaction systems and solutions.

2. Telxon's portable tele-transaction computers ("PTCs") and its wireless local area network ("LAN") systems are integrated with customer-specific enterprise computer systems and third-party wide area networks ("WANs"), enabling mobile workers to process data on a real time basis at the point of transaction.

3. Customers of Telxon's systems gather, process, store and communicate data between their centralized management information systems and remote or mobile employees who collect the data or process transactions in batch or on-line mode.

4. Telxon competes head-to-head with Symbol for the sale of wireless networks. *See* Exhibit X.[6]

5. Telxon and Symbol have about 60 percent of the market for wireless computer networks. *See* Hearing Transcript, p. 36.

6. The products at issue in this litigation are Telxon's and Symbol's wireless computer networks.[7]

7. In essence, these are computer networks that communicate or "talk" through radio airwaves instead of wires.

8. Symbol's frequency hopping wireless network is known as Spectrum 24.

9. Frederick P. Heiman ("Heiman") is Symbol's Executive Vice President and a member of its Board of Directors and he is Symbol's primary spokesperson and deponent in this controversy.

#### Wireless Networks

10. The components of a wireless network (including Spectrum 24) are access points, mobile units,[8] the radio cards that go inside of the mobile unit, and

---

6. The references to *"See* Exhibit" followed by a *letter* refer to Exhibits to plaintiff Telxon Corporation's supplemental brief in support of its motion for preliminary injunction. References to *"See* Exhibit" followed by a *number* refer to exhibits submitted by defendant Symbol Technologies, Inc. in opposition to plaintiff's motion for preliminary injunction.

7. Wireless computer networks are also referred to as wireless local area networks or wireless LANs.

8. Mobile units are also referred to as terminals. "An example of a mobile unit is a hand-held computer ... with a radio in it." Heiman Declaration, p. 2. At the preliminary injunction hearing, the mobile unit used for demonstration purposes by Telxon's counsel was a Telxon hand-held computer.

software. *See* Exhibit F, Heiman Deposition, pp. 61–62; Exhibit A, Mathias Affidavit, ¶¶ 34–35; Heiman Declaration, p. 2.

11. A diagram of a wireless network is attached. *See* Appendix 1.[9]

12. The individual user holds the mobile unit.

13. There is no physical wire going from the mobile unit to the rest of the network.

14. The access point (as pictured in the diagram) is attached to the network by a wire.

15. The mobile unit has a radio in it.

16. The radio in the mobile unit communicates or "talks" to an access point.

17. This communication through the air (as opposed to over a wire) from the mobile unit to the access point is referred to as the "airwave communication."

18. The communication received by the access point from the mobile unit is then transmitted through the wired portion of the network back to the host or server.

19. The host stores the information for use by others on the network. *See* Exhibit A, Mathias Affidavit, ¶¶ 34–36; *see also* Hearing Transcript, pp. 27–30.

20. As the person holding the mobile unit (in the diagram) moves from one circle (referred to as a "microcell") to another, the mobile unit changes the access point that it communicates with.

21. That is, the mobile unit wireless connection is handed off from one microcell to another.

22. The movement from one microcell to another is called "roaming."

23. The access points communicate or "talk" with each other.

24. The communication between access points is separate and distinct from the airwave communication that takes place between an access point and a mobile unit. *See* Exhibit A, Mathias Affidavit, ¶¶ 34–38.[10]

25. Avis is a real life example of a Telxon wireless network.

26. In the Avis application, a customer is greeted by an Avis employee when the customer exits the rental car.

27. The Avis employee is holding a mobile unit that instantly provides a receipt to the customer.

28. The mobile unit instantly transmits information through radio waves (the airwave communication) to access points.

29. As to Avis,[11] the access points take that information and send it to the host computer located in New Jersey. *See* Hearing Transcript, p. 31.

*Standards and the Institute of Electrical and Electronic Engineers.*

30. A "standard" is a model or blueprint that is established by a recognized group or authority for the design of a computer product.

31. By definition, the *standard* places the design in the public domain so that any vendor (*e.g.*, Telxon or Symbol) can design its products to comply with the *standard*.

32. When a *standard* does not exist, vendors develop their own proprietary or customized computer product.

33. The design for such proprietary products is not published in the public domain and remains confidential to a specific vendor. *See* Exhibit A, Mathias Affidavit, ¶¶ 11–13.

**9.** This diagram was attached to the Mathias Affidavit as Exhibit 3.

**10.** In his Declaration, Heiman correctly states that wireless networks are similar in concept to cellular telephone networks. "The relevant difference between the two is the size of the territory covered. A cellular telephone network may cover an entire city or more, whereas a wireless LAN typically covers only a single establishment like a supermarket or department store." *See* Heiman Declaration, p. 2.

**11.** During the hearing, the Court made reference to its recent experience in returning a rented car wherein a hand-held portable tele-transaction computer was apparently used to provide the Court, almost instantaneously, a printout of the bill for the rental car.

34. The Institute of Electrical and Electronic Engineers ("IEEE") is a world-wide technical professional society devoted to advancing the theory and application of electrical engineering, electronics and computer science.

35. One of the functions of the Institute is to develop standards.

36. IEEE 802.11 is the proposed standard that is being developed for wireless networks.

37. The draft standard contains specifications for two types of radios: frequency hopping and direct sequence. See Exhibit A, Mathias Affidavit, ¶¶ 20–31; Exhibit B, Salem Affidavit, ¶ 2.

38. The proposed IEEE 802.11 standard tells a vendor how to build the radio contained in a mobile unit so that the radio can communicate with an access point.

39. This process has been previously described above (*See* FF 17; *see also* FF 11–19) as the "airwave communication." *See* Exhibit A, Mathias Affidavit, ¶¶ 35–36; Heiman Declaration, pp. 3, 15–17.

40. The proposed IEEE 802.11 standard does not tell a vendor how to build its products so that access points can communicate with each other.

41. The communication between access points is not addressed.

42. The communication between access points will remain proprietary to each vendor unless and until an additional and separate standard is developed for that purpose. *See* Exhibit A, Mathias Affidavit, ¶¶ 10(e), 35–36; Exhibit F, Heiman Deposition, pp. 92, 142; Heiman Declaration, pp. 16–17.

43. There is no dispute that the IEEE 802.11 standard is still a proposed draft, and it has not been completed.[12]

44. IEEE 802.11 is still subject to "technical changes."

45. For a standard to be approved, it must go through "a rigorous review and approval process."

46. This process includes many interim levels of review before the draft becomes final.

47. Draft 5 is the current draft of IEEE 802.11.

48. The cover page for the standard (dated July 19, 1996) states in bold print: **"Do not claim compliance to this unapproved draft standard."** (Emphasis in original.)

49. The title page continues: "This is an unapproved IEEE Standard Draft subject to change." *See* Exhibit V; Exhibit A, Mathias Affidavit, ¶ 29.

50. Draft 4 contains the same admonition as Draft 5. *See* Exhibit A, Mathias Affidavit, ¶ 29.

*An Open System*

51. A computer product is considered an open system when it is *built to a published standard*, such as IEEE. *See* Exhibit A, Mathias Affidavit, ¶ 18.

52. Telxon does not dispute Symbol's definition and description of an open system.

53. These definitions are consistently found in Symbol's sales literature and in the testimony of Heiman:

The simplest and most general definition of an open system is one where multiple vendors using multiple protocols[13] can communicate with each other. *In other words. an open system is vendor-independent and designed to interconnect with a variety or products.* [Emphasis added.]

*See* Exhibit CC, Symbol's Spectrum 24 Sales Kit.

An open system is one in which a third-party terminal can operate on the Symbol network. Then *the Symbol network would be open if a third-party terminal*

---

12. Andrew Salem ("Salem"), the Managing Director of Standard Activities for the IEEE, testified that IEEE 802.11 has not been completed.

13. A protocol is a set of rules for communication between computers. Without these rules, computers are not able to understand each other. *See* Exhibit H, Symbol's Answer to First Amended Complaint, ¶ 12.

made by another manufacturer can communicate with that network. [Emphasis added.]

See Exhibit F, Heiman Deposition, p. 53; Hearing Transcript, p. 43. (See also Hearing Transcript p. 50 where Heiman states that this definition is correct.)

If a Telxon terminal with a Telxon manufactured radio card could communicate to a Symbol ... access point over the airwaves, that would deem it as an open network.

See Exhibit 50, Heiman Deposition, p. 54.

54. A computer product or network is not an open system when it is proprietary. See Exhibit A, Mathias Affidavit, ¶ 18.

55. "Proprietary is generally regarded in the industry as the opposite of open." See Heiman Declaration, p. 31.

56. Having an open system "means that third parties can develop products that can 'interoperate' with the system in question...." See Heiman Declaration, p. 28 at n. 1.

57. A computer product that is built to a standard is considered an open system.

58. An open system may provide the ground work for interoperability (defined below at FF 59ff); whereas, a proprietary (or closed) system will not be interoperable.

*The Interoperable Computer Products.*

59. If a customer can substitute one vendor's computer product with the product of another vendor, then those products are "interoperable."

60. This concept has been referred to as the ability to "plug and play" different vendors' products. See Exhibit AA (Heiman defining "interoperable" in a magazine article).

61. By contrast, if there is no interoperability, then all of the products must be purchased from a single vendor. See Exhibit A, Mathias Affidavit, ¶ 16.

62. Telxon does not dispute the definition of "airwaves interoperability" set forth in Heiman's Declaration:

Airwaves interoperability refers to communication over the airwaves between mobile units and access points. Airwaves interoperability means that if Manufacturer A's access points comply with the IEEE 802.11 standard, then mobile units manufactured by Manufacturer B but which also comply with the 802.11 standard have the ability to communicate with A's access points.

See Heiman Declaration, p. 3. See also Heiman Declaration, p. 16.

63. "Interoperability between access points" simply means that access points manufactured by different vendors can be used interchangeably in a computer network. See Heiman Declaration, p. 16; Exhibit A, Mathias Affidavit, ¶¶ 35–37.

64. Airwaves interoperability is a very important form of interoperability to wireless network users.[14]

*The Significance of Standards, Open Systems and Interoperability.*

65. Customers look to purchase computer products and networks that comply to a standard and are open and interoperable.

66. From the point of view of a customer, interoperability is important because it helps ensure the continued availability of products from a variety of sources; otherwise, a customer could be at risk in its ongoing ability to purchase products for its network. A customer that is limited to a single source risks the possibility that the vendor will go out of business or simply stop manufacturing the product. See Exhibit A, Mathias Affidavit, ¶ 17.

67. Interoperability is desired by customers and customers are more comfortable with a standard. See Exhibit F, Heiman Deposition, pp. 87–89.

---

**14.** Some people consider it the *most* important form of interoperability. See Heiman Declaration, p. 18.

68. In its Spectrum 24 Sales Kit, Symbol explains the significance of open systems architectures:

 Not too long ago, building an enterprise-wide network meant that you selected a single vendor and implemented that vendor's networking product line throughout your company. You are then tied to that vendor and that vendor's product line for the life of the application. Rewriting the application for a different vendor was just too costly. For this reason, multi-vendor interoperability and inter-networking is on the mind of every IS or IT manager and drives the open systems paradigm.

 *See* Exhibit CC.

*Symbol's False Claim of Compliance*

69. Symbol has announced to the world that its frequency hopping network, Spectrum 24, is compliant with or meets the IEEE 802.11 specifications by its two-page color advertisement that has been distributed throughout the world in the August–October 1996 time frame.[15] *See* Exhibit I.

70. After a brief introduction of Spectrum 24, the advertisement contains a bolded headline stating: Meets newly approved IEEE 802.11 specs.

71. Other sections of the advertisement refer to the "approved 802.11 spec" and declare IEEE 802.11 has been "newly endorsed." *See* Exhibit I.

72. Symbol *admits* that the statement "meets newly approved IEEE 802.11 specs" is false.[16]

73. Symbol is forced to make this admission because Spectrum 24 is *not* compliant with IEEE 802.11 D4 or D5, the current *draft* of the standard. *See* Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at Response Nos. 4 and 5.

74. After this case was filed, Heiman called Symbol's Vice President of Marketing and advised him that the headline was inaccurate and instructed him to modify the language. *See* Exhibit F, Heiman Deposition, pp. 118–119.

75. Symbol has now modified its advertisement: [17]

| Old Language | New Language |
|---|---|
| Meets newly approved IEEE 802.11 specs. | High performance, high throughput. |
| Newly endorsed. | Forthcoming. |
| Approved IEEE 802.11 spec | Forthcoming ... standard |

76. During the preliminary injunction hearing, Symbol conceded that the advertisement [Exhibit I] was a mistake.

77. Symbol further stated that it has not made any other claims of compliance.

78. This advertisement, however, was not the only time that Symbol has claimed compliance with IEEE 802.11.[18]

---

**15.** The advertisement appeared in the following magazines: WIRELESS FOR THE CORPORATE USER (July/August 1996); AUTO ID NEWS U.S. (September 1996); AUTO ID NEWS LATIN AMERICA (September 1996); AUTO ID NEWS EUROPE (September 1996); CHAIN STORE AGE EXEC. (September 1996); DATAMATION (World–Wide edition, September 1996); LAN MAGAZINE (October 1996); INTEROPERABILITY (October 1996). *See* Exhibit J, Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant Symbol Technologies, Inc. at Response No. 3.

**16.** *See* Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at Response No. 16.

**17.** *See* Exhibit J, Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant Symbol Technologies, Inc. at Response No. 4; Exhibit L; Exhibit M.

**18.** For example:

 (1) in his deposition, Heiman acknowledge that he has seen Symbol literature and presentations that improperly state that Symbol is compliant with IEEE 802.11. *See* Exhibit F. Heiman Deposition, pp. 96–97.

 (2) In a Symbol customer presentation chart comparing Telxon's wireless network to Symbol's Spectrum 24, the chart has a line item designated as "802.11 compatible." Next to the Telxon product it says "no" and next to the Symbol product it says "yes [compatible]." *See* Exhibit Q at D1140.

 (3) Symbol has sent letters to its customers or prospects claiming compliance: "The IEEE spec is in its final draft now. We are totally compliant with it." Symbol also makes a point of saying in this letter that Telxon is not compliant. *See* Exhibit O. Defendant's Response to Plaintiff's Second Request for Production of Documents at Response No. 19 permits a presumption that Symbol has sent

79. It is undisputed that Symbol has repeatedly represented that Spectrum 24 is compliant with IEEE 802.11 and its claims of compliance are false.

80. Symbol has been successful in confusing the public with respect to its claimed compliance with IEEE 802.11.

81. Various magazines and analysts have echoed Symbol's claims of compliance.[19]

82. It is clear that Symbol has been successful in making the public believe that it is compliant.

83. It is confusing and misleading to claim compliance to a draft standard because until the standard is finalized, it is subject to technical changes and no standard exists.[20]

84. The standard itself states: "This is an unapproved draft of a proposed IEEE Standard, subject to change.... Do not claim compliance to this unapproved draft standard." *See* Exhibit V.

85. In June 1995, Symbol spoke with IEEE about how to refer to the standard.

86. Symbol was told that it could not claim compliance. *See* Hearing Transcript, pp. 20–21.

87. IEEE has instructed Symbol to stop claiming compliance with the draft standard.

88. On October 27, 1995, IEEE sent a letter to Symbol stating that Symbol has been claiming compliance to the standard and that it should not "claim conformance to [the] IEEE standard."

89. The October 27, 1995 letter concludes: "We believe that it is in the best interest of your customers to ensure that references to IEEE documents provide accurate information on your product." *See* Exhibit D, Rowden Affidavit at Exhibit A. Symbol never responded to this letter. *See* Exhibit D, Rowden Affidavit.

90. At the preliminary injunction hearing, Heiman repeatedly stated that Symbol does "not want to claim compliance" and that it agrees that it "should not claim compliance." *See* Hearing Transcript, pp. 18–20.

*Symbol's False Claim of Open System.*

91. Symbol has announced that Spectrum 24 is an open system.[21]

---

countless similar letters to its customers or prospects. *See* Exhibit N.
(4) Heiman is responsible for making presentations to Symbol's "big customers." He uses slides and gives handouts to customers. *See* Exhibit F, Heiman Deposition, p. 33. His presentations include claims of compliance: "Conforms to open systems and IEEE 802.11 standard." *See* Exhibit P. Once again, during his deposition, Heiman noted that this "is an inaccurate statement." *See* Exhibit F, Heiman Deposition, p. 103. *See also* Exhibit Q.

**19.** For example:
(1) "It [Spectrum 24] is compliant with IEEE 802.11 standard." COMPUTER INDUSTRY UPDATE, July 1995. *See* Exhibit R.
(2) "The system [Spectrum 24] complies with the IEEE's 802.11 WLAN standard for open systems interoperability." AUTOMATIC ID NEWS, December 1995. *See* Exhibit
(3) "Symbol's Spectrum 24 wireless LAN is already in compliance with IEEE 802.11...." LEHMAN BROTHERS ANALYST REPORT, June 27, 1996. *See* Exhibit T.
(4) "Symbol ... already complies [with the IEEE standard]." FURMAN SELZ ANALYST REPORT, July 19, 1996. *See* Exhibit U.

**20.** *See* Exhibit A, Mathias Affidavit; Exhibit C, Salem Affidavit; Exhibit D, Rowden Affidavit.

**21.** Examples of Symbol's claim that Spectrum 24 is an open system are as follows:
(1) In the Symbol two-page advertisement that has been distributed around the world (*see* FF 69 above, Exhibit I), it contains the bolded headline: **Symbol's Open System Means a Riskless Investment.**
(2) "The Spectrum 24 Sales Kit contains a copy of ... slides used by Symbol sales people in competitive sales presentations.... (Exhibit 42, pp. 2, 3)." *See* Heiman Declaration, pp. 22–23. This slide prominently displays a circle-like emblem that contains the phrase: "Spectrum 24 Open Systems." *See* Exhibit 42.
(3) On most of Symbol's sales literature there is a circle-like emblem that contains the phrase: "Spectrum 24 Open Systems." *See* Exhibit DD.
(4) Symbol's customer presentations assert that Spectrum 24 "conforms to *open systems* and IEEE 802.11 standards." (Emphasis added.) *See* Exhibit Q at D1135.

92. Spectrum 24 is not an open system *by Symbol's own definition.* *See* FF 51–55 above.

93. Telxon does not dispute Symbol's definition.

94. Symbol's claim that Spectrum 24 is an open system is false.[22]

95. At the preliminary injunction hearing, Heiman restated that open "means in the industry that you can use third-party products ... not just products made by that manufacturer, to interface with it."[23] Hearing Transcript, p. 43.

96. Heiman also restated that "there is nothing open about" Spectrum 24 because the mobile unit is not going to work unless the access point is purchased from the same manufacturer. *See* Hearing Transcript, pp. 43–44.

97. At the preliminary injunction hearing, Heiman once again admitted that Spectrum 24 *is not an open wireless network.*[24]

98. The whole purpose of IEEE 802.11 is to develop a standard for airwave communications.

99. From a customer's point of view, this is the most important aspect of Spectrum 24.

100. No place in its advertising does Symbol disclose that Spectrum 24 is not open in the only important meaning of the term.

101. Symbol—by its own definition—admits that Spectrum 24 is proprietary in its airwaves communications.

102. Symbol admits that it is not an open system.

*Symbol's False Claim of Interoperability.*

103. Symbol has announced that compliance with IEEE 802.11 will result in interoperability of its frequency hopping products with other vendors that are compliant with the standard.

104. Telxon has established that Symbol is making false claims regarding interoperability as follows: (a) by claiming that IEEE 802.11 is an interoperability standard; (b) by claiming that compliance with the final IEEE 802.11 standard will result in airwaves interoperability; and (c) by claiming that compliance with the final IEEE 802.11 standard will result in access point interoperability.

105. The standard has not been finalized.

106. There can be no interoperability based on a non-existent standard. *See* Exhibit A, Mathias Affidavit.

107. Even after the standard is finalized, compliance with it will not result in interoperability. *See* Exhibit A, Mathias Affidavit, ¶¶ 10(d), 32, 33.

108. Compliant vendors will need to work together before interoperability can be achieved.

109. Without this step, there will be no interoperability among vendors.

110. In addition, interoperability testing must take place among vendors before they can claim interoperability.

111. The methodology for such interoperability testing has not been written. *See* Exhibit A, Mathias Affidavit, ¶ 25.

112. IEEE 802.11 is not designed to provide full interoperability of a wireless network.

---

**22.** *See, e.g.,* Exhibit F, Heiman Deposition, pp. 62–65. *See also* Heiman Declaration, p. 31; Exhibit A, Mathias Affidavit; Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at 15.

**23.** "Interface" refers to how two computer components exchange information. *See* Exhibit A, Mathias Affidavit, ¶ 11.

**24.** "The only point in this whole network that we don't conform to is the wireless part." Hearing Transcript, p. 49. Symbol argues that Spectrum 24 is partially open because it is open at interfaces that are unrelated to the wireless network. Symbol, however, does not advertise that it is partially open. In any event, that argument must fail because Symbol is not open by its own definition in the only relevant aspect of a wireless network.

113. IEEE 802.11 only provides a proposed standard for communication between a mobile unit and access points.

114. IEEE 802.11 does not contain any specifications for communicating between access points.

115. Because there is no standard for communications between access points, there cannot be interoperability between access points.[25]

116. In light of the above findings, Symbol's claims of interoperability are false.

*Injury to Telxon.*

117. Symbol's continued claims of compliance, open systems and interoperability will lead consumers to believe that Symbol has a product that is competitively superior to Telxon's similar products.

118. The IEEE has told Symbol not to claim compliance because it "wants to protect the consumers from receiving false, misleading or confusing information...." *See* Exhibit D, Rowden Affidavit, ¶ 12.

119. Because of the complexity of these products, customers look to purchase computer products and networks that comply to a standard.

120. Customers will often times delay purchasing decisions until a standard has been developed. See Exhibit A, Mathias Affidavit, § 12–13.

121. Symbol's advertising campaign is geared towards making customers and prospects believe that they no longer need to delay their purchasing decisions because, as Symbol falsely claims, Spectrum 24 *is compliant, open* and *interoperable.*

122. Those statements are false on their face.

123. Telxon and Symbol compete head-to-head in the same market, and it is quite likely that Symbol's assertions of competitive superiority, if permitted to continue, will result in lost sales to Telxon.

### C. Applicable Law

The Lanham Act, 15 U.S.C. § 1125(a)(1)(B), provides in relevant part:

(a) Civil action; any person

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

\* \* \* \* \* \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Under the Lanham Act, injunctive relief is appropriate. *See* 15 U.S.C. § 1116(a).

### D. Conclusions of Law

#### 1. Likelihood of Success on the Merits

■ The Sixth Circuit has not addressed the elements necessary to prove a Lanham Act claim. However, as pointed out by another Judge of this Court, recent case law establishes that the following must be shown in order to prevail:

(1) the advertisements at issue are false or misleading and the advertisements actually deceived or had the tendency to deceive a substantial segment of the audience,

(2) the deceptive or misleading portions of the advertisement were material, in other words they were likely to influence the purchasing decision,

(3) defendant caused the advertised goods to enter interstate commerce, and

(4) plaintiff has been or is likely to be injured either by direct diversion of sales from itself to defendant or by lessening the goodwill or acceptability its products enjoy with the buying public.

---

**25.** *See* Exhibit F, Heiman Deposition, pp. 92, 142; Exhibit A, Mathias Affidavit, ¶ 10(c).

*Hobart Corp. v. Welbilt Corp.,* 1989 WL 449696 (Oct. 4, 1989 N.D.Ohio) (quoting *Alpo Petfoods, Inc. v. Ralston Purina Co.,* 720 F.Supp. 194, 213 (D.D.C.1989) (citing *Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974)); *U–Haul Int'l. Inc. v. Jartran, Inc.,* 522 F.Supp. 1238, 1243 (D.Ariz. 1981), *aff'd,* 681 F.2d 1159 (9th Cir.1982)).

The case law makes clear that liability under the Lanham Act is not limited solely to descriptions which are literally false. "[A] mere showing that advertisements tend to create a false impression is sufficient to warrant injunctive relief." *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 647 (6th Cir.1982) (citing *Walker–Davis Publications, Inc. v. Penton/IPC, Inc.,* 509 F.Supp. 430, 435 (E.D.Pa.1981)). However, "[o]nce a challenged claim has been found 'actually false, relief can be granted on the court's own.findings without reference to the reaction of the buyer or consumer of the product." ' *Alpo Petfoods, Inc. v. Ralston Purina Co.,* 720 F.Supp. at 214 (quoting *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 272 (2d Cir.1987)). *See also McNeilab, Inc. v. American Home Prods. Corp.,* 501 F.Supp. 517, 543 (S.D.N.Y. 1980) ("it is immaterial what consumers find the message of the advertisement to be, and proof of consumer perception is therefore unnecessary").[26]

It is clear to this Court, in light of the findings of fact set forth above, that Telxon has a strong likelihood of success on the merits of its Lanham Act claims against Symbol. As a result this element of the analysis weighs heavily in favor of granting a preliminary injunction.

### 2. Irreparable Injury

The Second Circuit has noted that once the falsity of statements has been established, irreparable harm should be presumed:

A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.... In that context, we recently confirmed that irreparable harm will be presumed.

*McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988).

Because Symbol's representations about its product are either false or misleading, irreparable harm to Telxon may be presumed. Therefore, this factor weighs in favor of granting a preliminary injunction.

### 3. Injury to Others and the Public Interest

It is clear to this Court that the public should be protected from false and misleading statements. Requiring Symbol to stop making such statements will do no harm to Symbol. On the other hand the public will benefit from the issuance of a preliminary injunction.

### IV. CONCLUSION

Having weighed the relevant factors in light of the record evidence, the Court concludes that Telxon is entitled to a preliminary injunction. Accordingly, Telxon's motion for preliminary injunction, as amended (Docket Nos. 3 and 4) is granted.

### V. PRELIMINARY INJUNCTION

For the reasons set forth above, the Court will publish a separate judgment entry GRANTING the plaintiff a preliminary injunction enjoining the defendant Symbol Technologies, Inc. as follows:

A. from making statements (expressly or in substance) that Spectrum 24 is compliant, meets, conforms or is compatible with the IEEE 802.11 standard or draft standard.

---

**26.** The Ninth Circuit has recognized:

It is not easy to establish actual consumer deception through direct evidence. The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived. He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded.

*U-Haul Internat'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041(9th Cir.1986).

B. from making statements (expressly or in substance) that Spectrum 24 is an open system.

C. from making statements (expressly or in substance) that: (1) IEEE 802.11 is a standard for interoperability; (2) compliance with the IEEE 802.11 will result in interoperability; (3) Spectrum 24 is interoperable; and (4) IEEE 802.11 will provide interoperability between access points.

The Court's Order will further provide:

D. With respect to Paragraphs A and B above, the injunction shall expire as follows: (1) upon finalization of the IEEE 802.11 standard, and (2) written certification that Spectrum 24 is compliant to the final standard by an independent testing agency approved by IEEE 802.11 for testing compliance to the standard.

E. With respect to Paragraph C(*l*), C(2) and C(3) above, the injunction shall expire as follows: (1) upon satisfaction of Paragraph D above, and (2) additional written certification by an independent testing agency approved by IEEE 802.11 verifying that Spectrum 24 is airwave interoperable with other vendors' products.

F. With respect to Paragraph C(4) above, the injunction shall expire as follows: (1) upon completion of the drafting and finalization of a standard for inter-access point communication, (2) written certification that Spectrum 24 is compliant to the final standard for inter-access point communication by an independent testing agency approved for testing compliance to the standard, and (3) additional written certification by an independent testing agency approved for verifying that Spectrum 24 is access point interoperable with other vendors' products.

As an additional component of injunctive relief, the Court will order the defendant to issue a public retraction stating as follows:

1. That an injunction has been issued against Symbol for false and misleading advertising in the case styled *Telxon Corporation v. Symbol Technologies. Inc.,* U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 5:96 CV 1911.

2. Symbol has made false and misleading statements that Spectrum 24 (Symbol's frequency hopping network) is compliant with the IEEE 802.11 standard. The truth is that the IEEE 802.11 standard has not been finalized. Spectrum 24 is *not* compliant with the IEEE 802.11 draft standard.

3. Symbol has made false and misleading statements that Spectrum 24 is an open system. The truth is that Spectrum 24 is not an open system. Spectrum 24 is proprietary in its airwave communication. This means that if a customer purchases a Spectrum 24 network, the customer cannot use on that network mobile units containing radios that are manufactured by other vendors.

4. Symbol has made false and misleading statements that Spectrum 24 is interoperable. Interoperability is the ability of a customer to substitute one vendor's product with the product of another. The truth is that Spectrum 24 is not interoperable. In addition, once the standard is finalized, compliance with the standard will not result in interoperability. Vendors that are compliant with the standard will need to work together to achieve interoperability. If this is achieved, then there will be airwave interoperability. That is, a customer will be able to use on its network mobile units containing radios manufactured by multiple vendors. IEEE 802.11 does not contain specifications for communications between access points. As a result, finalization of the standard will not result in interoperability between access points.

The retraction shall be issued as follows: (1) by January 6, 1997, Symbol shall issue a press release containing the retraction; (2) by January 6, 1997, Symbol shall conduct a conference call inviting the same participants that were present at Symbol's conference call of June 25, 1996 and read the retraction; and (3) in the first available edition, Symbol shall publish the retraction in a full one page advertisement in each magazine where it published its advertisement (Exhibit I), including: WIRELESS FOR THE CORPO-

RATE USER; AUTO ID NEWS U.S.; AUTO ID NEWS LATIN AMERICA; AUTO ID NEWS EUROPE; CHAIN STORE AGE EXEC; DATAMATION; LAN MAGAZINE; and INTEROPERABILITY.

Symbol shall promptly file documents with the Court by January 8, 1997, showing compliance with this Order.

IT IS SO ORDERED.

APPENDIX 1

*JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED the plaintiff is granted a preliminary injunction against the defendant Symbol Technologies, Inc. whereby the defendant is enjoined as follows:

A. from making statements (expressly or in substance) that Spectrum 24 is compliant, meets, conforms or is compatible with the IEEE 802.11 standard or draft standard.

B. from making statements (expressly or in substance) that Spectrum 24 is an open system.

C. from making statements (expressly or in substance) that: (1) IEEE 802.11 is a standard for interoperability; (2) compliance with the IEEE 802.11 will result in interoperability; (3) Spectrum 24 is interoperable; and (4) IEEE 802.11 will provide interoperability between access points.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that:

D. With respect to Paragraphs A and B above, the injunction shall expire as follows: (1) upon finalization of the IEEE 802.11 standard, and (2) written certification that Spectrum 24 is compliant to the final standard by an independent testing agency approved by IEEE 802.11 for testing compliance to the standard.

E. With respect to Paragraph C(1), C(2) and C(3) above, the injunction shall expire as follows: (1) upon satisfaction of Paragraph D above, and (2) additional written certification by an independent testing agency approved by IEEE 802.11 verifying that Spectrum 24 is airwave interoperable with other vendors' products.

F. With respect to Paragraph C(4) above, the injunction shall expire as follows: (1) upon completion of the drafting and finalization of a standard for inter-access point communication, (2) written certification that Spectrum 24 is compliant to the final standard for inter-access point communication by an independent testing agency approved for testing compliance to the standard, and (3) additional written certification by an independent testing agency approved for verifying that Spectrum 24 is access point interoperable with other vendors' products.

IT IS FURTHER ORDERED, ADJUDGED and DECREED as an additional component of injunctive relief, that the defendant issue a public retraction stating as follows:

1. That an injunction has been issued against Symbol for false and misleading advertising in the case styled *Telxon Corporation v. Symbol Technologies. Inc.*, U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 5:96 CV 1911.

2. Symbol has made false and misleading statements that Spectrum 24 (Symbol's frequency hopping network) is compliant with the IEEE 802.11 standard. The truth is that the IEEE 802.11 standard has not been finalized. Spectrum 24 is *not* compliant with the IEEE 802.11 draft standard.

3. Symbol has made false and misleading statements that Spectrum 24 is an open system. The truth is that Spectrum 24 is not an open system. Spectrum 24 is proprietary in its airwave communication. This means that if a customer purchases a Spectrum 24 network, the customer cannot use on that network mobile units containing radios that are manufactured by other vendors.

4. Symbol has made false and misleading statements that Spectrum 24 is interoperable. Interoperability is the ability of a customer to substitute one vendor's product with the product of another. The truth is that Spectrum 24 is not interoperable. In addition, once the standard is finalized, compliance with the standard will not result in interoperability. Vendors that are compliant with the standard will need to work together to achieve interoperability. If this is achieved, then there will be airwave interoperability. That is, a customer will be able to use on its network mobile units containing radios manufactured by multiple vendors. IEEE 802.11

does not contain specifications for communications between access points. As a result, finalization of the standard will not result in interoperability between access points.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the retraction shall be issued as follows: (1) by January 6, 1997, Symbol shall issue a press release containing the retraction; (2) by January 6, 1997, Symbol shall conduct a conference call inviting the same participants that were present at Symbol's conference call of June 25, 1996 and read the retraction; and (3) in the first available edition, Symbol shall publish the retraction in a full one page advertisement in each magazine where it published its advertisement (Exhibit I), including: WIRELESS FOR THE CORPORATE USER; AUTO ID NEWS U.S.; AUTO ID NEWS LATIN AMERICA; AUTO ID NEWS EUROPE; CHAIN STORE AGE EXEC; DATAMATION; LAN MAGAZINE; and INTEROPERABILITY.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Symbol shall promptly file documents with the Court by January 8, 1997, showing compliance with this Judgment Entry.

UNITED STATES of America, Plaintiff,

v.

Larry Wayne HARRIS, Defendant.

No. CR–2–95–93.

United States District Court,
S.D. Ohio,
Eastern Division.

April 15, 1997.

George Clark Luther, Hilliard, OH, for Larry Wayne Harris.

Robyn R. Jones, J. Michael Marous, Asst. U.S. Atty., U.S. Attorney's Office, Columbus, OH, for U.S.

### OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the Defendant Larry Wayne Harris's ("Harris") motion to suppress statements, motion to suppress evidence, and motion to dismiss the indictment. The Court held hearings on these motions on April 1, 1997 and April 9, 1997. The Court **DENIES** Harris's motions.

### I. Findings of Fact

Harris is charged in an indictment with wire fraud and mail fraud. The indictment alleges that Harris used fraudulent misrepresentations to mail order three vial of yersinia pestis, the bacteria that causes bubonic plague, from a Maryland company known as American Type Culture Collection ("ATCC").

The Court begins with the government's version of the facts. At approximately 4:15 p.m. on May 11, 1995, Forrest Smith of the Ohio Department of Health called Edward Sachs of the Lancaster Health Department, and informed Sachs that Harris, a resident of Lancaster, Ohio, had ordered and received vials of yersinia pestis. Smith added that Harris was not qualified to possess the bacteria. (April 1 Tr. p. 6.) Around 5:20 p.m., Sachs contacted Captain Lutz of the Lancaster police department and together they investigated these allegations by confirming some of the details and by calling various health officials at both the state and federal level. (Tr. pp. 9–10.) Later that evening, Captain Lutz obtained a warrant from a state court to search Harris's residence at 266 Cleveland Avenue, Lancaster, Ohio. (Tr. p. 24; Gov. Exh. 1.)

At approximately 1:40 a.m., May 12, 1995, the Lancaster police arrived at Harris's residence to execute the search warrant. (Tr. pp. 24, 26.) The search team included public health officials, members of the Fairfield

County hazardous materials team, and a hazardous materials truck full of equipment and gear. (Tr. pp. 26, 54.) Some of the officers and members of the hazardous materials team were dressed in hazardous material suits. (*Id.*)

Captain Lutz and Lieutenant Regan approached the house in their regular uniforms. Lutz went to the door and lured Harris out of his residence by telling him his car had been involved in a hit-skip accident. (Tr. pp. 27, 54–55.) After Harris stepped out of his residence, Captain Lutz walked him over to Harris's car where Regan was standing; Lutz and Regan then handcuffed Harris over the hood of his car. (Tr. pp. 28–29, 55.) While they were handcuffing Harris, Harris spontaneously told them "if this is about the pestis, it's in the car." (Tr. pp. 30, 35–56, 57–58, 59.) Regan asked Harris's permission to search the car, which Harris granted; Harris told the officers that his keys were in his pocket. (Tr. pp. 30, 56, 58.) Lutz and Bill Bropst of the Fairfield County hazardous materials team searched the car while Regan read Harris his rights. (Tr. pp. 32, 56–57.) Harris was very talkative during this period, and told various officers and health agents that the pestis was safe to handle. (Tr. pp. 32–33, 56–57, 58.) Regan had to ask Harris to quit talking so that Regan could finish reading his rights. (*Id.*) After the vials were found in the car, Harris was placed in the back of a police vehicle and eventually transported to the Lancaster police station where he was held for questioning. (Tr. pp. 33, 57.) Lutz and Regan returned to the police station separately and interrogated Harris.

The police interrogated Harris at the Lancaster police station at around 2:40 a.m. The officers taped the interrogation with Harris's knowledge. (Gov. Exh. 6; Tr. pp. 74, 88.) Harris did not tell the officers that he wanted an attorney either before or during this interrogation. (Tr. pp. 34, 58.) After the interrogation, Harris was returned to his residence.

Later on May 12, the Lancaster police contacted the Federal Bureau of Investigation ("FBI") and Special Agent Roger Wilson was assigned to the case. (Tr. p. 63.) When Wilson arrived at the police station, the police briefed him on the case. Sometime that morning, the Chief of Police told Wilson that, during a phone conversation with Harris about Harris's impounded car, Harris asked the Chief whether the Chief thought that Harris needed an attorney. (April 9 Tr. p. 6.) The Chief responded "that's up to you." *Id.* Harris was at his residence at the time of the phone call. (*Id.* at 6–7, 10)

While Wilson contacted his superiors, the police used information gathered during the first search and interrogation to obtain an arrest warrant for Harris and a warrant to search his house again. (April 1 Tr. p. 64.) That afternoon, Lieutenant Michael Rosser went to Harris's residence to serve the arrest warrant on Harris. (Tr. p. 92.) Rosser asked Harris to step outside, Rosser read Harris the warrant and then placed Harris under arrest. (Tr. p. 93.) Rosser read Harris his *Miranda* rights at this time. (Tr. p. 74.) Harris did not say anything about an attorney to Officer Rosser. (Tr. p. 94.) Patrolman Gardner then cuffed Harris and transported him to the Lancaster Police Department. (Tr. p. 94.) Harris did not say anything at all on the ride to the station. (Tr. p. 66.)

Special Agent Wilson interrogated Harris at the police station. Wilson testified that when he introduced himself to Harris, Harris "immediately indicated to me that he wanted to tell me his side of the story regarding having the bubonic plague." (Tr. p. 66.) Wilson then handed Harris a waiver form and read from a copy of the form as Harris followed along. (Tr. p. 67; Gov. Exh. 8.) Wilson proceeded with the interrogation after Harris signed the waiver form. (Tr. p. 67.) Harris did not ask Wilson for an attorney nor did he mention to Wilson that he had called an attorney. (Tr. p. 68.)

For the most part, Harris does not dispute the facts as stated above. However, he takes several crucial exceptions. First, Harris contends that no one read him his *Miranda* rights until the arrest warrant was executed. (Tr. p. 74.) Second, Harris claims that he never consented to the search of his car or informed the officers that his keys were in his pocket. (Tr. pp. 74, 75, 76.) Third, Harris claims that in addition to telling the

police chief over the phone that he had contacted an attorney, he also told the arresting officer and Special Agent Wilson that he had contacted his attorney. (Tr. pp. 79, 80, 81, 84.)

Resolving these factual disputes is crucial to the decision of whether to grant or deny Harris's motions. Given the conflicting testimony, the resolution of these factual disputes depends upon whom the Court finds more credible. After observing the demeanor of the government witnesses and of Harris, the Court finds the government witnesses more credible than Harris. The Court doubts Harris's trustworthiness for three reasons.

First, Harris's testimony at the April 1 hearing is inconsistent with his statements at the first interrogation at the police station. When asked at the hearing whether he had a laboratory in his home, Harris testified:

I most certainly do, most definitely do.... I have, by all practical purposes, a very fine laboratory, very well equipped laboratory, even backup microscopes, backup equipment, and do extensive research.

(Tr. p. 77.) Despite Harris's emphatic certainty, this testimony is directly contradicted by a number of Harris's earlier statements. (*See, e.g.*, Gov. Exh. 6 at p. 11 ("I've been wanting to accumulate enough laboratory equipment so that I can build my own laboratory"); p. 13 ("Once I got my lab together."); p. 14 ("Once I get the laboratory going I can go ahead"); p. 23 ("I do not have, in my possession, the necessary equipment at this time to carry out the experiment."); p. 24 ("once I got my lab going").) Similarly, Harris testified that he "most definitely did not consent to the search of the vehicle." (Tr. p. 74.) Yet, Harris admitted during the initial interrogation that he volunteered the information about the location of the pestis and of his car keys to the officers. (Gov. Exh. 6. at p. 1.) Harris explained the inconsistency by saying that he was half asleep at the time he volunteered the information. This explanation, however, does not dispel the inconsistency.

Second, Harris spoke with certainty throughout his testimony when referring to events that were favorable to him. (*see* Tr. p. 74 ("[Lutz] most definitely did not advise me

of my rights"); p. 75 (same); p. 78 ("most definitely" tried to call attorney"); p. 79 ("most definitely" advised officers of call to attorney); p. 85; p. 89; p. 90.) Yet, when asked about events that were less favorable to him, Harris seemed uncertain and somewhat incoherent. (*See, e.g.*, Tr. pp. 82–83 ("I did not see [the waiver of attorney clause]"; "I did not understand it"; "I did not understand the fullest context of it."))

Third, the collective testimony of the government witnesses tells a consistent, coherent story of the events that occurred that night. Harris, on the other hand, provided little or no evidence to corroborate his testimony and his testimony was incoherent at times. (*See e.g.*, Tr. pp. 78–80, 82–83.)

In sum, based on the above three reasons and on the Court's observation of Harris's demeanor at the hearing, the Court finds that Harris's version of the facts is unreliable. The Court therefore adopts, for the purpose of resolving Harris's motions, the facts as stated in the testimony of the government witnesses.

## II. Analysis

### A. The First Warrant

Harris raises numerous challenges to the state court's finding of probable cause to support the first warrant. The government argues that there was probable cause for the first warrant. The Court agrees with the government.

■ "The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Padro*, 52 F.3d 120, 123 (6th Cir.1995) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Thus, the issuing judge must "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists. *Id.* A reviewing court, in turn, must give great deference to the decision of the issuing judge. *Id.* at 236, 103 S.Ct. at 2331. The role of the reviewing court is limited to en-

suring that the issuing judge had a " 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

The affidavit supporting the first warrant was prepared by Captain Lutz and Ed Sachs. (Tr. p. 21.) In the affidavit, Captain Lutz traces the official lines of communication from ATCC, who sent the bacteria to Harris and then became suspicious of his credentials, through the Center for Disease Control ("CDC") and the Ohio Department of Health, to Ed Sachs at the Lancaster Department of Health. (Gov.Exh. 1.) Lutz states that a call by the CDC to Harris corroborated ATCC's initial concern; Harris told a CDC official that he was conducting research with the bacteria to counteract an "imminent invasion from Iraq of super-germ-carrying rats." Lutz confirmed with the delivery company the exact time and date of the delivery of the bacteria to Harris's residence. Lutz also confirmed the allegations that Harris may have misrepresented to ATCC both that he had an Environmental Protection Agency certification number and that he had a small animals laboratory. Captain Lutz concluded that "Larry Wayne Harris probably used deception" to obtain the bacteria. The Court finds that this affidavit provided a substantial basis for the issuing judge's finding of probable cause to support the first search warrant.

■ Probable cause for a search warrant does not require certainty that a crime has been committed or that the evidence will be present in the residence to be searched. *See, e.g., United States v. Caicedo,* 85 F.3d 1184, 1192 (6th Cir.1996). On the date of the warrant, Captain Lutz had information that Harris had ordered the bacteria and had misrepresented himself to ATCC, and that the bacteria had been delivered to his residence earlier that day. (Gov.Exh. 1.) The issuing Court therefore had a sufficient basis on which to conclude that an offense had been committed and that the bacteria was probably in Harris's residence. Contrary to Harris's assertions, the use of the term "probably" in the affidavit, and the presence of hearsay in the affidavit, do not undermine

the issuing judge's finding of probable cause for the warrant. (Doc. # 13 at p. 10.) *Caicedo,* 85 F.3d at 1192–93 (finding probable cause based upon an affidavit that included the statements that incriminating evidence "could be" and "may be" present in a suspect's residence); *United States v. Plemmons,* 336 F.2d 731, 734 (6th Cir.1964) (a substantial basis for crediting hearsay evidence exists where a government officer is the declarant of the hearsay.)

■ Harris also asserts that the warrant was overbroad and did not adequately describe the property to be searched for and seized. (Doc. 13 at p. 2.) The Fourth Amendment requires a warrant "to particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The warrant must enable a searcher to reasonably ascertain and identify the things which are authorized to be seized. *United States v. Blakeney,* 942 F.2d 1001, 1026 (6th Cir.1991). This requirement eliminates the danger of unlimited discretion in the executing officer's determination of what is subject to seizure. *Id.* The search warrant in this case satisfies this standard. The search warrant provides in part as follows:

> As Judge of the Above Court of record, I command you [Captain Lutz] ... to search ... the person and/or place of: The residence of Larry Wayne Harris, 266 Cleveland Avenue, Lancaster Ohio. Property which is the subject to search and seizure, to wit: Three vials of yersinia pestis (Bubonic Plague Virus [sic] ), any and all records concerning the purchase and use of hazardous cultures.

(Gov.Exh. 1.) The Court concludes that this description reasonably identifies the three vials of yersinia pestis and the files authorized to be seized and properly limits the discretion of the executing agent. Therefore, the first warrant was validly issued by the state court.

### B. The First Search

### 1. Harris's challenges to all of the evidence seized.

Harris moves to suppress all of the evidence seized during the first search on the

ground that the execution of the warrant was illegal because (1) the officers failed to knock and announce their identity and purpose; (2) the officers used a ruse to get Harris to leave his house; and (3) the officers illegally detained Harris. The government denies that the police acted illegally when they executed the search warrant.

■ First, the "knock and announce" rule to which Harris refers is inapplicable here because the officers did not make a forced entry into Harris's home. *United States v. Gatewood,* 60 F.3d 248, 250 (6th Cir.1995) (holding that neither the Fourth Amendment nor the knock and announce statute, 18 U.S.C. § 3109, are implicated where there is no evidence of forcible entry).

■ Second, the officers' use of a ruse—telling Harris his car was in a hit-skip accident to lure him outside his residence—was valid in light of the circumstances. Courts have upheld the use of ruses when police officers have deceived suspects so that the officers may gain consent to enter the suspect's home and conduct a warrantless search. *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1967) (agent posed as customer to enter drug dealer's home without a warrant); *United States v. Baldwin,* 621 F.2d 251 (6th Cir.1980) (agent posed as chauffeur for six months to observe cocaine distribution); *United States v. Stevens,* 635 F.Supp. 1356 (W.D.Mich. 1986). In addition, the First Circuit has upheld the use of a ruse by government agents to get suspects to leave a motel room so that the agents could, without a warrant, arrest them and search their room. *United States v. Rengifo,* 858 F.2d 800, 804 (1st Cir.1988). The ruse in this case was far less intrusive than the ruses in the above mentioned cases. Unlike the law enforcement personnel in those cases, the police officers in this case had a properly issued warrant to search the premises, they did not use the ruse to gain entrance into Harris's home, and the ruse did not last more than a few moments. Therefore, the Court holds that the police officer's use of a ruse to lure Harris from his home was not invalid.

■ Finally, the Court holds that the officer's detention of Harris while they conducted their search was also valid. When police obtain a warrant to search a residence they also obtain the right to detain persons on the premises and take other such reasonable action that is necessary to protect themselves during the execution of the search. *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). In this case, the use of the ruse and subsequent detention of Harris were reasonable actions necessary for the protection of the officers. When the officers approached Harris's residence, they did not know Harris's motivations or the specific dangers that they would face; this was a new situation for them and it involved a potentially deadly pathogen. (*See, e.g.,* Tr. pp. 25–26, 55.) Therefore, both the ruse and detention were justified.

**2. Statements made during the search.**

Harris moves to suppress all of his statements made during the search on the ground that any statements he made were the result of police interrogation, while he was in custody, and before he had been read his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Harris also moves to suppress any evidence found by the officers in reliance on those statements. The government argues that the police did not interrogate Harris before they read him his *Miranda* rights, or in the alternative, that the "public safety" exception to *Miranda* applies.

The Supreme Court has found that, in certain circumstances, concern for public safety justifies an officer's failure to provide *Miranda* warnings before asking questions devoted to locating a dangerous instrumentality. *New York v. Quarles,* 467 U.S. 649, 657, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984). The *Quarles* Court held that the Fifth Amendment, as interpreted in *Miranda,* does not require the exclusion of a defendant's voluntary statements about the location of his gun, or the gun itself, when an officer asked the defendant where the gun was located while the defendant was in custody and before the officer read the defendant his rights. The Court stated that in a "kalei-

doscopic situation ... in which spontaneity rather than adherence to a police manual is necessarily the order of the day," the officers need not read a suspect his *Miranda* rights prior to asking questions reasonably prompted by a concern for public safety. *Id.*, 467 U.S. at 656, 104 S.Ct. at 2631.

■ The Court finds that the public safety exception to *Miranda* applies here. This investigation presented circumstances in which spontaneity rather than adherence to a police manual was the order of the day. Captain Lutz testified that no one in Lancaster had participated in a search for a deadly bacteria and, without assistance from someone who had, the officers had to "fly by the seat of our pants." (Tr. pp. 25–26.) The evidence shows that the officers were motivated by a concern for public safety when they questioned Harris prior to reading his rights; indeed, concern for public safety motivated this whole investigation as indicated by the presence of the hazardous materials team and the precautions taken by the officers. (Tr. pp. 11–12, 22–23, 25–28.) As in *Quarles,* the officers asked Harris only the questions needed to locate the dangerous instrumentality; Regan then read Harris his rights. In hindsight, it is possible to say that the immediate risk to the public posed by the freeze-dried bacteria was not as significant as the officers thought at the time. At the time the officers were faced by these circumstances, however, it was reasonable for them to anticipate danger from this bacteria and to have serious concern for the safety of the community and for their own safety. Therefore, the Court holds that the public safety exception to the *Miranda* rule applies here. As a result, any statements made by Harris before Lieutenant Regan read him his rights, and any evidence recovered in reliance on those statements, is admissible for purposes of trial.

### 3. The search of the car.

Harris argues that anything found in his car should be suppressed because the search of the car was outside the scope of the search warrant and no exception to the rule precluding warrantless searches applies in this case. (Doc. # 13 at p. 2, 5; Doc. # 14 at p. 3.) The Government argues that the officers were entitled to search the car for two reasons: first, Harris consented to the search; and second, they had probable cause to believe the vials were in the car. (Doc. # 21 at pp. 1–2, 4, 5.)

■ The Court holds that evidence found in the car is admissible because the search of the car was valid on a number of alternative theories. First, the Court holds that the warrant authorized the search. A warrant to search a residence at a particular address confers authority to search a vehicle parked in the driveway if the officers executing the warrant reasonably believe that the objects of the search might be located in the vehicle. *United States v. Gottschalk,* 915 F.2d 1459, 1461 (10th Cir.1990) (search of car in driveway); *United States v. Asselin,* 775 F.2d 445 (1st Cir.1985) (search of car next to carport); *United States v. Napoli,* 530 F.2d 1198 (5th Cir.1976) (search of camper in driveway). The warrant in this case describes the premises to be searched as a residence at a particular address. Harris's car was parked in his driveway in front of a car port. Given the size of the vials, the officers could reasonably believe that the vials might be in the car. Moreover based on Harris's statement that the pestis was in the car, the officers had reason to believe that the vials were in the car. Therefore, the officers were authorized by the warrant to search the car. The officers were authorized to open the locked glove box because vials are small enough to fit in that compartment. *See Cole,* 628 F.2d at 899 (authorizing the search of an attache case found in a truck.)

Second, the officers were justified in searching the car because Harris's statement that the pestis is in the car provided the officers with probable cause to search the car. *See United States v. Pasquarille,* 20 F.3d 682, 685–87 (6th Cir.1994) (finding probable cause to conduct warrantless search of vehicle); *United States v. Elkins,* 732 F.2d 1280, 1286 (6th Cir.1984).

■ Finally, the Court finds that the police were justified in searching the car because Harris consented to the search of his car. *See Schneckloth v. Bustamonte,* 412

U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Harris voluntarily told the officers that the pestis was in the car and that his car keys were in his pocket. Harris claims that he took sleeping pills and was asleep when the officers arrived; however, in his interrogation answers, Harris provided details and descriptions of his motivations and research that are inconsistent with a drug impaired or sleep deprived mind. Therefore, the Court finds that the consent was knowing and intelligent. The officers were justified in searching Harris's car based on Harris's consent to search.

### C. The First Interrogation

Harris moves to suppress any statement he made during the first interrogation because he claims he was not advised of his *Miranda* rights and did not waive those rights prior to the interrogation. (Doc. # 11 at p. 3.) The government claims that Harris was advised of his rights and voluntarily waived his rights before making any statements to law enforcement officers.

This Court has already found that Lieutenant Regan read Harris his *Miranda* rights after Regan handcuffed him and while Lutz was searching the car. Moreover, the Court has found that any statement Harris made to the officers at his residence was not coerced or involuntary. The only remaining issue, therefore, is whether Harris voluntarily waived his rights prior to the interrogation.

Harris's answers to the officer's interrogation at the police station were the result of a voluntary and intelligent waiver of his rights. Harris was very talkative and very willing to discuss his case to the officers during the interrogation. Harris provided long rambling answers in which he describes in extensive detail his research and motivations. (*See* Tr. pp. 3, 4, 5, 10.) Also, Harris admitted in the interrogation that the officers treated him decently and fairly and that the police made no threat against him. (Tr. p. 29.) Given Harris's age, education and the detail and description provided in his answers during the interrogation, the Court concludes that Harris voluntarily and intelligently waived his rights prior to the first interrogation.

### D. The Second Warrant

Harris challenges the validity of the second warrant on the grounds that it was supported by information obtained during the execution of the first warrant and that the first warrant was invalid. (Doc. # 13 at p. 11.) This argument fails because the Court has already held that the first warrant was valid.

### E. The Second Interrogation

Harris moves to suppress any statement he made during the second interrogation because he claims he invoked his right to an attorney and the officers interrogated him without his attorney present anyway. (Doc. # 11 at p. 4.) Moreover, Harris asserts that the second interrogation was the product of the first interrogation which was itself illegal. (*Id.*) This latter argument fails because the Court has already found that the first interrogation was valid.

With respect to the former argument, the only issue is whether Harris's statement to the Chief of the Lancaster Police, "do you think I need an attorney," was sufficient to invoke Harris's right to an attorney under the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* states that when an accused has invoked his right to have counsel present during custodial interrogation, no further interrogation is permitted until either his right is satisfied or the accused himself initiates further interrogation. The *Edwards* rule applies, however, only if the accused invokes his right to an attorney while in custody. *See Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) ("the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel"); *Oregon v. Bradshaw,* 462 U.S. 1039, 1043, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983) ("*Edwards* is a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers") *United States v. Mills,* 1 F.3d 414, 417 (6th Cir.1993) ("*Edwards* held that once a person in custody has expressed his desire to deal with the police only through counsel, the police violate his or

her rights if they initiate further questioning"). The *Edwards* rule does not apply here because Harris was at his home and not in custody, when he asked the police chief: "do you think I need an attorney?"

 The government, nevertheless, still bears the burden of showing that Harris waived his right to counsel, along with his other *Miranda* rights, prior to the second interrogation. *Maglio v. Jago,* 580 F.2d 202, 204–5 (6th Cir.1978). The government introduced a waiver of rights form signed by Harris. (Gov.Exh. 8.) The government also introduced the testimony of Special Agent Wilson who stated that he read this form to Harris and that Harris was very willing to tell his side of the story. This evidence satisfies the government's burden to show that Harris voluntarily and intelligently waived his rights.

### F. The Arrest

Harris claims that the criminal complaint was filed without probable cause and that, therefore, his arrest was unlawful. (Doc. # 14 at p. 4.) In particular, Harris asserts that the complaint charges him with receiving stolen property and that there is no evidence that the vials were obtained through the commission of a theft offense. (*Id.* at p. 3.) The Court disagrees. Probable cause to arrest is sufficient if there are facts and circumstances within the issuing judge's knowledge that are sufficient to allow a reasonably prudent person to believe that a suspect has committed an offense. *Harrison v. Metro Government of Nashville,* 80 F.3d 1107, 1107 (6th Cir.1996), This standard is satisfied here. The Lutz affidavit and the results of the search provided the issuing judge with evidence that Harris used deception to receive the vials from ATCC. The theft element of the crime of receiving stolen property is satisfied by theft by deception. *See* O.R.C. §§ 2913.02, 2913–51. Therefore, the criminal complaint and the warrant to arrest Harris for receiving stolen property were supported by probable cause.

### III. Conclusion

Upon consideration and being duly advised, the Court **DENIES** Harris's motion to suppress statements, **DENIES** Harris's motion to suppress evidence, and **DENIES** Harris's motion to dismiss the indictment.

IT IS SO ORDERED.

Gary L. POTTS,

v.

NATIONAL HEALTHCARE, L.P.

No. 3–95–0660.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 26, 1996.

W. Neil Thomas, III, J. Christopher Hall, Chattanooga, TN, for Plaintiff.

R. Eddie Wayland, Christopher M. Kato, Nashville, TN, for Defendant.

MEMORANDUM

CAMPBELL, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 25). For the reasons explained herein, Defendant's Motion for Summary Judgment (Docket No. 25) is GRANTED, and this case is dismissed.

Plaintiff, a citizen of Nebraska, alleges that he was terminated from his employment with Defendant, a Delaware corporation with its principal place of business in Tennessee, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA") and in violation of Section 510 (29 U.S.C. § 1140) of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"). He alleges jurisdiction in this Court pursuant to 28 U.S.C. §§ 1331 and 1332(a).

It is undisputed that Plaintiff was employed by Defendant from 1977 until his termination on or about August 3, 1994. Plaintiff alleges that he was terminated because of the disabilities of his two daughters,[1] who were dependents under Plaintiff's health care insurance with Defendant. It is also undisputed that Defendant was self-insured with respect to employee health insurance up to approximately $75,000 per covered individual.

Defendant claims that Plaintiff was terminated because his position was eliminated and the program with which he worked was discontinued. Defendant further contends that Plaintiff's position was eliminated and the program discontinued for economic reasons, specifically because of limitations on reimbursement funds from Medicare.

Defendant asserts that it is entitled to summary judgment on Plaintiff's ADA claim because Plaintiff cannot prove that the individuals involved in the decision to terminate Plaintiff's employment even *knew* about the alleged disabilities of Plaintiff's daughters and because Plaintiff cannot establish the elements of a prima facie case under the ADA.

Defendant also contends that it is entitled to summary judgment on Plaintiff's ERISA claim because Plaintiff cannot establish the elements of a prima facie case under Section 510 of ERISA and because Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination.

Plaintiff, on the other hand, contends that there are genuine issues of material fact as to these claims and that he "will be able to show with primarily circumstantial and indirect evidence that reasons given by NHC in the form of statements and opinions as the basis for Potts' termination are a mere pretext for the discriminatory basis of its actions in terminating Potts." *See* Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, p. 1.

As provided in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216.

The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

The Supreme Court concluded in *Anderson* that a dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence

---

1. It is undisputed, for purposes of this motion, that one of Plaintiff's daughters has a congenital heart problem and another daughter has a growth hormone deficiency.

standard is used in this determination, more than a mere scintilla of evidence in support of the non-moving party's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the nonmoving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991). The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## ADA CLAIM

The Americans with Disabilities Act of 1990, prohibits, among other things, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Plaintiff alleges that Defendant violated this portion of the ADA.

In order to prevail under this section of the ADA, Plaintiff must show that the alleged disability was, in the words of the statute, "known." In other words, Plaintiff must show that those responsible for his termination *knew,* at the time of the termi-

nation, of the alleged disability. *See, e.g., Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 932 (7th Cir.1995); *Maddox v. University of Tennessee,* 62 F.3d 843, 848 (6th Cir.1995) (noting that the head coach and athletic director who fired the plaintiff had no prior knowledge of his alcoholism); *Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178, 1181 (6th Cir.1993) (no showing that Board which suspended plaintiff had any knowledge of plaintiff's mental illness).

In *Morisky v. Broward County,* 80 F.3d 445 (11th Cir.1996), the court held that a plaintiff cannot sustain a prima facie case of handicap discrimination without proof that the employer had actual or constructive knowledge of the disability. *Id.* at 448. The court quoted *Hedberg* as follows:

> At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason.

*Id.* (quoting *Hedberg,* 47 F.3d at 932); *see also Miller v. National Casualty Co.,* 61 F.3d 627, 630 (8th Cir.1995) ("since [defendant] did not know of plaintiff's disability until after her employment was terminated, it would have been impossible for the company to have made that disability the basis for the termination").

Despite his assurances, Plaintiff is unable to cite any credible evidence to rebut Defendants' testimony that the only two persons involved in the decision to terminate Plaintiff, Mr. Blevins and Mr. Burgess,[2] did not know about Plaintiff's daughters' alleged disabilities or their medical claims. The evidence cited by Plaintiff to rebut this fact is simply insufficient under Rule 56(e) to avoid summary judgment.

For example, in response to several of Defendant's Statements of Undisputed Facts, Plaintiff responded as follows: "This state-

---

2. Plaintiff disputes Defendant's assertion that Blevins and Burgess were the only individuals involved in the decision to terminate Plaintiff, but he cites no specific facts to support that position or to demonstrate a genuine issue of material fact. The Court, therefore, takes this fact to be undisputed for purposes of this motion.

ment is disputed insofar as it is a statement of the opinion of an NHC employee or former employee and it is a mere pretext for NHC's actions in terminating Potts." *See, e.g.,* Plaintiff's Response Nos. 25–28.

Plaintiff's response cannot and does not create a genuine issue of material fact. First, Plaintiff fails to comply with Local Rule 8(7)(c), which requires that each disputed fact must be supported by specific citation to the record. In addition, if Plaintiff claims these facts are disputed, he must come forward with specific facts to demonstrate a genuine issue for trial. Fed.R.Civ.P. 56(e). Plaintiff has failed to do so.

The only evidence which Plaintiff even arguably sets forth to dispute the fact that neither person involved in his termination decision knew about his daughters' alleged disabilities is a bald assertion, with no citation to the record, that Plaintiff had talked about his daughters' health problems with his immediate supervisor, Mr. Blevins. Plaintiff's unsupported statement is insufficient under Rule 56(e) to avoid summary judgment on this issue.[3]

Neither may Plaintiff avoid summary judgment on this issue by his assertions that (1) Defendant's management committee regularly discussed health insurance; (2) Defendant made reports of health claims available to members of the management committee; or (3) Defendant's health care representatives receive reports of individual health claims.

Plaintiff has failed, first of all, to show that either Mr. Blevins or Mr. Burgess was a member of the management committee. Secondly, Plaintiff has failed to show that either Mr. Blevins or Mr. Burgess was a health care representative. Third, Plaintiff has failed to present any proof that Mr. Blevins or Mr. Burgess ever received any information concerning Plaintiff's specific health care claims. Plaintiff has also failed to rebut the sworn testimony of Defendant's representative that, at the management committee meetings, no specific claims of specific employees were ever discussed.

Thus, Plaintiff has demonstrated no evidence from which it would be reasonable to conclude that Blevins or Burgess knew of Plaintiff's daughters' alleged disabilities or their health insurance claims. As in *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995), Plaintiff here invites us to draw inferences that are merely speculative. And, "speculation does not meet a party's burden of producing some defense to a summary judgment motion." *Id.* (citing *Hedberg,* 47 F.3d at 931–32).

The cases cited by Plaintiff are distinguishable on this point about knowledge of the disabilities in question. In *Folz v. Marriott Corp.,* it was clear that the defendant knew about the plaintiff's multiple sclerosis. *Folz v. Marriott Corp.,* 594 F.Supp. 1007, 1011 (W.D.Mo.1984). In *LeCompte v. Freeport–McMoran,* 4 A.D. Cases 412, 1995 WL 313700 (E.D.La.1995), the defendant conceded that it knew about plaintiff's daughter's medical needs. 1995 WL 313700 at *2. Similarly, in *Gower v. Wrenn Handling, Inc.,* 892 F.Supp. 724 (M.D.N.C.1995), there was clear evidence that defendant knew about plaintiff's son's medical condition and bills. *Id.* at 728–29.

In summary, if Plaintiff has "circumstantial and indirect evidence" sufficient to rebut Defendant's assertions, as he contends, he must come forward with specific facts on this motion, and he has not. Plaintiff has offered no specific evidence, no affidavits from anyone, to say that Mr. Blevins and Mr. Burgess were aware of Plaintiff's daughters' health problems or medical claims prior to Plaintiff's termination.

The Sixth Circuit has held that Defendant may challenge Plaintiff to "put up or shut up" on an essential element of his claim. *See Street,* 886 F.2d at 1478. If Plaintiff cannot "put up," summary judgment is appropriate. *Id.*

For all these reasons, Plaintiff has failed to establish that there exist genuine issues of material fact as to his ADA claim, and Defen-

---

**3.** Plaintiff also avers that he discussed his daughters' health problems with Dan McKinnon, Administrator of Parkwood Nursing Home, the facility in which Plaintiff worked. Even accepting this statement as true for purposes of this motion, it is not material, since Mr. McKinnon had no role in Plaintiff's termination.

dant is entitled to judgment as a matter of law on this issue.

## ERISA CLAIM

■ Section 510 of ERISA makes it unlawful to discharge or otherwise discriminate against an employee for the purpose of interfering with certain protected rights. *Poff v. Chattanooga Group, Inc.*, 912 F.Supp. 298, 305 (E.D.Tenn.1996); 29 U.S.C. § 1140. To analyze claims under Section 510, courts use the *Burdine*[4] burden-shifting paradigm familiar to Title VII cases. *Id.* The *Burdine* analysis is summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection. ..." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988) (citing *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093, and quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).[5]

■ The ultimate burden of proving a case of employment discrimination rests at all times with the plaintiff. *Poff,* 912 F.Supp. at 306.

■ To establish his prima facie case under Section 510 of ERISA, Plaintiff must show (1) prohibited employer conduct, (2) taken for the purpose of interfering (3) with the attainment of any right to which he may become entitled. *Poff,* 912 F.Supp. at 305 (citing *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir.1992)). To demonstrate a violation of Section 510, an employee must show that the employer had a specific intent to violate ERISA. *Poff,* 912 F.Supp. at 305. The employee need not show that the employer's *sole* purpose for the discharge was interference with the employee's benefits, but rather that it was a "motivating factor" in the decision. *Id*[6]

■ If a plaintiff fails to show an employer's specific intent to violate Section 510 of ERISA, the plaintiff fails to demonstrate a prima facie case, and a court may grant summary judgment. *Poff,* 912 F.Supp. at 306 (citing *Wyatt v. United States Fidelity & Guaranty Co.* 59 F.3d 172 (table), 1995 WL 376719 at *2 (6th Cir.1995)). Thus, where the loss of benefits was a consequence of or incidental to the employee's discharge, there is an absence of specific intent. *Poff,* 912 F.Supp. at 306.

ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights. *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 238 (4th Cir.1991). "Consequently, it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision." *Id.*

■ Plaintiff must establish more than the mere fact that termination of his employment meant a monetary savings to Defendant, for otherwise, an ERISA violation would automatically occur every time an employer terminated a fully-vested employee. *Nixon v. Celotex Corp.,* 693 F.Supp. 547, 555 (W.D.Mich.1988) (citing *Donohue v. Custom*

---

4. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. "When an employment decision is adverse to a plaintiff, the shifting burden of proof is designed to sharpen vague allegations of discrimination and flush out the true reasons that prompted an employer's action." *Dister,* 859 F.2d at 1111–12.

6. Section 510 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir.1988) (citing *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980)).

**1142**

*Management Corp.,* 634 F.Supp. 1190, 1197 (W.D.Pa.1986)).

The "something more" which must be shown is a causal link between the plaintiff's benefits and the adverse employment decision. *Nixon,* 693 F.Supp. at 555. "In order to survive defendants' motion for summary judgment, plaintiff must come forward with evidence from which a reasonable jury could find that defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge." *Id.*

A review of the evidence in the light most favorable to the Plaintiff reveals that Plaintiff has failed to produce sufficient evidence to establish a prima facie case under ERISA. There is no direct or circumstantial evidence of a specific intent to violate ERISA.

Plaintiff has failed to produce any evidence that his termination was for the purpose of interfering with his employee benefits under the ERISA plan. Plaintiff has failed to rebut Defendant's sworn testimony that neither Mr. Blevins nor Mr. Burgess even knew whether Plaintiff was covered under Defendant's employee health care plan. They could not, therefore, have terminated him for the purpose of interfering with those rights.

Therefore, the Court finds that Plaintiff has failed to establish his prima facie case under ERISA and Defendant is, accordingly, entitled to judgment as a matter of law.

■ Even if Plaintiff had established his prima facie case, however, Defendant has come forward with a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant has produced sufficient admissible evidence that the position held by the Plaintiff was eliminated and the program in which he was employed was discontinued. Defendant asserts that reimbursement funds from Medicare were limited and, for economic reasons, it made the business decision to terminate the program in which Plaintiff was the only employee and to eliminate Plaintiff's position.

If the employer successfully asserts a legitimate reason for its actions, then the presumption of wrongful action drops from the case, and the plaintiff must either prove that the interference with benefits was a motivat-

ing factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence. *Humphreys,* 966 F.2d at 1043. In other words, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered legitimate reasons were actually a pretext for discrimination. *Poff,* 912 F.Supp. at 305.

■ To show pretext, the plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.* (citing *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir.1994)). To make this showing, the plaintiff is required to show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the discharge, or (3) that the proffered reasons were insufficient to motivate the discharge. *Id.*

Here, Plaintiff has presented no evidence to show that Defendant's reasons are pretextual. Although he asserts that he "will be able to show with primarily circumstantial and indirect evidence that reasons given by NHC in the form of statements and opinions as the basis for Potts' termination are a mere pretext for the discriminatory basis of its actions in terminating Potts," he has failed to offer any evidence that Defendant's proffered reasons have no basis in fact, were not the motivating factor in the decision, or were insufficient to motivate the discharge.

In *Humphreys,* the court stated that any possible inference of pretext that might be drawn from the proximity of plaintiff's termination to the vesting of his benefits was eliminated because the plaintiff was discharged on or about the date of the sale of the mine in which he worked. *Humphreys,* 966 F.2d at 1044–45. Similarly, here, any inference of pretext from the fact that Plaintiff's daughters both have disabilities and have submitted claims under Defendant's employee health care plan is eliminated because Plaintiff was discharged on or about the date of the elimination of his position and discontinuance of his program.

The Court finds that the reasons proffered by Defendant are not pretexual. The reasons for Defendant's discharging him—eco-

nomic factors requiring elimination of his position and discontinuance of his program—are legitimate business reasons. It is not the court's role to review a company's business decisions or question the soundness of an employer's business judgment. *Poff,* 912 F.Supp. at 307; *see also Dister,* 859 F.2d at 1116 ("it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal.")

As in *Poff,* the Plaintiff has offered little more than "mere personal beliefs, conjecture and speculation," which are insufficient to support a Section 510 claim. *See Poff,* 912 F.Supp. at 307. There is really no proof supporting Plaintiff's claim of pretext other than the fact that his termination probably did save Defendant some money. That is not enough to carry the Plaintiff's burden. *See Conkwright,* 933 F.2d at 239.

For all these reasons, Plaintiff cannot sustain his ERISA claim, and Defendant is entitled to judgment as a matter of law on this issue.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Docket No. 25) is GRANTED, and this case is dismissed.

It is so ORDERED.

**Dick L. LANSDEN and Martha S. Lansden, Plaintiffs,**

v.

**Richard MARSH, Director, Internal Revenue Service Center, Memphis, Tennessee, Defendant.**

No. 3:95–1093.

United States District Court, M.D. Tennessee, Nashville Division.

Feb. 7, 1997.

Dick L. Lansden, Waller, Lansden, Dortch & Davis, Nashville, pro se.

Robert Ladd DeLaney, DeLaney & Withers, Nashville, for Dick L. Lansden, Martha S. Lansden.

John M. Roberts, Office of the United States Attorney, Nashville, Shannon L. Hough, Department of Justice, Washington, DC, for Richard Marsh.

## MEMORANDUM

ECHOLS, District Judge.

Pending before the Court are the following: (1) Defendant's Motion for Summary Judgment (Docket Entry No. 12), to which Plaintiffs have filed a Response; (2) Plaintiffs' Cross–Motion for Summary Judgment (Docket Entry No. 34), to which Defendant has filed a Response; and (3) Plaintiffs' Request for Oral Argument (Docket Entry No. 37). For the reasons discussed more fully in the accompanying Memorandum, Defendant's Motion for Summary Judgement is hereby GRANTED; Plaintiffs' Cross–Motion for Summary Judgment is DENIED; and Plaintiffs' Request for Oral Argument is DENIED as MOOT.

Plaintiffs challenge Defendant Internal Revenue Service's ("IRS's") imposition and collection of a tax upon Social Security benefits Plaintiffs received for the 1992 taxable year. Plaintiffs contend that Defendant's taxation of Plaintiffs' Social Security benefits violates the United States Constitution's prohibition against the levy of direct taxes without apportionment according to population. Plaintiffs also allege that the imposition of a tax on such benefits violates the doctrine of intergovernmental tax immunity. Finally, Plaintiffs claim that the statute imposing the tax on Social Security benefits is so indefinite and vague as to be void. Defendant filed a Motion for Summary Judgment, contending that Congress may constitutionally impose a tax on Social Security benefits without apportionment, and that progressive taxation of such benefits is not violative of the principle of intergovernmental tax immunity. Plaintiffs filed a Cross–Motion for Summary Judgment, asserting that the tax upon Plaintiffs' Social Security benefits constituted a direct tax upon Plaintiffs' personal property, requiring apportionment among the states, and that progressive taxation of Social Security

benefits violates the principle of intergovernmental tax immunity.

In ruling on a motion for summary judgment, the Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. If so, summary judgment is inappropriate. Both parties agree that summary judgment is the appropriate procedure to determine the legal issues in this case.

The circumstances leading to this litigation are apparently undisputed. The present action arose after Plaintiffs demanded a refund of $3,867.00 for income tax paid on Social Security benefits received during the 1992 taxable year on the ground that the imposition of such a tax was unconstitutional. Plaintiffs initially filed an administrative claim with Defendant, which request was denied on the ground that Social Security benefits constitute taxable income under the Code. Plaintiffs then wrote a letter to Defendant, again demanding a refund. Defendant responded that Plaintiffs' initial claim would not be reviewed, and that if Plaintiffs wished to proceed with their complaint they would have to file a formal appeal. Plaintiffs then instituted the present action. Because there is no factual dispute, and because the parties' cross-motions for summary judgment concern the same dispositive issues, the Court will consider both motions together.

The first issue presented is whether Social Security benefits may constitutionally be taxed as income, without apportionment

among the states. Defendant contends that Social Security benefits are constitutionally included in the Internal Revenue Code's ("Code's") definition of taxable income because the receipt of such benefits constitutes a clearly realized accession to Plaintiffs' wealth. There is no dispute that Congress included Social Security benefits within the definition of taxable "gross income" in the Code. I.R.C. § 86.[1] Congress' inclusion of such benefits in the calculation of taxable income does not end the inquiry, however—the inclusion must fall within Congress' constitutional power to impose income taxes without apportionment among the states. *Eisner v. Macomber*, 252 U.S. 189, 206, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920) ("Congress cannot by any definition [of "income"] it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives the power to legislate, and within whose limitations alone that power can be lawfully exercised").

■ Under the Constitution, Congress' power to impose taxes on the general population is limited by Article I, Section 2, which states:

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ...

U.S. Const. art. I, § 2, cl. 3. The Sixteenth Amendment to the United States Constitution was ratified to provide an exception to this general restriction:

> The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

U.S. Const. amend. XVI. In short, the Constitution permits Congress to tax incomes without apportionment, but prohibits Con-

gress from levying direct taxes in this manner. Thus, the determinative issue in evaluating the constitutionality of a tax imposed without apportionment is whether the tax is a "direct" tax or an "income" tax. This inquiry requires the Court to determine whether that which is taxed—in this case, Social Security benefits—is "income." *Eisner*, 252 U.S. at 206, 40 S.Ct. at 193. *See Comm'r of Internal Revenue v. Obear-Nester Glass Co.*, 217 F.2d 56, 59 (7th Cir.1954) (declaring that it is the province of the judiciary to determine which gains Congress may constitutionally tax as income) *cert. denied*, 348 U.S. 982, 75 S.Ct. 570, 99 L.Ed. 764 (1955).

The United States Supreme Court first addressed the issue of the scope of constitutionally taxable income in Eisner. In that case, the Court defined income as "the gain derived from capital, from labor, or from both combined." 252 U.S. at 207, 40 S.Ct. at 193 (citing *Stratton's Independence v. Howbert*, 231 U.S. 399, 415, 34 S.Ct. 136, 140, 58 L.Ed. 285 (1913); *Doyle v. Mitchell Bros. Co.*, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054 (1918)). The Court later held that Eisner's definition was not meant to be exhaustive, and that other forms of gain could constitutionally be counted as income. *Helvering v. Bruun*, 309 U.S. 461, 60 S.Ct. 631, 84 L.Ed. 864 (1940). In turn, the lower courts gradually expanded the scope of constitutionally taxable income. *See Obear-Nester Glass*, 217 F.2d at 62 (treble damages awarded in an anti-trust action); *General American Investors Co. v. Comm'r of Internal Revenue*, 211 F.2d 522 (2d Cir.1954) ("insider profits" awarded under Section 16(b) of the Securities Exchange Act of 1934), *aff'd*, 348 U.S. 434, 75 S.Ct. 478, 99 L.Ed. 504 (1955); *James F. Waters, Inc. v. Comm'r of Internal Revenue*, 160 F.2d 596 (9th Cir.) (insurance proceeds), *cert. denied*, 332 U.S.

---

1. 26 I.R.C. § 86 provides in relevant part:
 (1) In general.—Except as provided in paragraph (2), gross income for the taxable year of any taxpayer described in subsection (b) ... includes social security benefits in an amount equal to the lesser of—
 (A) one-half of the social security benefits received during the taxable year, or
 (B) one-half of the excess described in subsection (b)(1).

 ...
 (d) Social Security benefit.—
 (1) In general.—For purposes of this section, the term "social security benefit" means any amount received by the taxpayer by reason of entitlement to—
 (A) a monthly benefit under title II of the Social Security Act, or
 (B) a tier I railroad benefit.

767, 68 S.Ct. 77, 92 L.Ed. 353 (1947). Finally, in *Comm'r of Internal Revenue v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955), the Supreme Court expressly rejected the contention that the Eisner definition was meant to be all-inclusive, stating that Eisner "was not meant to provide a touchstone to all future gross income questions." *Id.* at 431, 75 S.Ct. at 477. The Court adopted a broad definition of income to include all "undeniable accessions to wealth, clearly realized, and over which the taxpayer[ ][has] complete dominion." *Id.* This expansive interpretation of income has remained controlling. *See Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, ——, 115 S. Ct. 2159, 2163, 132 L.Ed.2d 294 (1995). As such, the inquiry for this Court is whether Social Security benefits should be characterized as clearly realized accessions to Plaintiffs' wealth.

Plaintiffs assert that receipt of such benefits does not constitute an accession to wealth. Rather, Plaintiffs argue that Social Security payments represent a return by the federal government to Plaintiffs of their personal property. Specifically, Plaintiffs assert that, in deducting Social Security tax from their paychecks, the government borrowed Plaintiffs' money to invest for Plaintiffs' benefit upon their retirement. Plaintiffs state that "[t]he income derived from this investment was to become a part of the social security benefit ultimately paid to [Plaintiffs] along with a donation or gift by the Government to compensate for cost of living increases." Thus, Plaintiffs contend that, to the extent that the Social Security benefits they have received constitute a return of the money previously borrowed by the federal government, such benefits are not accessions to their wealth, and therefore cannot constitutionally be defined as income.[2]

■ The Court finds that Social Security benefits may constitutionally be defined as income, and the receipt of such benefits constitutes an accession to the beneficiary's

wealth, not a return of the recipient's own property. The Supreme Court has explicitly held that there is no constitutionally protected property interest in Social Security benefits. *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In *Flemming*, the Court addressed the issue of whether the termination of a deported alien's Social Security benefits violated the alien's Fifth Amendment right to substantive due process. *Id.* at 606, 80 S.Ct. at 1370. The plaintiff argued that he had an "accrued property right" in his Social Security benefits by virtue of his payment of Social Security tax during his working years. In denying the plaintiff's claim, the Court expounded on the nature of the Social Security system:

> The Social Security system may be accurately described as a form of social insurance, enacted pursuant to Congress' power to 'spend money in aid of the "general welfare," 'whereby persons gainfully employed, and those who employ them, are taxed to permit the payment of benefits to the retired and disabled, and their dependents. Plainly the expectation is that many members of the present productive work force will in turn become beneficiaries rather than supporters of the program. But each worker's benefits, though flowing from the contributions he made to the national economy while actively employed, are not dependent on the degree to which he was called upon to support the system by taxation. It is apparent that the noncontractual interest of an employee covered by the Act cannot soundly be analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments.

*Id.* at 609–10, 80 S.Ct. at 1372 (citations omitted). The Court also noted that the Social Security Act provides that Congress may generally repeal or alter all recipients' "rights" to Social Security benefits. *Id.* at 610–11, 80 S.Ct. at 1372–73. In light of these considerations, the Court held that beneficia-

**2.** Although Plaintiffs do not explicitly state as such in their motion, the Court presumes that they concede that the portion of the Social Security benefits representing the interest earned on the original "investment" by the government is taxable income. Such interest is certainly a clearly realized accession to Plaintiffs' wealth. The Court assumes that Plaintiffs challenge the constitutionality of imposing income taxes on the return to Plaintiffs of the principal the government originally "borrowed" from them via paycheck deductions.

ries under the Social Security system have no constitutionally guaranteed property right in the payments they receive. *Id.* at 611, 80 S.Ct. at 1372. Similarly, in the present case, because Plaintiffs have no property interest in the benefits received, their argument that such benefits represented a return of *their property*, which was "borrowed" and "invested" by the federal government, must fail. Rather, such benefits necessarily augmented Plaintiffs' wealth, which gain was realized upon Plaintiffs' receipt of the payments. As such, the Court finds that the Social Security benefits paid to Plaintiffs constituted "income" according to the *Glenshaw Glass* definition of that term, and were therefore properly taxed without apportionment among the states.

Plaintiffs next argue that the Social Security system is based on the Federal Old Age and Survivors Trust Fund, established by Congress. Plaintiffs assert that Congress named the Department of Health, Welfare and Education as the trustee for this fund. Plaintiffs allege that, in imposing taxes on the beneficiaries of that trust, the federal government "gave up its right to take any action against the Trust that would damage it. The taxation of the beneficiaries of the Trust is such an act." (Amended Complaint **paragraph** 11.) Plaintiffs also state that "[t]he payment of benefits to the beneficiary of the Trust fund is not income, but is a return to the beneficiary of personal property of which he was the beneficial owner prior to the payment." (Id. **paragraph** 12.) The gravamen of this argument is that Plaintiffs, as beneficiaries to the "trust fund," had a

property right to receive the benefits paid out from the fund, and therefore that the government had no power to tax Plaintiffs on those benefits. This claim is substantively identical to the argument the Court rejected above. As such, the Court finds it to be without merit.

Plaintiffs also alternatively argue that taxation of Social Security benefits violates the principle of intergovernmental tax immunity. Plaintiffs contend that there is an "implied contract" between the government and Social Security beneficiaries that the government will invest the money received from such beneficiaries and then pay them the return on that investment in the form of Social Security benefits. Plaintiffs assert that, although Congress may generally impose income tax on gains earned through contractual dealings with the government, such taxation must be nondiscriminatory in character. With respect to Social Security benefits, however, the income tax imposed is discriminatory: those recipients who do not possess a threshold level of outside income are exempted from taxation, and wealthy recipients are taxed at a higher rate than lower-income recipients.[3]

In support of this theory, Plaintiffs rely upon *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), for their argument. That case held that the federal government may impose a nondiscriminatory tax on income earned on contracts with *state and local* governments and taxpayers without violating the principle of intergovernmental tax immunity. *Id.* at 524–

---

**3.** 26 U.S.C. § 86 establishes a graduated system of taxation of Social Security benefits. That section provides in relevant part:

(1) In general.—[G]ross income for the taxable year of any taxpayer.. includes social security benefits in an amount equal to the lesser of—
 (A) one-half of the social security benefits received during the taxable year, or
 (B) one-half of the excess described in subsection (b)(1).
(2) Additional amount.—In the case of a taxpayer with respect to whom the amount determined under subsection (b)(1)(A) exceeds the adjusted base amount, the amount included in gross income under this section shall be equal to the lesser of—
 (A) the sum of—
 (i) 85 percent of such excess, plus

 (ii) the lesser of the amount determined under paragraph (1) or an amount equal to one-half of the difference between the adjusted base amount and the base amount of the taxpayer, or
 (B) 85 percent of the social security benefits received during the taxable year.
(b) Taxpayers to whom subsection (A) applies.—
 (1) In general.—A taxpayer is described in this subsection if—
 (A) the sum of—
 (i) the modified adjusted gross income of the taxpayer for the taxable year, plus
 (ii) one-half of the social security benefits received during the taxable year, exceeds
 (B) the base amount.

25, 108 S.Ct. at 1367–68. *Baker* did not concern the constitutionality of *federal* taxation of income earned through contracts with the *federal* government, which is the issue presented by Plaintiffs here. As such, even assuming that a contractual relationship existed between Social Security beneficiaries and the federal government, it is unclear that *Baker* applies in the present case.

█ Plaintiffs contend, however, that by imposing a discriminatory income tax on the benefits received, Congress unconstitutionally burdened the government's ability to maintain its contractual relationship with Social Security recipients. The Court disagrees. Plaintiffs' argument rests on the erroneous assumption that there exists a contractual relationship between the federal government and Social Security beneficiaries. As discussed above, the government owes no contractual or constitutional duty to pay Social Security recipients anything. Said beneficiaries, therefore, have no property right in the payments they receive. *Flemming,* 363 U.S. at 610–11, 80 S.Ct. at 1372–73. Because no "implied contract" exists between the government and Plaintiffs, the imposition of a tax on Plaintiffs' benefits is not violative of the intergovernmental tax immunity doctrine.

Finally, although neither party raises the issue in the pending cross-motions for summary judgment, Plaintiffs in their Amended Complaint allege that the Code provision imposing an income tax on Social Security benefits *is so* vague that they are unable to comply with the statute. In particular, Plaintiffs charge that "modified adjusted gross income," as defined in I.R.C. § 86(b)(2), cannot be accurately calculated because the provision does not adequately identify which forms of "foreign source income" must be included in the calculation.[4]

I.R.C. § 86(b)(2) defines "modified adjusted gross income" to include:

[A]d[j]usted gross income—

(A) *determined without regard to this section and sections 135, 911, 931, and 933,* and (B) increased by the amount of interest received or accrued by the taxpayer during the taxable year which is exempt from tax.

I.R.C. § 86(b)(2) (emphasis added). Sections 135, 911, 931, and 933 of the Code exclude certain sources of taxpayer income from the calculation of taxable "gross income." Specifically, Section 135 excludes interest earned on United States savings bonds for taxpayers paying for "qualified" higher education expenses, Section 911 allows for the exclusion of income earned by United States citizens living abroad, Section 931 excludes certain income earned by residents of Guam, American Samoa, and the Northern Mariana Islands, and Section 933 excludes certain income earned by residents of Puerto Rico. I.R.C. §§ 135, 911, 931, 933.[5]

A statute is void for vagueness if people "of common intelligence must necessarily guess at its meaning and differ as to its

---

**4.** Determination of the taxpayer's "modified adjusted gross income" is necessary for calculating the portion of the social security benefits, if any, that must be included in the taxpayer's taxable "gross income." 26 U.S.C. § 86(b)(1).

**5.** 26 U.S.C. § 135 provides in relevant part:
In the case of an individual who pays qualified higher education expenses during the taxable year, no amount shall be includible in gross income by reason of the redemption during such year of any qualified United States savings bond.
26 U.S.C. § 911 provides in relevant part:
At the election of a qualified individual ... there shall be excluded from gross income of such individual, and exempt from taxation under this subtitle, for any taxable year—
(1) the foreign earned income of such individual, and

(2) the housing cost amount of such individual.
26 U.S.C. § 931 provides in relevant part:
In the case of an individual who is a bona fide resident of a specified possession [defined as Guam, American Samoa, and Northern Mariana Islands] during the entire taxable year, gross income shall not include—
(1) income derived from sources within any specified possession, and
(2) income effective connected with the conduct of a trade or business by such individual within any specified possession.
26 U.S.C. § 933 provides in relevant part:
The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
(1) ... In the case of an individual who is a bona fide resident of Puerto Rico, income derived from sources within Puerto Rico ...

application." *Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967) (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). The Sixth Circuit maintains that, when a statute does not concern criminal conduct or First Amendment rights, "the court must be fairly lenient in evaluating a claim of vagueness." *Doe v. Staples,* 706 F.2d 985, 988 (6th Cir.1983) (quoting *Exxon Corp. v. Busbee,* 644 F.2d 1030 (5th Cir.), *cert. denied,* 454 *U.S.* 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981)), *cert. denied,* 465 U.S. 1033, 104 S.Ct. 1301, 79 L.Ed.2d 701 (1984). The statute must be "substantially incomprehensible" to be deemed invalid. *Id.* Further, the court must evaluate the comprehensibility of the provision in light of the facts of the case at hand. *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975).

In the present case, the Court finds that the challenged section is not "substantially incomprehensible." The Court interprets Section 86(b)(2) to provide that the determination of "modified adjusted gross income" must take into account certain forms of income that would otherwise be excluded from the calculation of the taxpayer's "gross income." For instance, if the taxpayer earned income while abroad, she would not be required to include that amount in her calculation of "gross income," but she would count it in determining "modified adjusted gross income" under Section 86(b)(2). Because the Court finds that Section 86(b)(2) is not so unclear as to render it void for vagueness, it accordingly rejects that basis for invalidating the provision.

In sum, the Court finds that, as a matter of law, I.R.C. § 86 is not unconstitutional for the reasons stated herein. As such, the Court finds that Plaintiffs' theory cannot be supported under the law, and Defendant is entitled to summary judgment. Accordingly, Defendant's Motion for Summary Judgment is hereby GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED. The parties have carefully briefed the legal issues involved, and the Court finds oral argument would not be helpful. Therefore, Plaintiffs'

Request for Oral Argument is hereby DENIED, and this case is hereby DISMISSED.

Joan E. HANSEN,

v.

VANDERBILT UNIVERSITY.

No. 3–96–0716.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 11, 1997.

Charles R. Ray, Jeffrey S. Frensley, Ray & Housch, Nashville, TN, Deanna Bell Johnson, Nashville, TN, for Plaintiff.

William N. Ozier, Michael Scott Moschel, Bass, Berry & Sims, Nashville, TN, Leona Marx, Vanderbilt University, Nashville, TN, for Defendant.

### MEMORANDUM

HIGGINS, District Judge.

The Court has before it the defendant's motion (filed February 21, 1997; Docket Entry No. 13) for summary judgment; memorandum (Docket Entry No. 14) in support; the plaintiff's response (filed March 27, 1997; Docket Entry No. 19); and memorandum (Docket Entry No. 20) in support.

The Court has subject matter jurisdiction over the plaintiff's claim under 29 U.S.C. § 626(c), pursuant to 28 U.S.C. §§ 1331 and 1343, as well as supplemental jurisdiction over the plaintiff's state law claim pursuant to 29 U.S.C. § 1367.

For the reasons discussed below, the defendant's motion for summary judgment shall be granted.

### I.

The plaintiff, Joan E. Hansen, originally filed this age discrimination action on July 25, 1996. In her complaint, she alleges that the defendant, Vanderbilt University, retaliated against her in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), and the Tennessee Human Rights Act, Tenn.Code Ann. §§ 4–21–101 to 4–21–905. Specifically, Ms. Hansen contends that Vanderbilt retaliated against her by requiring that she withdraw a pending charge of age discrimination with the Equal Employment Opportunity Commission as a condition to the implementation of a recommended resolution to a grievance she had filed with Vanderbilt.

Ms. Hansen commenced employment with Vanderbilt in 1985. After a number of transfers, Ms. Hansen began working in the Division of Vascular Surgery of the Section of Surgical Sciences at Vanderbilt Medical Center in 1993. At all times relevant to this action, David S. Noel served as the administrator for the Section, Dr. Thomas C. Naslund served as the head of the Division, and Martina Hailey served as the administrative assistant for the Division.

On September 13, 1995, Ms. Hailey provided Ms. Hansen with a letter of reprimand known as a Performance Improvement Counseling letter. On September 17, 1995, Ms. Hansen filed an internal grievance against Ms. Hailey based on the issuance of this PIC. Ms. Hansen admits that this grievance did not allege age discrimination. On the same day, Ms. Hansen filed a second internal grievance against Dr. Naslund, objecting to his approval of the PIC issued by Ms. Hailey. In this grievance, Ms. Hansen also complained of derogatory, age-related remarks allegedly made by Dr. Naslund.[1]

---

1. According to the plaintiff's EEOC charge, Dr. Naslund asked her on September 14, 1995, "how long is it before you do not have to work?" When she replied "two and a half years," he

Dr. Naslund and Mr. Noel met with Ms. Hansen on September 21, 1995, and asked her to sign a voluntary resignation letter. According to the plaintiff, Dr. Naslund and Mr. Noel confined her in a conference room for approximately thirty minutes in an attempt to force her to sign the resignation letter. When she refused to sign the letter, she was discharged.

On September 23, 1995, Ms. Hansen filed a renewed internal grievance against Dr. Naslund and a new internal grievance against Mr. Noel. On September 29, 1995, Ms. Hansen filed an age discrimination charge with the EEOC, charging Vanderbilt University Medical Center and Dr. Naslund with age discrimination and harassment.

Pursuant to Vanderbilt's policy, Ms. Hansen's claim of age discrimination was referred to its Opportunity Development Center. Michael Miller, the assistant director of the ODC, investigated and found no basis for the claim.[2] A copy of this finding was forwarded to Dr. Deborah German, Associate Dean of Students, the hearing officer designated to hear Ms. Hansen's grievance.

On November 20, 1995, a grievance hearing was held before Dr. German. On December 6, 1995, Dr. German issued a recommendation[3] whereby Ms. Hansen would be placed on paid administrative leave for six months with a reasonable letter of recommendation to help her find another position within the Vanderbilt system. Ms. Hansen believed the six months paid leave was an "award" and that she had "won" her internal grievance procedure. Plaintiff's memoran-

dum (Docket Entry No. 20) at 7. In her letter to Ms. Hansen, Dr. German specifically explained that

> [d]ue to the nature of the environment of the office and the obvious tensions between yourself, Dr. Naslund, Mr. Noel and Ms. Hailey, it is impossible for me to find evidence of age discrimination or harassment. I do not believe that age discrimination is a factor in this case.

Complaint (Docket Entry No. 1) Exhibit D at 1.

On December 22, 1995, Richard Smogur, the Director of Human Resource Services, sent a settlement proposal to Ms. Hansen. The proposal explained that Vanderbilt would

> accept the recommendation of the hearing officer subject to Ms. Hansen's agreement to the full compromise and settlement of any and all claims or causes of action arising out of or in any way connected with her employment at Vanderbilt, including withdrawal of the EEOC charge.

Complaint (Docket Entry No. 1) exhibit E at 3.

When Ms. Hansen refused to withdraw her EEOC charge, Vanderbilt declined to implement Dr. German's recommended resolution.

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

---

allegedly told her she needed "to resign and go to temporary services, at your age you will not get back into the Vanderbilt system." Complaint (filed July 25, 1996; Docket Entry No. 1) exhibit C at 2.

**2.** Mr. Miller clarified his findings in a letter to Ms. Hansen dated November 30, 1995, where he stated:

Dr. Naslund states that he never told you that your age would prevent you from transferring within the Vanderbilt system, and Dr. Naslund was involved in the decision to hire you, as an internal transfer, less than two years ago when you were 61. Particularly given your success securing internal transfer opportunities at ages 52, 53, 56, 58, 60 and 61, it seems unlikely that

either you or Dr. Naslund had cause to believe that your current age, 62, would adversely affect your ability to secure an internal transfer opportunity. Therefore, I find that you have not been treated unfairly by Vanderbilt, because of your age.

Unless I hear otherwise from you, I will assume that this letter more completely addresses your age discrimination grievance against Dr. Naslund....

Complaint (Docket Entry No. 1) exhibit D at 4.

**3.** While the plaintiff insists on calling this recommendation an "award," the Court finds that Dr. German and Vanderbilt continually referred to Dr. German's findings as "recommendations." *See* Complaint (Docket Entry No. 1) exhibits D and E.

show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.,* 921 F.2d at 1349; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [4] *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.,* 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324,

106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

### III.

The ADEA prohibits discrimination in employment on the basis of age. 29 U.S.C. § 621. In addition to other proscriptions, the ADEA specifically prohibits employers from retaliating against employees who have filed charges with the EEOC alleging discrimination.[5] *Johnson v. U.S. Dept. of Health and Human Serv.,* 30 F.3d 45, 47 (6th Cir.1994).

In order to establish a prima facie case of age discrimination based on retaliation, the plaintiff must establish the existence of four required elements: (1) that she was engaged in a protected activity; (2) that the defendant knew she was engaged in this protected activity; (3) that the defendant subsequently took an employment action adverse to her; and (4) that a causal connection existed between the protected activity and the adverse employment action. *Latosky v. Morrison–Knudsen Corp.,* No. 95–4176, 1996 WL 708346 at *3 (6th Cir. Dec.5, 1996) (citing *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990)).[6]

---

**4.** The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

**5.** 29 U.S.C. § 623(d) provides in pertinent part as follows:

It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has made a charge

... in an investigation, proceeding or litigation under this chapter.

**6.** As there is no direct evidence of retaliation against the plaintiff, the plaintiff may carry her burden according to the guidelines of the *McDonnell Douglas* test established by the Supreme Court of the United States. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, as the Court disposes of this motion on the grounds that the plaintiff has failed to establish a prima facie case of retaliation, it need not reach the issues of

■ At issue in this case is whether Ms. Hansen can establish the third element, namely whether Vanderbilt took an employment action adverse to her.[7] According to the plaintiff, she had a right to participate in Vanderbilt's in-house grievance procedure and thus she was "entitled to the award" she received. Plaintiff's memorandum (Docket Entry No. 20) at 17. She argues that by taking that award away, thus denying what had already been given her, she suffered an adverse employment action. *Id.* at 17–18.

The defendant contends that coupling the settlement of an internal grievance with the withdrawal of an EEOC charge is not an adverse action. In support of this contention, the defendant points to the case of *Longworth v. Nat'l Supermarkets, Inc.*, No. 83–2689C(5), 1986 WL 8711 (E.D.Mo. June 6, 1986). In *Longworth*, the court found that an employer had not retaliated against an employee in violation of the ADEA when it refused to rehire her unless she accepted a settlement offer that required her to withdraw a charge she had filed with the EEOC. *Id.* at 9–10. The court found that the employee could not get the benefit of the bargain—reinstatement—without also performing her obligations—withdrawing her EEOC complaint. *Id.* at 10. The court further explained that:

> [i]f EEO complainants could prevail on the [plaintiff's theory] . . ., employers would never settle such complaints. Anytime an employer and employee reached a settlement agreement, the complainant would then refuse to compromise her EEO claim

and threaten to sue her employer for retaliation if it held her to the agreement. *Id.*

In a similar case, another court found that an employer had not retaliated against an employee when it offered a special award of three month's severance pay in exchange for the employee signing a separation agreement which released the employer from all claims the employee might have against it. *Cronin v. ITT Corp.*, 737 F.Supp. 224, 230–31 (S.D.N.Y.), *aff'd*, 916 F.2d 709 (1990). The court explained that the employee did not receive the special award because he refused to sign the separation agreement with the release clause, and not because the employer was retaliating against him. *Id.*

The Court finds that requiring an employee to withdraw an EEOC claim in order to have a recommended settlement award implemented is not an adverse employment action. Ms. Hansen may choose to pursue her EEOC claim, or she may choose to relinquish that claim in order to have Dr. German's recommendations implemented.[8] Choosing one option over the other based on an analysis of the risks and benefits is the essence of the settlement process. The Court fails to see why Vanderbilt should be expected to award the plaintiff compensation and receive nothing in return.

■ As Ms. Hansen has not established that Vanderbilt took an employment action adverse to her, she cannot prevail on her cause of action and the defendant is entitled to judgment as a matter of law.[9]

---

whether Vanderbilt had a legitimate nonretaliatory reason for the adverse action, nor whether this purported reason is merely pretextual. *See also, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 415 (1993).

**7.** The defendant concedes that the plaintiff can show the first and second elements of the prima facie case.

**8.** The Court notes that Dr. German recommended most of the relief which Ms. Hansen originally sought when she filed her internal grievances. *Compare* the complaint (Docket Entry No. 1) exhibit D with the defendant's memorandum (Docket Entry No. 14) exhibits 4 and 5.

**9.** The Court finds no merit to the plaintiff's contention that Vanderbilt's "policy" of requiring employees to withdraw their EEOC claims in order to reach a settlement agreement was "per se retaliatory." Plaintiff's memorandum (Docket Entry No. 20) at 10–14. In the case relied upon by the plaintiff, the court explained that a policy which *adversely* affected employees who exercised their statutory rights under the ADEA was per se retaliatory. *E.E.O.C. v. Board of Governors*, 957 F.2d 424, 429–31 (7th Cir.), *cert. denied*, 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992) (emphasis added). As this Court finds that a settlement offer which requires a plaintiff to withdraw her EEOC claims is not an adverse action, such a policy, if one even exists, is not per se retaliatory.

1154

## IV.

As the plaintiff has failed to sustain her burden of presenting a genuine issue of material fact as to one element of her prima facie case, the defendant is entitled to judgment as a matter of law. *Burns v. City of Columbus, Dept. of Public Safety, Div. of Police,* 91 F.3d 836, 845 (6th Cir.1996). Accordingly, the defendant's motion for summary judgment is granted.

As the Court dismisses with prejudice the federal claim, it declines to exercise supplemental jurisdiction over the plaintiff's pending state claim. *See* 28 U.S.C. § 1367(c)(3); *see also Cameron v. Seitz,* 38 F.3d 264, 276 (6th Cir.1994) ("With the dismissal of the [federal] claim, original jurisdiction over the state ... claim is lacking, and the district court has discretion as to whether to continue to exercise supplemental jurisdiction over it.") Thus, the Court dismisses without prejudice the plaintiff's state law claim.

**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 15, Defendant.**

Nos. 96 C 3989, 96 C 7295.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 31, 1996.

Brian Jeffrey Gold, Leah Ellen Pazol, Sonja L. Lengnick, Sidley & Austin, Chicago, IL, for Commonwealth Edison Co.

Robert Shorey Graettinger, Illinois Attorney General's Office, Chicago, IL, Charles A. Werner, Schuchat, Cook and Werner, St. Louis, MO, James M. Lockwood, Park Ridge, IL, for Local 15 Intern. Broth. of Elec. Workers.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District Judge.

Plaintiff International Brotherhood of Electrical Workers, Local Union No. 15 ("Local 15") filed suit against Commonwealth Edison Company ("ComEd"), Kincaid Generation, L.L.C. ("Kincaid"), and the Illinois Commerce Commission ("ICC") in the Circuit Court of Sangamon County, Illinois, alleging that the Asset Sale Agreement negotiated between ComEd and Kincaid for the sale of the Kincaid Generating Station (the "Generating Station") in Sangamon and Christian Counties, Illinois, is in direct violation of the Illinois Collective Bargaining Successor Employer Act, 820 ILCS 10/1. ComEd and Kincaid subsequently removed the case to the United States District Court for the Central District of Illinois where

Judge Richard Mills entered an order transferring the case to this Court. Local 15 now moves to remand this case to the Circuit Court of Sangamon County, Illinois, pursuant to 28 U.S.C. § 1447. For the following reasons, the motion to remand is denied.

### BACKGROUND

Defendant ComEd is a public utility company that provides electrical power to customers in the State of Illinois. Plaintiff Local 15 is the exclusive bargaining representative of ComEd's bargaining unit employees, including all of the bargaining unit employees at ComEd's Generating Station in Sangamon and Christian Counties, Illinois.

Local 15 and ComEd are parties to a collective bargaining agreement that governs the terms and conditions of employment for ComEd's bargaining unit employees, including all employees at the Generating Station. The collective bargaining agreement provides in part:

> This agreement shall be binding upon the parties and their respective successors and assigns. Subject to the Company obtaining all necessary approval of any governmental authority or regulatory body, including but not limited to the Illinois Commerce Commission, and except in cases of liquidation or condemnation or sale or transfer (i) to an entity which has the authority to initiate condemnation proceedings, or (ii) pursuant to any right granted prior to the date hereof, in the event the Company sells or otherwise transfers all or substantially all of its assets to another person, company, corporation, or firm during the term of this Agreement, the Company will require such purchaser or transferee to assume the obligations under this Agreement until the expiration of the term of this Agreement.

(Compl. ¶ 5; Answer ¶ 5). The agreement expires on September 30, 1997.

Defendant Kincaid is a Virginia limited liability company which operates public utility companies. On April 17, 1996, Kincaid entered into an Asset Sale Agreement (the "Sale Agreement") with ComEd for the purchase of ComEd's Generating Station in Sangamon and Christian Counties, Illinois. The Sale Agreement expressly provides that Kincaid is not required to assume ComEd's obligations under the collective bargaining agreement negotiated with Local 15. (Compl. ¶¶ 12–13; Answer ¶¶ 12–13).

The sale of the Generating Station is subject to approval by the ICC. On May 13, 1996, ComEd filed a petition with the ICC pursuant to section 7–102 of the Illinois Public Utilities Act, 220 ILCS 5/7–102, requesting the ICC's approval of the Sale Agreement. Local 15 opposes the sale and, consequently, moved to intervene in the proceedings. The ICC granted Local 15's motion to intervene in the proceedings on September 25, 1996. The proceedings before the ICC are currently pending and a ruling on ComEd's petition is not expected until February of 1997.

Local 15 objects to the sale of the Generating Station because the Sale Agreement does not require Kincaid to assume ComEd's obligations under the collective bargaining agreement negotiated with Local 15. According to Local 15, this constitutes a violation of the Illinois Collective Bargaining Successor Employer Act, 820 ILCS 10/1, (the "Illinois successor statute") which provides in part:

> Where a collective bargaining agreement between an employer and a labor organization contains a successor clause, such clause shall be binding upon and enforceable against any successor employer who succeeds to the contracting employer's business, until the expiration date of the agreement therein stated. No such successor clause shall be binding upon or enforceable against any successor employer for more than 3 years from the effective date of the collective bargaining agreement between the contracting employer and the labor organization.

820 ILCS 10/1(a). A "successor employer" is defined as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or transferee conducts or will conduct substan-

tially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b). The statute further provides:

An employer who is a party to a collective bargaining agreement containing a successor clause has the affirmative duty to disclose the existence of such agreement and such clause to any successor employer. Such disclosure requirement shall be satisfied by including in any contract of sale, agreement to purchase, or any similar instrument of conveyance, a statement that the successor employer is bound by such successor clause as provided for in the collective bargaining agreement. Failure of an employer to disclose the existence of a collective bargaining agreement containing a successor clause as required by subsection (d) shall not effect the enforceability of such collective bargaining agreement against a successor employer.

820 ILCS 10/1(d). Additionally, the statute imposes a fine not to exceed $5,000 on an employer that fails to comply with its provisions. 820 ILCS 10/2.

On July 1, 1996, ComEd filed suit against Local 15 in the United States District Court for the Northern District of Illinois, Eastern Division (Case No. 96 C 3989) seeking, among other things, a declaration that ComEd has not violated the Illinois successor statute because it is completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* Jurisdiction over this action is premised on 28 U.S.C. § 1331 and 29 U.S.C. § 185. ComEd has also filed a motion for a judgment on the pleadings which is currently pending before this Court.

On July 18, 1996, Local 15 filed the instant law suit (Case No. 96 C 7295) against ComEd, Kincaid, and the ICC in the Circuit Court of Sangamon County, Illinois, alleging that the Sale Agreement between ComEd and Kincaid for the sale of the Generating Station is in direct violation of the Illinois successor statute because the Sale Agreement expressly provides that Kincaid is not required to assume ComEd's obligations under the collective bargaining agreement ne-

gotiated with Local 15. (Compl.¶¶ 17–18). Local 15 seeks an order compelling ComEd to incorporate in the Sale Agreement the terms of the current collective bargaining agreement between ComEd and Local 15 and an order that those terms and conditions are binding on Kincaid. (Compl.¶ 19). Local 15 further requests that "the Court enjoin the ICC, ComEd, and Kincaid, from the continued processing of a Petition before the ICC containing an Asset Sale Agreement with provisions that are in direct violation of an Illinois statute; that the Court enjoin the ICC from issuing an Order consenting to and/or approving a Petition for the sale of certain utility property, including the Kincaid Generating Station, by ComEd to Kincaid when the Petition contains an Asset Sale Agreement which is in direct violation of an Illinois statute." (Compl.¶ 25).

On August 9, 1996, ComEd and Kincaid filed a timely notice of removal, *see* 28 U.S.C. § 1446(b), pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185 asserting that the Illinois successor statute is completely preempted by § 301 of the LMRA. Consequently, the case was removed to the United States District Court for the Central District of Illinois. The ICC did not join in the petition for removal. ComEd and Kincaid asserted that the ICC's consent to removal was not necessary because it was fraudulently joined as a party to this suit. ComEd answered the complaint on August 16, 1996. On August 29, 1996, ComEd and Kincaid filed separate motions for a judgment on the pleadings asserting that the Illinois successor statute is preempted by § 301 of the LMRA and by the NLRA.

On September 6, 1996, Local 15 filed a timely motion to remand the case to the Circuit Court of Sangamon County, Illinois, for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447. Local 15 asserted that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption. Local 15 further emphasized that removal was improper because the ICC did not join in the petition for removal with ComEd and Kincaid.

Judge Richard Mills of the United States District Court for the Central District of Illinois addressed Local 15's motion to remand on October 30, 1996. He concluded:

Because all three preemption doctrines have been raised in the Northern District case and only one has been raised here, it makes sense to consolidate these cases. It would be a waste of judicial resources to have two cases pending when the parties and the issues are nearly identical and the results of one case would be res judicata on the other. *See Kearney & Trecker Corp. v. Cincinnati Milling Mach. Co.*, 254 F.Supp. 130, 133 (N.D.Ill.1966). Furthermore, it would conserve judicial resources to have all preemption issues relating to the same statute decided in one forum.

*International Brotherhood of Electrical Workers, AFL–CIO, Local Union 15 v. Commonwealth Edison Company, Kincaid Generation L.L.C., and Illinois Commerce Commission*, No. 96–3228, slip op. at 5–6 (C.D.Ill. Oct. 30, 1996). In the interest of justice, Judge Mills transferred the case to this Court pursuant to 28 U.S.C. § 1404(a). *Id.* at 6.[1] Judge Mills also denied all pending motions as moot and granted the parties leave to refile them before this Court. *Id.*

On or about November 5, 1996, Local 15 filed the instant renewed motion to remand the case (Case No. 96 C 7295) to the Circuit Court of Sangamon County, Illinois, for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447. Local 15 argues that, contrary to defendants' assertions, this case does not involve the interpretation of a collective bargaining agreement. Thus, Local 15 asserts, the Illinois successor statute is not completely preempted by § 301 of the LMRA, 29 U.S.C. § 185. Local 15 further argues that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption. Additionally, Local 15 challenges removal on the grounds that the ICC failed to join the petition for removal and has not waived its sovereign immunity under the Eleventh Amendment.

**LEGAL STANDARD**

The burden of establishing federal jurisdiction falls on the party seeking to preserve removal. *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir.1993); *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921). Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum. *Doe v. Allied–Signal, Inc.*, 985 F.2d 908, 911 (7th Cir.1993). Any doubts regarding jurisdiction should be resolved in favor of remanding the action to state court. *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir.1976).

**DISCUSSION**

Removal may be challenged either for the absence of subject matter jurisdiction or for procedural defects. 28 U.S.C. § 1447(c); *Matter of Continental Cas. Co.*, 29 F.3d 292, 293 (7th Cir.1994). Here, Local 15 challenges removal on both grounds asserting that: (1) this Court lacks subject matter jurisdiction because the Illinois successor statute is not preempted by § 301 of the LMRA; and (2) removal was improper because the ICC did not join in the petition for removal and has not waived its sovereign immunity under the Eleventh Amendment. We address each issue in turn.

I. *Subject Matter Jurisdiction: § 301 of the LMRA*

Under 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States ..." 28 U.S.C. § 1441(a). Whether this Court has subject matter jurisdiction over the present case depends upon whether this Court has "federal question" jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction extends to "all civil actions arising under the Constitution, laws, or

---

1. Local 15's action (Case No. 96 C 7295) was originally assigned to our colleague Judge Harry D. Leinenweber. On December 20, 1996, the case was reassigned to this Court and consolidat-

ed with ComEd's declaratory judgment action (Case No. 96 C 3989) on the basis of relatedness pursuant to Local General Rule 2.31.

treaties of the United States." 28 U.S.C. § 1331.

ComEd and Kincaid assert that this Court has federal question jurisdiction because Local 15's claims under the Illinois successor statute are completely preempted by § 301 of the LMRA, 29 U.S.C. § 185. Local 15, however, claims that its complaint alleges an action arising solely under Illinois law.

 To determine whether federal question jurisdiction exists, a federal court must determine if the "plaintiff's well-pleaded complaint raises issues of federal law." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 9–12, 103 S.Ct. 2841, 2846–48, 77 L.Ed.2d 420 (1983); *Rice v. Panchal,* 65 F.3d 637, 639 (7th Cir. 1995). A defendant cannot create a federal question by asserting an issue of federal law in a pleading or in a petition for removal. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 391, 107 S.Ct. 2425, 2428–29, 96 L.Ed.2d 318 (1987). On the other hand, a plaintiff may not avoid a federal forum by drafting an essentially federal claim in terms of state law (the "artful pleading doctrine"). *Federated Dept. Stores Inc. v. Moitie,* 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981).

 Federal issues which serve as a defense to a state law action (sometimes called "conflict preemption") do not confer federal question jurisdiction and therefore cannot serve as the basis for removal. *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430; *Rice,* 65 F.3d at 639. Ordinarily, as Local 15 correctly notes, federal preemption is asserted as a defense to the allegations in a complaint. *Caterpillar,* 482 U.S. at 392, 107 S.Ct. at 2429–30; *Rice,* 65 F.3d at 639; *see also Franchise Tax Bd.,* 463 U.S. at 10, 103 S.Ct. at 2846–47 (case may not be removed to federal court on basis of a defense, including the defense of preemption).

 ComEd and Kincaid, however, invoke the "complete preemption" doctrine in support of removal. This doctrine is a well-established exception to the well-pleaded

complaint and conflict preemption rules. *Metropolitan Life,* 481 U.S. at 63, 107 S.Ct. at 1546; *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430. Pursuant to the Supremacy Clause of Art. VI of the United States Constitution, "Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life,* 481 U.S. at 63–64, 107 S.Ct. at 1546. When Congress has completely preempted an area of state law, any attempt by a plaintiff to allege a state law claim is properly characterized from its inception as a complaint arising under federal law. *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430; *Douglas v. American Information Technologies Corp.,* 877 F.2d 565, 569 (7th Cir.1989); *Atchley v. Heritage Cable Vision Associates,* 101 F.3d 495, 498–99 (7th Cir.1996).

 Congress has given § 301 of the LMRA such complete preemptive force. *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430; *Loewen Group Intern., Inc. v. Haberichter,* 65 F.3d 1417, 1420 (7th Cir.1995). Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). "This section provides federal court jurisdiction over controversies involving collective bargaining agreements and also authorizes federal courts to fashion a body of federal law for the enforcement of those agreements." *Loewen,* 65 F.3d at 1421; *see also Textile Workers Union of America v. Lincoln Mills of Ala.,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Federal law must be applied when resolving such disputes to ensure uniform interpretation of collective bargaining agreements. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct. 1877, 1879–80, 100 L.Ed.2d 410 (1988); *Loewen,* 65 F.3d at 1421. "Even if a plaintiff makes no mention of § 301 in a

complaint, § 301 nevertheless may displace entirely a state cause of action, allowing removal by the defendant under the complete preemption exception to the well-pleaded complaint rule." *Atchley,* 101 F.3d 495, 498.

In order to determine whether a party's state law claims are preempted under § 301, courts must decide whether the resolution of the state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement. *Lingle,* 486 U.S. at 405–06, 407, 409–10, 108 S.Ct. at 1881–82, 1882, 1883–84. Section 301 preempts claims "founded directly on rights created by collective bargaining agreements, and also on claims substantially dependent on analysis of a collective bargaining agreement." *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2431 (*quoting International Broth. of Elec. Workers, AFL–CIO v. Hechler,* 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987)); *Loewen,* 65 F.3d at 1421. If the "heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement, that complaint arises under federal law." *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2430 (*quoting Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers,* 390 U.S. 557, 558, 88 S.Ct. 1235, 1236, 20 L.Ed.2d 126 (1968)).

The broad preemptive effect of § 301 does not, however, apply in every case involving a collective bargaining agreement. *Loewen,* 65 F.3d at 1421. "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is preempted by § 301 or other provisions of the federal labor law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985); *Loewen,* 65 F.3d at 1421. "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994). Rather, preemption is found only when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent on an analysis of the terms of the collective bargaining agreement. *Loewen,* 65 F.3d at 1423; *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2430–31; *Lueck,* 471 U.S. at 210, 105 S.Ct. at 1910–11.

In the present case, the complaint does not allege a violation of the collective bargaining agreement but rather is based upon an alleged violation of the Illinois successor statute. ComEd and Kincaid argue that the Illinois successor statute is "inextricably intertwined" with, and dependent upon an interpretation of, the collective bargaining agreement negotiated between ComEd and Local 15 and is therefore completely preempted by § 301. We must therefore analyze the elements of the state law claim to assess whether it is founded upon the provision of a collective bargaining agreement or whether adjudication of the claim will require interpretation of the terms of a collective bargaining agreement. *See Smith v. Colgate–Palmolive Co.,* 943 F.2d 764 (7th Cir. 1991); *Bettis v. Oscar Mayer Foods Corp.,* 878 F.2d 192 (7th Cir.1989).

Local 15's complaint alleges a direct violation of the Illinois successor statute which makes a new employer liable for the obligations of a predecessor's collective bargaining agreement when that agreement contains a successor clause. (Compl.¶¶ 17, 23). The statute provides in part:

> Where a collective bargaining agreement between an employer and a labor organization contains a successor clause, such clause shall be binding upon and enforceable against any successor employer who succeeds to the contracting employer's business, until the expiration date of the agreement therein stated. No such successor clause shall be binding upon or enforceable against any successor employer for more than 3 years from the effective date of the collective bargaining agreement between the contracting employer and the labor organization.

820 ILCS 10/1(a). A "successor employer" is defined as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or

transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b). The statute also imposes a fine not to exceed $5,000 on an employer that fails to comply with its provisions. 820 ILCS 10/2.

Even the most cursory reading of the Illinois successor statute, on which Local 15's complaint is based, reveals that the "heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement." Specifically, the collective bargaining agreement at issue in this case contains the following provision which Local 15 refers to as a "successor clause":

> This agreement shall be binding upon the parties and their respective successors and assigns. Subject to the Company obtaining all necessary approval of any governmental authority or regulatory body, including but not limited to the Illinois Commerce Commission, and except in cases of liquidation or condemnation or sale or transfer (i) to an entity which has the authority to initiate condemnation proceedings, or (ii) pursuant to any right granted prior to the date hereof, in the event the Company sells or otherwise transfers all or substantially all of its assets to another person, company, corporation, or firm during the term of this Agreement, the Company will require such purchaser or transferee to assume the obligations under this Agreement until the expiration of the term of this Agreement.

(Compl. ¶ 5; Answer ¶ 5). The meaning, application, and enforcement of this provision, and not the Illinois successor statute, is the subject of this dispute. Indeed, the statute presupposes the existence of a "successor clause" in the collective bargaining agreement. It creates no rights independent of the collective bargaining agreement itself. Resolution of this dispute will therefore require a court initially to interpret the collective bargaining agreement to determine whether it contains a "successor clause" as defined by the statute.

In *Lueck*, a worker sued his employer and the insurance company that administered the provisions of the collective bargaining agreement relating to disability benefits. The worker alleged that the defendants had refused in bad faith to honor his claim for benefits. Although the Supreme Court upheld preemption of the bad faith tort by § 301 of the LMRA, it emphasized that not every state law asserting a right that relates to a collective bargaining agreement is preempted. 471 U.S. at 210–14, 105 S.Ct. at 1911–12. Rather, only "state law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are preempted by those agreements." *Id.* at 213, 105 S.Ct. at 1912. Thus, any claim that "is inextricably intertwined with consideration of the terms of a labor contract" is preempted. *Id.*

This rule was applied by Judge Susan Getzendanner in *SR Industries Corp. v. International Ass'n of Bridge, Structural and Ornamental Ironworkers, Shopmen's Div., Local No. 473*, No. 87 C 2370, 1987 WL 17818 (N.D.Ill. Sept.25, 1987). In that case, the plaintiff corporation and defendant union negotiated a collective bargaining agreement which provided for, among other things, annual vacation benefits in accordance with a schedule based on length of employment. After the agreement expired, the company discharged the majority of its employees. In response, the union requested the payment of vacation benefits which had accrued but had not been received during the tenure of the agreement. After the company refused to pay any vacation benefits and denied there was any obligation to do so, the union filed suit in the Circuit Court of Cook County, Illinois, alleging violations of the Illinois Wage Payment and Collection Act ("IWCPA"). The IWCPA provided that, unless otherwise provided for in a collective bargaining agreement, whenever an employment contract or policy provides for paid vacations, and an employee resigns without having taken all vacation time earned, the monetary equivalent shall be paid to him or her.

The company subsequently filed its own action in federal court seeking a declaration

*Cf. Houston v. Partee,* 776 F.Supp. 1309, 1312 (N.D.Ill.1991) (holding that police officer is entitled to qualified immunity where complaint alleges failure of officer to search out convict after his conviction for purpose of disclosing recently discovered exculpatory evidence since there was not clearly established authority imposing such a duty); Stanley Z. Fisher, *"Just the Facts, Ma'am:" Lying and the Omission of Exculpatory Evidence in Police Reports,* 28 New Eng. L.Rev. 1, 44 (1993). Having impugned no constitutional right by failing to test her blood for drugs, the Deputies are good-faith immune from liability under § 1983.[13]

### c. Failure to Preserve the Original Lien Report

Plaintiff in her brief alludes to the fact that the Deputies failed to preserve exculpatory evidence, to wit: the original lien report by Wayne County Dispatch and/or Michigan State Police Dispatch. She seems to be asserting that this action constituted a violation of her substantive due process rights under the Fourteenth Amendment of the Constitution of the United States. This court holds that the Deputies did not violate any such rights, and therefore are entitled to qualified immunity.

In *California v. Trombetta,* 467 U.S. 479, 481, 104 S.Ct. 2528, 2530, 81 L.Ed.2d 413 (1984), the Supreme Court held that it.was a violation of due process to fail to preserve "material" evidence, meaning evidence that might be expected to play a role in the defense, after it is gathered and in possession of the police when two conditions are met. First, the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed," and second, it "must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. Moreover, the Supreme Court held that failure to preserve evidence that is *potentially* exculpatory violates due process if the police acted in bad-faith. *Arizona v. Youngblood,*

488 U.S. 51, 58–59, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988), *reh'g. denied,* 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989). What is clear in either situation however is that the evidence must be of more than speculative exculpatory value. The Fourteenth Amendment does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58, 109 S.Ct. at 337. In the case at hand, there is no evidence of any kind that this so-called lien report was indeed exculpatory. It is pure conjecture whether the lien report would play a role in the exoneration of plaintiff. When "there is no indication that there was anything exculpatory about destroyed evidence, due process has not been violated." *United States v. Jobson,* 102 F.3d 214, 219 (6th Cir.1996) (*citing United States v. Braggs,* 23 F.3d 1047, 1051 (6th Cir.1994)). In this respect, the instant case is analogous to *United States v. Jobson,* where the court found no constitutional violation when police failed to preserve a dispatch tape since there was no evidence of any kind that the dispatch tape would contain exculpatory information. 102 F.3d 214, 219 (6th Cir.1996).

### d. Failing to Intervene During the Arrest

Plaintiff's last claim against the Deputies is that they failed to intervene and curtail the excessive use of force employed during her arrest. She asserts that these officers were present at the time of the arrest, should have seen her being beaten, and could have taken reasonable steps to protect her from the use of excessive force by other officers. In a nutshell, she contends that the Deputies cannot don the mantle of qualified immunity since their failure to intervene was objectively unreasonable in light of the law at the time the arrest took place.

Long before this incident occurred, it was clearly established that the Due Process Clause imposes on a police officer the duty to intervene and protect a citizen from another's use of excessive force. This duty was

---

**13.** Plaintiff's claim is unusual because typically the argument is *not* that a blood sample should have been taken, but that the taking of a blood sample constituted an unreasonable search proscribed by the Fourth Amendment.

originally defined in the case of *Byrd v. Brishke*, 466 F.2d 6 (7th Cir.1972), where the Seventh Circuit concluded that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person." *Id.* at 11. The court in *Byrd* stated that officers should not be insulated "for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace." *Id. See also Putman v. Gerloff*, 639 F.2d 415 (8th Cir.1981) (deputy's failure to intervene in beating administered by sheriff sufficient to subject him to liability). *Byrd* has since been adopted by the Sixth Circuit. *See e.g. Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982) (holding that "it is not necessary, in order to hold a police officer liable under section 1983, to demonstrate that the officer actively participated in striking a plaintiff"), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983).

Having identified the right as "clearly established," the court must now determine whether plaintiff has presented sufficient evidence showing that the Deputies' actions were objectively unreasonable in light of the clearly established right for purposes of defeating Pierce and Holme's motion for summary judgment on this claim. This court submits that she has.

The Deputies argue that their actions in not interceding were objectively reasonable. According to the deposition testimony of Deputy Pierce, he was standing fifteen feet behind the suspect vehicle. He testified at his deposition that he had a general observation of the arrest, but was focusing his interest and attention on whether there was any danger remaining inside the suspect vehicle. He stated that her vehicle was obstructing his view of her as she lay on the ground. Deputy Holme on the other hand, testified at his deposition that he was standing at the passenger side of his vehicle at the initial stage of the arrest. He was on the radio attempting to secure an EMS to the scene. Sometime during her arrest, he moved to the rear of his vehicle and then had only a limited view of her arrest.

■ This court finds that there is a genuine question of fact as to whether it was reasonable for Pierce and Holme not to intervene under the circumstances. The alleged gassing and beating of the plaintiff was at most for a period of a few minutes. Plaintiff does not, however, know what these Deputies were doing at the time the other officers were arresting her. She had no view of them, was blinded by the pepper gas and thus cannot controvert their testimony. Plaintiff, however, has pointed out the inconsistencies in the Deputies' current rendition of the facts. For instance, at the preliminary exam conducted on January 5, 1994 (12 days after the incident), Pierce boldly proclaimed that "yes I was on the scene and observed everything that took place." This seems contradictory to his present position that he merely had a "general observation" of the arrest since his attention was focused, not on plaintiff, but on the interior of the vehicle. In sum, there are genuine issues as to whether defendants saw the other officers use force, and whether there was sufficient time to intervene or prevent the alleged harm from occurring. These are issues for the trier of fact to resolve. *See Medley v. Turner,* 869 F.Supp. 567, 572 (N.D.Ill.1994) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."). *See also Diebitz v. Arreola,* 834 F.Supp. 298, 304 (E.D.Wis.1993) (holding that officer had ample opportunity to make some type of effort to protect plaintiff from being beaten during a jail elevator interlude lasting 30 to 60 seconds, even if it was a small gesture such as shouting to her fellow officers to stop the beating).

This court grants summary judgment in favor of the Michigan State Police Troopers Tamlyn, Harris, Drew and Crawford on all plaintiff's claims except for her claim that these defendants used excessive force during the arrest in violation of her Fourth Amendment rights. This court grants summary judgment to defendants County of Wayne, Wayne County Sheriff's Department, Wayne County Sheriff Ficano in his official and indi-

by Congress); *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 415, 84 S.Ct. 461, 464–65, 11 L.Ed.2d 440 (1964) (" 'When a federal court is properly appealed to in a case over which it has by law jurisdiction, it has a duty to take such jurisdiction' ") (*quoting Willcox v. Consolidated Gas Co. of New York,* 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909). Here, we have already determined that this Court has federal question jurisdiction under § 301 of the LMRA. Therefore, *Charles Dowd Box* imposes no bar to removal.

## II. *ICC*

■ Next, we must address the ICC's failure to join in the petition for removal filed by ComEd and Kincaid. Ordinarily, a petition for removal fails unless all defendants join in it. *Roe v. O'Donohue,* 38 F.3d 298, 301 (7th Cir.1994) (*citing Hanrick v. Hanrick,* 153 U.S. 192, 14 S.Ct. 835, 38 L.Ed. 685 (1894); *Torrence v. Shedd,* 144 U.S. 527, 12 S.Ct. 726, 36 L.Ed. 528 (1892). Local 15 contends that removal was improper on this basis alone since it is undisputed that the ICC did not join in the petition for removal.

Local 15 further indicates that there has been no explicit waiver of the State of Illinois' sovereign immunity. The Eleventh Amendment denies federal courts jurisdiction over any action wherein a state, state agency, or department is named as a defendant. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Pursuant to the Eleventh Amendment, Local 15 argues, this Court is without jurisdiction over the present case as long as the ICC is a defendant. *See Frances J. v. Wright,* 19 F.3d 337 (7th Cir.1994), *cert. denied,* 513 U.S. 876, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994).

ComEd and Kincaid contend that the ICC's consent to removal was not required because it was fraudulently joined in this action. Defendants further argue that the Eleventh Amendment will not bar removal when the state is fraudulently joined as a party.

■ The "fraudulently joinder" doctrine provides that when joinder of a given defendant destroys the removability of a case, and when there is no basis for stating a claim against that defendant in state court, a federal court may properly dismiss such a defendant and maintain jurisdiction over the case. *See generally,* 14A C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure* § 3723 (1985). The most common case involves the joinder of a nondiverse defendant to defeat subject matter jurisdiction based on diversity of citizenship. If the federal court finds there is no basis for the cause of action against the nondiverse defendant in state court, the court will dismiss the case as against that defendant and permit removal. *See, e.g., Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97–99, 42 S.Ct. 35, 37–38, 66 L.Ed. 144 (1921); *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1122–24 (5th Cir.1987); *Anderson v. Home Ins. Co.,* 724 F.2d 82, 84 (8th Cir.1983); *Roe v. General American Life Ins. Co.,* 712 F.2d 450, 452 (10th Cir.1983).

The Seventh Circuit has applied the "fraudulent joinder" doctrine in similar cases holding that diversity jurisdiction cannot be destroyed by fraudulent joinder of nondiverse parties. *Gottlieb v. Westin Hotel Co.,* 990 F.2d 323, 327 (7th Cir.1993); *see also Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 72–74 (7th Cir.1992); *Hoosier Energy Rural Elec. Co-op., Inc. v. Amoco Tax Leasing IV Corp.,* 34 F.3d 1310, 1314–16 (7th Cir.1994). "Fraudulent joinder occurs either when there is no possibility that a plaintiff can state a cause of action against nondiverse defendants in state court, or where there has been outright fraud in plaintiff's pleading of jurisdictional facts." *Gottlieb,* 990 F.2d at 327.

Although we are not aware of any case in which the Seventh Circuit has applied the doctrine in a case involving federal question jurisdiction, other courts have found fraudulent joinder equally appropriate in federal question cases. *See McKay By and Through McKay v. Boyd Const. Co., Inc.,* 769 F.2d 1084, 1087 (5th Cir.1985); *Simmons v. State of Cal., Dept. of Indus. Relations, Div. of Labor Standards Enforcement,* 740 F.Supp. 781, 786–87 (E.D.Cal.1990); *Stephans v. State of Nev.,* 685 F.Supp. 217, 219–20 (D.Nev.1988). In *McKay,* the Fifth Circuit,

which had previously applied the fraudulent joinder doctrine in diversity cases, found "no reason why a different rule would apply where the codefendant's presence bars federal jurisdiction because of the eleventh amendment." 769 F.2d at 1087.

District courts from other circuits have reached a similar conclusion. In *Simmons*, the plaintiffs filed a civil rights action in state court against the state of California, various subdivisions thereof, and various private defendants. The private defendants subsequently removed the action to federal court asserting federal question jurisdiction. The plaintiffs then moved to remand arguing that the district court lacked subject matter jurisdiction over the state defendants under the Eleventh Amendment. The district judge noted the applicability of fraudulent joinder in the diversity context but also found it equally appropriate in federal question cases when a claim is asserted against the state and a cause of action clearly does not exist. 740 F.Supp. at 786. The doctrine should be applied when the plaintiff knows a claim is groundless in law or fact to permit defendants to litigate federal claims in a federal rather than a local forum. *Id.* at 787. In such a case, the state will be disregarded for removal purposes. *Id.*

In *Stephans*, the court also applied the doctrine of fraudulent joinder in a federal question case. After determining that the plaintiff could state no cause of action against the state defendant in state court, the district court dismissed the state defendant and retained jurisdiction over the case pursuant to 28 U.S.C. § 1331. 685 F.Supp. at 219–21; *see also Insinga v. LaBella*, 845 F.2d 249, 254 (11th Cir.1988) (federal district court properly allowed removal under principles "akin to a finding of fraudulent joinder" after state court dismissed state defendant on sovereign immunity grounds); *Glover By and Through Glover v. Donnell*, 878 F.Supp. 898, 900–02 (S.D.Miss.1995) (joinder of state offi-

cial fraudulent and therefore no bar to removal when official could not be sued pursuant to qualified immunity); *Farmers' Bank Trust Co. of Hardinsburg, Ky. v. Atchison, T. & S.F. Ry. Co.*, 25 F.2d 23 (8th Cir.1928) (fraudulent joinder of claims in FELA case); *Preston v. Grant Advertising, Inc.*, 375 F.2d 439 (5th Cir.1967) (fraudulent joinder of claims in Jones Act case).

■ We find the reasoning in *McKay, Simmons*, and *Stephans* compelling in the instant case.[2] Local 15 has not provided, and nor have we discovered, any reason for not applying the fraudulent joinder doctrine in federal question cases. On the contrary, the rationale for applying the doctrine in federal question cases is equally compelling, if not more so, than in diversity cases. Defendants should be permitted to litigate federal claims in a federal forum. A plaintiff should not be allowed to defeat federal court jurisdiction under 28 U.S.C. § 1331 by fraudulently joining the state, or any other type of defendant, against whom no claim for relief could succeed in state court. In the absence of any Seventh Circuit authority to the contrary, we apply the doctrine of fraudulent joinder in the present case.

In determining whether the ICC was fraudulently joined, we must determine whether Local 15 can state a claim for relief against the ICC in Illinois state court. This is the same determination necessitated by a motion to dismiss. *See* Fed.R.Civ.P. 12(b)(6); *Green v. Amerada Hess Corp.*, 707 F.2d 201 (5th Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 701, 79 L.Ed.2d 166 (1984). Thus, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir. 1994); *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1031 (7th Cir.1992). "Dismissal is

---

**2.** We, of course, recognize that decisions of other courts of appeals and other district courts are not binding precedent on this Court. Nevertheless, when, as here, our circuit has not spoken on a particular issue, we must "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever we can," particularly when we find those decisions per-

suasive. *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir.1987) (*citing Richards v. Local 134, Intern. Broth. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir.1986)). Similarly, we may adopt and apply the reasoning of other district courts when it does not conflict with higher authority and we find it persuasive as applied to the facts of the case before us.

properly granted if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993) (*quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)). If Local 15 can state no claim for relief against the ICC in Illinois state court, we will dismiss the ICC as a party to this suit and retain jurisdiction over the case pursuant to 28 U.S.C. § 1331.

Having thoroughly reviewed Local 15's case against the ICC, we find that it is without merit. Local 15 has failed state a claim upon which relief can be granted against the ICC in state or federal court. To reach this conclusion, we look no further than Local 15's complaint. *See, e.g., Hoosier,* 34 F.3d at 1315.

Local 15 alleges that ComEd filed a petition with the ICC requesting approval of its Sale Agreement with Kincaid for the sale of the Generating Station. (Compl.¶ 20). This petition is currently pending before the ICC and a final decision is expected no earlier than February of 1997. Local 15 further alleges that the Sale Agreement is in direct violation of the Illinois successor statute which the "ICC must take into consideration when a Petition is filed asking for approval of the sale of certain utility property located in the State of Illinois, pursuant to Section 7–102 of the Illinois Public Utilities Act, all applicable Illinois Statutes that relate directly to the transaction pending before the ICC." (Compl.¶¶ 21–22). Injunctive relief is therefore necessary, Local 15 Alleges, to prevent the ICC "from issuing a final Order consenting to and/or approving said Petition with the aforementioned Asset Sales Agreement with provisions that are in direct violation of an Illinois statute." (Compl.¶ 23).

■ This claim is defective on several grounds. First, and most obviously, it is not yet ripe for review. As Local 15 concedes, the ICC has not yet decided ComEd's petition. Local 15 has therefore not suffered, and may never suffer, any concrete injury as a result of the ICC's final decision. It is entirely possible that the ICC will disapprove the petition thereby mooting Local 15's claims altogether.

■ In *National Marine, Inc. v. Illinois E.P.A.,* 159 Ill.2d 381, 203 Ill.Dec. 251, 639 N.E.2d 571 (1994), the plaintiff filed suit against the defendant state agency seeking declaratory and injunctive relief after the agency issued a notice informing the plaintiff that it may be potentially liable for the release, or substantial threat of release, of hazardous substances on its property. The case was dismissed by the circuit court and affirmed by the Illinois Appellate Court. The Illinois Supreme Court agreed holding that the plaintiff's claim was not a controversy "ripe" for review:

> The basic rationale of the ripeness doctrine … 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'

*Id.* at 388, 203 Ill.Dec. at 254, 639 N.E.2d at 574 (*citing Bio–Medical Laboratories, Inc. v. Trainor,* 68 Ill.2d 540, 546, 12 Ill.Dec. 600, 370 N.E.2d 223 (1977) (*quoting Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). An agency's preliminary, investigative action does not create an actual controversy capable of judicial resolution or review. *Id.* at 389–90, 203 Ill. Dec. at 254, 639 N.E.2d at 574. "Rather, it requires a showing that the underlying facts and issues of the case are not moot or premature, so as to require the court to pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events. [Citations.] The case must, therefore, present a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof." *Id.* at 390, 203 Ill.Dec. at 255, 639 N.E.2d at 575 (*citing Howlett v. Scott,* 69 Ill.2d 135, 141–42, 13 Ill.Dec. 9, 370 N.E.2d 1036 (1977) (*quoting Underground Contractors Ass'n v. City of*

*Chicago,* 66 Ill.2d 371, 375, 5 Ill.Dec. 827, 362 N.E.2d 298 (1977)).

In the instant case, an ICC decision is not final and appealable until the disposition of an application for rehearing before the ICC. 220 ILCS 5/10–113; *A.E. Staley Mfg. Co. v. Illinois Commerce Commission,* 166 Ill. App.3d 202, 205, 116 Ill.Dec. 915, 918, 519 N.E.2d 1130, 1133 (1988). A final ICC order also "terminates the litigation between the parties on the merits or disposes of the rights of the parties in regard to the entire controversy or some definite part thereof." *People v. Illinois Commerce Commission,* 114 Ill.App.3d 384, 388, 70 Ill.Dec. 108, 110, 448 N.E.2d 986, 988 (1983).

There has been no such order here. Local 15's complaint, under these circumstances, is therefore premature. *See, e.g., Big River Zinc Corp. v. Illinois Commerce Commission,* 232 Ill.App.3d 34, 38–40, 173 Ill.Dec. 548, 550–52, 597 N.E.2d 256, 258–60 (1992) (dismissing appeal of ICC order approving utility's rider proposal "in concept" as unripe when utility still had to seek ICC approval to implement rider, so that no concrete injury felt at time of suit); *A.E. Staley,* 166 Ill. App.3d at 207–08, 116 Ill.Dec. at 919, 519 N.E.2d at 1134 (dismissing appeal of ICC order implementing rule as unripe when there was no hardship imposed on plaintiffs and likelihood of future burden dependent on several contingencies).

■ Moreover, Local 15 has failed to exhaust its administrative remedies before the ICC. The Public Utilities Act provides the exclusive procedure for setting aside an order of the ICC. *N–Ren Corp. v. Illinois Commerce Com'n,* 98 Ill.App.3d 1076, 1079, 53 Ill.Dec. 582, 585, 423 N.E.2d 1386, 1389. Pursuant to the Act, any party aggrieved by a decision of the ICC must file an application for rehearing with the ICC before seeking relief in court. 220 ILCS 5/10–113 ("No appeal shall be allowed from any rule, regulation, order or decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission."); *Meinhardt Cartage Co. v. Illinois Commerce Commission,* 15 Ill.2d 546, 550, 155 N.E.2d 631, 634 (1959) ("It is the policy of the law to

require a petition for rehearing, since it is more expeditious than an appeal. Hence, errors can be remedied by the Commission while it has full control of the matter and no appeal may be necessary.").

In the present case, Local 15 has not exhausted its administrative remedies, and nor could it, since the ICC has not yet issued even its initial decision. Any attempt to obtain judicial review of this upcoming decision prior to the exhaustion of administrative remedies pursuant to an application for rehearing must result in dismissal. *See, e.g., Union Bank v. Blackstone Sunbury–Nevada Grain Co., Inc.,* 254 Ill.App.3d 206, 209–10, 194 Ill.Dec. 269, 271–72, 627 N.E.2d 385, 387–88 (1993) (dismissing suit for injunctive relief against agency on exhaustion grounds because plaintiff failed initially to present claims to agency).

■ Even if Local 15's claims against the ICC were ripe for review and all administrative remedies had been exhausted, the Circuit Court of Sangamon County, Illinois, does not have jurisdiction to review a final decision of the ICC. Decisions of the ICC are controlled exclusively by the Public Utilities Act, *see N–Ren Corp.,* 98 Ill.App.3d at 1079, 53 Ill.Dec. at 585, 423 N.E.2d at 1389, and are not reviewed by the circuit courts. Rather, any party challenging such a decision must, after filing an application for rehearing with the ICC, pursue that challenge before the appellate court of the judicial district in which the subject matter of the hearing is situated. 220 ILCS 5/10–201(a); *N–Ren Corp.,* 98 Ill.App.3d at 1079, 53 Ill.Dec. at 585, 423 N.E.2d at 1389. The Illinois Appellate Court's decision is then taken directly to the Illinois Supreme Court. 220 ILCS 5/10–202. Thus, the Circuit Court of Sangamon County, Illinois, lacks authority to review the ICC's final decision and provide the relief Local 15 seeks in this case.

Accordingly, we conclude that an Illinois state court would not, under any circumstances, find that Local 15 had validly stated a cause of action against the ICC. Because Local 15's case against the ICC fails to state a claim upon which relief can be granted, the joinder of the ICC may not be used to defeat

federal court jurisdiction. Pursuant to the doctrine of fraudulent joinder, the ICC is not a proper defendant to this action and is hereby dismissed. We retain subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question).

### CONCLUSION

For all of the foregoing reasons, Local 15's motion to remand is denied. The ICC is hereby dismissed as a party to this suit. The only remaining defendants are ComEd and Kincaid.

It is so ordered.

**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 15, Defendant.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, LOCAL UNION NO. 15, Plaintiff,**

v.

**COMMONWEALTH EDISON COMPANY, and Kincaid Generation, L.L.C., Defendants.**

Nos. 96 C 3989, 96 C 7295.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 21, 1997.

1170

Charles A. Werner, James I. Singer, Schuchat, Cook and Werner, St. Louis, MO, James Lockwood, Park Ridge, IL, Ralph H. Loewenstein, Deffenbaugh, Loewenstein, Hagen, Oehlert & Smith, Springfield, IL, for Local 15 Intern. Broth. of Elec. Workers.

Kenneth T. Lopatka, Craig T. Boggs, Matkov, Salzman, Madoff & Gunn, Chicago, IL, Thomas Schanzle–Haskins, Giffing, Winning, Cohen & Bodewes, Springfield, IL, W. Carter Younger, Gary S. Marshall, Pamela L. Ventura, McGuire, Woods, Battle & Boothe, Richmond, VA, for Kincaid Generation LLC.

Brian Jeffrey Gold, Leah Ellen Pazol, Sonja L. Lengnick, Sidley & Austin, Chicago, IL, for Commonwealth Edison.

Robert Shorey Graettinger, Illinois Atty. General's Office, Chicago, IL, Deborah Lynn Barnes, Asst. Atty. Gen., Springfield, IL, for Illinois Commerce Commission.

1. Because matters outside the pleadings were presented to and not excluded by the Court, all three motions for judgment on the pleadings shall be treated as motions for summary judg-

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District Judge.

Plaintiff International Brotherhood of Electrical Workers, Local Union No. 15 ("Local 15") filed suit (Case No. 96 C 7295) against Commonwealth Edison Company ("ComEd"), Kincaid Generation, L.L.C. ("Kincaid"), and the Illinois Commerce Commission ("ICC") alleging that the Asset Sale Agreement negotiated between ComEd and Kincaid for the sale of the Kincaid Generating Station (the "Generating Station") in Sangamon and Christian Counties, Illinois, is in direct violation of the Illinois Collective Bargaining Successor Employer Act, 820 ILCS 10/1 (the "Illinois successor statute"). ComEd and Kincaid have filed separate motions for judgment on the pleadings pursuant to Fed. R.Civ. P. 12(c) arguing that the Illinois successor statute is preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq.

ComEd has also filed suit (Case No. 96 C 3989) against Local 15 seeking, among other things, a declaration that ComEd has not violated the Illinois successor statute because it is completely preempted by § 301 of the LMRA, 29 U.S.C. § 185, and by the NLRA, 29 U.S.C. § 151 et seq. ComEd has filed a motion for a judgment on the pleadings[1] in this case as well.

For the following reasons, ComEd's and Kincaid's motions for summary judgment in Case No. 96 C 7295 are granted. ComEd's motion for summary judgment in Case No. 96 C 3989 is also granted.

## BACKGROUND

The undisputed facts are as follows. Defendant ComEd is a public utility company that provides electrical power to customers in the State of Illinois. Plaintiff Local 15 is the exclusive bargaining representative of ComEd's bargaining unit employees, including all of the bargaining unit employees at

ment in accordance with Rules 12(c) and 56(c). The parties have been given a reasonable opportunity to present all material made pertinent to such motions by Rule 56.

ComEd's Generating Station in Sangamon and Christian Counties, Illinois.

Local 15 and ComEd are parties to a collective bargaining agreement that governs the terms and conditions of employment for ComEd's bargaining unit employees, including all employees at the Generating Station. The collective bargaining agreement provides in part:

This agreement shall be binding upon the parties and their respective successors and assigns. Subject to the Company obtaining all necessary approval of any governmental authority or regulatory body, including but not limited to the Illinois Commerce Commission, and except in cases of liquidation or condemnation or sale or transfer (i) to any entity which has the authority to initiate condemnation proceedings, or (ii) pursuant to any right granted prior to the date hereof, in the event the Company sells or otherwise transfers all or substantially all of its assets to another person, company, corporation, or firm during the term of this Agreement, the Company will require such purchaser or transferee to assume the obligations under this Agreement until the expiration of the term of this Agreement.

(Compl. ¶ 5; Answer ¶ 5). The agreement expires on September 30, 1997.

Defendant Kincaid is a Virginia limited liability company which operates public utility companies. On March 29, 1996, Kincaid entered into an Asset Sale Agreement (the "Sale Agreement") with ComEd for the purchase of ComEd's Generating Station in Sangamon and Christian Counties, Illinois. The Sale Agreement provides in part:

Buyer shall not be subject to the provisions of any collective bargaining agreement between Seller and its employees as a result of the transactions contemplated by this Agreement and Buyer's employment of some or all of the employees of Seller employed at the Plant.

(Asset Sale Agreement ¶ 8.10; Compl. ¶¶ 12–13; Answer ¶¶ 12–13). The Sale Agreement also permits Kincaid to establish its own employment level at the generating Station and the terms and conditions for such employment, but requires Kincaid to offer positions to ComEd's bargaining unit employees who apply for non-supervisory positions up to the employment level established by Kincaid. (Asset Sale Agreement ¶ 6.12). If a majority of the non-supervisory employees hired by Kincaid were formerly employed by ComEd in the bargaining unit represented by Local 15, Kincaid will recognize Local 15 as the exclusive bargaining representative of employees holding non-supervisory positions at the Generating Station. (Asset Sale Agreement ¶ 6.12).

The sale of the Generating Station is subject to approval by the defendant ICC. On May 13, 1996, ComEd filed a petition with the ICC pursuant to § 7–102 of the Illinois Public Utilities Act, 220 ILCS 5/7–102, requesting approval of the Sale Agreement. Local 15 opposes the sale and, consequently, moved to intervene in the proceedings. The ICC granted Local 15's motion to intervene on September 25, 1996. Oral argument on the pending petition was conducted on January 21, 1997. The ICC has not yet issued a decision.

Local 15 objects to the sale of the Generating Station because the Sale Agreement does not require Kincaid to assume ComEd's obligations under the collective bargaining agreement negotiated with Local 15. According to Local 15, this constitutes a violation of the Illinois successor statute, 820 ILCS 10/1, which makes a new employer liable for the obligations of a predecessor's collective bargaining agreement when the agreement contains a "successor clause." The statute provides in part:

Where a collective bargaining agreement between an employer and a labor organization contains a successor clause, such clause shall be binding upon and enforceable against any successor employer who succeeds to the contracting employer's business, until the expiration date of the agreement therein stated. No such successor clause shall be binding upon or enforceable against any successor employer for more than 3 years from the effective date of the collective bargaining agreement between the contracting employer and the labor organization.

820 ILCS 10/1(a). A "successor employer" is defined as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b). The Illinois successor statute further provides: .

> An employer who is a party to a collective bargaining agreement containing a successor clause has the affirmative duty to disclose the existence of such agreement and such clause to any successor employer. Such disclosure requirement shall be satisfied by including in any contract of sale, agreement to purchase, or any similar instrument of conveyance, a statement that the successor employer is bound by such successor clause as provided for in the collective bargaining agreement. Failure of an employer to disclose the existence of a collective bargaining agreement containing a successor clause as required by subsection (d) shall not effect the enforceability of such collective bargaining agreement against a successor employer.

820 ILCS 10/1(d). Additionally, the statute imposes a fine not to exceed $5,000 on an employer that fails to comply with its provisions. 820 ILCS 10/2.

On July 1, 1996, ComEd filed suit against Local 15 in the United States District Court for the Northern District of Illinois, Eastern Division (Case No. 96 C 3989) seeking, among other things, a declaration that ComEd has not violated the Illinois successor statute because it is completely preempted by § 301 of the LMRA, 29 U.S.C. § 185, and by the NLRA, 29 U.S.C. § 151 *et seq.* Jurisdiction over this action is premised on 28 U.S.C. § 1331 and 29 U.S.C. § 185.

On July 18, 1996, Local 15 filed suit (Case No. 96 C 7295) against ComEd, Kincaid, and the ICC in the Circuit Court of Sangamon County, Illinois, alleging that the Sale Agreement between ComEd and Kincaid for the sale of the Generating Station is in direct violation of the Illinois successor statute because the Sale Agreement expressly provides

that Kincaid is not required to assume ComEd's obligations under the collective bargaining agreement negotiated with Local 15. (Compl.¶ 17–18). Local 15 seeks an order compelling ComEd to incorporate in the Sale Agreement the terms of the current collective bargaining agreement between ComEd and Local 15 and an order that those terms and conditions are binding on Kincaid. (Compl.¶ 19). Local 15 further requests that "the Court enjoin the ICC, ComEd, and Kincaid, from the continued processing of a Petition before the ICC containing an Asset Sale Agreement with provisions that are in direct violation of an Illinois statute; that the Court enjoin the ICC from issuing an Order consenting to and/or approving a Petition for the sale of certain utility property, including the Kincaid Generating Station, by ComEd to Kincaid when the Petition contains an Asset Sale Agreement which is in direct violation of an Illinois statute." (Compl.¶ 25).

On August 9, 1996, ComEd and Kincaid filed a timely notice of removal, *see* 28 U.S.C. § 1446(b), pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185 asserting that the Illinois successor statute is completely preempted by § 301 of the LMRA. Consequently, the case was removed to the United States District Court for the Central District of Illinois. The ICC did not join in the petition for removal. ComEd and Kincaid asserted that the ICC's consent to removal was not necessary since it was fraudulently joined as a party to this suit. On September 6, 1996, Local 15 filed a timely motion to remand the case to the Circuit Court of Sangamon County, Illinois, for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447.

Judge Richard Mills of the United States District Court for the Central District of Illinois addressed Local 15's motion to remand on October 30, 1996. He concluded:

> Because all three preemption doctrines have been raised in the Northern District case and only one has been raised here, it makes sense to consolidate these cases. It would be a waste of judicial resources to have two cases pending when the parties and the issues are nearly identical and the results of one case would be res judicata on the other. *See Kearney & Trecker*

*Corp. v. Cincinnati Milling Mach. Co.*, 254 F.Supp. 130, 133 (N.D.Ill.1966). Furthermore, it would conserve judicial resources to have all preemption issues relating to the same statute decided in one forum.

*International Brotherhood of Electrical Workers, AFL–CIO, Local Union 15 v. Commonwealth Edison Company, Kincaid Generation L.L.C., and Illinois Commerce Commission*, No. 96–3228, slip op. at 5–6 (C.D.Ill. Oct. 30, 1996). In the interest of justice, Judge Mills transferred the case to this Court pursuant to 28 U.S.C. § 1404(a). *Id.* at 6.[2] Judge Mills also denied all pending motions as moot and granted the parties leave to refile them before this Court. *Id.*

On or about November 5, 1996, Local 15 filed a renewed motion to remand the case (No. 96 C 7295) to the Circuit Court of Sangamon County, Illinois, for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447. On December 31, 1996, we denied the motion to remand holding that this case arises under § 301 of the LMRA and, therefore, pursuant to the complete preemption exception to the well-pleaded complaint rule, this Court is vested with subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). Se *Commonwealth Edison Company v. International Brotherhood of Electrical Workers, Local Union No. 15*, 961 F.Supp. 1154, 1164 (N.D.Ill.1996). We also dismissed the ICC as a party to this suit under the doctrine of fraudulent joinder thereby leaving ComEd and Kincaid as the only remaining defendants. *Id.* at 1168.

ComEd and Kincaid have filed motions for judgment on the pleadings—which we will treat as motions for summary judgment—in

**2.** Local 15's action (Case No. 96 C 7295) was originally assigned to our colleague Judge Harry D. Leinenweber. On December 20, 1996, the case was reassigned to this Court and consolidated with ComEd's declaratory judgment action (Case No. 96 C 3989) on the basis of relatedness pursuant to Local General Rule 2.31.

**3.** Oral argument on these motions was conducted on January 22, 1997.

**4.** Interestingly, Local 15 does not address ComEd's and Kincaid's claims that the Illinois successor statute is preempted by the NLRA.

Case No. 96 C 7295 contending that the Illinois successor statute is preempted by federal labor law, i.e., the LMRA and NLRA.[3] ComEd has filed a similar motion—which we will also treat as a motion for summary judgment—in its declaratory judgment action (Case No. 96 C 3989). Local 15 responds that the motions must be denied because: (1) this case is only of peripheral concern to the LMRA and touches interests in state law and local feeling and responsibility; (2) this case does not involve interpretation of the collective bargaining agreement but only application of its terms and conditions; (3) there are disputed material facts; and (4) this dispute is not a "real case" ripe for decision.[4]

## DISCUSSION

The issues in Local 15's case (No. 96 C 7295) against ComEd and Kincaid are identical to those in ComEd's declaratory judgment action (No. 96 C 3989): whether the Illinois successor statute is preempted by federal labor law, i.e., the LMRA and NLRA. The following discussion on federal preemption is therefore directed to both cases.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States which shall be made in Pursuance [of the Constitution] ... shall be the supreme law of the land." U.S. Const. art. VI, cl. 2.[5] This provision invalidates all laws that conflict or interfere with an Act of Congress. *Rose v. Arkansas State Police*, 479 U.S. 1, 3, 107 S.Ct. 334, 334–35, 93 L.Ed.2d 183 (1986). It also gives Congress the power to preempt state law. *NLRB v. State of Ill. Dept. of Employment Sec.*, 988 F.2d 735, 738 (7th Cir.1993).

**5.** In its entirety, the Supremacy Clause provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. art. VI, cl. 2.

■ Congressional power to legislate in the area of labor relations is well-established. *Evans v. Einhorn,* 855 F.2d 1245, 1249 (7th Cir.1988)(citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). Two federal statutes provide the major sources of federal preemption in this area: § 301 of the LMRA, 29 U.S.C. § 185(a), and § 8 and § 9(a) of the NLRA, 29 U.S.C. § 158 and § 159(a). Because Congress has never exercised its authority to occupy the entire field of labor relations, the question whether a certain state statute is preempted by federal labor law is one of congressional intent. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 248–54, 114 S.Ct. 2239, 2242–44, 129 L.Ed.2d 203 (1994); *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189–90, 55 L.Ed.2d 443 (1978).

■ Congress did not explicitly state to what extent it intended § 301 of the LMRA and § 8 and § 9(a) of the NLRA to preempt state law. In such instances, the court must begin with the basic assumption that Congress did not intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). Thus, courts should sustain a state law unless it "conflicts with federal law or would frustrate the federal scheme, or unless [the court] discern[s] from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the states." *Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island Inc.,* 507 U.S. 218, 224, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993)(*quoting Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747–48, 105 S.Ct. 2380, 2393–94, 85 L.Ed.2d 728 (1985)).

Here, ComEd contends that the Illinois successor statute is preempted by § 301 of the LMRA and by § 8 and § 9(a) of the NLRA. Kincaid relies strictly on NLRA preemption because it is not a party to the collective bargaining agreement negotiated with Local 15. The principal questions are therefore whether the Illinois successor statute conflicts or interferes with federal labor regulations such that the LMRA and the NLRA preempt its authority, or whether it is clear under the totality of the circumstances that Congress intended the present issues involving the collective bargaining process to be entirely occupied by federal regulations to the exclusion of the states. We address each federal statute in turn.

### I. § 301 of the LMRA

Congress exercised its power under the Supremacy Clause to preempt state law by enacting § 301(a) of the LMRA which provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). "This section provides federal court jurisdiction over controversies involving collective bargaining agreements and also authorizes federal courts to fashion a body of federal law for the enforcement of those agreements." *Loewen Group Intern., Inc. v. Haberichter,* 65 F.3d 1417, 1421 (7th Cir.1995); *see also Textile Workers Union of America v. Lincoln Mills of Ala.,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Federal law must be applied when resolving such disputes to ensure uniform interpretation of collective bargaining agreements. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct. 1877, 1879–80, 100 L.Ed.2d 410 (1988); *Loewen,* 65 F.3d at 1421.

In order to determine whether a party's state law claims are preempted under § 301, courts must decide whether the resolution of the state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement. *Lingle,* 486 U.S. at 405–06, 407, 409–10, 108 S.Ct. at 1881–82, 1882, 1883–84. Section 301 preempts claims "founded directly on rights created by collective bargaining agreements, and also on claims substantially dependent on analysis of a collective bargaining agreement." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987)(quot-

ing *International Broth. of Elec. Workers, AFL–CIO v. Hechler,* 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987)); *Loewen,* 65 F.3d at 1421. If the "heart of the [state law] complaint [is] a ... clause in the collective bargaining agreement, that complaint arises under federal law." *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2430 (*quoting Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers,* 390 U.S. 557, 558, 88 S.Ct. 1235, 1236, 20 L.Ed.2d 126 (1968)).

The broad preemptive effect of § 301 does not, however, apply in every case involving a collective bargaining agreement. *Loewen,* 65 F.3d at 1421. "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985); *Loewen,* 65 F.3d at 1421. "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994). Rather, preemption is found only when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent on an analysis of the terms of the collective bargaining agreement. *Loewen,* 65 F.3d at 1423; *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2430–31; *Lueck,* 471 U.S. at 210, 105 S.Ct. at 1910–11.

In our previous opinion denying Local 15's motion to remand, we already determined that § 301 of the LMRA completely preempts Local 15's claims under the Illinois successor statute. "[B]ecause a provision of the collective bargaining agreement is the subject of this dispute, and because there are no rights or obligations imposed on ComEd or Kincaid independent of the terms of the collective bargaining agreement," this cause of action is completely preempted by § 301 of the LMRA. *Commonwealth Edison,* at 1160–1164.[6] The same analysis applies here.

Local 15's complaint alleges a direct violation of the Illinois successor statute which makes a new employer liable for the obligations of a predecessor's collective bargaining agreement when that agreement contains a successor clause. (Compl.¶¶ 17, 23). The statute provides in part:

> Where a collective bargaining agreement between an employer and a labor organization contains a successor clause, such clause shall be binding upon and enforceable against any successor employer who succeeds to the contracting employer's business, until the expiration date of the agreement therein stated. No such successor clause shall be binding upon or enforceable against any successor employer for more than 3 years from the effective date of the collective bargaining agreement between the contracting employer and the labor organization.

820 ILCS 10/1(a). A "successor employer" is defined as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b). The statute also imposes a fine not to exceed $5,000 on an employer that fails to comply with its provisions. 820 ILCS 10/2.

Even the most cursory reading of the Illinois successor statute, on which Local 15's complaint is based, reveals that the "heart of the [state law] complaint [is] a ... clause in the collective bargaining agreement." Specifically, the collective bargaining agreement at issue in this case contains the following provision which Local 15 refers to as a "successor clause":

> This agreement shall be binding upon the parties and their respective successors and assigns. Subject to the Company obtaining all necessary approval of any governmental authority or regulatory body,

6. For purposes of the present motions, we as- sume familiarity with our previous opinion.

including but not limited to the Illinois Commerce Commission, and except in cases of liquidation or condemnation or sale or transfer (i) to an entity which has the authority to initiate condemnation proceedings, or (i) pursuant to any right granted prior to the date hereof, in the event the Company sells or otherwise transfers all or substantially all of its assets to another person, company, corporation, or firm during the term of this Agreement, the Company will require such purchaser or transferee to assume the obligations under this Agreement until the expiration of the term of this Agreement.

(Compl. ¶ 5; Answer ¶ 5). The meaning, application, and enforcement of this provision, and not the Illinois successor statute, is the subject of this dispute. Indeed, the statute presupposes the existence of a "successor clause" in the collective bargaining agreement. It creates no rights independent of the collective bargaining agreement itself. Resolution of this dispute will therefore require a court initially to interpret the collective bargaining agreement to determine whether it contains a "successor clause" as defined by the statute.

In *Lueck*, a worker sued his employer and the insurance company that administered the provisions of the collective bargaining agreement relating to disability benefits. The worker alleged that the defendants had refused in bad faith to honor his claim for benefits. Although the Supreme Court upheld preemption of the bad faith tort by § 301 of the LMRA, it emphasized that not every state law asserting a right that relates to a collective bargaining agreement is preempted. 471 U.S. at 211, 105 S.Ct. at 1911. Rather, only "state law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are preempted by those agreements." *Id.* at 213, 105 S.Ct. at 1912. Thus, any claim that "is inextricably intertwined with consideration of the terms of a labor contract" is preempted. *Id.*

This rule was applied by Judge Susan Getzendanner in *SR Industries Corp. v. Interna-*tional Ass'n of Bridge, Structural and Ornamental Ironworkers, Shopmen's Div., Local No. 473,* No. 87 C 2370, 1987 WL 17818 (N.D.Ill. Sept.25, 1987). In that case, the plaintiff corporation and defendant union negotiated a collective bargaining agreement which provided for, among other things, annual vacation benefits in accordance with a schedule based on length of employment. After the agreement expired, the company discharged the majority of its employees. In response, the union requested the payment of vacation benefits which had accrued but had not been received during the tenure of the agreement. After the company refused to pay any vacation benefits and denied there was any obligation to do so, the union filed suit in the Circuit Court of Cook County, Illinois, alleging violations of the Illinois Wage Payment and Collection Act ("IWCPA"). The IWCPA provided that, unless otherwise provided for in a collective bargaining agreement, whenever an employment contract or policy provides for paid vacations, and an employee resigns without having taken all vacation time earned, the monetary equivalent shall be paid to him or her.

The company subsequently filed its own action in federal court seeking a declaration that the IWCPA was preempted by § 301 of the LMRA. Judge Getzendanner concluded that preemption was appropriate since the right to vacation pay, if it still existed and was not divested by termination of the contract, must be derived from the collective bargaining agreement and not the IWCPA. *Id.* at *2. She also rejected any arguments that the case involved only interpretation of the IWCPA:

It is not correct to argue that this case depends only on an interpretation of the IWCPA, and so therefore preemption is unnecessary. The IWCPA presupposes the existence of an employment contract which creates the entitlement to vacation pay. It does not of its own force, create vacation pay entitlements. (citation omitted). Thus, rather than deriving from the IWCPA, if it exists at all, depends upon the contract and its interpretation. Accordingly, as in McNeil, § 301 preempts the Union's IWCPA claim.

*Id.; see also National Metalcrafters, Div. of Keystone Consol. Industries v. McNeil,* 784 F.2d 817, 824 (7th Cir.1986)(holding that § 301 preempted IWCPA because state law claim was simply whether employer had breached its agreement to pay vacation benefits; because there was no state law right to vacation benefits independent of labor contract, deciding whether the employer complied with its contractual obligations necessarily required an interpretation of the collective bargaining agreement).

■ Local 15's claim—or any claim brought pursuant to the Illinois successor statute for that matter—provides a much stronger case for preemption than *SR Industries* or *McNeil.* The Illinois successor statute does not, of its own force, impose successorship status on the prospective buyer. Rather, successorship exists, if at all, only when the collective bargaining agreement contains a "successor clause." Thus, enforcement of the statute depends upon whether the parties have negotiated a collective bargaining agreement that contains a "successor clause." The right or obligation to impose successorship, as Local 15 concedes, is negotiable; it is created by, and subject to, the terms of the collective bargaining agreement. *See, e.g., Livadas,* 512 U.S. at 122–24, 114 S.Ct. at 2078 (Although § 301 is not interpreted so broadly as "to preempt nonnegotiable rights conferred on individual employees as a matter of state law ... it is the legal character of a claim, as 'independent' of rights under the collective bargaining agreement ... that decides whether a state cause of action may go forward."). This obligation, which is not controlled or derived from the statute, can therefore be waived or altered by the parties. When "state-law rights and obligations ... do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are pre-empted by those agreements." *Lueck,* 471 U.S. at 213, 105 S.Ct. at 1912.

In sum, the heart of the present complaint is a violation of the alleged "successor clause" in the collective bargaining agreement which Local 15 seeks to enforce. "[T]he Supreme Court treats any attempt to interpret, en-

force or question a collective bargaining agreement as necessarily based on national law—in this case, [§ 301 of the LMRA.]" *Matter of Amoco Petroleum Additives Co.,* 964 F.2d 706, 709 (7th Cir.1992). The only thing the Illinois statute at issue in this case requires is that the employer honor the collective bargaining agreement. To decide whether he has done so necessarily requires interpreting that agreement. Such a claim falls squarely within the category of cases in which "the pre-emption rule has been applied to assure that the purposes animating § 301 will be frustrated neither by state laws purporting to determine 'questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement.'" *Livadas,* 512 U.S. at 122–23, 114 S.Ct. at 2078 (quoting *Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911).

Because the Illinois successor statute presupposes the existence of a "successor clause" in the collective bargaining agreement, adjudication of any claim brought pursuant to the statute will necessarily require interpretation of that agreement. The Illinois successor statute is therefore preempted by § 301 of the LMRA. *See Commonwealth Edison,* at 1160–1164.

We find Local 15's arguments to the contrary unpersuasive. During oral argument, counsel for Local 15 argued that this case, and the Illinois successor statute, do not implicate § 301 of the LMRA because the sale of the Generating Station involves only state matters. For instance, this case involves ICC approval of the sale of an Illinois generating station by an Illinois public utility to a purchaser authorized to do business in Illinois. Counsel further argued that Local 15's claims do not implicate the terms of the collective bargaining agreement.

In the same breath, however, counsel asserted that ComEd should have filed a grievance under the LMRA before filing its declaratory judgment action. These two contentions are entirely inconsistent; either the LMRA governs this dispute or it does not. We believe that it does. It seems a stretch to say that ComEd's dispute arises

under the LMRA but Local 15's does not when the issues, and indeed the dispute, are the same, i.e., the application and validity of the Illinois successor statute.

Local 15 further argues that there are disputed facts which preclude summary judgement here. Again, we disagree as Local 15 fails to identify any of these disputed material facts. In any event, we find that the material facts necessary for the resolution of this dispute are uncontested, particularly the terms of the collective bargaining agreement and the Sale Agreement. Further, there is no dispute over the substantive requirements of the Illinois successor statute.

Finally, Local 15 argues that this dispute may not be a "real case" ripe for the Court's review because the sale of the Generating Station may never be consummated. Specifically, the ICC might withhold its approval of the Sale Agreement or one of parties might unilaterally pull out of the sale. There is no question that these contingencies, should they occur, may very well moot the present issues altogether. Nonetheless, we reject this argument for the simple reason that Local 15 filed the present action for declaratory and injunctive relief alleging that "[i]rreparable damage will be done to the employees represented by [Local 15] at the [Generating Station] if the ICC consents to and/or approves ComEd's Petition of the Asset Sale Agreement." (Compl.¶ 25). For purposes of the present motions, we assume that Local 15 would not have filed the instant action were this controversy not ripe for review.[7]

For the reasons stated here, and in our previous memorandum opinion, we find that the Illinois successor statute is preempted by § 301 of the LMRA insofar as it applies to employers who are subject to the LMRA. *See Commonwealth Edison*, at 1160–1164.

## II. *NLRA*

■ The NLRA is undoubtedly an act of Congress made "in pursuance" of the Constitution. It is therefore the supreme law of the land and any state statute which the NLRA preempts necessarily violates the Constitution. *Cannon v. Edgar*, 33 F.3d 880, 883 (7th Cir.1994). In determining whether the Illinois successor statute is pre-empted by the NLRA and therefore invalid under the Supremacy clause of the Constitution, "our sole task is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987).

The NLRA "is a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce." *Nash v. Florida Indus. Commission*, 389 U.S. 235, 238, 88 S.Ct. 362, 365, 19 L.Ed.2d 438 (1967). It safeguards the right of employees to self-organization and to select representatives for collective bargaining. 29 U.S.C. § 157; *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 57 S.Ct. 615, 622, 81 L.Ed. 893 (1937). The NLRA reflects congressional intent to create a uniform, national body of labor law interpreted and administered by a centralized agency, the National Labor Relations Board. *New York Telephone Co. v. New York State Dept. of Labor*, 440 U.S. 519, 528, 99 S.Ct. 1328, 1334–35, 59 L.Ed.2d 553 (1979).

"[I]n passing the NLRA Congress largely displaced state regulation of industrial relations." *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986). The act vests the NLRB with primary jurisdiction over unfair labor practices. *See* 29 U.S.C. § 158; *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108, 110 S.Ct. 444, 449–50, 107 L.Ed.2d 420 (1989)[hereinafter *Golden State II.*] Thus, the NLRA "forecloses overlapping state enforcement of the prohibitions in Section 8 of the Act." *New York Telephone*, 440 U.S. at 528, 99 S.Ct. at 1334.

The Supreme Court has articulated two distinct preemption doctrines under the NLRA. The first, "*Garmon* preemption," forbids state and local activities which are protected by § 7 of the NLRA or which constitute unfair labor practices under § 8. *Building and Const. Trades Council*, 507

---

7. At oral argument, we inquired whether counsel for Local 15 wished to dismiss this action because it is not a "real case" ripe for decision. He politely declined.

U.S. at 224, 113 S.Ct. at 1194; *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption also prohibits state or local regulation of activities which the NLRA only arguably protects or prohibits. *Building & Const. Trades Council*, 507 U.S. at 225, 113 S.Ct. at 1194–95; *see also Gould*, 475 U.S. at 286, 106 S.Ct. at 1060–61.

"The Garmon rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of 'the integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613, 106 S.Ct. 1395, 1398, 89 L.Ed.2d 616 (1986)[hereinafter *Golden State I* ] (citation omitted). It "prevents states not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies." *Gould*, 475 U.S. at 286, 106 S.Ct. at 1061.

*Garmon* preemption is not absolute however. The Supreme Court has articulated two notable exceptions to the *Garmon* Rule. A claim is not preempted if (1) the activity regulated is merely a peripheral concern of the federal labor laws or (2) if the conduct touches interests so deeply rooted in local feeling that preemption cannot be inferred absent compelling congressional direction. *Garmon*, 359 U.S. at 243–244, 79 S.Ct. at 778–79; *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 660–61 (7th Cir. 1992). "When determining whether these exceptions apply, [the court] must balance the state's interest in remedying the effect of the challenged conduct against both the interference with the NLRB's ability to adjudicate the controversy and the risk that the state will approve conduct that the NLRA prohibits." *NLRB v. State of Ill. Dept., of Employment Sec.*, 988 F.2d 735, 739 (7th Cir.1993)(citing *Kolentus v. Avco Corp.*, 798 F.2d 949, 961 (7th Cir.1986), *cert, denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987)).

The second preemption doctrine, *"Machinists* preemption," prohibits state and local regulation of areas that have been left " 'to be controlled by the free play of economic forces.' " *Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976)(quoting *NLRB v. Insurance Agents' Intern. Union, AFL–CIO*, 361 U.S. 477, 488, 80 S.Ct. 419, 426–27, 4 L.Ed.2d 454 (1960)); *see also Building and Const. Trades Council*, 507 U.S. at 225, 113 S.Ct. at 1194–95. The Machinists rule preserves Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons which are part and parcel of the collective bargaining process. *Building and Const. Trades Council*, 507 U.S. at 226, 113 S.Ct. at 1195–96.

By enacting the NLRA, Congress explicitly chose to regulate some labor activities but at the same time leave other forms of economic pressure unregulated. *Machinists*, 427 U.S. at 145, 96 S.Ct. at 2555–56. Resort to economic weapons is the right of the employer as well as the employee, and the "State may not prohibit the use of such weapons or add to an employer's federal legal obligations in collective bargaining any more than in the case of employees." *Id.* at 147, 96 S.Ct. at 2556–57 (quotations omitted). Most importantly, states may not "introduce some standard of properly balanced bargaining" or define "what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Id.* at 149–50, 96 S.Ct. at 2557–58 (*quoting Insurance Agents'*, 361 U.S. at 497, 500, 80 S.Ct. at 431–32, 433).

■■■ With these principles in mind, we now turn to the Illinois successor statute which was enacted in 1988 to prevent the erosion of employee rights and benefits under collective bargaining agreements stemming from the mergers and acquisition activity of the 1980s. *See* H.R. 85th General Assembly, Transcription Debate at 68–69, 71–72 (Ill. May 13, 1987).[8] The statute makes a collective bar-

---

**8.** During the House debate, State Representative Saltsman stated:

This legislation is needed now to protect the working people of this state. With the mergers

gaining agreement which contains a "successor clause" binding against a "successor employer" for not more than three years from the effective date of the agreement. 820 ILCS 10/1(a). A "successor employer" is defined as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b).

Having reviewed the statute and its effects on the integrated scheme of regulation established by the NLRA, we conclude that the Illinois successor statute is preempted by the *Garmon* rule because it is a direct intrusion by the state into the collective bargaining process. Under *Garmon,* the government may not prescribe the terms of a collective bargaining agreement. The collective bargaining process is regulated solely by the NLRA which does not compel "either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). Indeed, free collective bargaining is a fundamental premise on which the NLRA is based. *NLRB v. Burns Intern., Sec. Services, Inc.,* 406 U.S. 272, 287, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1972); *Golden State I,* 475 U.S. at 616, 619, 106 S.Ct. at 1399–1400, 1401. The "NLRA leaves the substantive terms of collective bargaining agreements to management and union representatives to hammer out in the collective bargaining process." *Cannon,* 33 F.3d at 884–85.

In *NLRB v. Burns,* the Supreme Court explicitly held that a new employer could not be compelled to honor or assume the substantive terms of a predecessor's collective bargaining agreement. *Id.* 406 U.S. at 287–91, 92 S.Ct. at 1582–84. In reaching this decision, the court emphasized the importance of "bargaining freedom" under the NLRA:

> that are taking some of industry by surprise, with the gobble-up of small business by large corporations, working people in this state are being robbed of benefits which they previously bargained for in good faith.

This bargaining freedom means both that parties need not make any concessions as a result of Government compulsion and that they are free from having contract provisions imposed on them against their will. *Id.* at 287, 92 S.Ct. at 1582 (*quoting H.K. Porter Co. v. NLRB,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970)). Forcing a new employer to assume the terms of its predecessor's collective bargaining agreement "would violate the fundamental premise on which the [NLRA] is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *Id.* The court was also concerned with the free transfer of capital:

> A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.

*Id.* at 287–88, 92 S.Ct. at 1582. The balance of bargaining power must be controlled by the relative economic strength of the parties. *Id.* at 288, 92 S.Ct. at 1582–83.

The Illinois successor statute is in direct conflict with the NLRA's fundamental premise of free collective bargaining. It compels a new employer—in this case Kincaid—to assume or honor the terms of a collective bargaining agreement negotiated by its predecessor—here ComEd. The right to be free from such governmental compulsion is protected by § 8(d) of the NLRA. *See* 29 U.S.C. § 158(d); *Golden State I,* 475 U.S. at 616, 106 S.Ct. at 1399–1400 (the NLRA leaves the bargaining process largely to the parties); *see also Jones & Laughlin Steel,* 301 U.S. at 45, 57 S.Ct. at 628 ("The theory of the Act is that free opportunity for negotiation ... may bring about the adjustments

H.R. 85th General Assembly, Transcription Debate, at 73 (Ill. May 13, 1987).

and agreements which the Act in itself does not attempt to compel.").

In *Cannon v. Edgar*, the Seventh Circuit considered the constitutionality of the Illinois Burial Rights Act which required that cemeteries and the gravediggers union negotiate for the establishment of a pool of workers designated to perform religiously required interments during labor disputes. The Seventh Circuit held that under *Garmon* the Burial Rights Act was a direct intrusion into the collective bargaining process because it required that the parties actually agree on a pool of workers or face sanctions by the Illinois courts. 33 F.3d at 884. The court further noted that the NLRA does not tolerate such an invasion into the collective bargaining process but leaves the substantive terms of such an agreement to be hammered out by the parties. *Id.* at 884–85.

Here, the Illinois successor statute presents an even stronger case for *Garmon* preemption. It eliminates the bargaining process altogether by forcing a new employer to honor a collective bargaining agreement it neither bargained for nor assumed. We have no doubt such compulsion violates the NLRA's mandate that the parties not be compelled to agree to a proposal or make a concession. *See, e.g., Burns,* 406 U.S. at 287, 92 S.Ct. at 1582; *see also* 29 U.S.C. § 158(d). Moreover, the Illinois successor statute may also inhibit the free transfer of capital when, as here, Kincaid expressly negotiated in the Sale Agreement with ComEd that it would not be required to honor the terms and conditions of the present collective bargaining agreement. (*See* Asset Sale Agreement ¶ 8.10)

We are not the only federal court to reach this conclusion. In *United Steelworkers of America, AFL–CIO–CLC v. St. Gabriel's Hosp.,* 871 F.Supp. 335 (D.Minn.1994), Judge Doty of the District of Minnesota addressed the constitutionality of an identical successor statute.[9] Under *Garmon*, the court held that the statute was preempted because, contrary to § 8(d) of the NLRA, it compels "a new employer to honor, against its will, the terms of a collective bargaining agreement negotiated by its predecessor." *Id.* at 341. "By binding new employers to collective bargaining agreements against their will, Minnesota's successor statute impermissibly undermines federal labor law policy designed to ensure the free transfer of capital." *Id.* at 342.

The Illinois successor statute also conflicts with the federal successorship doctrine established by the Supreme Court in *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Bd., Hotel and Restaurant Emp. and Bartenders Intern. Union. AFL–CIO,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). There, Howard Johnson purchased a lodge and restaurant whose previous owner had entered into a collective bargaining agreement with the union representing its employees. The collective bargaining agreement contained a "successor clause" which provided that the agreement would be binding on the owner's "successors, assigns, purchasers, lessees or transferees." Howard Johnson refused to recognize the union or to assume any obligation under the collective bargaining agreement.

The Supreme Court noted that the mere existence of a bargained-for successor clause did not bind the purchaser "either to the substantive terms of the agreements or to the arbitration clauses thereof" unless the purchaser expressly or impliedly assumed the collective bargaining agreement or substantial continuity existed between the enterprises. *Id.* at 258 n. 3, 94 S.Ct. at 2241 n. 3. Here, the Illinois successor statute compels Kincaid to assume the terms of the collective bargaining agreement negotiated by its predecessor, ComEd, even though there has

---

**9.** The Minnesota successor statute provides in part:

> Where a collective bargaining agreement between an employer and a labor organization contains a clause regulating the rights and obligations of a new employer, that clause shall be binding upon and enforceable against any new employer until the expiration date of the agreement. That clause shall not be binding upon or enforceable against any new employer for more than three years from the effective date of the collective bargaining agreement between the contracting employer and the labor organization.

Minn.Stat. § 338.02, subd. 2.

been no implied or direct assumption of those terms by Kincaid.

Similarly, in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court held that successorship exists, if at all, only when there is a "substantial continuity of identity in the business enterprise." *Id.* at 551, 84 S.Ct. at 915. The court found such continuity in *Wiley* because the new employer or successor employed a majority of the predecessor's employees. Id. at 548–51, 84 S.Ct. at 913–15. In reaching this conclusion, the court recognized the need to balance the "rightful prerogative of owners ... to rearrange their businesses ... [against the need to protect] the employees from a sudden change in the employment relationship." *Id.* at 549, 84 S.Ct. at 914.

*Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) later clarified the test for determining when a purchaser becomes a legal "successor." The Supreme Court adopted a totality of the circumstances test for determining whether there is a substantial continuity between the business enterprises. Application of this test requires the evaluation of several factors including:

> whether the business of both employees is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Id.* at 43, 107 S.Ct. at 2236. Most importantly, the substantial continuity requirement will be satisfied—and therefore successorship status imposed—only if a majority of the purchaser's work force were previously employed by the predecessor. *Id.* at 46 n. 12, 107 S.Ct. at 2237 n. 12.

The Illinois successor statute ignores the substantial continuity requirements under *Wiley* and *Fall River Dyeing*. Rather, the statute defines a "successor employer" as "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee, or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." 820 ILCS 10/1(b). Kincaid is therefore deemed a legal successor under the statute because it plans to conduct substantially the same business in the same facilities regardless of whether it hires any of Local 15's bargaining unit employees.

Lastly, the Illinois successor statute imposes a fine not to exceed $5,000 on an employer that fails to comply with its provisions. 820 ILCS 10/2. Obviously, a $5,000 fine would have little, if any, effect on the conduct of large employers such as ComEd and Kincaid. That, however, is not controlling when, as here, the state law provides a punitive fine not provided by the NLRA. This state law remedy may be sufficient to raise the specter of preemption under *Garmon*.

The *Garmon* rule "prevents states not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies." *Gould*, 475 U.S. at 286, 106 S.Ct. at 1061. "[T]o allow the State to grant a remedy ... which has been withheld from the National Labor Relations Board only accentuates the danger of conflict" between state and federal law because "the range and nature of those remedies that are and are not available is a fundamental part of the comprehensive labor law system established by Congress." *Gould*, 475 U.S. at 287, 106 S.Ct. at 1061 (*citing Garmon*, 359 U.S. at 247–48, 79 S.Ct. at 781); *see also Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776*, 346 U.S. 485, 498–99, 74 S.Ct. 161, 170, 98 L.Ed. 228 (1953)(conflict is imminent whenever "two separate remedies are brought to bear on the same activity."). Punitive sanctions also conflict with the remedial philosophy of the NLRA. *Gould*, 475 U.S. at 288 n. 5, 106 S.Ct. at 1062 n. 5.

Local 15 contends that the Illinois successor statute is not preempted because it falls within the "peripheral concern" and "local feeling" exceptions to the *Garmon* rule.

(Pl.'s Mere. Opp'n Mot. Summ. J. at 11).[10] Specifically, Local 15 suggests that the Illinois successor statute reflects the state's substantial interest in protecting its citizens from the economic dislocation caused by a plant-closing or sale. Local 15 further argues that the sale of the Generating Station is overwhelmingly a state matter with minimal impact upon federal labor law matters. We disagree.

Alleviating worker dislocation is undoubtedly a legitimate state interest. However, by enacting the Illinois successor statute and forcing a new employer to accept terms and conditions of an agreement it did not bargain for, the State of Illinois has actually entered the collective bargaining process and prescribed the terms of agreement. The statute therefore affects free collective bargaining which, contrary to Local 15's assertions, has a substantial impact on federal labor law. "Free collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA." *Golden State I,* 475 U.S. at 619, 106 S.Ct. at 1401 (*quoting New York Telephone,* 440 U.S. at 551, 99 S.Ct. at 1346–47 (Powell, J.; dissenting)).

Additionally, the Supreme Court has made clear that the exceptions to the *Garmon* rule apply to matters of general state law such as criminal and tortious activity. *See Farmer v. United Broth., of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 292, 296, 97 S.Ct. 1056, 1059, 1061, 51 L.Ed.2d 338 (1977)(Court held that NLRA did not preempt state tort action for intentional infliction of emotional distress because it was unrelated to the collective bargaining process that Congress intended to regulate when it passed the NLRA); *Belknap, Inc. v. Hale,* 463 U.S. 491, 512, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983)(NLRA does not preempt state law action for misrepresentation and breach of contract by replacement worker against em-

ployer); *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978)(NLRA does not preempt state law trespass action); *Keehr v. Consolidated Freightways of Delaware, Inc.,* 825 F.2d 133 (7th Cir.1987)(NLRA does not preempt action for intentional infliction of emotional distress); *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 55, 86 S.Ct. 657, 659, 15 L.Ed.2d 582 (1966)(state law action for defamation not preempted by the NLRA). Similarly, the "[p]olicing of actual or threatened violence to persons· or destruction of property has been held most clearly a matter for the States." *Machinists,* 427 U.S. at 136, 96 S.Ct. at 2551.

The Illinois successor statute is unrelated to these matters of general state law. It neither creates a common law tort nor regulates public safety as in *Farmer, Belknap,* and *Sears Roebuck. See. e.g., Cannon,* 33 F.3d at 884. Rather, the statute compels a new employer to assume the terms of a collective bargaining agreement it is assumed nor bargained for in direct violation of § 8(d) of the NLRA. It also directly conflicts with the federal law of successorship as established by the Supreme Court in *Howard Johnson, Burns, Wiley,* and *Fall River Dyeing.* The exceptions to the *Garmon* rule therefore do not apply to save the Illinois successor statute from preemption.

For the same reasons that the Illinois successor statute does not satisfy the *Garmon* exceptions, it is likewise preempted by *Machinists* which prohibits state and local regulation of areas that have been left " 'to be controlled · by the free play of economic forces.' " *Machinists,* 427 U.S. at 140, 96 S.Ct. at 2553 (*quoting Insurance Agents',* 361 U.S. at 488, 80 S.Ct. at 426–27). The state may not "add to an employer's federal legal obligations in collective bargaining any more than in the case of employees." *Machinists,*

---

10. Local 15 actually invokes this exception with respect to preemption under § 301 of the LMRA. This exception, however, does not apply to LMRA preemption. *See Lueck,* 471 U.S. at 214 n. 9, 105 S.Ct. at 1913 n. 9 ("So-called *Garmon* preemption involves protecting the primary jurisdiction of the NLRB, and requires balancing of state and federal interests ... In this situation

[involving § 301 preemption] the balancing of state and federal interests required by *Garmon* preemption is irrelevant, since Congress, acting within its powers under the Commerce Clause, has provided that federal law must prevail."). Thus, we will discuss this exception with respect to NLRA preemption under *Garmon.*

427 U.S. at 147, 96 S.Ct. at 2557 (quotations omitted). Most importantly, states may not "introduce some standard of properly balanced bargaining" or define "what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Id.* at 149–50, 96 S.Ct. at 2557–58 (quoting *Insurance Agents'*, 361 U.S. at 497, 500, 80 S.Ct. at 431–32, 433).

As we previously discussed, the Illinois successor statute adds to an employer's federal legal obligations by forcing it to honor a collective bargaining agreement it neither bargained for nor assumed. It also requires the predecessor employer (ComEd) to include a statement in the sale agreement that the purchaser (Kincaid) must agree to assume the terms of the existing collective bargaining agreement. *See* 820 ILCS 10/1(d).

Further, the Illinois successor statute prohibits a new employer from exercising its well-established rights. The statute automatically makes the predecessor's employees the employees of a new employer who conducts substantially the same business using the same facilities. *See* 820 ILCS 10/1(b). In *Howard Johnson*, the Supreme Court emphasized that a new employer has the right not to hire any of the employees of its predecessor. 417 U.S. at 261–62, 94 S.Ct. at 2242–43. Such matters are left to the relative economic strength of the parties. *Id.* at 264, 94 S.Ct. at 2244. Because the Illinois successor statute regulates areas that have been left "to be controlled by the free play of economic forces," it is preempted under *Machinists*.

In sum, we do not question the Illinois legislature's motives in seeking to protect employee rights and benefits under collective bargaining agreements. On the contrary, we find fault only with the means employed by the state to achieve this purpose. By enacting the Illinois successor statute, the State of Illinois entered "into the substantive aspects of the bargaining process to an extent Congress has not countenanced." *Machinists*, 427 U.S. at 149, 96 S.Ct. at 2557 (*quoting Insurance Agents'*, 361 U.S. at 498, 80 S.Ct. at 432). The State of Illinois may not require a new employer such as Kincaid to honor the terms of a collective bargaining agreement it neither assumed nor bargained for. Such regulation is prohibited by the NLRA and is left to the free play of economic forces. The Illinois successor statute is therefore preempted under *Garmon* and *Machinists* insofar as it applies to employers who are subject to the NLRA.

### CONCLUSION

For all of the foregoing reasons, we find that the Illinois successor statute, 820 ILCS 10/1, is preempted by § 301 of the LMRA and by the NLRA insofar as it applies to employers who are subject to those federal labor statutes. Thus, the Illinois successor statute violates the Supremacy Clause of the United States Constitution, U.S. Const., art. VI, cl.2, insofar as it applies to employers who are subject to the LMRA and NLRA.

Accordingly, Coned's and Kincaid's motions for summary judgment in Case No. 96 C 7295 are granted. For the same reasons, ComEd's motion for summary judgment in Case No. 96 C 3989 is also granted. Judgement is hereby entered in favor ComEd and Kincaid in Case No. 96 C 7295 and in favor of ComEd in Case No. 96 C 3989. This is a final and appealable order.

It is so ordered.

**Myrna J. DRISKELL, Plaintiff,**

v.

**CONTINENTAL CASUALTY CO., an Illinois corporation d/b/a CNA Insurance Companies, Defendant.**

**No. 96 C 3489.**

United States District Court, N.D. Illinois, Eastern Division.

March 17, 1997.

David Mark Bagdade, Carey M. Stein, Ashman & Stein, Chicago, IL, for Plaintiff.

Allison Carol Blakley, Daniel A. Kazlauski, Fox and Grove, Chartered, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION*
### *AND ORDER*

ASPEN, Chief Judge.

Plaintiff Myrna J. Driskell brings this action against her former employer, Continental Casualty Company, alleging that she was terminated on the basis of age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Continental has moved for summary judgment. For

the reasons set forth below, the motion is denied.

## I. Background

Myrna Driskell began working for the Continental Casualty Company in 1976, and held a number of different positions there prior to her termination in November 1994 at the age of 43. Def.'s 12(M) ¶¶ 4–5. From 1989 until her termination, Driskell served as a medical malpractice liability underwriter. Her responsibilities were to review applications for insurance, evaluate risks, review loss information, determine continued insurability for existing clients, perform audits, discuss underwriting issues with sales agents, and occasionally meet with agents in the field. Pl.'s 12(N) ¶ 40. As a member of the "individual physicians program unit," Driskell's focus was on individual medical practitioners rather than health care institutions. Def.s 12(M) ¶ 4. Continental was satisfied with Driskell's performance of her duties as an underwriter: a formal performance review conducted in 1994 indicated that her technical skills, interpersonal skills, and her verbal and written communication skills all met—and sometimes exceeded—the company's expectations. *See* Def.'s 12(M) Ex. S–1.

In August 1994, Continental hired James Macdonald as the Chief Operating Officer of its Professional Liability Division (of which Driskell's program unit was a part), and gave him a mandate to improve the Division's profitability and efficiency. Def.'s 12(M) ¶ 7. Macdonald immediately began to formulate a restructuring plan intended to eliminate redundant positions, and sought to shift the Division's focus from individual medical practitioners to large health care institutions. Def.'s 12(M) ¶ 8. One redundancy identified by Macdonald was the existence of separate positions for "liability underwriters" like Driskell and "account executives," who were responsible for certain sales and marketing tasks. Def.'s 12(M) ¶¶ 8–9. Macdonald concluded that combining these responsibilities in a single position called a "production underwriter" would be more efficient, and would enable the Division to reduce its total workforce by terminating some employees. Def.'s 12(M) ¶¶ 9–10. Once this restructuring plan was approved by senior manage-

ment, Macdonald sought to identify which employees would be best equipped to perform in the new production underwriter position, considering such factors as technical skills, communication skills, problem-solving skills, and experience in dealing with institutional clients. Def.'s 12(M) ¶ 11.

After consultation with the supervisors in his division, Macdonald concluded that Driskell was not among the employees who deserved to be shifted into one of the new production underwriter positions. Def.'s 12(M) ¶ 14. According to Macdonald, the supervisors felt that Driskell's technical and communication skills were adequate but not especially strong, and they were concerned about her lack of experience dealing with institutional clients. *Id.* Consequently, Driskell was terminated on November 7, 1994, along with 13 of her co-workers whose skills were likewise seen as inadequate or redundant. Def.'s 12(M) ¶¶ 12, 16; Pl.'s 12(N) ¶ 42.

Not all of the company's liability underwriters were terminated in this manner. In particular, Continental elected to retain Michelin Abrahamson as one of its new production underwriters. Def.'s 12(M) ¶ 21. At the time of Continental's restructuring, Abrahamson was 23 years old and had worked at the company for only one month, plus 12 months of training. Pl.'s 12(N) ¶ 36. Since November 7, Abrahamson has worked with Driskell's former clients and assumed most of her former responsibilities, though she has also been given additional sales and marketing responsibilities that had never been performed by Driskell. Def.'s 12(M) ¶ 24; Pl.'s 12(N) ¶¶ 40–41; Johnson Dep. at 32–34.

Driskell infers from this sequence of events that the real reason why Continental chose to terminate her rather than Abrahamson was the 20–year difference in their ages. Having filed a charge of discrimination with the EEOC and having received a right to sue letter, Driskell now brings this claim asserting that Continental has violated the ADEA. Continental contends that Driskell has failed to raise a genuine issue of material fact regarding its discriminatory intent and moves for summary judgment.

## II. Summary Judgment Standard

"A district court must grant summary judgment where the record before it shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995) (quoting Fed.R.Civ.P. 56(c)). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If this burden is carried, in order to defeat summary judgment the non-movant "must set forth specific facts showing that there is a genuine issue for trial," and cannot merely rest on the allegations contained in the pleadings. Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. In deciding a motion for summary judgment we read the facts in a light most favorable to the non-moving party, *Cuddington v. Northern Ind. Public Serv. Corp. (NIPSCO)*, 33 F.3d 813, 815 (7th Cir.1994), and draw reasonable inferences from those facts in the non-movant's favor. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

## III. Discussion

Under the ADEA, an employer may not terminate an employee between the ages of forty and seventy on the basis of age. *See* 29 U.S.C. §§ 623(a)(1), 631(a). The plaintiff in an ADEA case need not prove that age was the sole factor for the employer's decision, only that "age was a determining factor in the sense that [she] would not have been fired but for the employer's motive to discriminate on the basis of age." *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988).

A plaintiff may prove intent to discriminate by either of two methods. First, a plaintiff may present "direct" evidence, meaning "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736

(7th Cir. 1994)). Alternatively, a plaintiff may create a presumption that her employer was motivated by discriminatory animus through the use of the burden-shifting procedure established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). This method of proving invidious discrimination requires the plaintiff to first put forth sufficient evidence of the elements of her prima facie case. *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir.1995). If the plaintiff can do this, a rebuttable presumption of discrimination arises, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. *Smith v. Cook County*, 74 F.3d 829, 830 (7th Cir.1996). Once the defendant satisfies this burden of production, then the plaintiff must come forward with evidence showing that this explanation is actually a pretext for unlawful discrimination. *Oxman*, 846 F.2d at 452. Where the plaintiff cannot present evidence that the proffered justification is pretextual. the defendant is entitled to summary judgment. *Collier*, 66 F.3d at 889; *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Driskell, lacking any direct evidence of discrimination, seeks to prove Continental's discriminatory intent by use of the *McDonnell Douglas* framework.

### A. Plaintiff's Prima Facie Case

When a case involves an employer's reduction in force (RIF), an ADEA plaintiff makes out her prima facie case by showing that: (1) she was in the protected age group, (2) she was performing to his employer's legitimate expectations, (3) she was discharged, and (4) substantially younger employees were treated more favorably. *See Collier*, 66 F.3d at 889; *Roper v. Peabody Coal Co.*, 47 F.3d 925, 926 (7th Cir.1995); *see also O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (holding that the younger employees need not be outside the protected class as long as they are "substantially younger" than the plaintiff).[1]

---

1. One recent case from this district, *Chiaramonte v. Fashion Bed Group, Inc.*, 932 F.Supp. 1080, 1087–88 (N.D.Ill.1996), has interpreted *O'Connor*

as requiring a substantial change to the fourth element of the plaintiff's prima facie case in RIF cases. Whereas *Collier* and *Roper* formerly re-

Driskell has unquestionably made out a prima facie case of age discrimination. At the time of her termination pursuant to Continental's RIF she was 43 years old and was performing her duties to Continental's expectations. Michelin Abrahamson, whom Continental chose to retain as a production underwriter, is 20 years younger than Driskell. At the time the decision to terminate Driskell rather than Abrahamson was made, the two were similarly-situated: they were performing similar duties as liability underwriters for Continental. These facts are sufficient to warrant an inference that Continental's "employment decision was based on [an illegal] discriminatory criterion." *O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310.

### B. Defendant's Non–Discriminatory Reasons

The second stage of the *McDonnell Douglas* framework requires the defendant to articulate at least one legitimate, non-discriminatory reason for the termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1330 (7th Cir.1995). The articulated reasons must be "clearly set forth[ ] through the introduction of admissible evidence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). At this stage it is not necessary that the defendant's proffered reasons be persuasive as long as they are supported by admissible evidence. *Hicks*, 509 U.S. at 510, 113 S.Ct. at 2749; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.

Continental offers three non-discriminatory reasons for its decision to terminate Dris-

kell. First, the company contends that the position formerly held by Driskell—liability underwriter—was eliminated pursuant to its restructuring plan. *See* Def.'s Br. at 9. Second, Continental claims that it elected not to place Driskell in the new "production underwriter" position because it believed that her lack of experience underwriting insurance policies for health care institutions would be a problem. *See id.* Third, Continental claims that it believed that Driskell's technical and communication skills were not strong enough for her to succeed as a production underwriter. *See id.* As reflected in the *Background* section *supra*, Continental's 12(M) statement and accompanying exhibits contain sufficient admissible evidence to support these assertions. *See, e.g.*, Def.'s 12(M) ¶¶ 9, 14. Thus, the burden shifts back to Driskell to demonstrate that these ostensible reasons were pretextual.

### C. Pretext

A plaintiff may show that her employer's proffered reasons for terminating her were pretextual by producing evidence that shows that they are "unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir.1996) ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.' "). This showing can be made by demonstrating that: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf*, 77 F.3d at 919. In general, where a defendant offers

---

quired the plaintiff merely to show that younger employees were treated more favorably, *Chiaramonte* suggests that the fourth element should now require the plaintiff to present "evidence . . . which creates an inference that [her] termination sprang from . . . age discrimination." *Id.* at 1087. We disagree. We cannot discern how *O'Connor* supports such a change: *O'Connor* merely indicates that the employee treated more favorably than the plaintiff need not be outside of the class protected by the ADEA—she need only be "substantially younger" than the plaintiff. *See O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310. This is in perfect harmony with the position already adopted by the Seventh Circuit in *Kral-*

*man v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 154–56 & n. 7 (7th Cir.1994), and merely requires the addition of the word "substantially" to the formulation employed in *Collier* and *Roper*. Moreover, the formulation suggested by *Chiaramonte* in effect collapses the pretext stage of the *McDonnell Douglas* framework into the prima facie case stage, increasing the potential for confusion. *See* Jessica Lind, Note, *The Prima Facie Case of Age Discrimination in Reduction–In–Force Cases*, 94 MICH.L.REV. 832, 843–45 (1995) (critiquing the practice of placing open-ended evidentiary burdens on plaintiffs at the prima facie case stage).

more than one non-discriminatory reason for its actions, the plaintiff must raise a genuine issue of fact regarding the veracity of each of the reasons or summary judgment will be granted. *See id.* at 920.

Continental's first non-discriminatory reason for terminating Driskell is that her position was eliminated. In their briefs, the parties engage in vigorous debate regarding the veracity of this claim, but their dispute appears to be more a matter of semantics than of substance. Continental is obviously correct in its claim that it has eliminated the job title "liability underwriter" from its corporate lexicon. But this is the only sense in which Driskell's position has been "eliminated" as we understand the term.[2] All of the duties formerly performed by liability underwriters at Continental continue to be performed by Continental employees. *See* Def.'s 12(M) ¶ 21. These duties do not appear to have been scattered "piecemeal" throughout the company, but remain concentrated in the hands of employees for whom they constitute a large portion of their total responsibilities. *See id.;* Johnson Dep. at 33–34. The only apparent difference between "liability underwriters" and "production underwriters" is that the latter have some additional responsibilities in the sales and marketing area. *See* Johnson Dep. at 33–34 (stating that for those liability underwriters who became production underwriters, their "duties remained the same, and in addition to that they were involved in direct sales, and they would give presentations with the agents if need be"). The similarity between the two positions is further illustrated by the fact that Continental retained two liability underwriters to become production underwriters in the restructured department, *see* Def.'s 12(M) ¶¶ 14, 20, implying that the

required skills overlap. In sum, we think there is ample evidence from which a jury might conclude that Driskell's position has not been eliminated but merely renamed and modified: this would render Continental's first non-discriminatory reason for terminating Driskell "factually baseless" and thus pretextual, *see Wolf,* 77 F.3d at 919.

Continental's second non-discriminatory reason for refusing to retain Driskell is that it believed her lack of experience underwriting policies for health care institutions would be a problem as the company increasingly concentrated its efforts on that segment of the market. In determining whether this reason is pretextual, we must bear in mind that it is not necessary for Continental to prove that its belief was correct, but only that it was sincere. *See Bechold v. IGW Sys., Inc.,* 817 F.2d 1282, 1285 (7th Cir.1987). The sincerity of Continental's concern about lack of experience is rendered highly dubious, however, by the fact that it selected Michelin Abrahamson to be a production underwriter. At the time these decisions were made, Abrahamson had only one month of experience as an underwriter, and this month appears to have been spent underwriting policies for dentists rather than large health care institutions. Pl.'s 12(N) ¶ 36. Because Abrahamson was only 22 years old when she entered Continental's training program, it is highly unlikely that she had any prior experience underwriting insurance policies for health care institutions. Construing these facts in a light most favorable to Driskell, we think there is genuine question of material fact as to whether Continental's refusal to retain Driskell as a production underwriter was really motivated by a belief that she lacked sufficient experience dealing with in-

---

**2.** A position is "eliminated" when the employer no longer requires any of its employees to perform the major functions of that position. For example, positions were eliminated in *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940 (7th Cir. 1997), where computers replaced editors who had manually laid out articles for a newspaper, and in *Smith v. Cook County,* 74 F.3d 829 (7th Cir.1996), where a hospital elected to have many of its information management services performed by an independent contractor rather than by its own employees. When positions are

"eliminated" in this sense, the elimination may constitute a non-discriminatory reason for the discharge of the plaintiff. But in the typical RIF case, such as this one, an employer simply wishes to reduce the number of employees performing a certain function: the function itself, however, must still be performed by the employees who remain. In these cases, the position has not been eliminated, but only the excess employees. The mere existence of a RIF does not explain why the plaintiff was let go while others were retained.

stitutions.[3]

Continental's third non-discriminatory reason for not retaining Driskell is that it believed her technical and communication skills "were not ... especially strong." Def.'s 12(M) ¶ 14. This contention is similarly undercut by the available facts. The most telling evidence is found in Driskell's performance evaluation, performed just a few months prior to her termination, which contains a wealth of praise for her technical and communication skills. In the section discussing technical knowledge, her evaluator observes that "[Driskell] has a good understanding of the requirements of a professional liability underwriter." *See* 12(M) Ex. S-1.4.[4] The evaluator also states that "[t]he quality of [Driskell's] work is good. She presents her referrals well and has done a very good job on her audits and program renewal materials." *See id.* Regarding her interpersonal skills, Driskell "works well with her coworkers in underwriting and those individuals in other corporate areas that we deal with. She is highly regarded by [customers]. [She] also responds well to direction." *See id.* With respect to communication skills, the evaluator says that Driskell "is a very effective communicator. She presents herself professionally in both her written and verbal communications." *See id.* At the end of the evaluation, "communication skills" is listed as one of Driskell's strengths. *See id.* Admittedly, this evaluation only addresses the skills pertinent to Driskell's position as a liability underwriter rather than the full set of skills required to be an effective production underwriter. It certainly does not prove that Driskell would have been the best—or even an adequate—choice for one of the production underwriter positions. But it nevertheless casts doubt upon Continental's claim that it believed Driskell's technical and communication skills were "not ... strong." This doubt is sufficient to create a genuine issue of material fact regard-

ing whether Driskell's supposedly inadequate skills were a pretext for terminating her. *Cf. Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir.1996) ("[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation.... In such circumstances, summary judgment is improper.").

## IV. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is denied.

It is so ordered.

Roy FUGMAN, Marilyn Fugman, Lillian O. Fugman, and the Estate of George Oskavarek, Plaintiffs,

v.

APROGENEX, INC., Joel Bresser, J. Donald Payne, and Luis Canterero, Defendants.

No. 96 C 5817.

United States District Court, N.D. Illinois, Eastern Division.

March 17, 1997.

---

3. Continental also hints that Driskell's lack of sales experience was a factor in its decision to terminate her, *see* Def.'s 12(M) ¶ 14, but this argument, even if it had been fully developed, fails under the same reasoning set forth above with respect to institutional experience.

4. Driskell's overall rating for technical skills was a "2," which the evaluation sheet defines as: "Performance meets and sometimes exceeds the expected level for the position. Individual has extensive knowledge of the position and is able to initiate and perform most work with minimal direction." *See* Def.'s 12(M) Ex. S-1.

Patrick Francis Solon, Paul K. Vickrey, Niro, Scavone, Haller & Niro, Chicago, IL, for Plaintiffs.

Jeffrey David Hupert, Hupert, Richards & Wood, Chicago, IL, David D. Sterling, Jeffrey A. Potts, Baker & Botts, L.L.P., Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiffs Roy, Marilyn, and Lillian Fugman, and the Estate of George Oskvarek, have brought suit against the defendants, Aprogenex, Inc., Joel Bresser, Donald Payne, and Luis Canterero, for securities fraud.[1] Aprogenex now moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted in part and denied in part.

### I. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of this motion, we must take all of the well-pleaded factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiff. *See Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995).[2]

### II. Background

Like many other contemporary securities fraud cases, this case involves a failed investment in speculative technology. The defendant, Aprogenex, is a Delaware corporation that sought to develop a diagnostic test system (the "GenSite system") to identify the presence and extent of certain prenatal genetic abnormalities and diseases. *See* Compl. ¶ 14. The GenSite system was designed to perform tests which would identify abnormal fetal cells in the mother's blood and permit early diagnosis of up to 95% of prenatal genetic abnormalities. *See id.* Aprogenex believed that its test could be performed at one-third the cost of existing procedures while minimizing the risks associated with them, such as spontaneous miscarriage or injury to the fetus. *See id.* ¶ 15. Given that the GenSite system would be cheaper, more reliable, and safer than the available alternatives, the company expected high profit margins and a large sales volume when the system reached the market. *See id.*

Aprogenex's written public disclosures expressed considerable confidence in its ability to deliver a marketable product in the near future. During 1994, the company indicated

---

1. Because the other named defendants are being sued in their capacities as Aprogenex employees, we will refer to Aprogenex as "the defendant" for the sake of simplicity.

2. In accordance with this principle, the *Background* section which follows assumes the factual accuracy of the allegations in the complaint for purposes of this motion only: we will dispense with qualifying terms such as "allegedly," but the statements herein should not be understood as representing factual findings by this court. Also, after the receiving Aprogenex's motion to dismiss, the plaintiffs responded by filing an Amended Complaint. Our citations, therefore, are to the Amended Complaint.

that it expected to begin sales in Europe in the third quarter of 1995, and revealed that it had contracted with a European company to handle product distribution there. *See id.* ¶ 17. In its SEC filings in early 1995, Aprogenex stated that in addition to product development, a principal focus of its efforts in the coming year would be obtaining regulatory approval for the GenSite system in the United States, *see id.* ¶ 19, and in its amended filing in late October 1995 the company continued to express optimism that its system would soon be marketable, *see id.* ¶ 21. Aprogenex's publications, however, repeatedly emphasized that the company's success was contingent on the success of its research and development efforts. *See id.* ¶¶ 18, 20.

The oral statements of Aprogenex officials regarding the company's prospects were even more effusively optimistic than those contained in the written disclosures. These officials repeatedly assured the plaintiffs, through their broker, Joseph Baba, that the GenSite system would be commercially viable. *See id.* ¶¶ 24–27. The Complaint contains a lengthy catalogue of these assurances, which included such items as: (1) a prediction that the European revenues from the GenSite kit would be $30–40 million in its first year of sales, at a profit margin of 60%; (2) a disclosure that financier Carl Icahn had expressed an interest in purchasing up to 20% of Aprogenex's stock; and (3) a claim that pre-clinical work on the GenSite system had been completed. *See id.* ¶ 27. Despite these assurances, Baba became concerned when a report issued by Hoak Securities in the summer of 1995 suggested that Aprogenex had not yet completed the essential "cell enrichment" component of the GenSite system. *See id.* In response to Baba's inquiries, Aprogenex officials stated that the problems with the cell enrichment component had been "fixed," and reiterated their earlier claims that the system would be introduced into the European market in short order. *See id.* ¶¶ 27, 33–34. They also suggested that Abbott Laboratories and other big players in the industry were interested in the company and might engage in a "bidding war" to acquire its stock. *See id.* ¶ 27. They dismissed the cautionary language in their public disclosures as inaccurate and indicated

that the language existed only because it was "required by the lawyers." *See id.* Baba requested copies of the scientific reports that would substantiate the company's claims that the cell enrichment component was viable, but Aprogenex refused to provide these documents due to "confidentiality concerns." *See id.*

Based on the information provided to him by Aprogenex during 1994 and 1995, Baba recommended that the plaintiffs purchase Aprogenex stock. *See id.* ¶ 23. The plaintiffs accepted this advice, and made a series of stock purchases between November 29, 1994, and October 26, 1995. *See id.* & Ex. A. During this period, Baba relayed the various statements made by Aprogenex officials to the plaintiffs, and they relied on this information in their decisions to purchase Aprogenex stock and thereafter to retain the stock they already owned. *See id.*

In early 1996, Aprogenex revealed that it had decided to abandon its efforts to develop the GenSite system and that it would focus on other "opportunities." *See id.* ¶¶ 29–30. It had never been able to develop the cell enrichment component of the GenSite system, and thus had never been close to marketing the system. *See id.* Its representations that the problems with the cell enrichment component had been "fixed" and that the product would be marketable in the near future had been false all along, and Aprogenex either knew or was reckless about their falsity. *See id.* ¶ 27. Many of the other statements Aprogenex officials had made to encourage the plaintiffs to purchase and retain stock in the company—Carl Icahn's interest, the impending "bidding war" among other biotech firms interested in acquiring Aprogenex, the completion of pre-clinical testing—were also intentional or reckless fabrications. *See id.* Given Aprogenex's status as a start-up company, these false claims had a material impact on the value of its stock: unlike an established enterprise, whose stock can be valued based on book value or earnings-per-share, the stock value of a start-up is almost entirely dependent on the market's perception of the probable success of the company's product development efforts. *See id.* ¶ 13. Because

the price of Aprogenex stock was artificially inflated due to the company's intentional or reckless misrepresentations and omissions regarding the GenSite system, the plaintiffs collectively lost over $175,000 on their investments in Aprogenex stock. *See id.* ¶ 23.

## III. Discussion

■ A plaintiff presenting a claim for securities fraud must allege that the defendant: "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *See In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir. 1996); *see also* 15 U.S.C. § 77j(b); 17 C.F.R. § 240.10b–5. Aprogenex does not dispute that the amended version of the Complaint at least superficially alleges all of these elements, but it nevertheless contends that the Complaint is inadequate in two ways: (1) it does not plead the elements of the fraud claim "with particularity" as required by Rule 9(b) of the Federal Rules of Civil Procedure and various provisions of the federal securities laws; and (2) the presence of cautionary language in Aprogenex's written publications renders the fraudulent statements immaterial, and reliance upon them unreasonable. Aprogenex also argues that claims based on stock purchases that occurred prior to September 19, 1995 are time barred. We consider each of these arguments in turn.

### A. Adequacy of the Pleadings

The Federal Rules of Civil Procedure state that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). Aprogenex argues that the plaintiffs' Complaint is insufficiently particular in three different respects: (1) it fails to provide enough detail in its list of fraudulent statements; (2) it fails to provide sufficient detail with respect to scienter; and (3) it fails

to provide sufficient detail to remove Aprogenex's predictive statements from the codified "safe harbor" for such statements. *See* Def.'s Reply Br. at 2–5.

### 1. Rule 9(b) in general

■ Pursuant to Rule 9(b), a complaint alleging securities fraud is sufficient only if "the circumstances are pled 'in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re HealthCare,* 75 F.3d at 281 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)); *see also* 15 U.S.C. § 78u–4(b). This requirement has three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994).

■ The plaintiffs' Amended Complaint unquestionably meets the "who, what, when, where, and how" standard for fraud pleadings. The Complaint sets forth 60 specific fraudulent statements, in each instance identifying the speaker, the time of the statement, and the substance.[3] Each statement or omission is accompanied by a brief explanation of why the plaintiffs believe it to have been false or misleading, and an allegation that it was material. These explanations, when viewed as a whole, provide a very clear picture of the fraud scheme the plaintiffs are alleging: the defendants knew that the Gen-Site system was not close to being marketable, and in fact might never be marketable, but they nevertheless engaged in a campaign of deception to persuade investors that the system was marketable, or would be in the very near future. Aprogenex has adequate notice of the nature of the claims against it, and this court has adequate assurance that we are not authorizing an open-ended fishing expedition by permitting the case to proceed.

---

**3.** While the plaintiffs are to be commended for the quantity of information provided with respect to the allegedly fraudulent statements, the format in which these details are presented is unfortunate. All of the statements are provided in a single paragraph of the Complaint (¶ 27), which includes 18 pages of single-spaced text, and which does not provide any numbering or reference system for the 60 statements contained therein. In their future pleadings in this court, the plaintiffs should take care to adhere to the requirement that "[e]ach averment of a pleading shall be ... concise." Fed.R.Civ.P. 8(e)(1).

Consequently, the purposes of Rule 9(b) are satisfied.[4]

## 2. *scienter*

Under the recently enacted Private Securities Litigation and Reform Act of 1995 (PSLRA), the pleading requirements for scienter in securities fraud cases have been made even more rigorous than Rule 9(b)'s already heightened standard: plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (West Supp.1997). Thus, the plaintiffs' Complaint must provide facts sufficient to create a "strong inference" that Aprogenex made the specified statements either knowing their falsity or with recklessness regarding their falsity. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (scienter means an "intent to deceive, manipulate or defraud"); *Rankow v. First Chicago Corp.*, 870 F.2d 356, 366–67 (7th Cir.1989) (recklessness satisfies the scienter requirement).

Although the "strong inference" requirement is relatively new, we can find guidance on its application in a recent and well-reasoned opinion by Judge Moran. *See Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246 (N.D.Ill. 1997). After careful consideration of the legislative history of the PSLRA, Judge Moran concluded that in adopting § 78u–4(b)(2), Congress intended to adopt a pleading standard similar to that employed by the Second Circuit in cases like *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994). *See Rehm*, 954 F.Supp. at 1252–53; *see also Marksman Partners, L.P. v. Chantal*

*Pharm. Corp.*, 927 F.Supp. 1297, 1309–10 (C.D.Cal.1996). Under this standard, a plaintiff may establish the requisite strong inference of scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *Rehm*, 954 F.Supp. at 1252–53; *Zeid v. Kimberley*, 930 F.Supp. 431, 438 (N.D.Cal. 1996).

■ In this case, we believe that the plaintiffs' Complaint alleges facts which "constitute strong circumstantial evidence of conscious misbehavior or recklessness" by Aprogenex.[5] Throughout the period in question—November 1994 through October 1995—Aprogenex represented that the Gen-Site system was (or would soon be) marketable, declining to disclose its inability to complete the essential "cell enrichment" component of the system. *See* Compl. ¶¶ 17–21, 24. When questioned specifically on the viability of this component following reports that it was not operable, Aprogenex, through Joel Bresser, continued to insist that the performance of this component was "adequate," that any problems had been "fixed," that it "was commercially viable," and that the system would be launched in July 1995. *See* Compl. ¶ 27. Yet even when Joseph Baba specifically requested evidence that might have confirmed its claim that the cell enrichment component was operable, Aprogenex refused to provide it. *See id.* In late 1995, Aprogenex claimed that its system was adequate to meet the standards of its prospective European distributor, and it was only delaying the launch date so that it could

---

**4.** Aprogenex draws our attention to two cases that dismissed complaints because the plaintiffs merely listed a number of statements and then generally alleged that they were fraudulent. *See* Def.'s Reply Br. at 2–3. These cases stand for the proposition that plaintiffs must provide some explanation of why the specified statements are fraudulent—bald assertions to that effect are insufficient. *See In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 273 (N.D.Ill.1992) (Aspen, J.) (complaint dismissed because the "plaintiffs fail[ed] to allege facts that might show why Bally's statements were fraudulent"), *aff'd*, 2 F.3d 1456 (7th Cir.1993); *In re First Chicago Corp. Sec. Litig.*, 769 F.Supp. 1444, 1453 (N.D.Ill.1991)

("Vague and conclusory allegations that the defendant's representations were not true, however, are insufficient for 9(b) purposes."). The instant Complaint is distinguishable from those that were dismissed in *Bally* and *First Chicago* because the plaintiffs allege facts which explain why they believe each statement was fraudulent.

**5.** Because we conclude that the plaintiffs satisfy part (b) of the Second Circuit's test, we need not consider whether they have satisfied the more intricate "motive and opportunity" requirement of part (a).

"tweak" the technology to get even better results. *See id.*

All of these facts must be viewed in relation to the fundamental fact underlying this case: at no time was Aprogenex capable of moving the GenSite system from the drawing board to the realm of marketable technology. *See* Compl. ¶¶ 29–30. The defendants were necessarily aware of this inability, even if they honestly believed it would soon be rectified. In combination with Aprogenex's refusal to release data to back up its optimistic forecasts, we think this awareness constitutes strong circumstantial evidence that Aprogenex knew all along that its representations that the GenSite system was "adequate" or "fixed," and that the launch date was imminent, were false. In *Rehm*, the court inferred scienter under similar circumstances. The court noted "the defendant's attempts to mollify public doubt about [their] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] shows that the defendants acted with knowledge of [their] deteriorating earnings." *Rehm*, 954 F.Supp. at 1256. The court concluded that, in combination with other evidence, "defendants' careful statements mitigating the seriousness of the [problem] raises a strong inference that defendants acted with [scienter]." *Id.* Similarly, we conclude that Aprogenex's statements mitigating the seriousness of their failure to complete the cell enrichment component of the GenSite system create a strong inference of scienter, and thus the plaintiffs have satisfied § 78u–4(b)(2).

### 3. *forward-looking statements*

■ As in the case of scienter, Rule 9(b)'s particularity requirement is heightened even further with respect to forward-looking statements,[6] which are protected by a "safe har-

bor" provision unless they are made in bad faith or without a reasonable basis. *See* 17 C.F.R. § 240.3b–6 (stating that a forward-looking statement "shall not be deemed to be a fraudulent statement ... unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith"); *In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 271 (N.D.Ill.1992) (Aspen, J.) (dismissing a securities fraud claim because of the safe harbor provision), *aff'd*, 2 F.3d 1456 (7th Cir.1993). Hence, when forward-looking statements are alleged to be fraudulent, the "plaintiffs must allege 'specific facts which illustrate that [the defendant's] predictions lacked a reasonable basis.'" *In re HealthCare*, 75 F.3d at 281 (quoting *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir.1993)); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir.1989.) Aprogenex contends that many of the allegedly fraudulent statements listed in the Complaint are subject to this safe harbor provision. *See* Def.'s Reply Br. at 4 & n. 2 (specifying predictive statements). We agree.

■ With respect to the forward-looking statements listed in the Complaint, the plaintiffs provide no facts that would support the view that Aprogenex lacked a reasonable basis when making them besides the simple reality that they ultimately proved to be wrong. To pick just two examples, in January 1995 Aprogenex predicted that when introduced in the European market, the GenSite system would attain $30–40 million in sales in its first year, *see* Compl. ¶ 27 (statement 7), and in April 1995 it predicted a July launch date, at which time the company would stage a number of promotional "hooplas," *see id.* (statement 12).[7] Obviously these optimistic predictions turned out to be false, but this alone does not permit us to

---

6. The definition of "forward-looking statement" is: "(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items; (2) A statement of management's plans and objectives for future operations; (3) A statement of future economic performance ... or (4) Disclosed statements of the assumptions underlying or relating to any of the statements ... above." 17 C.F.R. § 240.3b–6(c).

7. Aprogenex's use of the term "hooplas" to describe its anticipated promotional efforts is somewhat ironic in light of the fraud litigation in which it is now embroiled: in addition to the more common definition of the term as "jovial commotion or excitement," "hoopla" is also defined as "misleading or confusing talk." *See* Webster's New Riverside University Dictionary 591 (1984).

conclude that they lacked a reasonable basis when made. *See In re HealthCare*, 75 F.3d at 281 ("Projections which turn out to be inaccurate are not fraudulent simply because subsequent events reveal that a different projection would have been more reasonable."); *Wielgos*, 892 F.2d at 513 ("Forward-looking statements need not be correct, it is enough that they have a reasonable basis."). Aprogenex may have honestly believed that these predictions would come true: the plaintiffs have not shown that the European market for prenatal diagnostic testing systems was smaller than $30 million per year, or that a July launch date was impossible as of April 1995. The plaintiffs have failed to carry their burden of alleging facts indicating that Aprogenex lacked a reasonable basis for its predictions, and thus Aprogenex's motion to dismiss is granted with respect to those statements.[8]

### B. Cautionary Language

■ As discussed in the *Background* section *supra*, Aprogenex's written public disclosures contained a good deal of general cautionary language regarding the risks facing prospective investors. *See* Compl. ¶¶ 18, 20; Def.'s Motion Ex. 1 at 6–13 (Aprogenex's 1993 prospectus, containing a lengthy discussion of "risk factors" related to the company's stock). For instance, Aprogenex emphasized that "there can be no assurance that there will not be additional delays in the enrichment system ... or that the enrichment system will ever be successfully developed by the Company." *See* Compl. ¶ 20.

Aprogenex makes two separate arguments based on this kind of cautionary language. The first relies on the "bespeaks caution" doctrine, which provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language," the forward-looking statements may be deemed immaterial as a matter of law. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir.1995); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993). We need not address this argument since we have already dismissed the plaintiffs' claims insofar as they are based on forward-looking statements.[9] *See supra* Part III.A.3.

■ Aprogenex's second argument is that plaintiffs cannot claim to have reasonably relied on oral representations that are contradicted by the cautionary language in the company's written publications. Aprogenex directs our attention to the well-settled rule in securities fraud cases that "[d]ocuments that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements." *Associates in Adolescent Psych. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir.1991); *see also Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir.1996); *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 786 (7th Cir.1992); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir.1985). This principle is inapplicable to the facts of this case, however, because Aprogenex's

---

**8.** After an examination of the statements challenged by Aprogenex, we find that the following statements are subject to the safe harbor provision: 2–5, 7, 12–13, 16, 18, 20–25, 30–31, 33, 38, 43, 45, 47–50, 52, and 55–59. We disagree with several of Aprogenex's other suggestions however. Statement 9, where Joel Bresser claimed that "Carl Icahn had expressed an interest in Aprogenex," is not forward-looking, nor is the first part of Statement 19, containing the assertion that "pre-clinical work had been completed." Other non-forward-looking statements are Statement 35, where Aprogenex claimed that the use of another company's cell separation technology "would be acceptable to Zeneca," and Statement 39, containing Joel Bresser's suggestion that Joseph Baba ask for the scientific data that would prove that the GenSite system was viable. And as is implied by Aprogenex's decision to challenge only a select group of the

statements listed in the Complaint, many of the other statements are not forward-looking at all, but are simple statements of fact. These include representations such as those indicating that cell enrichment component was "commercially viable," that the problems with the GenSite system had been "fixed," and that the system was "ready for an immediate launch."

**9.** The bespeaks caution doctrine does not apply to fraud claims based on representations of "hard facts" rather than forward-looking statements. *See Harden*, 65 F.3d at 1406. Hence, the cautionary statements in Aprogenex's written public disclosures cannot render immaterial Aprogenex's factual representations that the cell enrichment component of the GenSite system was "adequate" or "fixed."

fraudulent oral representations were not contradicted by its written warnings. The warnings merely indicate that Aprogenex stock should be regarded as a risky investment because its research efforts might ultimately fail. This does nothing to contradict Aprogenex's subsequent assertions that the GenSite system had been "fixed" and was ready for market: the riskiness of Aprogenex's venture *ex ante* does not mean that its subsequent success was impossible or implausible. The *Carr* case, upon which Aprogenex primarily relies, supports this reasoning: to contradict a representation that an investment is risky, one must represent that the investment is safe. *See Carr*, 95 F.3d at 547. The investment's actual success or failure is a different issue. The plaintiffs might reasonably have relied on Aprogenex's representations that its efforts had been successful despite the substantial risks looming at the outset of the venture, and we therefore decline to dismiss the Complaint on this ground.

### C. Statute of Limitations

■ Securities fraud claims must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation. *See* 15 U.S.C. 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991). The one-year clock begins to run when the plaintiff is put on inquiry notice of the fraud, rather than when the plaintiff actually discovers it. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir.1995). Inquiry notice occurs " 'when the victim of the alleged fraud [becomes] aware of facts that would have led a reasonable person to investigate whether he might have a claim.' " *Id.* (quoting *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993)). In the context of a motion to dismiss, we must bear in mind that the statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint. *See Tregenza*, 12 F.3d at 718; *cf. LaSalle v.*

*Medco Research, Inc.*, 54 F.3d 443, 447 (7th Cir.1995) (suggesting that statute of limitations questions are easier to resolve after discovery). But if the plaintiff pleads facts that show that his suit is time-barred, he can plead himself out of court. *Tregenza*, 12 F.3d at 718.

■ Aprogenex contends that claims based on stock purchases that occurred more than one year prior to the filing of this suit are barred because the plaintiffs had inquiry notice of the fraud as soon as the fraudulent statements were made.[10] See Def.'s Reply Br. at 8. Aprogenex's argument is very similar to its reasonable reliance challenge: it suggests that the "contradictory" cautionary language contained in its written publications would have caused a reasonable person to doubt the company's representations that the GenSite system was "fixed" and ready for market. *See id.* at 9–10. The problem with this reasoning, as we have already pointed out, is that there is really no contradiction between Aprogenex's initial warnings regarding the riskiness of the venture and its subsequent claim that the GenSite system was marketable. *See supra* Part III.B. The mere existence of the cautionary language would not compel a reasonable investor to suspect that Aprogenex's subsequent representations about the GenSite system were fraudulent.

When the critical misrepresentations were made—in August and September of 1995—there was no reason (or at least there is none apparent on the face of the complaint) why the plaintiffs' suspicions would necessarily have been aroused. The only evidence available to the plaintiffs that was in tension with Aprogenex's claims was the July report by Hoak Securities which suggested that the cell enrichment component of the GenSite system was not yet complete. When the plaintiffs, through Joseph Baba, asked Aprogenex officials whether the Hoak report was accurate, the officials specifically indicated that the problems had been fixed. A reasonable investor in the plaintiffs' position in August of 1995 might well have trusted the

---

**10.** Aprogenex contends that "claims accruing before September 19, 1995 are time-barred." We assume that Aprogenex means September 12, 1995, since the initial complaint in this case was filed on September 12, 1996.

representations of the scientists at Aprogenex rather than those made by the investment bankers who authored the Hoak report, whose information, even if initially accurate, might have grown stale since July. The only event we can see that would unquestionably provoke suspicion in a reasonable investor is Aprogenex's refusal in October 1995 to provide Baba with test results that would back up its claims that the GenSite system was marketable. But if inquiry notice did not occur until October—eleven months prior to the filing of this suit—then the statute of limitations has not been violated.[11] Accordingly, we decline to dismiss this case pursuant to the statute of limitations.

## IV. Conclusion

For the foregoing reasons, Aprogenex's motion to dismiss is granted with respect to the forward-looking statements in the Complaint, but denied in all other respects. It is so ordered.

**Lisa TRULL, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**GC SERVICES LIMITED PARTNERSHIP, Defendant.**

**No. 96 C 3401.**

United States District Court, N.D. Illinois, Eastern Division.

March 24, 1997.

---

11. We express no view at this stage as to when inquiry notice actually occurred: perhaps discovery will reveal that a reasonable investor would have become suspicious prior to October 1995. That is for Aprogenex to prove, however; we cannot infer it from the face of the complaint.

Brian K. Hodes, Christopher V. Langone, Chicago, IL, for Lisa A. Trull.

John Michael Hynes, Mary Blake Nasenbenny, Bruce A. Radke, Clausen, Miller, Gorman, Caffrey & Witous, P.C., for GC Services Ltd. Partnership.

*MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

Plaintiff Lisa A. Trull ("Trull") brings a two-count Complaint against Defendant GC Services Limited Partnership ("GC"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Illinois Collection Agency Act, 225 ILCS 425/1 *et seq.*, arising from Defendant's debt collection practices.[1] Presently before the Court is Defendant's Motion to Dismiss.

**ALLEGED FACTUAL BACKGROUND**

The facts alleged in support of Plaintiff's Complaint consist entirely of the contents of four pieces of correspondence from Defendant to Plaintiff. Thus, the Court reproduces the text of the letters:

**LETTER # 1**

| | | |
|---|---|---|
| FOR | : | L A TRULL |
| DATE | : | May 23, 1995 |
| SUBJECT | : | BMG MUSIC SERVICE'S CLAIM AGAINST L A TRULL |

Your account has now been referred to GC Services and we intend to obtain payment from you.

In the process of writing this memorandum to you, this firm has accessed the computer information on you provided by BMG MUSIC SERVICE, which is now contained in our National Database. Please be advised that this information will be used by GC Services, including my office, to proceed with our formal collection procedures to settle your account with BMG MUSIC SERVICE.

If you do not think this debt is a just one, you may want to obtain advice on this question. Otherwise, we will expect payment promptly to remedy this claim.

When remitting your payment, detach and return the upper portion of this notice. A return envelope is enclosed for your convenience.

(Ex. A).

**LETTER # 2**

| | | |
|---|---|---|
| YOU OWE | : | BMG MUSIC SERVICE |
| ACCOUNT# | : | 3683915395 |
| BALANCE DUE | : | $68.05 |

The debt listed above has been placed with us for collection. (Since you ignored our previous notice, we assume this debt is correct). We intend to take all appropriate steps to see that you pay it.

Your failure to pay has been listed by BMG MUSIC SERVICE with a National Credit Reporting Bureau as an outstanding delinquency. This delinquent credit report will be maintained and available as part of your personal file by the National Credit Reporting Bureau. This may be used by interested consumer product and service companies, or other creditors in case you should attempt to obtain goods or credit from them.

Pay what you owe and further collection activities on your account will stop. Failure to resolve this delinquent account will result in continued collection activity.

(Ex. B, dated June 13, 1995).

**LETTER # 3**

**WARNING!**

Don't even think about ignoring this notice as you've ignored others in the past requesting

---

1. Plaintiff has agreed to dismissal of Count III, brought under the Illinois Consumer Fraud Act,

225 ILCS 425/9(a)26–27.

you to pay what you owe BMG MUSIC SERVICE.

Buying on credit can be highly convenient. Why run the risk of losing that privilege? You need to take action immediately in order to avoid being labeled as a bad credit risk by BMG MUSIC SERVICE.

Pay your bill and wipe your record clean today!

* * *IMPORTANT NOTICE* * *

YOUR ACCOUNT HAS BEEN TRANS-FERRED FROM BMG MUSIC SERVICE TO GC SERVICES' AGENCY MASTER DEBTOR FILE. YOUR PAYMENT MUST BE RECEIVED BY GC SERVICES AT THE ADDRESS INDICATED ABOVE IN ORDER TO ENSURE PROPER CREDIT OR ADJUSTMENT TO YOUR ACCOUNT.

(Ex. C, dated July 5, 1995).

### LETTER # 4

This is the last effort I will be making to settle your account with BMG MUSIC SER-VICE.

Your lack of response to date indicates to us that you do not intend to pay for the merchandise you received from BMG MUSIC SERVICE. Your name will be retained as part of our records along with others who, despite their good name and reputation, have shirked their payment responsibility.

Is it not about time you settled this matter, especially in view of the consequences? We are anxious to clear your record as well as ours. Send you payment!

* * *IMPORTANT NOTICE* * *

YOUR ACCOUNT HAS BEEN TRANS-FERRED FROM BMG MUSIC SERVICE TO GC SERVICES' AGENCY MASTER DEBTOR FILE. YOUR PAYMENT MUST BE RECEIVED BY GC SERVICES AT THE ADDRESS INDICATED ABOVE IN ORDER TO ENSURE PROPER CREDIT OR ADJUSTMENT TO YOUR ACCOUNT.

(Ex. D, dated August 15, 1995).

Further, each letter concludes with the following sentence: "NOTICE: see reverse side for important consumer information." The reverse side then provides the following in all capital letters:

This is an attempt to collect a debt and any information obtained will be used for *that* purpose. Consumer information:

Unless you, within thirty (30) days after your receipt of GC Services' initial written notice to you concerning this debt, dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid by GC Services. If you notify GC Services in writing within the above described thirty (30) day period that the debt, or any portion thereof, is disputed, GC Services will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by GC Services upon your written request within the above described thirty (30) day period, GC Services will provide you with the name and address of the original creditor, if different from the current creditor.

The demands for payment in this letter do not reduce your rights to dispute this debt, or any portion thereof, and/or to request verification within the thirty (30) day period as set forth above.

### ANALYSIS

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *Adams v. Cavanagh Communities Corp.*, 847 F.Supp. 1390, 1396 (N.D.Ill.1994). In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. *Davis v. Frapolly*, 747 F.Supp. 451 (N.D.Ill.1989). The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 207 (7th Cir.1985).

The Court must accept as true all well-pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993). However, the

Court need not accept conclusory legal allegations as true. *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir.1994). A strict standard applies when a court evaluates the legal sufficiency of a plaintiff's factual allegations. A court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Cushing v. City of Chicago*, 3 F.3d 1156, 1159 (7th Cir.1993).

## I. COUNT II: FAIR DEBT COLLECTION PRACTICES ACT

### A. Section 1692e(16)

Plaintiff complains that the correspondence from Defendant violates 15 U.S.C. 1692e(16), which provides:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 1681a(f) of this title.

Section 1681a(f) defines consumer reporting agency as "any person which ... regularly engages ... in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of preparing or furnishing consumer reports to third parties...." Defendant moves to dismiss for failure to state a claim, arguing that the correspondence at issue neither represents nor implies that Defendant operates a consumer reporting agency. However, since Plaintiff only claims that GC implied it operates a consumer reporting agency, the first argument is inapposite.

The Seventh Circuit has identified the "unsophisticated consumer" as "the hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading," in *Gammon v. GC Services Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir.1994). This standard is designed to protect consumers who are of below-average sophistication or intelligence, uninformed, naive, or trusting, while incorporating an objective element of reasonableness that "shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Id.*

Applying the standard to this case, the Court concludes that an unsophisticated consumer, who has been informed that "This is the last effort I will be making to settle your account with BMG Music Service," reasonably could interpret the statement, "Your name will be retained as part of our records along with others who, despite their good name and reputation, have shirked their payment responsibility," followed by a reference to (1) the need to "settle[ ] this matter, especially in view of the consequences," (2) the statement that "[w]e are anxious to clear your record as well as ours," and (3) the " * * *IMPORTANT NOTICE* * *" that "YOUR ACCOUNT HAS BEEN TRANSFERRED TO GC SERVICES' AGENCY MASTER DEBTOR FILE," to imply that GC operates a consumer reporting agency that assembles consumer credit information for the purpose of furnishing consumer reports to third parties.

Like GC's language at issue in *Gammon*, "the language in the collection letter appears to be cleverly drafted in order to insinuate what obviously cannot be stated directly." *Id.* at 1258. Moreover, the *Gammon* court explained that "GC Services appear[ed] to have implied that its development of governmental 'systems' for the collection of delinquent taxes would enable it to cause 'problems' for the delinquent debtor," falsely implying that it had an affiliation with the United States or various states, in violation of Section 1692e. Likewise, in the present case, GC Services has implied that, despite the letter being its last effort to settle the debt, Plaintiff's inclusion in GC Services' "master debtor file" will have "consequences." The reasonable unsophisticated consumer could construe the furnishing of this master debtor file to third parties to be among those vague consequences and, therefore,

the purpose behind the "master debtor file." Thus, Trull has sufficiently stated a claim upon which relief may be granted.

### B. Section 1692e(10)

■ Plaintiff further claims in Count II that Exhibit C simulates a telegram, thus deceptively overstating and misrepresenting the urgency of the communication, in violation of the Act. Plaintiff's responsive brief invokes Section 1692e(10), which includes "The use of any false representation or deceptive means to collect or attempt to collect any debt" as a violation of the Act. Thus, Plaintiff apparently claims that Defendant falsely represented the correspondence to be a telegram as a means of collecting a debt. Defendant moves to dismiss, arguing that the Act does not prohibit debt collectors from simulating telegrams and, regardless, the correspondence at issue does not simulate a telegram.

Plaintiff's Complaint merely alleges that the letter simulates a telegram, without specifying in what manner. Nevertheless, as the letter is attached to the Complaint, the Court may consider the letter in determining whether Plaintiff states a claim upon which relief may be granted. Plaintiff argues in her responsive brief that the letter of June 13, 1995 simulates a telegram because it is on yellow paper and headed "STAR High Priority Communication" and because of the layout and type face.

The Staff Commentary on the Fair Debt Collection Practices Act advises that "A debt collector may not communicate by a format or envelope that misrepresents the nature, purpose, or urgency of the message. It is a violation to send any communication that conveys to the consumer a false sense of urgency." 53 Fed.Reg. 50,106 (1988). The only case cited by Plaintiff that held a simulated telegram violates Section 1692e(10) is distinguishable, as the letter was headed "Tell–A–Gram." (Resp. at 9). Nevertheless, assuming, without purporting to decide, that simulating a telegram violates the Act, the Court finds that Plaintiff cannot state such a claim, as even an unsophisticated consumer could not reasonably construe the letter at issue to be a telegram. First, unlike a tele-

gram, the letter was sent through the mail. One who lacks the information to appreciate this distinction would be similarly unaware of the expense that attaches to a telegram and, thus, would not interpret the letter with the same urgency as one who believed it was hand delivered. Further, no derivation of the word telegram appears on the letter; rather, a sentence appears below the heading, stating in all capital letters that "This star high priority letter is being sent to you by GC Services," clearly identifying it as a letter. This is a situation where the standard's objective element of reasonableness "shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Gammon*, 27 F.3d at 1257. Accordingly, that claim is dismissed, with prejudice.

### C. Section 1692g

■ Plaintiff claims that the correspondence violated Section 1692g in two ways: (1) each letter contained a validation notice, diluting the meaning of the warning and confusing the consumer, and (2) the second letter was sent within 30 days of the initial communication, overshadowing and effectively invalidating the validation notice. Section 1692g, entitled "Validation of Debts," provides in pertinent part:

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt ... is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment

will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. 1692g(a).

Drawing all reasonable inferences in favor of Plaintiff, the Court finds that it appears beyond doubt that she can prove no set of facts in support of the claim arising from repeated validation notices that would entitle her to relief. The validation notice defines the validation period as being "within thirty (30) days after your receipt of GC Services' *initial* written notice to you concerning this debt." (Ex.'s A–D)(emphasis added). It is unreasonable for even the consumer of below-average sophistication or intelligence, who is uninformed, naive, or trusting, to ignore the word "initial," and, as explained above, the standard protects the compliant debt collector from a peculiar interpretation.

■ In contrast, Plaintiff states a claim arising from the letter of June 13, 1996, because it states "Since you ignored our previous notice, we assume this debt is correct," contradicting notice of the thirty-day period before which the debt will be assumed to be valid. The Court finds that an unsophisticated consumer reasonably could be misled reading that statement within the validation period. The Court rejects Defendant's argument that the following statement on the reverse of the letter, below the validation notice, precludes such a claim: "The demands for payment in this letter do not reduce your rights to dispute this debt, or any portion thereof, and/or request verification within the thirty-day period (30) as set forth above." The argument begs the question, as the issue is whether the admonition that "we assume this debt is correct" overshadows and contradicts the notice on the reverse. As the Seventh Circuit recently explained, "A debt validation notice, to be valid, must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message. To protect the uninformed, the naive, and the trusting—the sort of peo-

ple who easily fit under the umbrella of the 'unsophisticated consumer'—the notice cannot be as misleading and tricky as the one used [by the defendants]." *Avila v. Rubin,* 84 F.3d 222, 226 (7th Cir.1996).

■ However, the claim fails to the extent it is based upon mere collection activity being made during the validation period, as Section 1692g does not require the debt collector to suspend collection activities. Rather, the debt collector need only cease collection if the consumer disputes the debt or requests the name and address of the original creditor within the validation period, and then only until it mails a copy of the verification to the consumer. § 1692g(b). *See Robinson v. Transworld Systems, Inc.,* 876 F.Supp. 385, 391 (N.D.N.Y.1995); *Rabideau v. Management Adjustment Bureau,* 805 F.Supp. 1086 (W.D.N.Y.1992); *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 170 (D.Del.1991). Thus, the motion to dismiss the claim based upon the letter of June 13, 1995 is granted in part and denied in part.

## II. COUNT I: ILLINOIS COLLECTION AGENCY ACT

Plaintiff claims that the correspondence violates the Illinois Collection Agency Act, 225 ILCS 425/9(a)(15)(B), by falsely giving the impression that, as a debt collector, it operates a consumer reporting agency. Section 9 provides in pertinent part:

(a) The Department may refuse to issue or renew, or may revoke, suspend, place on probation, reprimand or take other disciplinary action as the Department may deem proper, including fines not to exceed $1,000 per licensee per complaint, for any one or any combination of the following causes:

(15) Communicating with the debtor or any member of the debtor's family at such a time of day or night and with such frequency as to constitute harassment of the debtor or any member of the debtor's family. For purposes of this Section the following conduct shall constitute harassment:

(B) The threat of publication or publication of a list of consumers who allegedly

refuse to pay debts, except to a consumer reporting agency.

Moreover, the last sentence of Section 9 provides: "No debt collector while collecting or attempting to collect a debt shall engage in any of the Acts specified in this Section, each of which shall be an unlawful practice." Defendant moves the Court to dismiss Count I on several grounds.

## A. Private Right of Action

■■■ Defendant argues that the Collection Agency Act does not provide for a private right of action. However, the only court to have addressed the issue found an implied private right of action. *Sherman v. Field Clinic*, 74 Ill.App.3d 21, 29 Ill.Dec. 597, 603–04, 392 N.E.2d 154, 160–61 (1st Dist.1979). In the exercise of supplemental jurisdiction over an Illinois claim, federal courts "apply the law that would be applied in this context by the Illinois Supreme Court. We are obliged to consider the holdings of state appellate courts, but not bound to do so if we have good reasons for diverging from those decisions." *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294. 1301 (1995)(internal citations omitted); *see also* 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4507 (2d ed.1996). Defendant submits the following argument for diverging from *Sherman,* reproduced in its entirety: "the *Sherman* court failed to address the comprehensive statutory scheme giving the Illinois Department of Professional Regulation regulatory authority for violations of the Act and, therefore, the *Sherman* decision was incorrectly decided." (Mem. at 3).

The Court rejects this argument for several reasons. Defendant cryptically assumes that consideration of the statute's grant of regulatory authority over violations warrants divergence from *Sherman,* without articulating a basis for that assumption. Regardless, the following excerpt from *Sherman* belies Defendant's argument that the *Sherman* court failed to address the Act's grant of regulatory authority over violations:

the need for a civil action for damages under the statute is clear. The act contains no provision for compensating debt-

ors for their injuries and therefore provides little incentive for them to seek enforcement of the Act. Although an aggrieved debtor may derive some psychological satisfaction from the suspension or revocation of a collection agency's certificate, or from the criminal prosecution of an offending agency, it seems unlikely that most debtors will initiate and pursue their complaints through all the steps in the administrative or criminal justice processes in the absence of any tangible reward. Finally, nothing in the Act indicates an intent to limit the remedies available to those, administrative or criminal, enumerated in the Act. Other statutes providing for such remedies have nevertheless been held to embrace implied civil rights of action, and the Act itself manifests an intent contrary to exclusivity.

29 Ill.Dec. at 604, 392 N.E.2d at 161 (internal citations omitted). Thus, contrary to Defendant's argument, the *Sherman* court addressed the regulatory authority over violations of the Act and found that it counseled in favor of a private right of action.

Furthermore, the Illinois Supreme Court's adoption of the *Sherman* standard as a basis for finding an implied private right of action for damages under the Illinois Real Estate Brokers and Salesmen License Act, curiously absent from the parties' briefs, demonstrates that the Illinois Supreme Court would find an implied private right of action under the Illinois Collection Agency Act. *Sawyer v. Jarvis Corp.*, 89 Ill.2d 379, 385–91, 59 Ill.Dec. 905, 907–11, 432 N.E.2d 849, 851–55 (1982). Indeed, the Supreme Court rejected the reasoning (presumably) behind Defendant's argument when it recognized the remedies provided under the act in question but stated that "departmental enforcement does not necessarily mean that they must not have intended a private right of action." *Id.* at 391, 59 Ill.Dec. at 910, 432 N.E.2d at 854.

Defendant also notes that "[t]he Act has been amended, most recently on January 1, 1996, and the Illinois state legislature has declined to authorize a private right of action for damages." However, in reply, Defendant concedes that the issue was not considered

by the legislature when it amended the Act, but explains that the legislature is presumed to have knowledge of and consider all judicial decisions when amending legislation, citing *In re Haas,* 48 F.3d 1153, 1157 (11th Cir. 1995). Yet, under that logic a legislature who intended to preclude a private right of action, with knowledge of an Illinois Appellate Court decision implying a private right of action, would amend the Act to deny a private right of action. Thus, Defendant's argument proves too much. *See Central Bank v. First Interstate Bank,* 511 U.S. 164, 185, 114 S.Ct. 1439, 1452, 128 L.Ed.2d 119 (1994)("When Congress reenacts statutory language that has been given a consistent judicial construction, we often adhere to that construction in interpreting the reenacted statutory language."); *Pierce v. Underwood,* 487 U.S. 552, 567, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988)(same); *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978)(same). Although the Court does not consider a single opinion a sufficient condition for applying the reenactment doctrine, the doctrine nonetheless compels the Court to reject the opposite doctrine proffered by Defendant, even without considering the Illinois opinion.

### B. Failure to State a Claim

■■■■ Nevertheless, the Court grants Defendant's Motion to Dismiss Count I, as 225 ILCS 425/9(a)(15)(B) does not provide a cause of action arising from the false impression that a debt collector operates a consumer reporting agency. Rather, Section 9(a)(15)(B) defines the following conduct as unlawful harassment: "The threat of publication or publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency." Plaintiff has completely ignored Defendant's argument, instead incorporating the argument that she states a claim for relief under Section 1692e of the Fair Debt Collection Practices Act, entitled "False or misleading representations," which prohibits "[t]he false representation or implication that a debt collector operates ... a consumer reporting agency." 15 U.S.C. § 1962e(16). However, implying that one operates a consumer reporting agency is not synonymous with threatening

publication of a list of consumers who refuse to pay debts to someone other than a consumer reporting agency. Indeed, the Fair Debt Collection Act explicitly prohibits the latter in Section 1692d, entitled "Harassment or abuse," despite Section 1692e(16)'s explicit prohibition of the former, demonstrating the distinction. *See* § 1692d(3). Moreover, as several courts have explained, a consumer's sophistication level, the standard Plaintiff relies upon, is inapposite to the determination of whether unlawful harassment has occurred, further illustrating the distinction. *See Jeter v. Credit Bureau, Inc.,* 760 F.2d 1168 (11th Cir.1985)(but analogous standard required) & *Beattie v. D.M. Collections, Inc.,* 754 F.Supp. 383 (D.Del.1991). Thus, as Plaintiff has not stated a claim under the Illinois Collection Agency Act, the Court dismisses the claim, without prejudice.

### C. Damages

■■■ Defendant also moves to dismiss Count I for failure to allege actual damages. In support, Defendant points to the *Sherman* Plaintiff's allegations of emotional and mental distress and the *Sherman* court's holding that "a private right of *action for damages* may be founded on a violation of Section 9 of the Collection Agency Act...." 29 Ill.Dec. at 604, 392 N.E.2d at 161 (emphasis added). Moreover, in finding a private right of action, the court relied upon the findings that "the injury allegedly suffered by plaintiffs is within the range of injuries the statute was designed to prevent" and "the act contains no provision for *compensating debtors for their injuries.*" *Id.* (emphasis added). Thus, argues Defendant, there is no need to imply a private right of action absent actual damages, because in that case the Illinois Department of Regulation's enforcement of the Act is adequate. The Court agrees and finds that, due to the regulatory scheme and reasoning underpinning the private right of action, actual injury is an element of a cause of action under the Illinois Collection Agency Act. Notably, Plaintiff has not provided the Court with any authority in support of a contrary conclusion, which would be the exception, rather than the rule. *Cf. Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55

L.Ed.2d 252 (1978). Accordingly, the Court also dismisses Count I, without prejudice, for failure to allege any actual injury.

## CONCLUSION

For the reasons given, Defendant's Motion to Dismiss in GRANTED in part and DENIED in part. Specifically, Count I is dismissed without prejudice, the claims brought in Paragraphs 25 and 26 of Count II are dismissed, with prejudice, and the claim brought in Paragraph 27 of Count II is dismissed with prejudice to the extent it arises from the mere act of sending Exhibit B. Additionally, Count III is dismissed pursuant to agreement of the parties. Plaintiff shall file a motion for class certification and a memorandum in support within 28 days of this Order and, if appropriate, an amended complaint. Defendant shall respond within 21 days, and Plaintiff shall reply within 14 days. The Court shall rule by mail.

**Hilary ANDERSON, Plaintiff,**

v.

**ILLINOIS BELL TELEPHONE COMPANY n/k/a Ameritech Illinois and Ameritech, Ameritech Sickness and Accident Disability Benefits Plan, and Ameritech Comprehensive Health Care Plan, Defendants.**

No. 96 C 3286.

United States District Court,
N.D. Illinois,
Eastern Division.

March 26, 1997.

Jeffrey Morris Jacobson, Jacobson, Berlin & Kotz, Chicago, IL, Charles Drake Boutwell, Northbrook, IL, for Hilary Anderson.

J. Paula Roderick, Barbara Susan Smith, Grady B. Murdock, Jr., Jerome A. Siegan, Earl L. Neal & Associates, Chicago, IL, Benjamin Ghess, Ameritech Corp., Chicago, IL, for Illinois Bell Telephone Co., Ameritech Sickness Disability Benefits Plan and Ameritech Comprehensive Health Care Plan.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Hilary Anderson brings this employment-based action against the following defendants: the Illinois Bell Telephone Company, now known as Ameritech Illinois and Ameritech (collectively, "Ameritech"); the Ameritech Sickness Disability Benefits Plan ("ASDBP"); and the Ameritech Comprehensive Health Care Plan ("ACHCP"). She brings claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, against Ameritech only (Count I); Title I of the Americans with Disabilities Act of 1990 ("ADA") and Title I of the Civil Rights Act of 1991 against Ameritech only (Count II); the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), against Ameritech and the ASDBP (Count III); the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161, against Ameritech and ACHCP or, alternatively, against Ameritech alone under 29 U.S.C. §§ 1132(a)(2) and (3) (Count V); and state law claims alleging common law breach of contract and violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/4, against Ameritech only (Count IV). Pending before the court is the defendants' motion to dismiss various aspects of Counts II through V.

## RELEVANT FACTS

Anderson's first amended complaint alleges the following facts which are taken as true on a motion to dismiss. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). Ameritech, a corporation with more than 500 employees, maintains two employee benefit plans, the ASDBP and the ACHCP. Ameritech is a fiduciary to the ACHCP. In addition, Ameritech provides for the payment of benefits under each of these plans from its assets. Anderson was employed by Ameritech under the terms of an oral contract for approximately fifteen years. The last position that Anderson held at Ameritech was that of a Level 2A Manager.

Due to illness, Anderson went on sick leave in early November 1992. Anderson's last day of active work was November 6, 1992, and she began collecting disability benefits under the ASDBP on November 17, 1992. Anderson was eligible to receive these benefits for one full year. Ameritech prematurely stopped the payment of benefits to Anderson on November 1, 1993, at which time Anderson requested payment of benefits through November 17, 1993. In addition, Anderson sought an extension of benefit payments through November 30, 1993. This request was submitted to the Ameritech Employees' Benefit Committee and was subsequently approved in March 1994. Despite the Committee's approval, however, Anderson has never received benefits for the period of November 1, 1993 through November 30, 1993.

On November 17, 1993, Anderson sent a letter to Ameritech stating that she would be ready, willing, and able to return to work as of December 1, 1993. Although Anderson had not resigned and continued to await assignment, Ameritech failed to assign any duties to her. During the spring of 1994, Ameritech sent Anderson letters congratulating her on completing 15 years in service, and other materials designed for current employees. Ameritech terminated Anderson's employment on June 28, 1994. On July 7, 1994, Ameritech sent Anderson a notice informing her of her right to elect continuing life insurance coverage. Ameritech filled

Anderson's position with individuals under the age of forty.

Anderson called Ameritech every month beginning in July, 1994 with questions regarding her health insurance coverage. Until October 18, 1995, Ameritech and the ACHCP continuously advised Anderson that she was covered under the ACHCP. On October 11, 1995, Anderson's doctor verified Anderson's coverage under the ACHCP. Anderson's doctor then scheduled Anderson for surgery which was performed on October 16, 1995. In November of 1995, Anderson learned that the ACHCP refused to pay for her surgery, as her health care coverage had been retroactively canceled effective October 1, 1995. Upon cancellation of Anderson's health care coverage, neither Ameritech nor the ACHCP provided Anderson with notice of her right to elect continuation or conversion health insurance coverage.

## LEGAL STANDARDS

In considering a motion to dismiss, a court takes all well-pled factual allegations as true, and views those allegations and any reasonable inferences drawn from them in the light most favorable to the plaintiff. *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir. 1996). All ambiguities are resolved in the plaintiff's favor. *Curtis v. Bembenek,* 48 F.3d 281, 283 (7th Cir.1995). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

When ruling on a motion to dismiss, a court may consider exhibits attached to the complaint. FED.R.CIV.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Schnell v. City of Chicago,* 407 F.2d 1084, 1085 (7th Cir.1969). In addition, documents that were not attached to the complaint but are referred to in the complaint and are central to the claims raised will be treated as part of the pleadings. *Wright v. Assoc. Ins. Cos., Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994).

## ANALYSIS

The defendants have not raised any arguments as to Count I in this motion to dismiss. Thus, the court will first consider the defendants' motion as it relates to Count II, followed by Counts III, V, and IV in that order.

### Count II: Damages Recoverable Under the ADA

In Count II, Anderson alleges that Ameritech violated the ADA and the Civil Rights Act of 1991. Anderson prays for compensatory damages in an unspecified amount as well as punitive damages in the amount of $300,000. Ameritech states that the ADA limits recovery of compensatory and punitive damages to a combined total amount of $300,000. Ameritech moves to strike Count II to the extent that it seeks damages in excess of the statutory limit.

■ Anderson has conceded, as she must, that the statutory limit on damages for a violation of the ADA by an employer with more than 500 employees is $300,000. 42 U.S.C. § 1981a(b)(3)(D) (1997). Ameritech responds to Anderson's concession by arguing that Count II should be stricken in its entirety and Anderson should be required to amend her complaint to comport with the damage limitations of the ADA. Rather than requiring the plaintiff to amend her complaint, this Court prefers to simply strike the unavailable remedy. *See Cabin v. Plastofilm Indus., Inc.,* No. 96 C 2564, 1996 WL 496604 at *2 (N.D.Ill. Aug.29, 1996). Ameritech's motion to strike Anderson's demand in Count II for amounts in excess of $300,000 is granted.

### Count III: Recovery of November 1993 Benefits

In Count III, Anderson claims that Ameritech and the ASDBP violated ERISA by failing to provide her with benefits for the period of November 1, 1993 through November 30, 1993 after the plan administrator agreed to do so. She seeks to recover these benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Ameritech requests dismissal from Count III, arguing that the only permissible defendant under § 1132(a)(1)(B)

is the benefit plan. Anderson's response is twofold. First, Anderson asserts that Ameritech is a proper defendant in an action for the recovery of benefits because "Ameritech is the fiduciary that provides the services to maintain the ASDBP" and fiduciaries are proper defendants under ERISA. Second, Anderson contends that since the payment of benefits under the ASDBP is provided by Ameritech, Ameritech will be the ultimate cost bearer anyway, and thus will not suffer any harm if retained as a defendant.

■ Section 1132(a)(1)(B) states that an ERISA plan beneficiary may bring a civil action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (1997). It is well established that the proper defendant to a § 1132(a)(1)(B) suit is the plan. *Jass v. Prudential Health Care Plan, Inc.,* 88 F.3d 1482, 1490 (7th Cir.1996) (the appropriate defendant in a civil action brought under § 1132(a)(1)(B) is the plan itself; *Riordan v. Commonwealth Edison Co.,* 953 F.Supp. 952, 956–57 (N.D.Ill.1996) (the only proper defendant in a § 1132(a)(1)(B) claim is the plan as an entity).[1] In the present case, the plan subject to suit is ASDBP. Although Anderson claims in her complaint that Ameritech maintains the ASDBP, and the letter approving the payment of benefits for the month of November 1993 (Ex. B) is on Ameritech stationery, Anderson does not suggest—and we cannot conclude—that Ameritech and the ASDBP are one and the same.

Anderson does not attack the inherent limitations on who may be sued under § 1132(a)(1)(B). Rather, Anderson argues that Ameritech is a proper defendant because ERISA allows for civil actions against the fiduciary of the plan. By endeavoring to detain Ameritech as a defendant based on Ameritech's fiduciary relationship with the ASDBP, assuming arguendo that such a relationship exists, Anderson implicitly attempts to recast her claim against Ameritech as one for breach of fiduciary duty. Although subsections of § 1132 other than (a)(1)(B) allow a breach of fiduciary action to be brought by a participant of the benefit plan, Anderson has not pled such a claim. Even aside from the fact that she specifically identifies subsection (a)(1)(B), and not the other subsections, as the source of her claim, the allegations of Count III do not support a claim for breach of fiduciary duty under either of the other subsections.

In *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986 (7th Cir.1993), the court noted that "[a]n action to recover from a breach of fiduciary duty . . . is distinct from an action to recover plan benefits under section 1132(a)(1)(B) of the Act," and cited *McMahon v. McDowell,* 794 F.2d 100, 109 (3d Cir.1986) to the effect that "when a plaintiff's ERISA claim is based upon a breach of fiduciary duty, the plaintiff must bring the action under section 1132(a)(2) and not section 1132(a)(1)(B)."[2] *Id.* at 992. Under *Anweiler,* Anderson cannot bring a claim under subsection (a)(1)(B) and simultaneously state an implicit claim based upon subsection (a)(2).

■ Moreover, Count III cannot be read to state a claim under § 1132(a)(2). Subsection (a)(2) provides that a plan participant may commence a civil action against a plan fiduciary for breach of fiduciary duty as described in 29 U.S.C. § 1109. Section 1109(a) states that a fiduciary who breaches any of the duties imposed upon a fiduciary with regards to a benefit plan "shall be personally liable to make good *to such plan* any losses *to the plan* . . . and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109 (emphasis

1. Ameritech and Anderson each cite *Auto Club Ins. Ass'n v. Safeco Life Ins. Co.,* 833 F.Supp. 637 (W.D.Mich.1993), to support their respective arguments. Anderson's reliance on this case is puzzling, as *Auto Club* holds that the proper defendant under § 1132(a)(1)(B) is the plan, and thus clearly advances Ameritech's position. *See id.* at 643.

2. An action for breach of fiduciary duty may also be brought under subsection (a)(3) of § 1132. *Kessen v. Plumbers' Pension Fund,* 877 F.Supp. 1198, 1205 (N.D.Ill.1995). *See* discussion *infra.*

added). As can easily be seen, relief under § 1109 may only be granted to the plan, not to individuals, and § 1132(a)(2) is subject to the same limitation. *Anweiler*, 3 F.3d at 992 (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985)). Because Anderson brings Count III on behalf of herself, not the plan, she has not stated a claim under subsection (a)(2).

■ The only other section of ERISA which would allow Anderson to bring an action for breach of fiduciary duty is 29 U.S.C. § 1132(a)(3). In *Kessen v. Plumbers' Pension Fund*, 877 F.Supp. 1198 (N.D.Ill.1995), the court held that while a breach of fiduciary duty action cannot be maintained under subsection (a)(2) when individual relief is sought, such an action can be brought pursuant to subsection (a)(3). *Id.* at 1205; *see also Anweiler*, 3 F.3d at 993. However, recovery under subsection (a)(3) is limited to "appropriate equitable relief." *See* 29 U.S.C. § 1132(a)(3); *Anweiler*, 3 F.3d at 993. "Appropriate equitable relief" in an action for breach of fiduciary duty under section 1132(a)(3) includes only the usual remedies available in equity and not legal remedies like compensatory damages or monetary relief. *Id.* (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260, 113 S.Ct. 2063, 2070–71, 124 L.Ed.2d 161 (1993)); *see also Kessen*, 877 F.Supp. at 1205 (plaintiff could not maintain an action under § 1132(a)(3) because the relief he sought was monetary). As Anderson seeks in Count III to recover unpaid benefits allegedly owed to her, a monetary form of relief, her action does not comport with the requirements of § 1132(a)(3).

■ Anderson's second argument as to why Ameritech should remain a defendant to Count III proves even less fruitful than her first. Anderson proposes, without providing any support, that the limitations of ERISA should be disregarded and Ameritech should remain a defendant in Count III because doing so will not impose any harm upon Ameritech. Without determining the impact that would befall Ameritech if retained as a defendant in Count III, we reject Anderson's argument as inconsistent with the stated provisions of ERISA. The Court finds that Ameritech is not a proper defendant under § 1132(a)(1)(B), and that claims under §§ 1132(a)(2) and 1132(a)(3) are precluded by the relief Anderson requests. We therefore dismiss Ameritech from Count III.

*Count V: Continuation/Conversion Coverage*

Count V comprises Anderson's claims arising from the manner in which the defendants first provided and then canceled her health insurance, all without proper notice of her rights to continuation and conversion coverage as required by the COBRA amendments to ERISA, 29 U.S.C. §§ 1161–68. Anderson alleges that Ameritech repeatedly informed her that it was voluntarily maintaining her former health insurance coverage. After almost a year and a half of doing so, Ameritech abruptly canceled that coverage, without providing her with notice or the opportunity to elect further coverage under COBRA, just as she was undergoing expensive surgery. Anderson brings Count V against both Ameritech and the ACHCP, contending that both were required to provide her with notification of continuation and conversion coverage within specified time periods after her termination from Ameritech. Alternatively, Anderson alleges that Ameritech's failure to provide that notice amounted to a breach of fiduciary duty under 29 U.S.C. §§ 1132(a)(2) and (3). Anderson seeks injunctive relief and damages arising from these actions and omissions. The defendants have moved to dismiss the ACHCP from Count V, arguing that COBRA does not place any duty on a health care plan to provide notification of continuation coverage to a terminated employee. We conclude that, indeed, a plan such as the ACHCP is not required to provide notice of either continuation or conversion coverage to a terminated employee.

COBRA draws a distinction between continuation and conversion coverage. *Reynolds v. Massachusetts Cas. Ins. Co.*, 900 F.Supp. 915, 921 (E.D.Tenn.1995). Upon termination of employment, an employee is entitled to elect continuation coverage under the employer's group health plan for eighteen months. 29 U.S.C. §§ 1161(a), 1162(2). At the expiration of this eighteen-month period, the employee then has the opportunity to

convert the continuation coverage under the group policy to coverage under an individual plan, i.e., "conversion coverage." *Id.* § 1162(5); *Reynolds,* 900 F.Supp. at 921.

■ Continuation coverage possesses two advantages over conversion coverage. The first lies in the type of coverage required under each option. Section 1162(1) mandates that continuation coverage "must consist of coverage which ... is identical to the coverage provided under the plan to similarly situated beneficiaries" who have not been terminated. 29 U.S.C. § 1162(1). In other words, Anderson was entitled to the same exact coverage for a period of eighteen months after her termination that she received prior to her termination. No such "identical" coverage language appears in § 1162(5) for a conversion health plan. Section 1162(5) only requires that the employee be provided with the "option of enrollment under a conversion health plan." *Id.* § 1162(5). The conversion health plan need not be as comprehensive as the continuation health plan. *King v. Provident Life & Accident Ins. Co.,* 908 F.Supp. 1395, 1408 (S.D.Miss.1995).

■ The second advantage that continuation coverage holds over conversion coverage is the cost of each type of coverage. The continuation coverage mandated in CO-BRA is for a continuation of coverage at approximately the group rate. *Local 217, Hotel & Restaurant Employees' Union v. MHM, Inc.,* 976 F.2d 805, 809 (2d Cir.1992). Conversion coverage, on the other hand, is according to an individual policy. *See Reynolds,* 900 F.Supp. at 921. Continuation coverage at the group rate is generally much cheaper than coverage based on an individual plan. *See Local 217,* 976 F.2d at 809.

In Count V, both continuation and conversion coverage are at issue. Anderson alleges that Ameritech and the ACHCP have breached their statutory duties to inform her of her option to purchase each type of coverage. We conclude that the ACHCP is not

liable to Anderson under either of these claims.

A comprehensive list of notice requirements for post-employment health care coverage is provided in 29 U.S.C. § 1166. Section 1166 does not place any post-termination duty of notification on the plan.[3] Rather, § 1166(a)(2) declares that "the employer of an employee under a plan must notify the administrator of a qualifying event" such as termination. *Id.,* § 1166(a)(2). Once the employer notifies the administrator of the qualifying event, the administrator then has a duty to notify the employee of the employee's rights. *Id.* § 1166(a)(4)(A).

■ Applying § 1166 to the present case, Ameritech, as Anderson's employer, was required to notify the plan administrator of Anderson's termination. The plan administrator was then obligated to notify Anderson of the qualifying event which triggered her right to elect continuation coverage. Anderson's complaint does not explicitly identify the plan administrator. However, Exhibit B to Anderson's first amended complaint is a letter informing Anderson that the Ameritech Employee Benefits Committee ("AEBC") approved a payment of benefits to Anderson on March 25, 1994. This letter creates a reasonable inference that the AEBC is the plan administrator. The AEBC, or possibly Ameritech, would then be the proper defendant to Anderson's claim of a failure to notify her of the right to elect continuation coverage. But the ACHCP had no statutory duty to notify Anderson of her right to continuation coverage, and thus is not a proper defendant to that claim.

■ Nor did the ACHCP have any statutory duty to notify Anderson of her option to enroll in a conversion health insurance plan. COBRA decrees that when "continuation coverage expires ... the plan must, during the 180–day period ending on such expiration date, provide to the qualified beneficiary the option of enrollment under a conversion health plan." 29 U.S.C. § 1162(5). The key question is whether the language "provide

---

**3.** Section 1166(a)(1) does obligate the plan to "provide, at the time of *commencement of* coverage under the plan, written notice to each covered employee and spouse of the employee (if

any) of the rights provided under this subsection." 29 U.S.C. § 1166(a)(1) (emphasis added). Anderson has not alleged any failure to comply with this provision.

... the option" merely requires a health plan to have conversion coverage available, or whether the plan must also notify the beneficiary of the option to elect that coverage at the expiration of continuation coverage.

One of the few cases to consider whether § 1162(5) contains an implicit post-termination notification requirement is *O'Brien v. Rifkin, Radler & Kremer,* No. 95 C 5923, 1996 WL 41723 (N.D.Ill. Feb.2, 1996). In *O'Brien,* the plaintiff sued the defendant employer for failing to provide the plaintiff with notification of the option to enroll under a conversion health plan. *Id.* at *1. Although *O'Brien* considered the employer's notification duty under § 1162(5), the court's analysis is applicable to the plan's duty as well, because the court read the plain language of the statute as requiring only that conversion coverage be available, not that the employee be notified of its existence upon termination.[4]

In *O'Brien,* the court was "hesitant to hold that a statute requires notice when the statute itself clearly does not use the words 'notice' or 'notify.'"[5] *Id.* at *3. Lack of "notice" language, however, does not definitively resolve this issue. It must be noted that § 1161(a), which establishes a qualified beneficiary's right to continuation coverage, also does not use any "notice" language. Similar to § 1162(5), § 1161(a) merely states that the plan sponsor shall provide the qualified beneficiary with the option to elect continuation coverage under the plan. The critical difference in the duty of notification between the continuation and conversion sections is made clear in the "notice requirements" provision of COBRA, 29 U.S.C. § 1166. Whereas § 1166 explicitly imposes a requirement on the employer and the plan administrator to notify an employee of the option to elect continuation coverage in a situation where termination of the employee would lead to the end of the employee's

---

4. There is a line of Fifth Circuit cases, including *Baker v. Washington Nat. Ins. Co.,* 823 F.2d 156 (5th Cir.1987) and *Ramsey v. Colonial Life Ins. Co.,* 843 F.Supp. 1103 (S.D.Miss.1992), *aff'd,* 12 F.3d 472 (5th Cir.1994), holding that an insurer or employer must provide employees notice in some fashion regarding the scope of the conversion coverage—i.e., what is covered under the conversion plan. However, the court in *Baker* "declined to adopt a standard method" of notification with which insurers or employers must comply, instead offering several possibilities:

> A company can state in its contract that it will offer a specific level of coverage in its conversion policy.... It can attach the conversion policy it will issue to the group policy. It can refer to a form of conversion policy on file with the employer or the state insurance authority. It can delineate what particular risks it will cover or exclude in any conversion policy it may issue.

*Baker,* 823 F.2d at 159. *Cf Babikian ·v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 843–44 (9th Cir.1995) (company was obliged to provide employee with adequate information regarding the scope of its conversion policy); *Ramsey v. Colonial Life Ins. Co.,* 843 F.Supp. 1103 (S.D.Miss. 1992), *aff'd,* 12 F.3d 472 (5th Cir.1994) (insurer met the requirements of *Baker* by having a copy of its conversion policy on file with employer). Anderson claims in Count V that her employer and the plan failed to inform her *at the time of her termination or the cancellation of her coverage* of the existence of the conversion option. Nothing in the above case requires this specific type of post–termination notice. *See also supra* note 3.

5. In addition to relying on the plain language of § 1162(5) to decide that no notice requirement exists for that section, *O'Brien* also gave a substantial amount of deference to the Second Circuit's holding in *Howard v. Gleason Corp.* 901 F.2d 1154 (2d Cir.1990). In *Howard,* the plaintiff claimed that her employer had violated a New York state statute requiring the employer to notify the plaintiff of her option to elect conversion coverage. The court held that ERISA preempted the state statute and that ERISA does not mandate that an employee be notified of his right to conversion coverage. *Id.* at 1161.

A careful reading of *Howard* yields some doubt as to whether that court confronted the issue presented in *O'Brien* and in this case. While *Howard* does use the term "conversion," it is not used in the same context as conversion coverage under § 1162(5). First, *Howard* neglects to specify the particular provision of ERISA that it is analyzing. Second, § 1162(5) speaks of conversion coverage as coverage that follows an eighteen-month continuation coverage period, but in *Howard,* the coverage referred to followed immediately after termination. 901 F.2d at 1155. Furthermore, the conversion option referred to in § 1162(5) is for a health insurance plan, while *Howard* involved the conversion of a life insurance policy. *Id.* The combination of these factors renders it difficult to discern whether *Howard* even addresses § 1162(5). Notwithstanding these drawbacks to *Howard* for our purposes, the holding in *O'Brien* that § 1162(5) does not impose a notification requirement on the plan is well-supported in other ways, and we find it to be sound.

coverage, there is no mention of any notification requirement for conversion coverage. Indeed, as noted above, even the notification requirements for continuation coverage do not impose any post-termination duty on the plan. The comprehensive nature of CO-BRA, in conjunction with the plain language of § 1162(5), thus strongly suggests that there is no duty to notify a terminated employee of the right to conversion coverage. We therefore hold that § 1162(5) did not require the ACHCP to notify Anderson after her termination of her option to enroll under a conversion health plan. Thus, the ACHCP is not a proper defendant to any portion of Count V.

Ironically, Anderson defends against this conclusion by pointing to Ameritech's contention in Count III that the proper defendant to a claim brought to recover benefits under § 1132(a)(1)(B) is the plan. Anderson posits that because she also brings Count V pursuant to § 1132(a)(1)(B), the ACHCP is the proper defendant to Count V and should not be dismissed. The problem with this argument is that it ignores the lack of any underlying claim against the ACHCP.

The ACHCP has moved to dismiss Count V for failure to state a claim upon which relief can be granted. Anderson's claim against the ACHCP alleges that the ACHCP violated the notification requirements of CO-BRA. As we have decided that the ACHCP had no duty to notify Anderson of her options for either continuation or conversion coverage, it is clear that Count V fails to state a claim upon which relief can be granted against the ACHCP. If Count V had stated a claim upon which relief could be granted against the ACHCP, then the vehicle for bringing that action would be § 1132. *Hamilton v. Mecca, Inc.*, 930 F.Supp. 1540, 1554 (S.D.Ga.1996) (§ 1132 serves as the sole mechanism whereby plan participants or beneficiaries can enforce their COBRA rights). However, Anderson is not entitled to recover benefits from the ACHCP. The nature of the relief sought cannot change this fact.

Anderson's last attempt to avoid the dismissal of the ACHCP from Count V simply reiterates her harm argument in Count III.

Here Anderson contends that the ACHCP should remain a defendant to Count V because the ACHCP may ultimately bear the responsibility of paying her medical claims. As in Count III, this argument for denying the ACHCP's motion to dismiss is unsupported by case law or any provision of ERISA and the Court once again rejects it. Anderson fails to state a claim against the ACHCP upon which relief can be granted, and accordingly we dismiss the ACHCP from Count V.

### *Count IV: State Law Claims*

Anderson alleges that Ameritech failed to pay her wages for the period of December 1, 1993 through June 28, 1994. In Count IV, she claims that this failure violated the Illinois Wage Payment Collection Act ("IWPCA"), and also breached her oral contract of employment with Ameritech. In response, Ameritech first argues that Count IV is insufficient as a matter of law, because IWPCA only allows for recovery of wages and benefits actually earned through the performance of work. Since it is clear from the complaint that Anderson did not engage in any actual labor for Ameritech during the time period in question, Ameritech contends that Anderson is not entitled to any compensation for that time period. Ameritech also argues that the documents that Anderson attached to her complaint mean that an oral contract cannot have existed between Anderson and Ameritech under Illinois law. Ameritech bases this contention on the proposition that an "implied oral contract" cannot be created when written documents exist between the parties on the same subject matter. The Court will consider Ameritech's latter argument first.

 We initially note that Ameritech fails to identify the legal basis for its argument. "It is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir.1996) (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. *1986)); see also* Stransky v. Cummins Engine Co., 51 F.3d 1329, 1335 (7th Cir.1995) ("The federal courts will not invent

legal arguments for litigants.") Moreover, neither of the two legal doctrines that the defendants are possibly attempting to raise—the implied/express contract rule or the parol evidence rule—is applicable here. The first of these doctrines states that a court will not find that a contract between the parties is implied in law where there is also an express contract on the same subject matter. *Saunders v. Michigan Avenue Nat'l Bank*, 278 Ill.App.3d 307, 314, 214 Ill.Dec. 1036, 1043, 662 N.E.2d 602, 609 (1st Dist.1996). As Anderson has not brought any claims alleging the existence of an implied contract, this rule has no application here. The parol evidence rule states that where the parties have reduced their agreement to an integrated writing, extrinsic evidence, oral or written, must be excluded. *Epstein v. Northfield Inv. Co.*, No. 90 C 5283, 1991 WL 127746 at *2 (N.D. Ill. July 8, 1991). Anderson does not allege that a written contract ever existed between her and Ameritech, nor do the exhibits to her complaint establish the existence of one. It is self-evident that if a written contract never existed, there is no document which claims to be the final expression of the parties and the parol evidence rule is inapplicable.

Under Illinois law, if the parol evidence rule does not apply to the case at hand, but documents, nevertheless, do exist and those documents are "construed as part of the contract—and the contract is thus found to be partly written and partly oral—then the law governing oral contracts [applies]." *Respect Inc. v. Committee on the Status of Women*, 781 F.Supp. 1358, 1363 (N.D.Ill.1992). When an oral contract has been created, documents often accumulate over time that evidence the existence of that contract. While these documents may or may not ultimately be construed as part of the oral contract itself, they tend to support the inference that a contract exists between the parties.

In the present case, Anderson has attached four documents to her first amended complaint which she claims evidence the existence of an oral contract. These exhibits include a letter from Ameritech to Anderson stating that Anderson's sickness disability benefits would be extended (Ex. B), a letter from Ameritech to Anderson congratulating her for fifteen years of service with Ameritech (Ex. E), a follow up letter from Ameritech to Anderson reminding Anderson that she was eligible to receive an award for her fifteen years of service (Ex. F), and a pamphlet entitled "Your Personal Statement of Benefits" (Ex. G). In addition, Anderson has alluded to certain written records, including payroll records, which Ameritech allegedly has in its possession. Neither Anderson nor Ameritech contends that these documents constitute a written contract. Rather, Anderson asserts that the documents are evidence of the existence of an oral contract. Whether an oral contract exists is a matter to be decided by the trier of fact. *Sanchez v. Walls*, 59 Ill.App.3d 75, 78, 16 Ill.Dec. 507, 509, 375 N.E.2d 138, 140 (2d Dist.1978). We make no findings on that point, but merely hold that the existence of these documents does not preclude the creation of an oral contract between the parties. For all of these reasons, the defendants' attack on Anderson's breach of contract claim fails.

We now turn to the defendants' remaining argument under Count IV. Ameritech asserts that Anderson cannot recover wages under the IWPCA because she performed no work for Ameritech during the period for which she seeks wages, and application of the IWPCA is contingent on an employee actually performing services. A careful reading of the IWPCA shows, however, that nothing in it limits its reach to comport with Ameritech's interpretation. The IWPCA defines wages as "compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (1997). In fact, the Illinois legislature amended the IWPCA in 1984 to eliminate from the definition of wages the phrase "compensation for labor or services rendered." P.A. 83–198, § 1 (1984).

One of the few courts to address the issue Ameritech raises held that to be consistent with the legislative intent, the term "wages" must be broadly construed to encompass a wide range of compensation due employees.

*Shields v. Associated Volume Buyers, Inc.,* No. 93 C 7620, 1994 WL 110397 at *2 (N.D.Ill. March 31, 1994). In *Shields,* the plaintiff was terminated with eighty-seven weeks remaining in his three-year employment contract. The defendant employer argued that under the IWPCA, the plaintiff was not entitled to wages for the remainder of his contract because no services were actually rendered during that time period. The court, for the same reasons we find persuasive here, rejected this narrow interpretation of wages as inconsistent with the legislative intent of the IWPCA. *Id.*

In opposition, Ameritech cites *Camillo v. Wal–Mart Stores, Inc.,* 221 Ill.App.3d 614, 164 Ill.Dec. 166, 582 N.E.2d 729 (5th Dist. 1991). *In Camillo,* the plaintiff sought a pro rata recovery of a management "earned bonus" pursuant to the IWPCA. Ameritech correctly asserts that the court *in Camillo* found that because services were rendered, the employee was entitled to the compensation of the bonus. *Id.,* 221 Ill.App.3d at 623, 164 Ill.Dec. at 172, 582 N.E.2d at 735. However, nothing *in Camillo* supports Ameritech's argument that the only way in which compensation can become due under the IWPCA is for the employee to render services. Citing no other case law to support its narrow interpretation of the scope of the IWPCA, Ameritech's argument must be rejected. The motion to dismiss is denied as to Count IV.

### CONCLUSION

For the foregoing reasons, the defendants' motion to strike and dismiss is granted in part and denied in part. The motion to strike Anderson's request in Count II for damages in excess of $300,000 is granted. Count III is dismissed as to defendant Ameritech only. Count V is dismissed as to defendant ACHCP only. In the event that discovery demonstrates a proper basis to reinstate these defendants to Counts III and V, the plaintiff may seek leave of court to move for such reinstatement. The motion to dismiss is denied with respect to Count IV.

**Fred A. BLUM, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**FISHER AND FISHER, ATTORNEYS AT LAW P.C., an Illinois professional corporation, Defendant.**

No. 96 C 2194.

United States District Court, N.D. Illinois, Eastern Division.

April 3, 1997.

Eugene W. Beeler, Jr., James S. Shedden, David J. Philipps, Catherine Lee Gemrich, Michael S. Hilicki, Beeler, Schad & Diamond, P.C., Chicago, IL, for Plaintiff.

Robert C. Heist, Scott L. Carey, Monica T. Sullivan, Bates, Meckler, Bulger & Tils, Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Fred A. Blum (Blum) brought this putative class action against Fisher and Fisher, Attorneys at Law (Fisher), charging that a debt collection letter regularly sent by defendant violates the Fair Debt Collection Practices Act (FDCPA). 15 U.S.C. §§ 1692 *et seq.* Fisher has moved for summary judgment and Blum has filed a cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, defendant's motion and plaintiff's cross-motion are denied.

## BACKGROUND

On or about July 24, 1990, plaintiff signed a Mortgage and Note pursuant to which he agreed to make monthly mortgage payments. While there is some dispute regarding the original mortgagor, the mortgage was eventually acquired by Mellon Mortgage Company (Mellon). On approximately February 21, 1996, plaintiff's mortgage fell into default and Mellon commenced internal foreclosure proceedings by referring the defaulted mortgage to Fisher for collection. Plaintiff was notified of this action in a letter from Mellon dated February 21, 1996. On February 27, 1996, plaintiff's counsel faxed Fisher a letter telling the firm that he represented Blum with respect to his mortgage and that he would accept service of any foreclosure complaint on Blum's behalf. Thereafter, Eliza-

beth Kaplan, an attorney at Fisher, had a telephone conversation with plaintiff's attorney during which she provided plaintiff's attorney with the amount of the outstanding mortgage debt that was due and owing in order to reinstate the loan. Fisher offered to refrain from further action until March 10, 1996. Fisher claims that Blum's attorney indicated he would contact Blum and respond to Fisher regarding the reinstatement prior to the March 10 date. Plaintiff disputes that his attorney ever agreed to respond to Fisher by any particular date.

Between February 27, 1996 and March 29, 1996, there was no further communication between Blum's attorney and Fisher. On March 29, 1996, Fisher filed a Complaint to Foreclose the Mortgage against Blum in the Northern District of Illinois. On the same date the complaint was filed, Fisher mailed the following letter (dated March 26, 1996), to plaintiff:

Dear Homeowner:

A mortgage foreclosure has been filed by this office because of your failure to make your mortgage payments. The amount of your outstanding debt is $59,044.85 (principal balance) plus interest, advances and attorneys' fees and costs.

This foreclosure could result in the mortgage lender taking title to your property in approximately 7 months. During that time you may be allowed to stay in the house absolutely rent free. In addition, you have the right to save your house from foreclosure by either catching up your loan or by paying off the total mortgage debt through sale, refinancing or otherwise.

At the end of the foreclosure process, the mortgage lender will expect you to move out immediately or be evicted.

This letter is an attempt to collect a debt; any information obtained will be used for that purpose. Pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. (1977), we will assume this debt to be valid unless you dispute the validity of all or any part of it in writing within 30 days of receipt of this letter. If you notify us in writing that you dispute all or a portion of the debt, we will obtain and send to you verification of the debt. Likewise, upon written request within 30 days after receipt of this notice we will provide you with the name and address of the original creditor, if different from the creditor named above.

(Compl.Ex. C).

On April 15, 1996, plaintiff filed a class action complaint against defendant alleging violations of the Fair Debt Collection Practices Act (FDCPA). 15 U.S.C. § 1692 et seq. On behalf of the putative class, plaintiff claims that the March 26, 1996 letter from Fisher is false, deceptive, and misleading in violation of 15 U.S.C. § 1692e and unfair and unconscionable in violation of 15 U.S.C. § 1692f for the following reasons: (1) it misrepresents the homeowner's options in response to the foreclosure by implying that the homeowner can either pay the balance on his mortgage or do nothing and live "rent free" for 7 months pending foreclosure; (2) it falsely implies that the homeowner must pay attorneys' fees related to the foreclosure when it has not yet been shown that the lender is entitled to foreclose and that the requested fees are reasonable; and (3) it fails to advise the homeowner to seek independent counsel. Plaintiff also makes the individual claim that defendant violated 15 U.S.C. § 1692c(a)(2) by sending its March 26, 1996 letter directly to him knowing that he was represented by an attorney.

## DISCUSSION

### I. Standard for Resolving Cross–Motions for Summary Judgment

The parties seek to dispose of this case through the filing of cross-motions for summary judgment. Summary judgment may only be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant must point to those portions of the record which demonstrate the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett*, 477

U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). On cross-motions for summary judgment, "[w]e therefore apply the traditional standard that summary judgment will not lie unless, construing all inferences in favor of the party against whom the motion is made, no genuine issue of material fact exists." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996) (citations omitted). There is a genuine dispute over a material fact if the evidence would allow a reasonable trier of fact to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## II. *The Fair Debt Collection Practices Act (FDCPA)*

The FDCPA is a broad prohibitive statute designed "to protect consumers from a host of unfair, harassing, and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." *Johnson v. NCB Coll. Servs.*, 799 F.Supp. 1298, 1303 (D.Conn.1992) (quoting S.Rep. No. 382, 95th Cong. 1st Sess. 1, 2, reprinted in, 1977 U.S.C.C.A.N. 1695, 1696). The prohibitions of the FDCPA apply only to "debt collectors." *See generally* 15 U.S.C §§ 1692c–1692j.[1] It is undisputed that Fisher was acting as a debt collector within the meaning of the FDCPA when it sent the March 26 letter to plaintiff in this case. *See Heintz v. Jenkins*, 514 U.S. 291, 292–93, 115 S.Ct. 1489, 1490, 131 L.Ed.2d 395 (1995); *see also Oglesby v. Rotche*, No. 93–C–4183, 1993 WL 460841 at *1, 1993 U.S. Dist. LEXIS 15687, at *2 (Nov. 4, 1993) ("an attorney whose principle business is debt collection or who regularly collects the debts of another falls within the prohibitive scope of the FDCPA").

Plaintiff maintains that Fisher's letter violated the FDCPA as a matter of law in four separate ways. Fisher disputes each of plaintiff's claims, and asks this court to find as a matter of law that its debt collection letter was in compliance with the FDCPA's

provisions. Plaintiff's first three claims are made on behalf of the putative class and relate to specific portions of the collection letter that allegedly violate §§ 1692e & f of the FDCPA. Plaintiff's final claim is made on his own behalf, and alleges that the letter constituted an improper direct communication in violation of § 1692c(a)(2).

### A. Violations of § 1692e and § 1692f

■ Under § 1692e, a debt collector may not use any "false, deceptive, or misleading representations or means in connection with the collection with any debt." 15 U.S.C. § 1692e. The sixteen subsections of § 1692e set forth a non-exhaustive list of deceptive debt collection practices that fall within this ban. Prohibited conduct relevant to this summary judgment motion includes:

(2) The false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(15) The false representation or implication that documents are not legal process or do not require action by the consumer.

15 U.S.C. § 1692e. However, because the list is non-exhaustive, a debt collection practice can be "false, deceptive, or misleading" in violation of § 1692e even if it does not fall within any of the subsections of § 1692e. *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir.1993).

■ Under § 1692f, a debt collector may not use "unfair or unconscionable means to collect or attempt to collect any debt." 15

---

1. A "debt collector" is defined as:
 any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the

collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another ...

U.S.C. § 1692f.[2] A single violation of § 1692e or § 1692f is sufficient to establish civil liability under the FDCPA. See 15 U.S.C. § 1692k (establishing civil liability for "any debt collector who fails to comply with any provision of this subchapter").

In determining whether challenged debt collection activity violates § 1692e, we must apply the "unsophisticated consumer" test as enunciated in *Gammon v. GC Serv. Limited Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994). In *Gammon*, the Seventh Circuit adopted the "unsophisticated consumer" as the "hypothetical consumer whose reasonable perceptions will be used to determine if the collection messages are deceptive or misleading." *Id.* This objective unsophisticated consumer standard protects consumers who are "of below average sophistication or intelligence" or are "uniformed, naive or trusting" while at the same time "shielding complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Id.* In his concurrence in *Gammon*, Judge Easterbrook defined the parameters of this threshold showing: "the plaintiff will have to show that a significant fraction of the letters' addressees were deceived—for if showing a handful of misled debtors were enough, we would as a practical matter be using the 'least sophisticated consumer' doctrine." *Id.* at 1260 (Easterbrook, J., concurring). However, this does not mean that a plaintiff is always required to empirically demonstrate that a significant number of the letter's addressees were in fact deceived in order to establish a violation of § 1692e. *Avila v. Rubin*, 84 F.3d 222, 227 (7th Cir.1996).

■ It is true that the unsophisticated consumer is assumed to be a "reasonable" person, *Gammon*, 27 F.3d at 1257. On this basis, defendants suggest that the standard for evaluating false and misleading statements must be ratcheted up (or down) to conform to the reasonable perceptions of a consumer standing in the position of the plaintiff "at the time he engaged in the transaction that resulted in the need to collect a

debt from him"—in this case, a person sophisticated enough to negotiate a mortgage and purchase a home (Def. Reply, at 4–5). However, we find no support in the case law for this proposition. To the contrary, courts have consistently found that debtors who claim to have been deceived by collection letters are governed by a uniformly low standard. *See Avila*, 84 F.3d at 227; *Young v. Meyer & Njus*, 953 F.Supp. 238, 239–40 (N.D.Ill.1997); *Vaughn v. CSC Credit Services, Inc.*, No. 93–C–4151, 1995 WL 51402, at *2 (N.D.Ill. Feb.3, 1995). Contrary to defendant's contention that the reasonable consumer in this case should be endowed with a heightened level of business savvy, our benchmark remains the "unsophisticated consumer," who "while not at the bottom rung of the ladder, is still unsophisticated—uninformed, naive, trusting, possessing below average intelligence." *Vaughn*, 1995 WL 51402, at *2.

Pursuant to this standard, plaintiff claims that Fisher's collection letter is false, deceptive, and misleading in the following ways. First, plaintiff makes several related claims that the letter misrepresents the options a homeowner has in response to the foreclosure. The letter states in relevant part:

> This foreclosure could result in the mortgage lender taking title to your property in approximately 7 months. During that time you may be allowed to stay in the house absolutely rent free. In addition, you have the right to save your house from foreclosure by either catching up your loan or by paying off the total mortgage debt through sale, refinancing or otherwise.

(Compl.Ex. C). According to plaintiff, this portion of the letter purports to give the homeowner salutary advice which has the insidious effect of lulling him into inaction in order to facilitate foreclosure. Specifically, plaintiff argues that the letter crucially fails to advise the homeowner to file an answer or other pleading in response to the foreclosure complaint. Instead, the letter gives the general impression that unless the homeowner

---

15 U.S.C. § 1692a(6).

